UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

BAKER'S ISLAND LIGHTHOUSE
PRESERVATION SOCIETY, INC.
And ROBERT LEAVENS
              Plaintiffs,
v.

UNITED STATES DEPARTMENT OF
INTERIOR, SECRETARY OF THE
INTERIOR, NATIONAL PARK
SERVICE, DIRECTOR NATIONAL
PARK SERVICE, CRAIG MANSON,
As He Is Assistant Secretary Of Fish,
Wildlife And Parks, JANET SNYDER
MATTHEWS, As She Is Associate
Director, Cultural Resources, National
Park Service, P. DANIEL SMITH, As
He Is Former Special Assistant to the
Office Of The Director, National Park
Service, ADMINISTRATOR OF
GENERAL SERVICES, GENERAL
SERVICES ADMINISTRATION, and
JOHN KELLY, As He is Acting Director
of Property Disposal, General Services
Administration
              Defendants

C.A. No. 05-10855 PBS

## OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FIVE UNNECESSARY DEFENDANTS

### Introduction

The plaintiffs oppose the Motion to Dismiss Five Unnecessary Defendants on the

grounds that the defendants have misread the explicit provisions of the Administrative

Procedures Act ("APA") and misinterpreted cases decided under the Act. In their motion to

dismiss, the defendants rely upon a body of case law developed to address the question of whether or not an agency has committed "final action" which is a prerequisite to review under the APA.   Here, the moving defendants concede that the Department of the Interior and the National Park Service and the Department of Fish and Wildlife and Parks have taken "final action" in selecting an eligible entity for the Bakers Island Light Station; but since the defendants claim they were not the ultimate decision makers in the final action, they seek dismissal of the complaint as against them.   According to the plain language of the statute, however, once the threshold of "final agency action" has been met, then "preliminary, procedural or intermediate agency action" **is also** reviewable.

> "A preliminary, procedural, or intermediate agency action or ruling not directly reviewable **is subject to review on the review of the final agency action**."

5 U.S.C. §704.  (emphasis added).  The conduct complained of in the complaint includes **both** final agency action **and** the underlying preliminary, procedural and intermediate agency action, **all** of which is subject to review under the clear provisions of 5 U.S.C. §704.

The government's argument that there is no waiver of sovereign immunity as to the "non-decision making defendants" is similarly unavailing given the Act's explicit provision for judicial review of "preliminary, procedural, or intermediate agency action". There can be no argument that sovereign immunity has not been waived with regard to review of the intermediate agency action of which the plaintiffs complain -- action which is plainly authorized by the statute.

Finally, to the extent that the General Services Administration ("GSA") argues that no cause of action has been stated against it, plaintiffs will move to amend the complaint to more clearly state their cause of action against the GSA.  A copy of the proposed amended complaint

is attached hereto as Exhibit A.[1]  The amended complaint makes absolutely clear that the plaintiffs are seeking review of the GSA's inaction in failing to timely develop policies and procedures required by the National Historic Light House Preservation Act ("NHLPA") and in promising to convey the Baker's Island Light Station when, in fact, the United States has no valid deed to the Light Station, does not hold good title to the Light Station and has no power to convey the Light Station as promised in its Notice of Availability and has taken no action to correct the title defect.  In any event, under the notice pleading requirements of Rule 8, a claim against the GSA has been amply stated both in the complaint and in the amended complaint and dismissal is not warranted.

## Background [2]

### 1.    The Baker's Island Light Station

On April 8, 1796 the United States Congress approved an Act authorizing the erection of a light house on approximately 10 acres of privately owned land located on Baker's Island, a 60 acre island situated in Salem Sound, Essex County, Massachusetts.  Although there is no record of compensation paid to the private owner and the property was never deeded to the United States and no deed was recorded, the United States Light House Service and its successor, the U.S. Coast Guard, used the Light Station for many years.  Throughout its history, Baker's Islanders played an important role in preserving, guarding and maintaining the Baker's Island Light Station and reservation.  The Coast Guard officially excessed a portion of the land and the

---

[1] Plaintiffs have not yet filed the motion to amend, and have agreed to refrain from filing the motion to amend until August 29, 2005, the date on which the Assistant U.S. Attorney returns from her vacation.  Plaintiffs have refrained from filing the motion at the request of the government's counsel to accommodate her vacation schedule.

[2] The background facts are drawn primarily from the Complaint and the Amended Complaint which, for purposes of the defendants' motion to dismiss, must be taken as true.  Rossiter v. Potter, 357 F. 3d 26, 27 (1st Cir. 2004).

3

keeper's residences in 1973.[3]  In 1980 the Coast Guard entered into a license agreement with the

Baker's Island Association, a group of homeowners on the island, whereby the Association

undertook to maintain, restore and preserve the two lighthouse keepers residences.  To date, the

Association is continuing its preservation efforts with regard to the lighthouse keeper's

residences under a 1988 thirty year license agreement with the Coast Guard.  The Association

has faithfully restored, preserved and managed the residences continuously since 1980 and,

under its license, plans to continue to do so at least until 2017 when its license is up for renewal.

     2.    **NHLPA**

In 2000, Congress amended the National Historic Preservation Act of 1966 by adding

provisions known as the National Historic Lighthouse Preservation Act of 2000, 16 U.S.C. 470

w-7, et seq. ("NHLPA").  NHLPA authorizes the disposal of historic lighthouses and stations,

contemplating a multi-agency process in the disposition of lighthouses.  Id. [4] First, the Secretary

of the Interior ("the Secretary") and the Administrator of the General Services Administration

("the Administrator") shall "not later than one year after October 24, 2000. . . establish a process

and policies for identifying, and selecting, an eligible entity to which a historic light station could

be conveyed for education, park, recreational, cultural or historic preservation purposes, and to

monitor the use of such light station by the eligible entity."  16 U.S.C. 470 w-7(b)(1).  The

statute contemplates that the agency with administrative jurisdiction over the historic light

station, in this case the Coast Guard, identifies and reports "excess" light stations to the General

Services Administration ("GSA").  16 U.S.C. 470 w-7 (b)(2).  In practice, according to Defendant

---

[3] In excessing the property in 1973, the Coast Guard acted pursuant to the provisions of 40 U.S.C. §102 (3) which is the same excessing procedure required by the National Historic Lighthouse Preservation Act of 2000.

[4] There were at least five agencies involved in the decision making process regarding Baker's Island Light Station; General Services Administration, Department of Interior, National Park Service, The United States Coast Guard, and the Department of Fish and Wildlife and Parks.

4

Craig Manson ("Manson") Assistant Secretary of Fish and Wildlife and Parks, eligible

lighthouses and stations will be announced by GSA through a Notice of Availability, sent

directly to interested parties, published in local newspapers and posted on the Internet[5].  The

National Park Service ("NPS") issues applications to interested parties, reviews and evaluates

applicants, and selects a grantee.  Id.  According to the Manson, "a group's financial ability to

maintain the historic light station and adhere to historic conveyance and other terms of

conditions with the transfer will be given significant consideration in the review process."  Id.

GSA then develops and executes conveyance documents.  The statute specifically requires that

"the Administrator shall convey, by quitclaim deed, without consideration, all right, title, and

interest of the United States in and to the historic light station, subject to [certain] conditions. . ."

16 U.S.C. §470 w-7 (b)(3).  The statute is silent with regard to a situation in which the United

States has no "right, title, and interest" in an historic light station.

**3.    The NHLPA Decision Making Process With Regard to the Baker's Island
        Light Station**

Although, pursuant to the NHLPA, no later than October 24, 2001, the Secretary of the

Interior and the Administrator of the General Services Administration **were required** to establish

a process and policies for identifying and selecting an eligible entity to which a historic light

station would be conveyed and for monitoring the use of the light station by the entity, no such

process and policies were established.  In fact, as late as November, 2004, plaintiffs were

informed that no such process or policies were even in existence.

In addition, the Baker's Island Light Station was never legally conveyed to the Coast

Guard in the first place and the GSA did not and does not have a valid deed for the real estate,

---

[5] See, Decision, Assistant Secretary of Fish and Wildlife and Park regarding the Currituck Beach Lighthouse, Corolla, North Carolina (copy attached as Exhibit B).

5

does not have good title to the real estate, has not taken steps to obtain good title and has no power to convey the real estate. Notwithstanding that no process and policies were established under NHLPA and notwithstanding that GSA had no valid deed to the premises, GSA nevertheless issued a Notice of Availability on May 23, 2003 under NHLPA promising to convey the Light Station to the eligible entity to be selected by the Department of Interior.

Two applicants responded to the Notice of Availability: the plaintiff, Baker's Island Lighthouse Preservation Society, Inc. and the Essex National Heritage Commission, Inc. ("the Commission"). The application of the Commission contained numerous, serious misrepresentations concerning such fundamental issues as access to the Light Station, the Commission's ability to obtain insurance for its planned activities at the Light Station, and, most importantly, the Commission's application states that it matches the $1 million dollars it receives annually through the Department of the Interior by donations, in kind contributions and other funds which, the plaintiffs are informed and believe, is not true. Moreover, by its own enabling legislation, the Commission has no authority to own real estate and Baker's Island is not even within the physical jurisdiction of the Commission.

In addition, numerous questionable procedural irregularities occurred in the process of evaluating the competing applications. For example, the Commission was given an opportunity to make a preliminary visit to the Light Station for the purpose of facilitating the success of its application. Also, the defendant P. Daniel Smith, then of the Department of the Interior, a government employee deeply involved in the decision making process, indicated almost two months prior to the selection of the eligible entity that the Heritage Commission, and not the Preservation Society, was going to prevail in being selected as the party to whom the Light

6

Station would be conveyed, revealing that the Heritage Commission was preselected prior to the completion of the decision-making process.

On July 14, 2004, the plaintiffs were informed by Defendant Janet Snyder Matthews that the National Park Service had chosen Essex National Heritage Commission as the recipient of the Baker's Island Light Station in accordance with NHLPA. The plaintiffs subsequently filed a request for administrative review of Mathew's decision which was undertaken by Defendant Craig Manson, Assistant Secretary of Fish and Wildlife and Parks, who issued a decision on January 18, 2005, affirming Mathews' recommendation that the Light Station be transferred to the Commission. From these decisions and from the inaction of the GSA and the Interior to develop a process and policies governing the selection of an eligible entity, and from the GSA's promise to convey the Light Station in circumstances where the GSA had no valid deed nor legal title to the property of the Light Station and has taken no action to obtain good title to the Light Station, the plaintiffs have taken this appeal pursuant to the Administrative Procedures Act.

## Argument

**I.    Since the "unnecessary defendants" engaged in preliminary, procedural or intermediate action, their conduct is reviewable under the APA.**

It is clear by the plain language of the Act, as well as cases decided under the Act, that preliminary, procedural or intermediate agency action is subject to review when the Court is reviewing the final agency action. 5 U.S.C. §704. As explained by the Court of Appeals for the Federal Circuit in U.S. Association of Importers of Textiles and Apparel v. United States Department of Commerce _ F.3d _2005 WL 1514248 (Fed. Cir. 2005):

> "Under the provision of the APA, 5 U.S.C. §704, "final agency action" is required before judicial review is appropriate. Other agency actions, such as "[a] preliminary, procedural

or intermediate agency action or ruling" are "subject to review on the review of the final agency action."

Similarly, in <u>Burns v. Director, Office of Worker's Compensation Programs</u>, 441 F.3d 15555

(D.C. Cir., 1994), the Court found that agency action that did not constitute a "final" order was

nevertheless reviewable under the APA as long as the final order itself was under review.  <u>Burns</u>

41 F. 3d at 1561.  The United States Supreme Court in <u>Bowen v. Massachusetts</u>, 487 U.S. 879,

108 S. Ct. 2722 (1988) explained:

> "The legislative material elucidating that seminal act [5 U.S.C. §704] manifests the congressional intention that it cover a broad spectrum of administrative actions, and this Court has echoed that theme by noting that the Administrative Procedure Act's generous review provisions must be given a hospitable interpretation."

<u>Bowen</u>, 108 S. Ct. at 904. (citations and quotations omitted)

The defendants' argument in their Motion to Dismiss boils down to the claim that since they were not the actors who took "final agency action", they cannot be sued under the Administrative Procedures Act.  This is contrary to the plain language of the statue which this Court has no power to rewrite.  It is also contrary to the mandate given by the Supreme Court that the "generous review provisions of the Act" be given a "hospitable interpretation".  Clearly, the conduct of all of the defendants falls within the broad spectrum of administrative actions reviewable under the Act.  The defendants simply cannot evade review by claiming that because they were not the ultimate decision makers, their improper or unlawful conduct is not subject to review.

ID # 426316v03/14457-2/ 08.17.2005

**II. Since The Complaint Properly Seeks Review of Preliminary, Procedural and Intermediate Agency Action and All of the Defendants Participated in the Action Under Review, A Cause of Action has Been Stated Against All Defendants.**

The moving defendants insist that no cause of action is stated against them and the complaint as to them is subject to dismissal pursuant to Rule 12 (b)(6) for failure to state a claim. However, since the complaint alleges that all of the defendants participated at various stages of "preliminary, procedural or intermediate agency action" in connection the NLHPA process, their actions are reviewable under the plain provisions of the statute which authorizes an action for judicial review to be brought against "the appropriate officer." 5 U.S.C. §703.

With regard to the GSA, however, to the extent that the plaintiffs' claims against the GSA are in any way unclear, plaintiffs will move to amend the complaint (copy of the amended complaint attached hereto as Exhibit A; amendments are highlighted provisions) which clarifies that this lawsuit is seeking review not only of the Decision of the Department of Fish and Wildlife and Parks, United States Department of Interior confirming the recommendation of the National Park Service to convey the historic Light Station to the Commission, but also of the intermediate actions and inaction of the GSA in failing to develop guidelines to govern the process and in promising to convey the Light Station in circumstances where it has no power to do so. The Amended Complaint also requests an order enjoining the GSA from conveying the Light Station unless and until it has obtained a valid deed and establishes good title to the Light Station. In circumstances where the complaint requests such mandatory injunctive relief the decree "shall specify the federal officer or officers by name or by title, and their successors in office, personally responsible for compliance." 5 U.S.C. §702. The relief requested in the Amended Complaint asks the Court to order the GSA, through its Acting Director of Property

9

Disposal, John Kelly, to take steps necessary to obtain a valid deed to the Light Station and establish good title to the Light Station. Such mandatory injunctive relief requires inclusion of John Kelly as a defendant in this action. 5 U.S.C. §702.

Even if the Amended Complaint is not allowed[6], the current version of the complaint, under the generous pleading requirements of Fed. R. Civ. p. 8, amply states a cause of action against all of the defendants moving for dismissal, and, in particular, raises the issue of the GSA's failure to promulgate a process and procedure for the selection of the eligible entity and the impropriety of the GSA's initiation of the NHLPA process given that it has neither a valid deed nor good title to the premises at issue and, in fact, has no power to convey the Light Station to anyone.

The remaining non-GSA moving defendants, Craig Manson, Janet Snyder Matthews and P. Daniel Smith, according to the allegations of the complaint, all engaged in intermediate administrative action under the NHLPA process, clearly reviewable under the Administrative Procedures Act, and engaged in improper or unlawful conduct as alleged in the complaint which, under the notice pleading requirements of Rule 8, states a cause of action requesting review of their conduct.

## CONCLUSION

Since the decision of the National Park Service which has been affirmed by the Department of Fish and Wildlife and Parks of the United States Department of Interior, to award the Light Station to the Essex National Heritage Commission is clearly "final agency action", all of the actions and decisions underlying that decision are reviewable in this case. To the extent that the specific claims against the GSA have not been clearly stated in the original complaint,

---

[6] The plaintiffs have agreed to refrain from filing their Motion to Amend the Complaint until the Assistant U.S. Attorney representing the defendants returns from her vacation.

the plaintiffs proposed amended complaint cures that problem. For these reasons, the defendants

Motion to Dismiss should be denied.

Respectfully Submitted,

**BAKER'S ISLAND LIGHTHOUSE
PRESERVATION SOCIETY, INC. AND
ROBERT LEAVENS**

By their attorney,


  /s/Catherine J. Savoie
Catherine Savoie, BBO #544599
POSTERNAK, BLANKSTEIN & LUND, L.L.P.
The Prudential Tower
800 Boylston Street
Boston, MA  02199
(617) 973-6100

Dated:  8/10/05


## CERTIFICATE OF SERVICE

I, Catherine J. Savoie, hereby certify that on this 10th day of August 2005, a copy of the
within was electronically served on opposing counsel.


  s/Catherine J. Savoie
Catherine J. Savoie, Esq.

11



UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

BAKER'S ISLAND LIGHTHOUSE
PRESERVATION SOCIETY, INC.
And ROBERT LEAVENS
    Plaintiffs,
v.

UNITED STATES DEPARTMENT OF
INTERIOR, SECRETARY OF THE
INTERIOR, NATIONAL PARK
SERVICE, DIRECTOR NATIONAL
PARK SERVICE, CRAIG MANSON,
As He Is Assistant Secretary Of Fish,
Wildlife And Parks, JANET SNYDER
MATTHEWS, As She Is Associate
Director, Cultural Resources, National
Park Service, P. DANIEL SMITH, As
He Is Former Special Assistant to the
Office Of The Director, National Park
Service, ADMINISTRATOR OF
GENERAL SERVICES, GENERAL
SERVICES ADMINISTRATION, and
JOHN KELLY, As He is Acting Director
of Property Disposal, General Services
Administration
    Defendants

C.A. 05-10855PBS

## AMENDED COMPLAINT

### Introduction

This is a claim for declaratory and injunctive relief brought pursuant to the administrative

procedures act, 5 U.S.C. §702, et seq., seeking judicial review of a decision issued by the

**Department of Fish and Wildlife and Parks**, United States Department of the Interior,

confirming the recommendation of the National Park Service to convey the historic light station

on Baker's Island, Salem Sound, Massachusetts ("the Light Station") to the Essex National

Heritage Commission ("the Heritage Commission") pursuant to the provisions of the National

Historic Lighthouse Preservation Act ("NHLPA") 16 U.S.C. §470 w-7, et seq. ("the Decision").

**The plaintiffs also seek review of the failure of the Defendants, Department of the
Interior ("Interior") and General Services Administration ("GSA") to timely develop
policies and procedures required by NHLPA to govern the process by which an applicant
for a historic light station is selected.  The plaintiffs also seek judicial review of GSA's
promise to convey the Light Station in circumstances where the GSA does not have a valid
deed for the Light Station, does not hold good title to the Light Station and has no power to
convey the Light Station as promised.  Review of these intermediate and/or final actions
and inaction is sought pursuant to 5 U.S.C. §704.**

The plaintiffs are aggrieved by the Decision which is arbitrary and capricious, an abuse

of discretion, not in accordance with law, contrary to the constitutional rights of the plaintiffs, in

excess of statutory jurisdiction and authority,  unwarranted by the facts and not supported by

sufficient evidence.  The National Park Service has unlawfully and arbitrarily chosen to convey

the Light Station to the Heritage Commission, an entity whose physical jurisdiction as

established by federal law does not include Baker's Island; an entity that was created by

Congress, but was not empowered to own land; an entity who, on information and belief, has not

and is not able to meet the requirement that it match one million dollars in federal funding

annually; and an entity who has submitted an application which contains serious

misrepresentations as to its ability to gain access to the Island, to insure its dangerous intended

operations on the Island, to fund its intended operations, to acquire municipal approvals required

to conduct its proposed activities and to form partnerships with entities who have not agreed to

participate in the Commission's proposal.  In addition, the Defendants conducted their decision

2

making in an unlawful manner that deprived the plaintiff's application from receiving any

meaningful review or consideration and thereby deprived the plaintiff of its constitutional rights

to equal protection and due process. Finally, the Decision is contrary to law. First, the Decision

was made in the absence of policies and procedures which the defendants Secretary of the

Interior and the GSA Administrator were required by NHLPA to establish on or before October

24, 2001; and second, the defendant General Services Administration does not own the Light

Station in question and, absent a deed or good title to the premises, has no legal capacity to

convey the property to the Commission. For all of these reasons, the plaintiffs request that the

Decision be declared unlawful and that any agency action based upon the Decision be set aside.

## Parties

1.  Plaintiff, Baker's Island Lighthouse Preservation Society, Inc. ("the Preservation

Society") is a 501(c) (3) non profit preservation organization comprised of residents of Baker's

Island, an island consisting of approximately 60 acres located in Salem Sound, Essex County,

Massachusetts.

2.  The Plaintiff, Robert Leavens ("Leavens"), is an individual owner of approximately one

quarter acre of land on Baker's Island, shown on the Salem Tax Assessor's map 46 as lot 89, which

land shares an approximate 200 foot common boundary with the Baker's Island Light Station and

Reservation ("the Light Station" or "the Reservation") which is the subject matter of this lawsuit.

Leavens is also a director of the Baker's Island Lighthouse Preservation Society.

3.  Plaintiffs are aggrieved parties who have suffered a legal wrong and have been adversely

affected by the final agency action of the Defendants General Services Administration and the

Department of Interior, National Park Service, Assistant Secretary of Fish, Wildlife and Parks

regarding the application for the acquisition of the Baker's Island Light Station pursuant to the

National Historic Lighthouse Preservation Act, 16 U.S.C., 479 w-7. **Plaintiffs have also suffered a legal wrong by virtue of the failure of the defendants GSA and Interior to timely develop policies and procedures to govern the selection process and by the GSA's promise to convey the Light Station in circumstances where the GSA does not have a deed to the Light Station, does not hold title to the Light Station and has no power to convey the Light Station.**

4.   The defendants are the United States Department of the Interior, the Secretary of the Interior, the National Park Service, the Director of the National Park Service, Craig Manson, Assistant Secretary for Fish and Wildlife and Parks, Janet Snyder Matthews, Associate Director, Cultural Resources, United States Department of Interior, National Park Service, P. Daniel Smith, Former Special Assistant to the Office of the Director, National Park Service, The General Services Administration, the Administrator of General Services and John Kelly, Acting Director of Property Disposal for the General Services Administration.

### Jurisdiction

5.   Jurisdiction is conferred pursuant to 28 U.S.C. §1331 and 16 U.S.C. §470 w-7.

### History Of The Baker's Island Lighthouse

6.   On April 8, 1796, the United States Congress approved an act authorizing the erection of a lighthouse on what was privately owned land located on Baker's Island, a 60 acre Island situated in Salem Sound, Essex County, Massachusetts.

7.   Although there is no record of compensation paid to the private owner and the property was never deeded to the United States and no deed was recorded, the United States Light House Service and its successor, the U. S. Coast Guard, used the Light Station for many years.

8.   The Light Station consists of 10 acres more or less and contains a 59 foot high granite light tower constructed in 1816, a two story wood frame keepers dwelling, a two story wood frame

4

assistant keepers dwelling, a one story oil house, a one story fog signal building and several other accessory structures.

9.  Throughout its history, Baker's Islanders have played an important role in preserving, guarding and maintaining the Baker's Island Light Station and Reservation.

10.  In the early 1970's the Coast Guard **excessed** the property when the light became automated.  After the Coast Guard's abandonment, the Baker's Island Association, an association of home owners on Baker's Island ("the Association") assumed the maintenance and repair of the buildings.

11.  On or around November 21, 1976 the Light Station was designated a National Register Historic Site by the National Park Service.

12.  Except for the Light Reservation, virtually all the remaining property on Baker's Island as been privately owned since 1731.

13.  In 1980, the Coast Guard and the Association entered into a license agreement whereby the Association undertook to maintain, restore and preserve the two light house keepers residences.

14.  In 1988, a license was granted to the Association for a period of thirty years by the Coast Guard allowing the Association to use and preserve the residences.

15.  The Association has faithfully restored, preserved and managed the residences continuously since 1980 and, under its license, plans to continue to do so until **2117**.

16.  Plaintiff Baker's Island Lighthouse Preservation Society, Inc. (the "Preservation Society") was formed in 1999 in anticipation of the eventual disposal of the Light Reservation by the Coast Guard.

5

17.  Due to the remote location of the Reservation and the lack of public docking or landing facilities, physical access to the Reservation is not readily available.  The beach is dotted with jagged rocks and is subject to heavy swells, breaking waves and strong current.

18.  In addition, the area experiences a significant tidal range of twelve feet that presents a range of beach profiles depending on the tidal stage.

19.  In adverse weather conditions, access to the Island poses a significant and serious safety threat.

## The NHLPA Application Process

20.  Pursuant to National Historic Lighthouse Preservation Act, 16 U.S.C. §470 w-7 (b)(1), no later than October 24, 2001, the Secretary of the Interior and the Administrator of the General Services Administration were required to establish a process and policies for identifying and selecting an eligible entity to which a historic light station could be conveyed, and for monitoring the use of the light station by the entity.

21.  On information and belief, no such process and policies were established.

22.  As late as November, 2004, plaintiffs were informed that no such process and policies were in existence.

23.  On March 10, 2005, plaintiffs were informed that a "draft National Park Service Regional Handbook for implementing NHLPA" had been developed.  The plaintiffs have requested the Handbook but it has not been provided.  The plaintiffs are informed and believe that this Handbook did not exist during the decision making process with regard to the Baker's Island Light Station challenged herein.

24.  On information and belief, no process and policies governed the selection of an eligible entity for the Baker's Island Light Station.

6

**25. On information and belief, the GSA does not have a valid deed to the Light Station, does not hold good title to the Light Station and has no power to convey the Light Station.**

26. Notwithstanding that no process and policies were established under NHLPA, **and that the GSA does not have a valid deed or good title or the power to convey the Light Station,** on or around May 23, 2003 a Notice of Availability under the Act for Baker's Island Light Station was issued by the GSA, **through its agent John Kelly, promising to convey the Light Station to the eligible entity selected by the Department of Interior.** A true and accurate copy of the Notice of Availability is attached hereto as Exhibit A.

27. According to the Notice of Availability and consistent with the requirements of the National Historic Lighthouse Preservation Act, 16 U.S.C., §470 w-7, the eligible entity to which the historic light station is conveyed *shall not* conduct any commercial activities at the historic light station. (emphasis added).

28. Also according to the Notice of Availability, only shoreline access to the Island is available because the only pier providing access to the Island is privately owned and operated. The Notice of Availability also represented that no submerged lands were to be conveyed with the lighthouse property.

29. In response to the Notice of Availability, the Plaintiff, The Baker's Island Lighthouse Preservation Society, Inc., ("the Preservation Society" or "the Society") submitted an application to the United States Department of the Interior, National Park Service on October 31, 2003. A true and accurate copy of the Society's application is attached hereto as Exhibit B.

30. Sometime after November 10, 2004, the Essex National Heritage Commission, Inc. ("the Heritage Commission" or "the Commission") submitted an application to become transferee of the Baker's Island Light station. The plaintiffs are informed and believe that the application submitted

7

by the Heritage Commission did not meet the required 90 day time frame for submission of an application pursuant to Notice of Availability. A true and accurate copy of the Commission's Application, without attachments, is attached as Exhibit C.

31. The Essex National Heritage Commission is the designated management entity for the Essex National Heritage Area and is incorporated in the Commonwealth of Massachusetts as a tax-exempt, 501 ( c) (3) Corporation.

32. The Heritage Commission was created as the management entity for the Essex National Heritage Area pursuant to 5 U.S.C. §505 et seq.

33. Designation of the Essex National Heritage Area is set forth in 5 U.S.C. §503 (a) and (b), pursuant to which the Area "shall comprise the lands generally depicted on the map numbered NAR-51-80,000, dated August, 1994". A true and accurate copy of the map referred to in the statute is attached hereto as Exhibit D.

34. Baker's Island is not on the map designating the boundaries of the Essex National Heritage Area.

35. The boundaries shown on the map referred to in the legislation do not include Salem Sound in which Baker's Island is situated.

36. Baker's Island is not within the jurisdiction of the Heritage Commission and the Commission has no statutory authorization to conduct any activities on any portion of Baker's Island.

37. The authority of the Heritage Commission is established in 5 U.S.C. §504 (a) and (b), which sets forth the duties and powers of the Commission. Ownership in land is not included within the powers of the Commission granted in the statute.

8

38. 5 U.S.C. §508 authorizes federal appropriations to be made to the Heritage Commission, but limits the appropriations to not more than one million dollars in any fiscal year and requires that the federal funding provided may not exceed 50% of the total cost of any assistance or grant provided or authorized under the statute.

39. The Heritage Commission is required to match funding dollar for dollar in order to conduct its activities.

40. The plaintiffs are informed and believe that the Heritage Commission has continually accepted funding for the Area but is unable to establish that it has met its requirement of matching funds for any of its activities or that it has ever met its requirement of matching nearly one million dollars in funding per year.

41. Notwithstanding that the Heritage Commission is unable to establish that it has met its match and that the Heritage Commission is not empowered to own real estate and that Baker's Island and the Light Station are not within the Heritage Commission's jurisdiction limited by Congress, the Commission nevertheless submitted an application to become the transferee of the Light Station which application contains numerous misrepresentations, including but not limited to the following:

  a)  The Commission's application erroneously claims that the Island is currently accessible "by private pier, by beach landing or by helicopter pad adjacent to the lighthouse". The Commission's application states that the lighthouse property has "excellent beach front access". In truth and in fact, access to the lighthouse property is exceedingly dangerous in many weather conditions that characterize coastal New England. The Coast Guard itself has refused to land its own personnel on the beach, has deemed such landing unsafe, and has refused to permit helicopter landings for the recipient of the Light Station.

9

b)    According to the Commission's application, arrangements have been made with a company called "Sunline Cruises" to provide public access from off island to the Light Station.  However, Sunline Cruises is a company that has been out of business for two years and, on information and belief, there are no other providers currently in the area available to provide service or boats capable of providing service for one to two trips per day during the summer season as promised in the Commission's application.

c)    The Commission's application identifies the insurance agent for the Commission as Robert J. Cappadona Insurance Agency in Watertown, Massachusetts and claims that the agency has the necessary information to provide a binder at the appropriate time.  Mr. Cappadona has stated that his agency was supplied incomplete information on defining the risks associated with the project and cannot provide insurance because of the extremely high risk associated with the access plan described in the Commission's application.

d)    The Commission's application states that the one million dollars it receives annually through the Department of Interior are matched by donations, in kind contributions, state and other non-matching funds at an average ratio of 1.8 to 1 million dollars funding.  The Commission is required by its enabling legislation to match funds it receives annually. On information and belief, the Commission has never met its match in any year in which it has been in operation, cannot meet its match, and has insufficient funds to conduct its proposed operations on Baker's Island.

10

e)    The Commission's application indicates that at least four professors from the Gordon College Academic Staff will participate in the marine biological studies and the marine history programs proposed for the Baker's Island lighthouse property. Two professors are no longer on the Gordon College staff (either having retired or left the employment of the college).

f)    The Commission states in its application that if for any reason it ceases owning the light station and light reservation, it will designate the National Park Service, Gordon College or the Trustees of the Reservation to own and operate the light station. However, according to the Commission's articles of organization, if the Commission is no longer is in existence, the Commission's assets must be transferred to another 503 (c)(3) corporation. The National Park Service is not a 503 ( c) (3) organization; therefore the property cannot lawfully not be conveyed to the National Park Service.

42.   On or about August 26, 2003 the General Services Administration held its official site visit of the Baker's Island Light station. This site visit was attended by a parties interested in securing the "deed" to the Light Station.

43.   The Society was informed that any party who fails to comply with the strict 90 day time period for submitting an application after receiving an information package from the GSA would be automatically disqualified from the application process.

44.   On information and belief, the Commission submitted its application beyond the 90 day period applicable to its application.

45.   On or about May 19, 2004, P. Daniel Smith ("Smith") of the Department of the Interior conducted a site visit of the Baker's Island Light Station. Smith arrived at the island via a U.S.

11

Coast Guard boat and conducted a site visit with the two entities who had submitted applications to secure the "deed" to the Light Station: the Essex National Heritage Commission and the Baker's Island Lighthouse Preservation Society.

46.  At the May 19, 2004 site visit, defendant Smith emphasized that the light keepers cottages could not be occupied by any recipient for residential purposes and were required to be available for the public to view during tours.

47.  The Commission's application includes the marketing and rental of the light keeper's cottages which constitutes commercial activity and is contrary to Notice of Availability, the governing statute and Smith's stated requirements.

48.  At the May 19, 2004 site visit, Smith informed representatives of the Society that (a) the Heritage Commission, not the Preservation Society, would most likely prevail in being selected as the transferee of the reservation; (b) Smith, personally, would write the recommendation to the Secretary of the Interior as to who should be the recipient of the "deed"; and that (c) the Society should be aware that he would write the recommendation so that it would be impregnable to any appeal of the Society and would be acceptable to the Secretary of the Interior.

49.  At the completion of the May 19, 2004 site visit with the two applicants, the Commission's Executive Director, Annie Harris, left the island on the same Coast Guard boat that transported Defendant Smith to Baker's Island.  On information and belief, Harris' transfer was to permit a further private meeting with officials and representatives from the Department of the Interior National Park Service and the U.S. Coast Guard in order to facilitate the success of the Heritage Commission's application.

12

**The Decision**

50. On or around July 14, 2004, Baker's Island Light House Preservation Society was informed by defendant Janet Snyder Matthews, Associate Director, Cultural Resources, National Park Service, Department of Interior, that the National Park Service had chosen the Essex National Heritage Commission as the recipient of the Baker's Island Light Station in accordance with NHLPA. A true and accurate copy of the letter from Matthews to Thomas B. Hallowell of the Baker's Island Light House Preservation Society is attached as Exhibit E.

51. On or around July 27, 2004, Baker's Island Light House Preservation Society submitted to defendant Craig Manson, Assistant Secretary for Fish, Wildlife and Parks, United States Department of Interior, a request for administrative review, to review the National Park Service recommendation that the Secretary of the Interior select the Commission as the recipient of the Light Station. Attached as Exhibit F is a true and accurate copy of the society's request for administrative review.

52. On or around July 26, 2004, defendant Robert Leavens submitted supplementary information for the appeal of the July 14, 2004 decision on behalf of the Preservation Society and on behalf of himself as a direct abutter and as a director of the Preservation Society. A true and accurate copy of plaintiff Leavens' request to add information to the administrative review is attached as Exhibit G.

53. On or around January 18, 2005, defendant Manson issued his response to the request for administrative review confirming the National Park Service recommendation that the Baker's Island Light Station be transferred to the Commission. Attached as Exhibit H is a true and accurate copy of defendant Manson's January 18, 2005 decision.

13

54. Plaintiff Baker's Island Light House Preservation Society, Inc. is aggrieved by the
Decision of the National Park Service to transfer the "deed" to the Heritage Commission
because: (a) the Society's application was not evaluated under policies and procedures
required by NHLPA to be established prior to making the decision; (b) the Society's
application was not given any meaningful review since the Heritage Commission was the
pre-selected entity; (c) unlike the Commission, the Society was not permitted any private or
secret meeting or viewings of the Light House Station; (d) the Society's application was
required to be submitted within the 90 day time period unlike the Commission's application
which was accepted after the time period expired; (e) the Society's application was required
to provide for no occupancy of the light keeper's cottages and for no commercial activity
unlike the Commission's application which was approved notwithstanding the Commission's
plans to rent the light keeper's cottages; **(e) the Society participated in the process in good
faith without knowing that the GSA has no deed to the Light Station has taken no steps
to obtain good title and is unable to convey the Light Station in any event;** and (f) the
Decision contravenes the Society's rights to equal protection and due process guaranteed by
the Fourteenth Amendment of the United States Constitution.

55. Plaintiff Robert Leavens is aggrieved by the Decision of the National Park
Service in so far as he is a member of the Board of Directors of the Preservation Society, and,
as a direct abutter of the light station, he will be directly adversely affected by the
Commission's unlawful and unsafe activities.

56. The Decision of the National Park Service is arbitrary and capricious, not
supported by substantial evidence, contrary to the facts and law, in excess of statutory
authority and contrary to the Society's constitutional rights in that:

14

(a)     it was not made pursuant to policies and procedures required by NHLPA prior to the decision making;

(b)     the winning applicant was given preferential treatment over the other applicant and was pre-selected;

(c)     the winning applicant was not an "eligible entity" as that term is defined in 16 U.S.C. §470 w-7;

(d)     the winning applicant cannot comply with the terms of conveyance set forth in 16 U.S.C. §470 w-7;

(e)     the winning applicant plans to engage in commercial activities prohibited by 16 U.S.C. §470 w-7;

(f)     the winning applicant is unable to establish that, at its own cost and expense, it has the ability to use and maintain the Light Station in accordance with the standards for the treatment of historic properties as required by 16 U.S.C. §470 w-7;

(g)     the winning applicant cannot establish that it is able to provide access to the general public for recreational, cultural, education or historic preservation purposes as required by 16 U.S.C. §470 w-7;

(h)     the Heritage Commission has no jurisdiction over Baker's Island;

(i)     the Heritage Commission has no statutory authority to own real estate;

(j)     the Heritage Commission has not and cannot establish its ability to raise one million dollars annually in order to satisfy the legislative mandate creating it;

15

(k)    the defendant, General Services Administration does not have good title to the Light Station, does not have a deed to the Light Station, and has no power to effectuate a valid transfer of the premises to the Heritage Commission; and

(l)    the procedures employed by the National Park Service in making its decision, including a secret meeting with the winning applicant's executive director, pre-selection of the winning applicant, and special exceptions and treatment granted to the winning applicant deprive the Society of rights guaranteed by the U.S. Constitution.

55. The failure of the GSA and the Department of Interior to timely issue policies and procedures governing the selection process is arbitrary and capricious and contrary to law and in excess of statutory authority and requirements.

56. The defendant GSA's promise to convey the Light Station to the selected entity in circumstances where the GSA has no deed to the Light Station, has no valid title to the Light Station, has taken no steps to obtain good title to the Light Station and has no power to convey the Light Station is arbitrary and capricious, contrary to the facts and law and in excess of statutory authority.

WHEREFORE, plaintiffs request an order of this Court:

(A)    Declaring the Decision issued by the National Park Service, United States Department of Interior confirming the recommendation of the National Park Service to convey the historic Light Station on Baker's Island, Salem Sound, Massachusetts to the Essex National Heritage Commission arbitrary and capricious, an abuse of discretion, not in accordance with law, in excess of statutory jurisdiction and authority and unwarranted by the facts;

(B)    Declaring the Decision contrary to Baker's Island Light House Preservation Society, Inc.'s constitutional rights to equal protection and due process of law guaranteed by the Fourteenth Amendment of the United States Constitution;

16

(C)    Declaring the Decision unlawful, null and void;

(D)    Declaring that any agency action based upon the unlawful decision be set aside;

(E)    **Declaring that the failure of the GSA and the Department of the Interior to issue policies and procedures to govern the selection process prior to selecting an eligible entity was unlawful and rendered the process arbitrary and capricious and constitutes grounds for annulling the decision.**

(F)    **Declaring that the defendant GSA has no valid deed or title to the Light Station, and issuing a mandatory injunction directing GSA and its Acting Director of Property Disposal, John Kelly, to take steps to obtain a valid deed and establish good title to the Light Station.**

(G)    Enjoining the defendants, their agents, employees and all persons acting in concert with them from taking any action pursuant to the decision;

(H)    Awarding the plaintiffs their costs and attorneys fees; and

(I)    For such other and further relief as this Court deems meet and just.

**BAKER'S ISLAND LIGHTHOUSE
PRESERVATION SOCIETY, INC. AND
ROBERT LEAVENS**
By their attorney,

_____
Catherine Savoie, BBO #544599
POSTERNAK, BLANKSTEIN & LUND, L.L.P.
The Prudential Tower
800 Boylston Street
Boston, MA  02199
(617) 973-6100

Dated: _____

ID # 440277v01/14457-2/ 08.17.2005

Ex "B"



**National Park Service**
**U.S. Department of the Interior**

Office of Communications

1849 C Street NW
Washington DC 20240

202 208-6843 phone
202 219-0910 fax

# **National Park Service** News Release

**For Immediate Release:** July 30, 2003

**Contact(s):**           Kym Hall, 202-208-4206
                          Danny Smith, 202-219-1688

## Currituck Beach Lighthouse Decision Reached

**(Washington, D.C.)** – A non-profit organization that has been successfully restoring and managing a lighthouse on North Carolina's Outer Banks for over two decades will be granted ownership of the historic structure. Assistant Secretary for Fish and Wildlife and Parks Craig Manson has upheld the decision of the review committee, and has recommended that the lighthouse be deeded by the U. S. General Services Administration to the Outer Banks Conservationists, Inc.

The Currituck Beach Lighthouse in Corolla, North Carolina was one of about 300 lighthouses made available to federal, state and local agencies, non-profit corporations, educational agencies, or community development organizations for education, park, recreation, cultural, or historic preservation purposes under the National Historic Lighthouse Preservation Act of 2000.

Both the non-profit Outer Banks Conservationists, Inc. and the County of Currituck Board of Supervisors forwarded applications for ownership of lighthouse in February 2003. The National Park Service Review Committee rated the two applications in March 2003. It recommended that Outer Banks Conservationists, Inc. be awarded the lighthouse. Currituck County appealed that decision and requested a review.

The Lighthouse Preservation Act states that the final decision on the disposition of the lighthouse rests with the Secretary of the Interior. The Secretary delegated that responsibility to Assistant Secretary Manson. Manson attempted to bring the two parties together to develop a cooperative approach to the management of the lighthouse, but it became apparent that an agreement was unlikely. No further appeals are permitted.

### - NPS -

**EXPERIENCE YOUR AMERICA ™**

*The National Park Service cares for special places saved by the American people so that all may experience our heritage.*

***\*Please Note\* Editors/Producers Note:*** Complete text of the Assistant Secretary's decision is attached.

**Assistant Secretary for Fish and Wildlife and Parks United States Department of the Interior**

**DECISION OF THE ASSISTANT SECRETARY FOR FISH AND WILDLIFE AND PARKS ON THE REQUEST OF THE BOARD OF COMMISSIONERS OF CURRITUCK COUNTY, NORTH CAROLINA FOR A DE *NOVO* REVIEW OF THE APPLICATIONS IN THE MATTER OF THE DISPOSITION OF THE CURRITUCK BEACH LIGHTHOUSE, COROLLA, NORTH CAROLINA, UNDER THE PROVISIONS OF THE NATIONAL HISTORIC LIGHTHOUSE PRESERVATION ACT OF 2000**

*July 30, 2003 Washington, D.C.*

"North Carolina has few symbols like her lighthouses. From the majestic coastal towers at Cape Hatteras, Bodie Island, Currituck Beach and Cape Lookout to the more demure lights at Ocracoke, Bald Head Island and Price's Creek, the eight sentinels of our shores are among the best?known and most?loved treasures. But the lighthouses still standing along the North Carolina coast are but a few of the beacons that once marked the nighttime landscape. Nearly thirty other lighthouses and light vessels as well as dozens of smaller aids to navigation that once marked the state's coastline have been lost to time, neglect and warfare.

Lighthouses played a significant role in the early development of eastern North Carolina. Unlike her colonial counterparts, the state lacked a safe deepwater harbor. Instead, ships had to negotiate the constantly changing inlets and a maze of shifting shoals and sandbars. As early as 1715, state officials had already begun to mark the channels at Ocracoke Inlet in an effort to improve commerce, but it was clear much more needed to be done.

Shortly after the American Revolution, the N.C. General Assembly moved to construct lighthouses marking the inlet at Ocracoke and the mouth of the Cape Fear River, the two principal ports at the time. In 1789, work began on a lighthouse at Smith Island, also known as Bald Head Island, at the mouth of the river, and plans were also underway to build an Ocracoke lighthouse. The same year, the federal government assumed control of all maritime aids to navigation in the country. North Carolina officials readily agreed to pass to another governing body the daunting task of marking more than three hundred miles of ocean coastline and thousands of miles of inland shores. Building lighthouses was an expensive proposition for new states and the problems soon became a federal concern. . . . With the principal promontories and navigation routes marked, federal officials next turned their attention to other problem areas. The portion of the Outer Banks from Cape Hatteras north to the Virginia border lacked any navigational aids. In 1836, a survey report recommended construction of a lighthouse on Bodie Island, south of Nags Head. Although it was agreed a light was needed, it took more than ten years before the tower was erected in 1848. Even then

the lighthouse was beset by problems. Lacking a proper foundation, the tower soon began to tilt, fouling the delicate mechanism that rotated the beacon and rendering the light almost useless within ten years.

The 1850s witnessed even greater attention on North Carolina's lighthouses. Virtually all of the coastal lights were refitted with state-of-the-art Fresnel lenses and painted to increase their visibility. Two of the coastal towers -- Cape Lookout and Bodie Island -- were replaced with new lighthouses, and the Cape Hatteras light was boosted from ninety to one hundred and fifty feet above the ground. . . .

By the end of the 1850s, North Carolina's navigation system was at its peak. Tall, coastal towers guided ocean?going ships, while smaller interior lighthouses, lightships, and screw-pile lights guided traffic along the sounds and rivers. But the dawn of the Civil War turned into the twilight of the early Tar Heel lights. The winds of war would soon unravel more than a half-century of effort as the lights became strategic objectives.

The Union naval blockade of the South forced Confederate planners to extinguish and often destroy the lighthouses they had lobbied so hard for in the halls of Congress. The lights did little to benefit the Southern cause and destroying them helped hinder Union commercial and military traffic. The effects on the beacons were devastating. Confederate forces destroyed the lighthouse at Bodie Island and on Bogue Banks, along with most of the lights along the Cape Fear River. They removed or vandalized the Fresnel lenses from Cape Hatteras to Cape Fear and damaged or destroyed all of the lightships. Although Union engineers were able to replace the lenses, the damage was done. Gone was a generation of lights and lightships. Soon to follow was the Cape Hatteras Lighthouse, which was so badly damaged by a half? century of wind erosion to its foundation that a replacement was erected in 1870 and the original 1803 tower destroyed. . . ."

From Bearings The Atlantic Coastline: The Lost Lights, *by Thomas Yocum, as it appeared at* **http://coastalguide.com/bearings/lostlights.htm**, reprinted from Our State magazine, May 1999.

This matter concerns one of those most-loved North Carolina treasures: the historic light station at Corolla village (36 22 36 N, 75 49 51 W) known as the Currituck Beach Lighthouse. Perhaps ironically emblematic of the great love North Carolinians have for lighthouses, two applicants vie amid much acrimony, controversy, hyperbole, and vitriol for the right to acquire the lighthouse under the provisions of the National Historic Lighthouse Preservation Act of 2000, Pub.L. 106-355, 2, Oct 24, 2000, 114 Stat. 1675, codified at 16 U.S.C. 470w?7 et seq.

### The Lighthouse

As noted by historian Yocum, the forces of nature and the Civil War left the North Carolina coast without the significant light coverage it had gained by the 1850's. By 1870, efforts were underway to rectify this situation. A new lighthouse replaced the 1802 Cape Hatteras structure in 1870. The Bodie Island lighthouse, completed in 1848 and destroyed during the war, was replaced in 1872. The remaining darkness was between Bodie Island and Cape Henry, Virginia. In 1873, construction began on a lighthouse at the Whaleshead settlement adjacent to Currituck Sound. This construction was completed in 1875 and in December of that year, the Currituck Beach Lighthouse became operational.

The Currituck Beach Lighthouse is a first-order lighthouse (as are Cape Hatteras and Bodie Island), meaning that it has the largest size Fresnel lens. It stands 163 feet high and is constructed of more than one million bricks. Unlike the other lighthouses on North Carolina_s Outer Banks, the Currituck Beach Lighthouse was left unpainted.

The United States Coast Guard automated the Currituck light in 1939 and vacated the property that same year (although some of the property was utilized during World War II). The lighthouse remains today an active aid to navigation and for a number of years was the only lighthouse along the Outer Banks open to the public. It is the only lighthouse in North Carolina still housed in its original structure. It is one of only a dozen lighthouses nationwide with an original Fresnel lens still in use. In 1973, the lighthouse was added to the National Register of Historic Places.

### The County and the Community

Currituck County, the most northeastern county in North Carolina, is older than the United States and, in fact, older than the state of North Carolina. Established in 1668, it was one of the five original ports for North Carolina and one of the original counties. The word "Currituck" in the Algonquian Indian language means "The Land of the Wild Goose."

Currituck County is one of the fastest growing counties in North Carolina (U.S. Census 2002 pop. est. 19,623). The mainland of the County connects the coastline of northeastern North Carolina with a peninsula that is bounded on the west by the North River, on the south by the Albemarle Sound and on the east by the Currituck Sound. Currituck County's northern beach strand separates Currituck Sound from the Atlantic Ocean. The county's beaches attract millions of vacationers each year.

The county is governed by a five?member board of commissioners, which hires a county manager as the chief operating officer of the county government. Prominently displayed on the county seal is a goose in flight as well as the Currituck Beach Lighthouse. The lighthouse is in the community of Corolla, the northernmost accessible Outer Banks community in North Carolina. Corolla is at the site of the Whalehead settlement, and according to some sources, the name Whalehead was used interchangeably with Corolla until the mid-1970's. This village was essentially isolated until the state extended Highway 12 north from the Dare County line in 1984. The lighthouse complex along with the Whalehead Club forms the core of the community. Built in the 1920_s by industrialist Edward C. Knight, the Whalehead Club was one of several hunt clubs in Currituck County. In October 1992, the county purchased the club and 28.5 acres of adjacent land and established the Whalehead Preservation Trust.

### Transfer of Lighthouses

### The Statute

In 2000, Congress amended the National Historic Preservation Act of 1966 by adding provisions known as the National Historic Lighthouse Preservation Act of 2000 (NHLPA). NHLPA authorizes the disposal of historic lighthouses and stations. The Act recognizes the cultural, recreational, and educational value associated with these historic resources by allowing lighthouse properties to be transferred at no cost to federal agencies, state and local governments, nonprofit corporations and community development organizations for park and

recreation, cultural and historic, and educational uses. For the first time, non?profit entities are on equal footing with federal agencies and other public bodies to obtain historic lighthouse properties.

The statute contemplates a multi?agency process in the disposition of lighthouses. The Coast Guard identifies and reports excess light stations to the General Services Administration (GSA). Eligible lighthouses and stations will be announced by GSA through a Notice of Availability, sent directly to interested parties, published in local newspapers and posted on the Internet. The Department of the Interior, through the National Park Service (NPS), issues applications to interested parties. NPS reviews and evaluates applicants and selects a grantee. GSA then develops and executes conveyance documents. In applying for the property, grantees agree to rehabilitate the lighthouse in accordance with the Secretary of the Interior's Standards for Rehabilitation, to maintain the property in perpetuity, to allow Coast Guard access to the navigation aid, and to provide regular public access to the property. A group's financial ability to maintain the historic light station and adhere to historic covenants and other terms and conditions of the transfer will be given significant consideration in the review process. In the event no new acceptable steward is found, the act authorizes the sale of the property by GSA.

### *Disposition of the Currituck Beach Lighthouse*

The Coast Guard determined the Currituck Beach Lighthouse to be excess in 2001. It was among the first lighthouses to be excessed after the passage of NHLPA. NPS included Currituck in a pilot program under NHLPA. The intent of the pilot program was to transfer properties where there was an existing organization involved in preserving a lighthouse and no competing applications were expected. Three parties expressed interest in the Currituck light: Outer Banks Conservationists, Inc. (OBC), a non-profit group which had restored the lighthouse beginning in the 1980's; the county of Currituck; and the State of North Carolina Department of Cultural Resources.

The National Park Service over many months made considerable efforts to have the three parties cooperate with respect to acquisition of the lighthouse. OBC was in actual possession of the lighthouse under the terms of a twenty year lease with the United States and had spent more than a million dollars restoring the lighthouse and the keeper's house. The state owns the property surrounding the lighthouse and had leased that property to OBC for a term of fifty years. The county owns the Whalehead Club property adjacent to the state?owned property. Despite the obvious possibilities, the efforts at a collaboration among the parties failed. Because of the apparent controversy, the Currituck light was withdrawn from the pilot program and placed on the normal competitive track.

NPS sent applications to the parties on November 4, 2002. Completed applications were due on and received prior to February 7, 2003, from Currituck County and OBC. A panel of four NPS employees convened on March 5, 2003, to evaluate the applications. The panelists each scored the applications on a 100-point scale in the following categories: Preservation & Maintenance; Use; Financial; and Management. Out of a possible 400 points, the panel scored OBC at 388 and the county at 132. The average score for OBC was 97 and for the county, 33.

As required by NHLPA, the panel consulted with the State Historic Preservation Officer (SHPO) for North Carolina. The SHPO was provided with both applications. The SHPO informed NPS of his recommendation that the lighthouse be transferred to OBC.

On March 20, 2003, the NPS Acting Associate Director for Cultural Resources forwarded to the NPS Director the panel's recommendation. That same day, the Director forwarded the recommendation to the DOI Assistant Secretary for Fish and Wildlife and Parks. The Assistant Secretary transmitted the panel's recommendation to the parties on April 4, 2003, and announced that the county would have fifteen days to request a de novo review of the panel's recommendation. The county then made such a request, accompanied by a supporting memorandum, on April 17, 2003.

The Assistant Secretary announced that the de novo review would result in a decision not later than June 2, 2003. However, on May 30, 2003, information was received in the office of the Assistant Secretary that the parties might be interested in discussing a cooperative agreement. Therefore, the time for decision on review was extended by ten days to permit the parties to attempt an agreement. On June 4, 2003, staff members in the office of the Assistant Secretary facilitated a telephonic meeting between the parties. Staff reported to the Assistant Secretary on the substance and tenor of the meeting. Having considered the report of the meeting, the Assistant Secretary determined that agreement between the parties was not likely in the near term. Nonetheless, the Assistant Secretary's office remained in contact with both parties. Although both parties eventually agreed to meet and discuss other aspects of managing the lighthouse, neither party demonstrated any willingness to change its basic position that it should own the lighthouse.

On July 17, 2003, the Assistant Secretary determined to make a last attempt at facilitating a collaborative approach to ownership of the lighthouse and preservation of the associated historic and cultural resources. Both parties were invited to meet in Washington on July 23, 2003. OBC declined the invitation.

### The County's Memorandum on Review

The County submitted a ten page memorandum (not including exhibits) on de novo review. Mainly, the County takes issue with the Review Committee's characterization of elements of the County's application. The County indeed makes several good points and it is clear that on its face the County's application is probably not incomplete or in the abstract, inadequate. In fact, a different panel of reviewers might reasonably score the County's application significantly higher than did the panel in this case. For example, it is not difficult to conclude, contrary to the apparent view of the Review Committee, that the County has an adequate financial plan and an adequate management plan. Likewise, a reasonable person could find the County's use plan sufficient and adequate. All of the foregoing begs the real issue, however. The adequacy of the County's plans is not sufficient to award the lighthouse to the County. NHLPA places preservation of the historic light station first. It directs federal agencies to work with the General Services Administration and the National Park Service to choose the best stewards for long-term preservation[1]. The record supports the Review Committee's conclusion that OBC is the best steward for long-term preservation of the Currituck Beach Lighthouse.

***The County's Memorandum recognizes the fundamental goal of NHLPA:*** *The Lighthouse Preservation Act of 2000 clearly contemplates that the transfer is to be made to the applicant best able to maintain, preserve, protect, and promote the Station. This is without regard to whom presently has an operational history.*

While the statement in the second sentence quoted above is true, the Review Committee was

not expected to disregard the twenty-two year operational history of OBC in determining which applicant could best preserve the lighthouse. Indeed, the Review Committee would not have fulfilled its duties under NHLPA had it ignored OBC's long involvement with the lighthouse.

There is the suggestion in several places in the County's Memorandum that the County was somehow disadvantaged by having to compete against an applicant with a current operational history at the lighthouse. For example, the County asserts that it cannot reasonably be expected to address in detail a budget, when it has no history. Clearly, OBC's two decades of managing the lighthouse gives it an advantage that no other applicant was likely to overcome. That fact was a part of the risk the County took on when it decided to compete for the lighthouse.

The County had observed OBC's management for twenty-two years and thus was aware of the measures OBC had undertaken at the lighthouse. The County was provided with two examples of successful applications and therefore knew what would satisfy the Review Committee. The County complains that it took to heart the statement in the application package that [t]he application should be concise and that detailed plans and specifications are not required. Under the circumstances, the County had a full and fair opportunity to compete and was simply outdone by a more experienced applicant.

None of the foregoing means that the Review Committee was predisposed to favor OBC over the County, as the County and various of its supporters have implicitly and explicitly suggested.[2] Again, the record demonstrates that the County was out-competed by OBC's superior experience.

The Review Committee's conclusions are not clearly erroneous nor do they constitute an abuse of discretion.

### De Novo Review

On de novo review, the reviewer is not bound by the findings made in the first instance. No deference is owed the conclusions of the initial recommender. Instead, the reviewer may substitute the reviewer's judgment for that of the original recommending body. I have examined the applications of OBC and the County, independently and without regard to the findings and recommendations of the NPS Review Committee. I have considered the applications in the same categories rated by the Review Committee: Preservation & Maintenance; Use; Financial; and Management.

### Preservation & Maintenance

**OBC's Plan:** OBC devotes a total of 227 pages to the Preservation & Maintenance portion of the application. OBC describes its 20-year history of successful preservation and restoration of the lighthouse and associated properties. OBC has engaged leading experts as its consultants and contractors with respect to maintenance, restoration and preservation activities. OBC has a well-considered plan and budget for future maintenance activities. On the other hand, periodic Coast Guard inspections, documented in reports submitted by OBC with its application, have noted deficiencies in various aspects of lighthouse maintenance over the years. The Coast Guard appears to consider the deficiencies as "minor." Coast Guard reports include numerous comments such as "Presents good overall appearance,"

"well-maintained," "they are doing a great job at maintaining the lighthouse," and "The OBC has done an excellent job restoring the light." One Coast Guard inspector commented in 1992, "It appears that this is one instance where leasing a light is working." In July, 2003, the Vice Commandant of the Coast Guard, Vice Admiral Thomas Barrett, visited the lighthouse and praised OBC's maintenance and management.

*The County's Plan:* The County's description of its proposed Preservation & Maintenance activities takes up just under two pages and contains nothing more than general statements. In its memorandum on review, the County elaborates on its plans, noting that it has been in contact with experts from various academic institutions to assist with the project. Reasonable persons could differ over the adequacy of the County's plan for Preservation & Maintenance; assuming, however, that it is adequate, the fact remains that it is not comparatively the best plan. That distinction clearly belongs to OBC.

*Use*

OBC and the County have remarkably similar visions for the use of the lighthouse. Both recognize the historic and cultural links between the lighthouse and other significant features in the village of Corolla and around the Outer Banks. Each owns interests in adjacent or nearby property. Each professes a desire to integrate the lighthouse and the other features such as the Whalehead Club into a unitary visitor experience. OBC perhaps has a slight edge in this category because it has partnered with the State of North Carolina and because of its long experience in making historic and cultural resources available to the public.

*Financial Plan*

OBC's Plan: OBC is an entity described under section 50l(c)(3) of the Internal Revenue Code. As such, OBC is required to file annual tax returns (IRS Form 990). Its application for the lighthouse includes 990's for several years. The latest, for tax year 2000-2001, shows revenues of $597,881 and expenses of $493,175. OBC's fund balance at the end of the fiscal year was $449,596.

OBC charges an admission fee of $6.00 to the lighthouse and the surrounding grounds[3, 4]. Additionally, it sells items in a museum shop and takes donations, both on-site and otherwise. It has a prudent investment portfolio. OBC has shown steady financial growth over the years as lighthouse visitation has increased fivefold in a decade. As a result, OBC has raised over $4 million in private funds for maintenance of the lighthouse.

Only about 3%-6% of OBC's expenses appear to be administrative, while 48% (excluding salaries) goes directly into operations.

OBC has provided what appear to be reasonably prudent budget projections through 2007.

The County' s Plan: The County provided a financial statement for 2001-2002 which shows revenues of $25,665,374 and expenses of $22,757,706. With a beginning fund balance of $12,749,130, the County ended the year with a surplus of $14,310,794. Currituck claims to be the "wealthiest county in North Carolina." The County says that this year it has an "unrestricted fund balance" of $35,000,000.

The County's plan for the lighthouse calls for operating it through the Whalehead

Preservation Trust. An audited financial statement for 2002 for the Trust was provided. The County would charge a single admission fee to "Currituck Heritage Park," which would include the Whalehead Club, the Outer Banks Center for Wildlife Education, and the lighthouse. Five dollars of the proposed $17.00 fee would be allocated to the lighthouse. Additionally, the County would raise revenues from sales at a retail shop at the Outer Banks Center for Wildlife Education, which the County estimates would yield $10,000 the first year in lighthouse-related revenue. The County also counts on annual memberships in the "Friends of Currituck Heritage Park," to yield $2,000 the first year in lighthouse revenues. Finally, the County says that additional revenues will be raised through investment earnings, private contributions, special event receipts, vending sales, and "other secondary sources." The County projects $2,000 in revenue from this "miscellaneous income."

The County refers to two other potential revenue sources that might be utilized. First, the County suggests the creation of a "cultural heritage and historic preservation endowment." No such thing presently exists. This endowment, if created, would "provide individual, corporate and estate planning contribution options" to interested parties. Second, the County suggests that an additional 1% occupancy tax would yield more than $1,000,000 for Currituck Heritage Park. The County apparently has authority to levy a 3% occupancy tax for the benefit of the Whalehead Club. The County's lighthouse application states that the Board of Commissioners intends to seek a "minor modification" to the enabling legislation to allow the funds to be dedicated to Currituck Heritage Park.

The County's projected budgets for the lighthouse through 2008 anticipate revenues and expenses substantially less than the projected budgets of OBC.

The County's financial plan suffers from the following problems:

- Its projections of revenues is wholly speculative and no basis for its assumptions is provided.
- It is unclear whether under North Carolina law a county can make the commitments necessary for long-term financial stability of the lighthouse and the County's application provides no basis to evaluate this ambiguity.
- It is not clear in places what portions of revenues and expenses attributable to "Currituck Heritage Park" are attributable to the lighthouse.
- The reliance on an endowment that does not exist, although "interest abounds," is entirely imprudent, especially since it is not clear who would create and manage the endowment.
- The reliance on the "minor modification" to the occupancy tax is imprudent, given that such an amendment appears to require action by the North Carolina Legislature. Although the County's asserts that "local legislation is very routinely passed without objection," and that "it is more than remote that the legislature would not accommodate the County by this ever so modest amendment," there simply is no way prudently to forecast what the legislature might do. Indeed, the very political controversy over the ownership of the lighthouse illustrates the folly of counting one's chickens before they hatch. This is particularly true in the present time of state budget difficulties.[5]

On the other hand, OBC's budgets are based on real experience managing the lighthouse. Again, OBC is the best qualified applicant to provide for the long-term preservation of the lighthouse.

*Management Plan*

*OBC:* As noted, OBC is a non-profit organized for charitable purposes. It has a track record of over twenty years of community service. It has an experienced board of directors and a dedicated staff. The public record reveals it to be an exceptionally well-managed organization with outstanding experience managing historic and cultural resources.

*The County:* As noted, the County plans to manage the lighthouse through the Whalehead Preservation Trust. The Trust has a well-qualified board of directors, all of whom individually have extensive experience in public, private, and community-based organizations. However, compared to OBC, the Trust's board is lacking the unified, long-term experience as a team with respect to the management of historic lighthouses. Furthermore, while OBC is focused on historic preservation, the County seems to be concerned primarily with "public" ownership of the lighthouse. Given the standards that must be applied in selecting an appropriate transferee for the lighthouse, OBC has the advantage in this category as well.

*Other Issues*

The County has raised a late issue that should be addressed briefly here. The County believes that a transfer of the lighthouse property from federal ownership to a non-profit would trigger application of the county Unified Development Ordinance. The County seems to suggest that the issues relating to the application of that ordinance must be resolved in this NHLPA process.

Whether a particular local land use ordinance applies in this case is purely a matter for local resolution and is beyond the jurisdiction of the Secretary of the Interior to adjudicate. The sole issue here is which applicant is best suited to provide for the preservation of the lighthouse in accordance with the NHLPA. Local ordinances and permits, to the extent that they do not implicate or conflict with the NHLPA, are to be dealt with between the successful applicant and the appropriate local government.

*Summary*

The standard to be applied is the "best stewardship" standard; that is, on the record, which applicant appears best able to provide for the preservation of the lighthouse. No other consideration is relevant. The record shows as follows:

- Preservation & Maintenance: OBC, because of its extensive experience with the lighthouse and elsewhere, is the best applicant in this category.
- Use: The applicants are closely matched in this category. OBC's long partnerships with the Coast Guard and the State of North Carolina give it a slight advantage.
- Financial: OBC brings a strong track record of financial success. The County's financial plan relies on events uncertain to occur. Notably, OBC has relied largely on private fundraising, while the County's plan in part calls for a tax increase.
- Management: The applicants each have strong management capabilities. OBC's specific relevant experience and history of successful management of the lighthouse give it a significant advantage in this category.

*Conclusion*

Both of these applicants bring unique perspectives to the potential ownership of the lighthouse. Both claim the lighthouse as part of their heritage. Both have similar visions of a greater cultural site integrating the lighthouse. For those reasons, this transfer presented a special opportunity for cooperation for the benefit of the Corolla community and all who have an interest in the history and culture of the Outer Banks. Sadly, this opportunity may have been missed. However, although the Department of the Interior now decides the successful applicant, one can hope that the community will put the divisiveness of this matter aside and begin to consult, cooperate, and communicate, all in the service of Currituck.

As important as the community interest is, it must be emphasized that the NHLPA is about the preservation of national treasures. The successful applicant is a steward not just for its own community, but for all of America.

For the reasons herein stated, I find Outer Banks Conservationists, Inc., to be the applicant best able to provide for the preservation and maintenance of the Currituck Beach Lighthouse. The application of Outer Banks Conservationists, Inc., for transfer of the lighthouse pursuant to the National Historic Lighthouse Preservation Act of 2000 is approved and shall be forwarded to the Administrator of General Services forthwith. This constitutes the final agency decision of the Secretary of the Interior.

By:_____ Date:_____

Craig Manson

Assistant Secretary for Fish and Wildlife and Parks

United States Department of the Interior

_____

*footnotes*

1. Gale Norton, Secretary of the Interior, quoted in press release announcing first transfers under NHLPA, Secretary Norton Announces First Lighthouses Selected Under National Preservation Program, U.S. Dept of Interior, June 10, 2002, available at *http://www.doi.gov/news/020610c.html*

2. Indeed, no credible evidence of such alleged predisposition has been produced.

3. Three dollars is the admission fee to the lighthouse itself. The other $3.00 is a requested donation to OBC which is dedicated to the other preservation and conservation efforts of OBC in the area such as the Corolla Wild Horse Fund. A single collection point is used for these fees, although accounting is separate. The Coast Guard has approved this arrangement.

4. In comparison, the National Park Service charges $5.00 for admission to the compound of the Cape Hatteras Lighthouse. The County proposes a $17.00 single ticket to "Currituck Heritage Park," of which $5.00 would be allocated to the lighthouse.

5. North Carolina has a projected state budget deficit of $650 million. American Legislative Exchange Council and National Association of State Budget Offices (chart available at *http://www.alec.org/meSWFiles/pdf/Deficits.pdf.*

<u>Secretary Norton Announces First LIghthouses Selected Under National Preservation Program</u>

<u>Back to Press Releases</u>