UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BAKER'S ISLAND LIGHTHOUSE PRESERVATION SOCIETY, INC. And ROBERT LEAVENS<br>        Plaintiffs,<br>v.<br><br>UNITED STATES DEPARTMENT OF INTERIOR, SECRETARY OF THE INTERIOR, NATIONAL PARK SERVICE, DIRECTOR NATIONAL PARK SERVICE, CRAIG MANSON, As He Is Assistant Secretary Of Fish, Wildlife And Parks, JANET SNYDER MATTHEWS, As She Is Associate Director, Cultural Resources, National Park Service, P. DANIEL SMITH, As He Is Former Special Assistant to the Office Of The Director, National Park Service, ADMINISTRATOR OF GENERAL SERVICES, GENERAL SERVICES ADMINISTRATION, and JOHN KELLY, As He is Acting Director of Property Disposal, General Services Administration<br>        Defendants | C.A. 05-10855PBS |

AMENDED COMPLAINT

Introduction

        This is a claim for declaratory and injunctive relief brought pursuant to the administrative

procedures act, 5 U.S.C. §702, et seq., seeking judicial review of a decision issued by the

Department of Fish and Wildlife and Parks, United States Department of the Interior, confirming

the recommendation of the National Park Service to convey the historic light station on Baker's

Island, Salem Sound, Massachusetts ("the Light Station") to the Essex National Heritage

ID # 440277v01/14457-2/ 08.24.2005

Commission ("the Heritage Commission") pursuant to the provisions of the National Historic

Lighthouse Preservation Act ("NHLPA") 16 U.S.C. §470 w-7, et seq. ("the Decision").

The plaintiffs also seek review of the failure of the Defendants, Department of the

Interior ("Interior") and General Services Administration ("GSA") to timely develop policies and

procedures required by NHLPA to govern the process by which an applicant for a historic light

station is selected. The plaintiffs also seek judicial review of GSA's promise to convey the

Light Station in circumstances where the GSA does not have a valid deed for the Light Station,

does not hold good title to the Light Station and has no power to convey the Light Station as

promised. Review of these intermediate and/or final actions and inaction is sought pursuant to 5

U.S.C. §704.

The plaintiffs are aggrieved by the Decision which is arbitrary and capricious, an abuse

of discretion, not in accordance with law, contrary to the constitutional rights of the plaintiffs, in

excess of statutory jurisdiction and authority, unwarranted by the facts and not supported by

sufficient evidence. The National Park Service has unlawfully and arbitrarily chosen to convey

the Light Station to the Heritage Commission, an entity whose physical jurisdiction as

established by federal law does not include Baker's Island; an entity that was created by

Congress, but was not empowered to own land; an entity who, on information and belief, has not

and is not able to meet the requirement that it match one million dollars in federal funding

annually; and an entity who has submitted an application which contains serious

misrepresentations as to its ability to gain access to the Island, to insure its dangerous intended

operations on the Island, to fund its intended operations, to acquire municipal approvals required

to conduct its proposed activities and to form partnerships with entities who have not agreed to

participate in the Commission's proposal. In addition, the Defendants conducted their decision

2

making in an unlawful manner that deprived the plaintiff's application from receiving any meaningful review or consideration and thereby deprived the plaintiff of its constitutional rights to equal protection and due process. Finally, the Decision is contrary to law. First, the Decision was made in the absence of policies and procedures which the defendants Secretary of the Interior and the GSA Administrator were required by NHLPA to establish on or before October 24, 2001; and second, the defendant General Services Administration does not own the Light Station in question and, absent a deed or good title to the premises, has no legal capacity to convey the property to the Commission. For all of these reasons, the plaintiffs request that the Decision be declared unlawful and that any agency action based upon the Decision be set aside.

Parties

1.  Plaintiff, Baker's Island Lighthouse Preservation Society, Inc. ("the Preservation Society") is a 501(c) (3) non profit preservation organization comprised of residents of Baker's Island, an island consisting of approximately 60 acres located in Salem Sound, Essex County, Massachusetts.

2.  The Plaintiff, Robert Leavens ("Leavens"), is an individual owner of approximately one quarter acre of land on Baker's Island, shown on the Salem Tax Assessor's map 46 as lot 89, which land shares an approximate 200 foot common boundary with the Baker's Island Light Station and Reservation ("the Light Station" or "the Reservation") which is the subject matter of this lawsuit. Leavens is also a director of the Baker's Island Lighthouse Preservation Society.

3.  Plaintiffs are aggrieved parties who have suffered a legal wrong and have been adversely affected by the final agency action of the Defendants General Services Administration and the Department of Interior, National Park Service, Assistant Secretary of Fish, Wildlife and Parks regarding the application for the acquisition of the Baker's Island Light Station pursuant to the

3

National Historic Lighthouse Preservation Act, 16 U.S.C., 479 w-7.  Plaintiffs have also suffered a

legal wrong by virtue of the failure of the defendants GSA and Interior to timely develop policies

and procedures to govern the selection process and by the GSA's promise to convey the Light

Station in circumstances where the GSA does not have a deed to the Light Station, does not hold title

to the Light Station and has no power to convey the Light Station.

4.  The defendants are the United States Department of the Interior, the Secretary of the

Interior, the National Park Service, the Director of the National Park Service, Craig Manson,

Assistant Secretary for Fish and Wildlife and Parks, Janet Snyder Matthews, Associate Director,

Cultural Resources, United States Department of Interior, National Park Service, P. Daniel Smith,

Former Special Assistant to the Office of the Director, National Park Service, The General Services

Administration, the Administrator of General Services and John Kelly, Acting Director of Property

Disposal for the General Services Administration.

<u>Jurisdiction</u>

5.  Jurisdiction is conferred pursuant to 28 U.S.C. §1331 and 16 U.S.C. §470 w-7.

<u>History Of The Baker's Island Lighthouse</u>

6.  On April 8, 1796, the United States Congress approved an act authorizing the erection of

a lighthouse on what was privately owned land located on Baker's Island, a 60 acre Island situated in

Salem Sound, Essex County, Massachusetts.

7.  Although there is no record of compensation paid to the private owner and the property

was never deeded to the United States and no deed was recorded, the United States Light House

Service and its successor, the U. S. Coast Guard, used the Light Station for many years.

8.  The Light Station consists of 10 acres more or less and contains a 59 foot high granite

light tower constructed in 1816, a two story wood frame keepers dwelling, a two story wood frame

4

assistant keepers dwelling, a one story oil house, a one story fog signal building and several other accessory structures.

9.  Throughout its history, Baker's Islanders have played an important role in preserving, guarding and maintaining the Baker's Island Light Station and Reservation.

10.  In the early 1970's the Coast Guard excessed the property when the light became automated.  After the Coast Guard's abandonment, the Baker's Island Association, an association of home owners on Baker's Island ("the Association") assumed the maintenance and repair of the buildings.

11.  On or around November 21, 1976 the Light Station was designated a National Register Historic Site by the National Park Service.

12.  Except for the Light Reservation, virtually all the remaining property on Baker's Island as been privately owned since 1731.

13.  In 1980, the Coast Guard and the Association entered into a license agreement whereby the Association undertook to maintain, restore and preserve the two light house keepers residences.

14.  In 1988, a license was granted to the Association for a period of thirty years by the Coast Guard allowing the Association to use and preserve the residences.

15.  The Association has faithfully restored, preserved and managed the residences continuously since 1980 and, under its license, plans to continue to do so until 2117.

16.  Plaintiff Baker's Island Lighthouse Preservation Society, Inc. (the "Preservation Society") was formed in 1999 in anticipation of the eventual disposal of the Light Reservation by the Coast Guard.

5

17. Due to the remote location of the Reservation and the lack of public docking or landing facilities, physical access to the Reservation is not readily available. The beach is dotted with jagged rocks and is subject to heavy swells, breaking waves and strong current.

18. In addition, the area experiences a significant tidal range of twelve feet that presents a range of beach profiles depending on the tidal stage.

19. In adverse weather conditions, access to the Island poses a significant and serious safety threat.

<u>The NHLPA Application Process</u>

20. Pursuant to National Historic Lighthouse Preservation Act, 16 U.S.C. §470 w-7 (b)(1), no later than October 24, 2001, the Secretary of the Interior and the Administrator of the General Services Administration were required to establish a process and policies for identifying and selecting an eligible entity to which a historic light station could be conveyed, and for monitoring the use of the light station by the entity.

21. On information and belief, no such process and policies were established.

22. As late as November, 2004, plaintiffs were informed that no such process and policies were in existence.

23. On March 10, 2005, plaintiffs were informed that a "draft National Park Service Regional Handbook for implementing NHLPA" had been developed. The plaintiffs have requested the Handbook but it has not been provided. The plaintiffs are informed and believe that this Handbook did not exist during the decision making process with regard to the Baker's Island Light Station challenged herein.

24. On information and belief, no process and policies governed the selection of an eligible entity for the Baker's Island Light Station.

6

25. On information and belief, the GSA does not have a valid deed to the Light Station, does not hold good title to the Light Station and has no power to convey the Light Station.

26. Notwithstanding that no process and policies were established under NHLPA, and that the GSA does not have a valid deed or good title or the power to convey the Light Station, on or around May 23, 2003 a Notice of Availability under the Act for Baker's Island Light Station was issued by the GSA, through its agent John Kelly, promising to convey the Light Station to the eligible entity selected by the Department of Interior.   A true and accurate copy of the Notice of Availability is attached hereto as Exhibit A.

27. According to the Notice of Availability and consistent with the requirements of the National Historic Lighthouse Preservation Act, 16 U.S.C., §470 w-7, the eligible entity to which the historic light station is conveyed *shall not* conduct any commercial activities at the historic light station.  (emphasis added).

28. Also according to the Notice of Availability, only shoreline access to the Island is available because the only pier providing access to the Island is privately owned and operated.  The Notice of Availability also represented that no submerged lands were to be conveyed with the lighthouse property.

29. In response to the Notice of Availability, the Plaintiff, The Baker's Island Lighthouse Preservation Society, Inc., ("the Preservation Society" or "the Society") submitted an application to the United States Department of the Interior, National Park Service on October 31, 2003.  A true and accurate copy of the  Society's application is attached hereto as Exhibit B.

30. Sometime after November 10, 2004, the Essex National Heritage Commission, Inc. ("the Heritage Commission" or "the Commission") submitted an application to become transferee of the Baker's Island Light station.  The plaintiffs are informed and believe that the application submitted

ID # 440277v01/14457-2/ 08.24.2005

by the Heritage Commission did not meet the required 90 day time frame for submission of an application pursuant to Notice of Availability. A true and accurate copy of the Commission's Application, without attachments, is attached as Exhibit C.

31. The Essex National Heritage Commission is the designated management entity for the Essex National Heritage Area and is incorporated in the Commonwealth of Massachusetts as a tax-exempt, 501 ( c) (3) Corporation.

32. The Heritage Commission was created as the management entity for the Essex National Heritage Area pursuant to 5 U.S.C. §505 et seq.

33. Designation of the Essex National Heritage Area is set forth in 5 U.S.C. §503 (a) and (b), pursuant to which the Area "shall comprise the lands generally depicted on the map numbered NAR-51-80,000, dated August, 1994". A true and accurate copy of the map referred to in the statute is attached hereto as Exhibit D.

34. Baker's Island is not on the map designating the boundaries of the Essex National Heritage Area.

35. The boundaries shown on the map referred to in the legislation do not include Salem Sound in which Baker's Island is situated.

36. Baker's Island is not within the jurisdiction of the Heritage Commission and the Commission has no statutory authorization to conduct any activities on any portion of Baker's Island.

37. The authority of the Heritage Commission is established in 5 U.S.C. §504 (a) and (b), which sets forth the duties and powers of the Commission. Ownership in land is not included within the powers of the Commission granted in the statute.

ID # 440277v01/14457-2/ 08.24.2005

38. 5 U.S.C. §508 authorizes federal appropriations to be made to the Heritage Commission, but limits the appropriations to not more than one million dollars in any fiscal year and requires that the federal funding provided may not exceed 50% of the total cost of any assistance or grant provided or authorized under the statute.

39. The Heritage Commission is required to match funding dollar for dollar in order to conduct its activities.

40. The plaintiffs are informed and believe that the Heritage Commission has continually accepted funding for the Area but is unable to establish that it has met its requirement of matching funds for any of its activities or that it has ever met its requirement of matching nearly one million dollars in funding per year.

41. Notwithstanding that the Heritage Commission is unable to establish that it has met its match and that the Heritage Commission is not empowered to own real estate and that Baker's Island and the Light Station are not within the Heritage Commission's jurisdiction limited by Congress, the Commission nevertheless submitted an application to become the transferee of the Light Station which application contains numerous misrepresentations, including but not limited to the following:

    a)    The Commission's application erroneously claims that the Island is currently accessible "by private pier, by beach landing or by helicopter pad adjacent to the lighthouse". The Commission's application states that the lighthouse property has "excellent beach front access". In truth and in fact, access to the lighthouse property is exceedingly dangerous in many weather conditions that characterize coastal New England. The Coast Guard itself has refused to land its own personnel on the beach, has deemed such landing unsafe, and has refused to permit helicopter landings for the recipient of the Light Station.

9

b)      According to the Commission's application, arrangements have been made with a company called "Sunline Cruises" to provide public access from off island to the Light Station. However, Sunline Cruises is a company that has been out of business for two years and, on information and belief, there are no other providers currently in the area available to provide service or boats capable of providing service for one to two trips per day during the summer season as promised in the Commission's application.

c)      The Commission's application identifies the insurance agent for the Commission as Robert J. Cappadona Insurance Agency in Watertown, Massachusetts and claims that the agency has the necessary information to provide a binder at the appropriate time. Mr. Cappadona has stated that his agency was supplied incomplete information on defining the risks associated with the project and cannot provide insurance because of the extremely high risk associated with the access plan described in the Commission's application.

d)      The Commission's application states that the one million dollars it receives annually through the Department of Interior are matched by donations, in kind contributions, state and other non-matching funds at an average ratio of 1.8 to 1 million dollars funding. The Commission is required by its enabling legislation to match funds it receives annually. On information and belief, the Commission has never met its match in any year in which it has been in operation, cannot meet its match, and has insufficient funds to conduct its proposed operations on Baker's Island.

10

e)    The Commission's application indicates that at least four professors from the Gordon College Academic Staff will participate in the marine biological studies and the marine history programs proposed for the Baker's Island lighthouse property. Two professors are no longer on the Gordon College staff (either having retired or left the employment of the college).

f)    The Commission states in its application that if for any reason it ceases owning the light station and light reservation, it will designate the National Park Service, Gordon College or the Trustees of the Reservation to own and operate the light station. However, according to the Commission's articles of organization, if the Commission is no longer is in existence, the Commission's assets must be transferred to another 503 (c)(3) corporation. The National Park Service is not a 503 ( c) (3) organization; therefore the property cannot lawfully not be conveyed to the National Park Service.

42.   On or about August 26, 2003 the General Services Administration held its official site visit of the Baker's Island Light station. This site visit was attended by a parties interested in securing the "deed" to the Light Station.

43.   The Society was informed that any party who fails to comply with the strict 90 day time period for submitting an application after receiving an information package from the GSA would be automatically disqualified from the application process.

44.   On information and belief, the Commission submitted its application beyond the 90 day period applicable to its application.

45.   On or about May 19, 2004, P. Daniel Smith ("Smith") of the Department of the Interior conducted a site visit of the Baker's Island Light Station. Smith arrived at the island via a U.S.

11

Coast Guard boat and conducted a site visit with the two entities who had submitted applications to secure the "deed" to the Light Station: the Essex National Heritage Commission and the Baker's Island Lighthouse Preservation Society.

46.  At the May 19, 2004 site visit, defendant Smith emphasized that the light keepers cottages could not be occupied by any recipient for residential purposes and were required to be available for the public to view during tours.

47.  The Commission's application includes the marketing and rental of the light keeper's cottages which constitutes commercial activity and is contrary to Notice of Availability, the governing statute and Smith's stated requirements.

48.  At the May 19, 2004 site visit, Smith informed representatives of the Society that (a) the Heritage Commission, not the Preservation Society, would most likely prevail in being selected as the transferee of the reservation; (b) Smith, personally, would write the recommendation to the Secretary of the Interior as to who should be the recipient of the "deed"; and that (c) the Society should be aware that he would write the recommendation so that it would be impregnable to any appeal of the Society and would be acceptable to the Secretary of the Interior.

49.  At the completion of the May 19, 2004 site visit with the two applicants, the Commission's Executive Director, Annie Harris, left the island on the same Coast Guard boat that transported Defendant Smith to Baker's Island.  On information and belief, Harris' transfer was to permit a further private meeting with officials and representatives from the Department of the Interior National Park Service and the U.S. Coast Guard in order to facilitate the success of the Heritage Commission's application.

12

### The Decision

50. On or around July 14, 2004, Baker's Island Light House Preservation Society was informed by defendant Janet Snyder Matthews, Associate Director, Cultural Resources, National Park Service, Department of Interior, that the National Park Service had chosen the Essex National Heritage Commission as the recipient of the Baker's Island Light Station in accordance with NHLPA. A true and accurate copy of the letter from Matthews to Thomas B. Hallowell of the Baker's Island Light House Preservation Society is attached as Exhibit E.

51. On or around July 27, 2004, Baker's Island Light House Preservation Society submitted to defendant Craig Manson, Assistant Secretary for Fish, Wildlife and Parks, United States Department of Interior, a request for administrative review, to review the National Park Service recommendation that the Secretary of the Interior select the Commission as the recipient of the Light Station. Attached as Exhibit F is a true and accurate copy of the society's request for administrative review.

52. On or around July 26, 2004, defendant Robert Leavens submitted supplementary information for the appeal of the July 14, 2004 decision on behalf of the Preservation Society and on behalf of himself as a direct abutter and as a director of the Preservation Society. A true and accurate copy of plaintiff Leavens' request to add information to the administrative review is attached as Exhibit G.

53. On or around January 18, 2005, defendant Manson issued his response to the request for administrative review confirming the National Park Service recommendation that the Baker's Island Light Station be transferred to the Commission. Attached as Exhibit H is a true and accurate copy of defendant Manson's January 18, 2005 decision.

ID # 440277v01/14457-2/ 08.24.2005

54. Plaintiff Baker's Island Light House Preservation Society, Inc. is aggrieved by the Decision of the National Park Service to transfer the "deed" to the Heritage Commission because: (a) the Society's application was not evaluated under policies and procedures required by NHLPA to be established prior to making the decision; (b) the Society's application was not given any meaningful review since the Heritage Commission was the pre-selected entity; (c) unlike the Commission, the Society was not permitted any private or secret meeting or viewings of the Light House Station; (d) the Society's application was required to be submitted within the 90 day time period unlike the Commission's application which was accepted after the time period expired; (e) the Society's application was required to provide for no occupancy of the light keeper's cottages and for no commercial activity unlike the Commission's application which was approved notwithstanding the Commission's plans to rent the light keeper's cottages; (e) the Society participated in the process in good faith without knowing that the GSA has no deed to the Light Station has taken no steps to obtain good title and is unable to convey the Light Station in any event; and (f) the Decision contravenes the Society's rights to equal protection and due process guaranteed by the Fourteenth Amendment of the United States Constitution.

55. Plaintiff Robert Leavens is aggrieved by the Decision of the National Park Service in so far as he is a member of the Board of Directors of the Preservation Society, and, as a direct abutter of the light station, he will be directly adversely affected by the Commission's unlawful and unsafe activities.

56. The Decision of the National Park Service is arbitrary and capricious, not supported by substantial evidence, contrary to the facts and law, in excess of statutory authority and contrary to the Society's constitutional rights in that:

14

(a)    it was not made pursuant to policies and procedures required by NHLPA prior to the decision making;

(b)    the winning applicant was given preferential treatment over the other applicant and was pre-selected;

(c)    the winning applicant was not an "eligible entity" as that term is defined in 16 U.S.C. §470 w-7;

(d)    the winning applicant cannot comply with the terms of conveyance set forth in 16 U.S.C. §470 w-7;

(e)    the winning applicant plans to engage in commercial activities prohibited by 16 U.S.C. §470 w-7;

(f)    the winning applicant is unable to establish that, at its own cost and expense, it has the ability to use and maintain the Light Station in accordance with the standards for the treatment of historic properties as required by 16 U.S.C. §470 w-7;

(g)    the winning applicant cannot establish that it is able to provide access to the general public for recreational, cultural, education or historic preservation purposes as required by 16 U.S.C. §470 w-7;

(h)    the Heritage Commission has no jurisdiction over Baker's Island;

(i)    the Heritage Commission has no statutory authority to own real estate;

(j)    the Heritage Commission has not and cannot establish its ability to raise one million dollars annually in order to satisfy the legislative mandate creating it;

ID # 440277v01/14457-2/ 08.24.2005

(k)    the defendant, General Services Administration does not have good title to the Light Station, does not have a deed to the Light Station, and has no power to effectuate a valid transfer of the premises to the Heritage Commission; and

(l)    the procedures employed by the National Park Service in making its decision, including a secret meeting with the winning applicant's executive director, pre-selection of the winning applicant, and special exceptions and treatment granted to the winning applicant deprive the Society of rights guaranteed by the U.S. Constitution.

55. The failure of the GSA and the Department of Interior to timely issue policies and procedures governing the selection process is arbitrary and capricious and contrary to law and in excess of statutory authority and requirements.

56. The defendant GSA's promise to convey the Light Station to the selected entity in circumstances where the GSA has no deed to the Light Station, has no valid title to the Light Station, has taken no steps to obtain good title to the Light Station and has no power to convey the Light Station is arbitrary and capricious, contrary to the facts and law and in excess of statutory authority.

WHEREFORE, plaintiffs request an order of this Court:

(A)    Declaring the Decision issued by the National Park Service, United States Department of Interior confirming the recommendation of the National Park Service to convey the historic Light Station on Baker's Island, Salem Sound, Massachusetts to the Essex National Heritage Commission arbitrary and capricious, an abuse of discretion, not in accordance with law, in excess of statutory jurisdiction and authority and unwarranted by the facts;

(B)    Declaring the Decision contrary to Baker's Island Light House Preservation Society, Inc.'s constitutional rights to equal protection and due process of law guaranteed by the Fourteenth Amendment of the United States Constitution;

(C)    Declaring the Decision unlawful, null and void;

16

(D)     Declaring that any agency action based upon the unlawful decision be set
        aside;

(E)     Declaring that the failure of the GSA and the Department of the Interior to
        issue policies and procedures to govern the selection process prior to selecting
        an eligible entity was unlawful and rendered the process arbitrary and
        capricious and constitutes grounds for annulling the decision.

(F)     Declaring that the defendant GSA has no valid deed or title to the Light
        Station, and issuing a mandatory injunction directing GSA and its Acting
        Director of Property Disposal, John Kelly, to take steps to obtain a valid deed
        and establish good title to the Light Station.

(G)     Enjoining the defendants, their agents, employees and all persons acting in
        concert with them from taking any action pursuant to the decision;

(H)     Awarding the plaintiffs their costs and attorneys fees; and

(I)     For such other and further relief as this Court deems meet and just.

                            BAKER'S ISLAND LIGHTHOUSE
                            PRESERVATION SOCIETY, INC. AND
                            ROBERT LEAVENS
                            By their attorney,


                            Catherine Savoie, BBO #544599
                            POSTERNAK, BLANKSTEIN & LUND, L.L.P.
                            The Prudential Tower
                            800 Boylston Street
                            Boston, MA  02199
                            (617) 973-6100

Dated: August 24, 2005

17

## CERTIFICATE OF SERVICE

I, Catherine J. Savoie, hereby certify that on this 24th day of August 2005, a copy of the within was served electronically and by first class mail on opposing counsel.

_____
Catherine J. Savoie, Esq.

18

EXHIBIT A

# NATIONAL HISTORIC LIGHTHOUSE PRESERVATION ACT
## NOTICE OF AVAILIBILITY
### For
### Bakers Island Light
#### Bakers Island, Salem Harbor Approach
#### County of Essex, Commonwealth of Massachusetts

### May 23, 2003

The light station property described on the attached sheet has been determined to be excess to the needs of the Federal Government. Pursuant to the National Historic Lighthouse Preservation Act of 2000, 16 U.S.C 470, this property is being made available at no cost to other Federal Agencies, state and local agencies, non-profit corporations, educational agencies, or community development organizations for education, park, recreation, cultural or historic preservation purposes ("eligible entity").

Any eligible entity with an interest in acquiring the described property for a use consistent with the purposes stated above should submit a letter of interest to the address listed below by July 25, 2003.

Letters of interest should include:
- Name of property
- Name of eligible entity
- Point of contact, title, address, phone and email
- Non-profit agencies must provide a copy of their state-certified articles of incorporation.

Eligible entities that submit a letter of interest will be sent an application and given an opportunity to inspect the property. Building inspectors and/or contractors may accompany the applicant to the site visit. The completed application must be submitted to the Department of the Interior within 90 days after receipt. The Department of the Interior will review the applications and select an eligible entity to receive the property. The General Services Administration will complete the conveyance to the selected recipient.

For more information on the disposal of lighthouses, please visit our web site at http://www.cr.nps.gov/maritime/nhlpa/nhlpa.htm.

Letters of interest should be directed to:            cc to:

Ms. Saundra Robbins                      Ms. Cara Metz
General Services Administration          State Historic Preservation Officer
Property Disposal Division               Executive Director
Suite 925, 10 Causeway Street            Massachusetts Historical Commission
Boston, MA  02222                        220 Morrissey Boulevard
                                         Boston, MA  02125

# National Historic Lighthouse Preservation Act
## Notice of Availability

### May 23, 2003

| | |
|---|---|
| GSA Control No. | 1-U-MA-822 |
| Property Identification | Bakers Island Light Station |
| Property Address | Bakers Island, Salem Harbor Approach<br>Essex County, Massachusetts |
| Property Description | The 10.02-acre +/- site contains a 59-foot high granite light tower constructed in 1821, two-story wood frame keeper's dwelling, two-story frame assistant keeper's dwelling, one-story oil house and one-story fog signal building. |
| Condition of Property | The property is offered "AS IS' and "WHERE IS" without representation, warranty, or guarantee as to quality, quantity, title, character, condition, size or kind. |
| Range of Possible Uses | Historic Lights and Light Stations may be used for education, park, recreation, cultural, or historic preservation purposes. |
| Commercial Activities | Commercial activities are prohibited unless approved by the Secretary of the Interior. |
| Utilities | No utilities on site.<br>Electricity is solar-generated. |
| Historical Information | Property is eligible to be listed on the National Register of Historic Places. Property must be maintained in accordance with the Secretary of Interior's Standards for Rehabilitation. Historic covenants will be incorporated into the deed. |
| Aid to Navigation | The Federal aid to navigation located at the site is active and remains the personal property of the United States Government. |
| Access | Shoreline access only. The pier that provided access to the Coast Guard property was destroyed by storm in the 1950s. Anyone wishing to construct a new pier must obtain necessary permits from the Massachusetts Department of Environmental Protection and the U.S. Corps of Engineers. **The only pier currently providing access to the island is privately owned and operated by the Bakers Island Wharf Co.** |
| Easements -- to be retained by the U.S. Coast Guard | The U. S. Coast Guard shall maintain an Arc of Visibility and will require an easement for ingress and egress with unrestricted right of access to and across the Property to maintain, operate, service, repair and install equipment as necessary to aid navigation and/or to make any changes to any portion of the property as may be necessary for navigation purposes. |

**EXHIBIT B**

# Baker's Island
## Salem, Massachusetts



Submitted by the Baker's Island Lighthouse Preservation Society, Inc.

31 October 2003

Baker's Island Lighthouse Preservation Society 

October 31, 2003

Kevin J. Foster, Chief
Maritime Heritage Program
United States Department of the Interior National Park Service
1849 C Street N.W.
Washington, DC 20240

Dear Mr. Foster,

Thank you for your letter dated August 14, 2003 notifying me of the Baker's Island Lighthouse Preservation Society's eligibility to apply for the acquisition of the Baker's Island Light. To that end, enclosed are two originals and three copies of our proposal for your inspection.

Should you or any of your colleagues have any questions regarding the proposal, please do not hesitate to contact me. I can be reached at 978-921-0452 X 212 or 978-468-3638.

Sincerely,

*Thomas B. Hallowell*

Thomas B. Hallowell
President

# Baker's Island Light Station
## Baker's Island
## Salem Harbor Approach
## Essex County, Salem, MA 01970

## Proposal to the National Park Service
### GSA Control No. 1-U-MA-822

# 31 October 2003

Applicant:            Baker's Island Lighthouse Preservation Society, Inc.

Applicant Type:    Non-Profit Preservation Organization, 501(C)(3)

Authorized Representative:        Mr. Thomas Hallowell, President
26 Pleasant Street
Wenham, MA 01984
978-468-3638 (h)
978-921-0452 (w)
978-927-6321 (fax)
Thallowell@Essex400.com (w)
ThorHall@aol.com (h)



MAY 1 9 2003

Mr. Tom Hallowell, President
Bakers Island Lighthouse Preservation Society
26 Pleasant Street
Wenham, MA 01984

Subject: Bakers Island Light

Dear Mr. Hallowell:

Enclosed are the Notice of Availability and Fact Sheet for Bakers Island Light, located on
Bakers Island, Salem, Massachusetts. Per the Notice of Availability, this property is to
be conveyed under the National Lighthouse Preservation Act of 2000.

Should you have any questions, please contact David Stinson or myself. David can be
reached at (617) 565-5703. My direct line is (617) 565-5710.

Sincerely,

Saundra Robbins
Project Manager
General Services Administration
Property Disposal Division, Room 925
10 Causeway Street
Boston, MA 02222

Enclosures

# NATIONAL HISTORIC LIGHTHOUSE PRESERVATION ACT
## NOTICE OF AVAILIBILITY
### For
## Bakers Island Light
### Bakers Island, Salem Harbor Approach
### County of Essex, Commonwealth of Massachusetts

### May 23, 2003

The light station property described on the attached sheet has been determined to be excess to the needs of the Federal Government. Pursuant to the National Historic Lighthouse Preservation Act of 2000, 16 U.S.C 470, this property is being made available at no cost to other Federal Agencies, state and local agencies, non-profit corporations, educational agencies, or community development organizations for education, park, recreation, cultural or historic preservation purposes ("eligible entity").

Any eligible entity with an interest in acquiring the described property for a use consistent with the purposes stated above should submit a letter of interest to the address listed below by July 25, 2003.

Letters of interest should include:
- Name of property
- Name of eligible entity
- Point of contact, title, address, phone and email
- Non-profit agencies must provide a copy of their state-certified articles of incorporation.

Eligible entities that submit a letter of interest will be sent an application and given an opportunity to inspect the property. Building inspectors and/or contractors may accompany the applicant to the site visit. The completed application must be submitted to the Department of the Interior within 90 days after receipt. The Department of the Interior will review the applications and select an eligible entity to receive the property. The General Services Administration will complete the conveyance to the selected recipient.

For more information on the disposal of lighthouses, please visit our web site at
http://www.cr.nps.gov/maritime/nhlpa/nhlpa.htm.

Letters of interest should be directed to:          cc to:

Ms. Saundra Robbins                         Ms. Cara Metz
General Services Administration             State Historic Preservation Officer
Property Disposal Division                  Executive Director
Suite 925, 10 Causeway Street               Massachusetts Historical Commission
Boston, MA  02222                           220 Morrissey Boulevard
                                            Boston, MA  02125

# National Historic Lighthouse Preservation Act
## Notice of Availability

### May 23, 2003

| | |
|---|---|
| GSA Control No. | 1-U-MA-822 |
| Property Identification | Bakers Island Light Station |
| Property Address | Bakers Island, Salem Harbor Approach Essex County, Massachusetts |
| Property Description | The 10.02-acre +/- site contains a 59-foot high granite light tower constructed in 1821, two-story wood frame keeper's dwelling, two-story frame assistant keeper's dwelling, one-story oil house and one-story fog signal building. |
| Condition of Property | The property is offered "AS IS" and "WHERE IS" without representation, warranty, or guarantee as to quality, quantity, title, character, condition, size or kind. |
| Range of Possible Uses | Historic Lights and Light Stations may be used for education, park, recreation, cultural, or historic preservation purposes. |
| Commercial Activities | Commercial activities are prohibited unless approved by the Secretary of the Interior. |
| Utilities | No utilities on site. Electricity is solar-generated. |
| Historical Information | Property is eligible to be listed on the National Register of Historic Places. Property must be maintained in accordance with the Secretary of Interior's Standards for Rehabilitation. Historic covenants will be incorporated into the deed. |
| Aid to Navigation | The Federal aid to navigation located at the site is active and remains the personal property of the United States Government. |
| Access | Shoreline access only. The pier that provided access to the Coast Guard property was destroyed by storm in the 1950s. Anyone wishing to construct a new pier must obtain necessary permits from the Massachusetts Department of Environmental Protection and the U.S. Corps of Engineers. **The only pier currently providing access to the island is privately owned and operated by the Bakers Island Wharf Co.** |
| Easements – to be retained by the U.S. Coast Guard | The U. S. Coast Guard shall maintain an Arc of Visibility and will require an easement for ingress and egress with unrestricted right of access to and across the Property to maintain, operate, service, repair and install equipment as necessary to aid navigation and/or to make any changes to any portion of the property as may be necessary for navigation purposes. |

Baker's Island Lighthouse Preservation Society

May 22, 2003

**Via Certified Mail**
**Return Receipt Requested**

Ms. Saundra Robbins
General Services Administration
Property Disposal Division
10 Causeway Street
Suite 925
Boston, MA 02222

*Re: Bakers Island Light Station Property*

Dear Ms. Robbins,

I am in receipt of your letter dated May 19, 2003 enclosing the notice of availability and fact sheet for the above captioned property located on Bakers Island, Salem, Massachusetts.

Receipt of this letter represents notification of the interest of the Bakes Island Lighthouse Preservation Society, Inc. in acquiring the light station property and our request for an application.

The following information is forwarded upon your request:

Name of Property:                Bakers Island Light Station
Name of Eligible Entity:        Bakers Island Lighthouse Preservation Society, Inc.
Point of Contact:                Thomas B. Hallowell
Title:                            President
Address, Phone and Email:    26 Pleasant Street, Wenham, MA 01984,
                                978-921-0452 Ext. 212, Thallowell@essex400.com

Thank you for your attendance to this matter.

Sincerely,

Thomas B. Hallowell
President

Baker's Island Lighthouse Preservation Society

CC: Ms. Carla Metz
State Historic Preservation Officer
Executive Director
Massachusetts Historical Commission
220 Morrissey Boulevard
Boston, MA 02125

## APPLICATION TO OBTAIN HISTORIC LIGHT STATION PROPERTY
## COVENANT AGREEMENT

The undersigned _Baker's Island Lighthouse Preservation Society, Inc._, hereinafter referred to as the
(state or local government; or non-profit)

Applicant or Grantee, acting by and through _Thomas Hallowell, President_
Name and Title

_26 Pleasant Street, Wenham, Massachusetts, 01984_
Street Address, City/Town, Zip Code

hereby applies for the conveyance, without monetary consideration, for use for education, park, recreation, cultural or historic preservation purposes, from the United States of America pursuant to the National Historic Lighthouse Preservation Act of 2000 and in accordance with the rules and regulations of the General Services Administration, hereinafter referred to as GSA, the

_Baker's Island Light, GSA Control No. 1-U-MA-822_
(name of light station)

This property is more fully described in the Application attached hereto and made a part hereof.

Enclosed is a resolution or certification as to the authority of the undersigned to execute this application and to do all other acts necessary to consummate the transaction.

The undersigned agrees that this application is made subject to the following terms and conditions:

The applicant(s) understand(s) and agree(s) that the Application is made, and the conveyance of the property shall be accomplished by an instrument, or instruments, in a form satisfactory to the Administrator of the GSA without warranty, express or implied, and shall contain substantially, but may not be limited to, the following reservations, restrictions, and conditions, which may be enforced through a reversionary right in the property reserved to the United States of America. In accordance with 16 U.S.C. § 470w-7 (b)(3)(A), the Administrator will be issuing the quitclaim deed on behalf of the United States.

## I.     HISTORIC PRESERVATION and OTHER USES.

a. Compliance with this Application.  The grantee shall, at its own cost and expense, use and maintain the historic light station in accordance with the plans described in this Application. Proposed changes to any part of the Application shall be reviewed and approved by the National Park Service, acting on behalf of the Secretary of the Interior, in consultation with the State Historic Preservation Officer of the State in which the historic light station is located.

b. Limitations on Sale, Conveyance, etc.  The grantee shall not sell, convey, assign, exchange, or encumber the historic light station, any part thereof or any associated historic artifact conveyed to the eligible entity in conjunction with the historic light station conveyance, including but not limited to any lens or lanterns, unless such sale,

conveyance, assignment, exchange or encumbrance is approved by the National Park Service prior to its execution.

c.  Limitations on conduct of Commercial Activities.  The grantee shall not conduct any commercial activities at the historic light station, any part thereof, or in connection with any associated historic artifact conveyed to the eligible entity in conjunction with the historic light station conveyance, in any manner, unless such commercial activities are approved by the National Park Service.

d.  Reversionary Interest of the United States.  The conveyance of a historic light station shall include a condition that the historic light station, or any associated historic artifact conveyed to the grantee in conjunction with the historic light station conveyance, including but not limited to any lens or lanterns, shall at the option of the GSA Administrator, revert to the United States and be placed under the administrative control of the Administrator, if:

    1.  the historic light station, any part thereof, or any associated historic artifact ceases to be available for education, park, recreation, cultural, or historic preservation purposes for the general public at reasonable times and under reasonable conditions which shall be set forth in the application;

    2.  the historic light station or any part thereof ceases to be maintained in a manner that ensures its present or future use as a site for a Federal aid to navigation;

    3.  the historic light station, any part thereof, or any associated historic artifact ceases to be maintained in compliance with the NHLPA, the Secretary of the Interior's "Standards for the Treatment of Historic Properties," 36 CFR part 68, and other applicable laws;

    4.  the grantee sells, conveys, assigns, exchanges, or encumbers the historic light station, any part thereof, or any associated historic artifact, without approval of the National Park Service;

    5.  the grantee conducts any commercial activities at the historic light station, any part thereof, or in conjunction with any associated historic artifact, without approval of the National Park Service;

    6.  or at least 30 days before the reversion, the Administrator of GSA provides written notice to the owner that the historic light station or any part thereof is needed for national security purposes.

*See* 16 U.S.C. § 470w-7(c)(3).

## II.    COMPLIANCE

a. The Government and any representative it may so delegate, shall have the right of entry upon the premises at any time to conduct periodic inspection to ensure compliance with the terms and conditions of the conveyance. The failure of any agency of the United States to exercise any right, term, covenant, condition or remedy granted under either this instrument or a deed of conveyance from the United States for a historic light station shall not be deemed to be a waiver of the same or any other term, covenant, condition, right or remedy. No term, covenant, condition, right or remedy shall be deemed to have been waived by the United States unless such waiver is in writing executed by a duly authorized representative of the United States.

b. Beginning two years from the date of conveyance, the grantee shall prepare biennial reports describing the development and use of the property, and any revenue generated from its operation during the preceding two-year period. The grantee shall prepare and submit consecutive biennial reports to the appropriate National Park Service office.

## III.    INSURANCE

Buildings, structures, or improvements located upon the property shall be insured by the approved applicant to protect the residual financial interest of the United States of America. The grantee agrees, for itself, its successors and assigns, that any conveyed improvements will be insured against loss, damage or destruction and if such loss, damage or destruction should occur, said insurance and all moneys shall be held in trust by the approved applicant for the purpose of repairing such improvements and restoring the same to their former condition and use. A certificate of insurance shall be available for review prior to conveyance of the property. The amount of the insurance shall be the replacement value of the property.

## IV.    FEDERAL AIDS TO NAVIGATION

a. The United States will continue to own, operate and maintain, and have the right to install, remove, relocate, or replace, any "Federal aid to navigation," upon any property conveyed under the NHLPA. A Federal aid to navigation is defined as any device, operated and maintained by the United States, external to a vessel or aircraft, intended to assist a navigator to determine position or safe course, or to warn of dangers or obstructions to navigation, and shall include, but not be limited to, a light, lens, lantern, antenna, sound signal, camera, sensor, electronic navigation equipment, power source, or other associated equipment.

b. The United States Coast Guard (USCG) is the Federal agency responsible for operating and maintaining any Federal aid to navigation located upon the property. The eligible entity to which the property is conveyed shall not interfere, or allow interference in any manner, with any Federal aid to navigation, nor hinder activities required for the operation and maintenance of any Federal aid to navigation without the express written permission of the USCG.

c. In those instances in which a Federal aid to navigation remains upon the property conveyed, the United States has the right to reserve:

1. Easements for the operation and maintenance of such aid to navigation, including but not limited to, an easement for the arc of visibility if a lighted aid to navigation or an easement to produce sound if a fog horn or other sound based aid to navigation;

2. Unrestricted easements for access upon, through, over, and across the property at any time, including but not limited to, the right of ingress and egress in, to, and through the interior of the lighthouse structure; and

3. Easements for utility, power, and communication lines.

d. The United States shall have the right, at any time, to enter the historic light station conveyed under this section without notice, for purposes of operating, maintaining, and inspecting any aid to navigation and for the purpose of ensuring compliance with 16 U.S.C. § 470w-7(c) to the extent that it is not possible to provide advance notice.

e. The United States shall retain a reversionary interest (*i.e.*, title to the property conveyed would revert to the United States) and may exercise said interest in the event the property or any part thereof ceases to be maintained in a manner that ensures its present or future use as a site for a Federal aid to navigation.

## V.    GENERAL TERMS AND CONDITIONS

a. This application and its acceptance shall constitute the entire agreement between the grantee and the United States of America, unless modified and approved in writing by both parties. This agreement becomes binding once the quitclaim deed for the property is executed or delivered by the United States.

b. The description of the property set forth herein is believed to be correct, but any error or omission shall not constitute ground or reason for nonperformance of the agreement resulting from the acceptance of this application.

c. If any portion of the property is situated on bottomlands, the United States will convey only an interest in the structure described in the published Notice of Availability. No submerged lands shall be conveyed by the transfer of ownership of the light pursuant to Section (d)(4) of the National Historic Lighthouse Preservation Act. Bottomlands are held by the state where the property is located. It is incumbent upon the selected recipient to secure the necessary rights to the bottomland from the state.

d. If an application for the conveyance of a historic light station is approved, then, the Property will be conveyed without consideration via a quitclaim deed "AS IS" and "WHERE IS" without representation, warranty, or guaranty as to quantity, quality, character, condition, size or kind, or that the property is in condition or fit to be used for

the purpose intended. No claim for any adjustment upon such grounds will be considered after this application has been accepted.

e. The grantee shall save, hold harmless, defend, and indemnify the United States, its employees, agents, and representatives from any suit, claim, demand or action, liability, judgment, cost or other fee arising out of any claim for personal injury or property damage (including death, illness, or loss of or damage to property or economic loss) that arises from the grantee's or the grantee's employee's, agent's, or representative's use or occupancy of the property and/or the grantee's failure to comply with the terms and conditions of the conveyance.

f. The grantee shall obtain the required authorization from the U.S. Army Corps of Engineers District office having the jurisdictional responsibility for access and utilization of lighthouse structures located on U.S. Army Corps of Engineers navigation structures (i.e. breakwalls, jetties, piers, etc).

g. The grantee shall pay all taxes imposed on this transaction and shall obtain at its own expense and affix to all instruments of conveyance and security documents such revenue and documentary stamps as may be required by Federal and local law. All instruments of conveyance and security documents shall be recorded at the grantee's expense within 30 days of their receipt in the manner prescribed by local recording statutes.

h. The grantee shall provide the General Services Administration with a certified copy of the instrument of conveyance within 30 days of the date of recordation which indicates the date, location, and book and page number of its recording.

i. The grantee further covenants and agrees for itself, its successors, and assigns, to comply with the provisions of the Federal Disaster Protection Act of 1973 (87 Stat. 975); Executive Order 11988, relating to the evaluation of flood hazards; Executive Order 11288, relating to the prevention, control, and abatement of water pollution; and Executive Order 11990, relating to the protection of wetlands, where and to the extent said Act and Orders are applicable to the property herein conveyed, and the approved applicant shall be subject to any use restrictions issued under said Act and Orders.

j. The grantee further covenants and agrees for itself, its successors and assigns, to comply with all Federal laws relating to nondiscrimination in connection with any use, operation, program, or activity on or related to the property requested in this application, including, but not limited to:

    1. All requirements imposed by or pursuant to the regulations of the U.S. Department of the Interior (43 C.F.R. Part 17);

    2. Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d-1), which prohibits discrimination on the basis of race, color, or national origin;

    3. The Age Discrimination Act of 1975, as amended (42 U.S.C. § 6101 et seq.), which prohibits discrimination on the basis of age;

4. Section 504 of the Rehabilitation Act of 1973, as amended (29 U.S.C. § 794), which prohibits discrimination on the basis of handicap;

5. The Architectural Barriers Act of 1968, as amended (42 U.S.C. § 4151), which requires facilities located on the property to be accessible to the physically handicapped; and

6. The Americans with Disabilities Act of 1990 (42 U.S.C. § 12101 et seq.), which requires that no otherwise qualified handicapped individual shall, solely by reason of his or her handicap, be excluded from the participation in, be denied benefits of, or be subject to discrimination under any program or activity receiving Federal financial assistance.

k. The grantee shall, within three months of the date of the recording of the instrument of conveyance, erect and forever maintain a conspicuous sign or signs near the principal point or points of access to the property that states: "The United States of America donated this land to the *name of grantee* for _____ use through the National Historic Lighthouse Preservation Act."

## VI.    REVERSION

a. Title to the property transferred shall revert to the United States of America at its option for non-compliance with any of the terms and conditions of the conveyance. In the event that there is a breach of any of the conditions and covenants herein contained by the grantee, its successors and assigns, whether caused by legal or other inability of the grantee, its successors and assigns, to perform said conditions and covenants, or otherwise, all right, title, and interest in and to the said premises shall revert to and become the property of the United States at its option. The United States, in addition to all other remedies for such breach, shall have the right of entry upon said premises, and the approved applicant, its successor and assigns, shall forfeit all right, title, and interest in said premises and in any and all of the tenements, hereditaments, and appurtenances thereunto belonging.

b. The grantee, by its acceptance of the deed, covenants and agrees for itself, and its successors and assigns, that in the event the United States exercises its power to terminate the grantee's estate in the property then the approved applicant shall provide protection to and maintenance of said property at all times until such time as the title is actually reverted, including the period of any notice of intent to revert. Such protection and maintenance shall, at a minimum, conform to the standards prescribed by the GSA in its Federal Property Management Regulations in effect at the time of the reversion. Prior to any such reversion, the grantee further agrees to complete and submit to the United States an environmental assessment of the property that sufficiently documents and evaluates its condition in regard to the release of hazardous substances as defined under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended [42 U.S.C. § 9601(14))].

October 31, 2003
_____
Date


*Thomas Hallowell, President*
_____
Signature


Thomas Hallowell
_____
Name - printed


President, Baker's Island Lighthouse Preservation Society, Inc.
_____
Title


26 Pleasant Street, Wenham, Massachusetts, 01984
_____
Address of Applicant

_____


## ACCEPTANCE BY THE GOVERNMENT


The foregoing application is hereby approved and accepted by and on behalf of the Secretary of the Interior for the United States of America this _____ day of _____, _____.


_____
(Signature)


_____
(Title)


_____
(Office)

National Park Service
U.S. Department of the Interior


Application to Obtain Historic Light Station Property          National Park Service     10

Accepted by and on behalf of the United States of America this _____ day of
_____, 20____.


GENERAL SERVICES ADMINISTRATION

By:_____
Signature


_____
Name – printed


_____
Title



Baker's Island Lighthouse Preservation Society

### Resolution/Certification of Authority to Acquire Property

Whereas, certain real property owned by the United States of America, located in the City of Salem, County of Essex, Commonwealth of Massachusetts has been declared surplus at the discretion of the General Services Administration, and the National Historic Lighthouse Preservation Act (16 U.S.C. § 470w-7) and policies promulgated pursuant thereto, more particularly described as follows:

Baker's Island Light House Station and Reservation on Baker's Island, Salem Sound, MA

Consisting of approximately 10 acres

Whereas, the Baker's Island Lighthouse Preservation Society, Inc. needs and will use said property in perpetuity for the purposes as set forth in its application and in accordance with the requirements of said Act and any regulations and policies promulgated thereunder:

Now, Therefore, Be It Resolved, that the Baker's Island Lighthouse Preservation Society, Inc, shall make application to the Department of Interior for, and secure the transfer to, the above-mentioned property for said use and subject to such exceptions, reservations, terms, covenants, agreements, conditions, and restrictions as the Department of Interior and the Federal disposal agency may require in connection with the disposal of said property under said Act and the regulations and policies issued pursuant thereto.

Be it Further Resolved that the Baker's Island Lighthouse Preservation Society, Inc, has legal authority, and is willing and able, to properly develop, maintain, operate, and assume liability of the property, and that Mr. Thomas Hallowell, President, Baker's Island Lighthouse Preservation Society, Inc. is hereby authorized, for and on behalf of the Baker's Island Lighthouse Preservation Society, Inc. to do and perform any and all acts and things which may be necessary to carry out the foregoing resolution, including the preparing, making, and filing of plans, applications, reports, and other documents, the execution, acceptance, delivery, and recordation of agreements, deeds, and other instruments pertaining to the transfer of said property, including the filing of copies of the application and the conveyance documents in the records of the governing body, and the payment of any and all sums necessary on account of the purchase price thereof or fees or costs incurred in connection with the transfer of said property for survey, title searches, recordation or instruments, or other costs identified with the acquisition of said property.

Baker's Island Lighthouse Preservation Society, Inc.
c/o Mr. Thomas Hallowell, President
26 Pleasant Street
Wenham, MA 01984


I, Thomas Hallowell, hereby certify that I am the President of the Baker's Island
Lighthouse Preservation Society, Inc.; and that the foregoing resolution is a true and
correct copy of the resolution adopted by the vote of a majority of the members of said
Baker's Island Lighthouse Preservation Society, Inc., present at a meeting of said body on
the 25th day of May, 2003, at which a quorum was present.


*Thomas B. Hallowell, President*
                    (signature)

MASSACHUSETTS
ESSEX   SS


As subscribed and sworn to before me on October 15, 200

*Mark G. Gobeille*   NOTARY PUBLIC
MARK J GOBEILLE
COMMISSION EXPIRES: 10-9-10

# CONTENTS

EXECUTIVE SUMMARY                                           1

I.    PROPERTY DESCRIPTION/BASELINE DATA                    2
      Description
      Environment
      History
      Background
      Photographs                                           6

II.   PRESERVATION AND MAINTENANCE                          12
      Introduction
      Licensed Structures...Maintained by BIA
      Unlicensed Structures... Maintained by Coast Guard
      Conservation Plan

III.  USE PLAN                                              15
      Ecology
      Public Access
      Educational Collaboratives

IV.   FINANCIAL PLAN                                        22
      Background
      Income
      Expenses

V.    MANAGEMENT PLAN                                       25
      Baker's Island Lighthouse Preservation Society
      Personnel
      Baker's Island Association
      Baker's Island Homeowner's Corporation
      Baker's Island Wharf Company
      Security

VI.   QUALIFYING CRITERIA                                   30
      Summary

Exhibit 1    ENVIRONMENTAL QUESTIONAIRE            separate

# Executive Summary

Since 1972, when the Coast Guard automated Baker's Island Light, Baker's Islanders have played an important stewardship role in preserving, guarding, and maintaining the Baker's Island Light Station and Reservation (hereinafter referred to as the Reservation) so that it may be enjoyed by future generations. Islanders have maintained a cooperative role with the Coast Guard and its predecessors since the light's origin in 1796.

The Reservation consists of approximately ten acres (of the island's 60 acres) and was designated a National Register Historic Site by the National Park Service on November 21, 1976. Except for the Reservation, virtually all the remaining property on Baker's Island has been privately owned since 1731. Its residents have maintained a harmonious working relationship with the Coast Guard and its lighthouse keepers since Congress approved an act on April 8, 1796 authorizing the erection of a lighthouse. A further demonstration of the islanders' close association, is evidenced by a license granted for a period of 30 years that was signed in 1988 between the Coast Guard and the Baker's Island Association allowing the Association the use and preservation of the two lighthouse keeper residences. The Baker's Island Lighthouse Preservation Society, Inc. (hereinafter referred to as the Society) was formed in 1999 in anticipation of the eventual disposal of the Reservation by the Coast Guard.

If chosen by the National Park Service to become the new Reservation owner, the Society would put into effect processes to:

➢ Preserve and maintain the Reservation as it is currently constituted.

➢ Enlarge the Society's existing endowment through continued fund raising to insure perpetual financial viability.

➢ Establish an ecological arm to work closely with the Baker's Island Ecology Committee (part of the Baker's Island Association) for the ecological preservation of the Reservation.

➢ Implement an educational collaborative at elementary, secondary and collegiate level.

➢ Implement a public access program to insure the public's access to the property consistent with preserving the fragile ecology of the island. The Baker's Island Wharf Company board of director's voted unanimously to allow the Society use of the wharf for this purpose. The Baker's Island Wharf Company, as private owners of the wharf, has not granted other competing entities this important privilege.

The Society should receive this property because its members, and their predecessors, who comprise a broad cross section of individuals who love the island and its lighthouse, have shepherded and nurtured a unique relationship with the Reservation and its inhabitants for more than 200 years. The Society fervently believes that its members have demonstrated a beneficial continuity of care and responsibility to the Reservation during that time and they are fully prepared to continue it if given the opportunity.

# I.    Property Description/Baseline Data

## Description

Baker's Island commands the entrance to the main shipping channel to Salem, Massachusetts. Its lighthouse has guided mariners such as Nathaniel Bowditch into port for more than 200 years. Major traffic still plies this deepwater channel, bringing fuel to Salem's large power plant. The island is under the jurisdiction of the City of Salem, although its surrounding waters are considered a part of neighboring Beverly, both approximately five nautical miles to the west. Other nearby communities include, Marblehead to the southwest, Manchester-by-the-Sea to the north, and Gloucester to the northeast.

The Baker's Island Coast Guard Station and Reservation comprises approximately 10 acres on the northwest sixth of Baker's Island's 60 acres. Despite its small size, Baker's is the fifth largest island exposed to the open ocean between Cape Cod and Casco Bay, Maine and the second largest on Massachusetts's north shore. These islands provide an important toehold for native plants and animals, especially migratory and nesting birds. The station is dominated by coastal heathland vegetation, and is difficult to traverse (see attached photographs and a more detailed description in Exhibit 1). The coast consists of rocky shoreline to the north, and cobble beach to the west. The Reservation beach is accessible from sea under calm weather conditions, but is not a suitable location for a pier due to its exposure to strong westerly winds in the winter, and severe battering from swells generated during gales, northeast storms, and hurricanes. The Coast Guard maintained a boathouse and ramp on this beach until Hurricane Carol destroyed both in 1954. No structures have been at this location since.

The remaining 50 of the 60 island acres are privately owned. Some 62 cottages are found on these 50 acres along with several supporting structures such as a community hall, grocery store, gift shop, pump house and fire barn. The island supports no roads, only private pathways. Privately owned cottages abut the entire southern and eastern boundary of the Reservation. Baker's Island has been inaccessible to the public because of its private ownership status since 1731. The only pier is owned and operated by the Baker's Island Wharf Company, a private entity that maintains the structure for the sole use of Wharf Company members. The pier has always been made available to the Coast Guard to aid in their maintenance of the Reservation. Recently, the Wharf Company board of directors unanimously voted to grant the Society use of the wharf for implementation of its public access initiative for the Reservation.

## Environment

Water is found on the Reservation grounds with access through a surface well and one bedrock well. Due to the shallow nature of the surface well, the water is not considered potable and is not used for consumption. Potable water is available from two deep artesian wells located near the center of the island and is carried by hand to the various residences, as there is no potable water distribution or supply system. The island

contains two marshes and a pond.  Surface water storage of about 909,000 gallons recharges two subsurface aquifer systems, and the island's vegetation is an important element in moisture retention.  "The type of vegetation cover and its extent are important factors in the overall hydrologic nature of Baker's Island."[1]  The Reservation's original vegetation is not known, but it is likely that it was heavily forested as the island's forests were extensively lumbered soon after the settlement of Salem.  Since that time, the Reservation's vegetation has succeeded from grasses (as pasture for domestic animals) to herbs (goldenrod, milkweed, yarrow, cattail) and shrubs (bayberry, blueberry, sumac, juniper, gooseberry, wild rose, poison ivy).  Strong winds and salt spray keep trees from reaching towering heights.

The Reservation currently supports seven structures; the light tower, #1 keeper's residence, #2 assistant keeper's residence, signal building, oil house, storage building and solar array.  There is also a turf helicopter pad, that is marked but not lighted, located adjacent to the lighthouse.  The origin of the Reservation dates to April 8, 1796 when Congress passed an act authorizing the erection of a lighthouse.  The ten acre parcel was ceded shortly thereafter by the Commonwealth of Massachusetts to the United States at a cost of $500.00.

<u>History</u>

The first lighthouse was a wooden structure with a keeper's residence in its middle and light towers on either end.  These twin lights were kindled on January 3, 1798.  In 1817 one of the lights was ordered extinguished by the government.  A succession of ships, including the UNION, crashed on the rocks at Bakers and finally in 1820 the government authorized restoration of the second light.  "Towers for Ma and Pa Baker, as the twin lights of Baker's Island were affectionately known to the early Islanders, resulted from the 1820 action of the Salem Town Meeting."[2]  The light source at first came from lard oil.  In 1878 that gave way to kerosene, and electrification, via underwater cable from shore, arrived in 1938 to replace the incandescent oil vapor lamp.

The present tower was erected of stone and concrete, 59' high and 13'4" diameter, conical shape and 111ft focal plane above mean high water.  The twin lights were not discontinued until 1926 when the smaller twin was demolished and a new light – the present one- was kindled at sunset, June 30.

From early times, a fog bell was located midway from the high tide mark to the lighthouse.  A new fog bell, which began operation on August 1, 1877, was destroyed by lightning in July 1879, to be replaced in October of that year.  This Baker's Island fog bell operated until 1907 when it was superceded by a fog siren which, in 1959, gave way in turn to a Supertyphon Air Horn.

Thirteen civilian keepers preceded the first of a succession of U. S. Coast Guard keepers introduced in 1943, a keeper and an assistant keeper, each with an island home.

---

1 Hydrology of Baker's Island, (Master's Thesis), Jack M. McKenna, Boston University Grad School, 1984
2 Now, Then Baker's Island, DeWitt D. Wise pg 30, BIA, Inc, Bakers Island, Salem, MA 1964

By 1969, the Coast Guard was intimating that it hoped to automate fully all of its coastal installations. Two years later, the Baker's Island light had automation. The power in the light was lowered and the light characteristic was changed to flashing white. The flashing white light often blended with coastal lights and marker buoy lights to mislead seafarers. This white light was replaced by the Coast Guard in 1974 and the light characteristic was changed back to the original alternating red and white beam. The solar array was added in 1999 and the electric cable from shore was removed.

Bakers' Island light has earned its place in history. A most significant event occurred during the War of 1812, when the United States fought Great Britain over territory and trading rights. The quick action of Baker's Island lighthouse keeper, Captain Joseph Perkins, saved the frigate *U.S.S. CONSTITUTION*. "It was Captain Joseph Perkins, an early pilot and the second keeper of the Baker's Island Light, who was the saviour of "Old Ironsides". From the heights of the Island, he "watched with fear and trepidation the pursuit of the frigate '*Constitution*' by the British vessels, '*Tenedos*' and '*Endymion*'. Noticing that 'Old Ironsides' was having difficulty making the harbor, Perkins jumped into his dory and rowed out to offer his services as pilot. Under his guidance, the frigate made Marblehead—and safety."[3] A first day cover and United States postage stamp was issued on June 24, 1995 to commemorate this event.

Another event of historic significance occurred more recently. To observe the bicentennial of Baker's Island light, which was kindled in 1798, as well as to acknowledge the long-standing and continuing cooperative relationship between Baker's Islanders and the Coast Guard, the Baker's Island Association members sponsored a celebration that was held on August 15, 1998. The invitation list included: the Commander, First Coast Guard District; the Chief, Office of Aids to Navigation, First Coast Guard District; the Group Commander and Deputy Group Commander of Coast Guard Group Boston, which is responsible for the operation and maintenance of the lighthouse; the Massachusetts Executive Office of Environmental Affairs Secretary and Chief of Staff; and the Director of Massachusetts Coastal Zone Management Office. Also invited were former Coast Guard personnel and their families who were stationed at Baker's Island light before it was automated, as well as their civilian counterparts and their families. More than 200 people attended the 200th anniversary celebration and four generations of one lighthouse keeper's family were represented.

## Background

Although the Society was formerly incorporated in 1999, it's roots extend much further. It is important to understand the self-governing bodies on Baker's Island and their relationship to each other and the island. Each of these entities are legally established, serve different purposes, and date back as early as 1910. Members willingly subject themselves to the jurisdiction of and abide by the decisions of these governing bodies. Membership criteria is different for each, and includes a broad cross section of people and families from all over the United States who share a love for Baker's Island. Please see the management plan on pages 26 and 27 for a more detailed description of each.

---

[3] Baker's Island Now and Then, DeWitt D. Wise, pg 16, BIA, Baker's Island, Salem, MA 1940

Below is a synopsis of why the Society believes it is the preferred steward for the Reservation. Throughout the remainder of this proposal supporting background and details are provided which the Society believes fully supports its contention that the Society is best positioned, is the best candidate, is the best equipped and should be awarded the deed and responsibility for shepherding the Reservation into the next century.

| BAKER'S ISLAND LIGHTHOUSE PRESERVATION SOCIETY ASSETS | COMPETITORS LIABILITIES |
| --- | --- |
| • Pier access | • Beach only egress |
| • Fire station/protection | • No fire protection |
| • Existing year round security | • Off season vandalism |
| • All weather access | • Limited accessibility highly weather dependent |
| • Existing proven Coast Guard liaison | • --- |
| • Potable water | • No potable water unless brought from shore |
| • Medical personnel | • --- |
| • Handicap access | • --- |
| • Immediate proposal implementation | • --- |
| • Focused attention exclusively on Baker's Island Reservation | • Diluted resources due to other commitments/responsibilities |

The following pictures offer a visual tour of the Reservation and a sample representation of the restoration efforts regarding the Reservation structures.



BAKER'S ISLAND

BILPSPROPOSAL091603 ©



baker's Island

Vegetation, Blocks,
and Shaded Relief

Scale 1 : 3,250

This map shows vegetation types
from a color infrared airphoto taken
in March 1991. The photo was
scanned and warped to correct for
distortion, and paths and areas of
similar vegetation were drawn over
this image on screen.

Contours and hillshading were
interpreted from a 1995 survey
of houses' elevations. Contour
interval 5 feet.

Houses from Salem tax map, 199

Copyright (C) 1996, BIAS

5' contour
Natural block

Trees
Shrubs
Open water
Marsh
Grassland
Mowed grass
Rock ledge
Rocky shore



# Baker's Island

## Purple loosestrife
## Infestations - 1999

Scale 1 : 3,000

● Purple loosestrife
Detailed vegetation:
  Mixed hardwood
  Low tree
  High shrub
  Low shrub
  Conifer plantation
  Sumac
  Apple plantation
  Rosa Rugosa
  Bittersweet
  Fresh marsh
  Open water
  Grassland
  Mowed grass
  Rock ledge
  Rocky shore

Copyright (c) 199, BIAS.



# Baker's Island

Scale 1 : 3,000
(1 inch = 250 feet)

General vegetation:
- Trees
- Shrubs
- Old field
- Mowed grass
- Marsh
- Open water
- Rock ledge
- Rocky shore

Baker's Island Lighthouse Station boundary
5' Contour

This map shows vegetation types from a color infrared airphoto taken in March 1991.
Contours were interpreted from a 1995 survey of houses' elevations.
Contour interval 5 feet.
Houses: Salem tax map, 1991.

Copyright (c) 2002, BIAS.

# Baker's Island
# Light Station









Above: Panoramic view looking south from Baker's Island Lighthouse
Below:  BI Lighthouse, keepers residences, fog signal building, upper storage shed, lower storage shed and helicopter pad looking NW





Above: BI keeper's residence, upper storage building, lighthouse and helicopter pad
Below: Expanded view





Upper keeper's residence





Upper keeper's residence





Upper keeper's residence before and after



LIGHTHOUSES OF MASSACHUSETTS
THEMATIC GROUP NOMINATION

LIGHTHOUSE INFORMATION FORM                                    NUMBER 2

MASSACHUSETTS HISTORICAL COMMISSION              See National Register File
80 Boylston Street, Boston, MA 02116
                                                      Listed 11/21/76

PHOTOGRAPH KEY                    HISTORIC NAME: Bakers Island Light Station

                                  TOWN:        Salem

                                  LOCATION:       less than one mile off coast

                                  COUNTY:        Essex      CODE: 009

                                  CONGRESSIONAL DISTRICT: 6

                                  LOCATION OF LEGAL DESCRIPTION:

                                   Registry of Deeds Essex County

                                   32 Federal Street, Salem, MA  01970

                                  VERBAL BOUNDARY DESCRIPTION:

                                   See National Register nomination


SKETCH MAP                        LAT./LONG.:

                                  UTM COORDINATE: 19/353/400/4710/200

                                  USGS QUADRANGLE: BOSTON, MA; NH; CT; RI; ME

                                  SCALE: 1:250,000

                                  ACREAGE:        11.5 acres

                                  OWNER(S):       United States

                                                  Coast Guard


                                                  unoccupied
                                  STATUS:



RECORDED BY: Michael Flaherty
              1st Coast Guard District
ORGANIZATION:
              1976
DATE:

Form No. 10-306 (Rev. 10-74)

UNITED STATES DEPARTMENT OF THE INTERIOR
NATIONAL PARK SERVICE

# NATIONAL REGISTER OF HISTORIC PLACES
## INVENTORY -- NOMINATION FORM
### FOR FEDERAL PROPERTIES

| FOR NPS USE ONLY |
| --- |
| RECEIVED |
| DATE ENTERED |

SEE INSTRUCTIONS IN *HOW TO COMPLETE NATIONAL REGISTER FORMS*
TYPE ALL ENTRIES -- COMPLETE APPLICABLE SECTIONS

## 1 NAME

HISTORIC

AND/OR COMMON

BAKERS ISLAND LIGHT STATION

## 2 LOCATION

STREET & NUMBER

CITY. TOWN — NOT FOR PUBLICATION

SALEM — VICINITY OF     CONGRESSIONAL DISTRICT

| STATE | CODE | COUNTY | CODE |
| --- | --- | --- | --- |
| MASSACHUSETTS | 25 | Essex | 009 |

## 3 CLASSIFICATION

| CATEGORY | OWNERSHIP | STATUS | PRESENT USE | |
| --- | --- | --- | --- | --- |
| —DISTRICT | X PUBLIC | —OCCUPIED | —AGRICULTURE | —MUSEUM |
| —BUILDING(S) | —PRIVATE | X UNOCCUPIED | —COMMERCIAL | —PARK |
| —STRUCTURE | —BOTH | —WORK IN PROGRESS | —EDUCATIONAL | —PRIVATE RESIDENCE |
| X SITE | PUBLIC ACQUISITION | ACCESSIBLE | —ENTERTAINMENT | —RELIGIOUS |
| —OBJECT | —IN PROCESS | X YES: RESTRICTED | X GOVERNMENT | —SCIENTIFIC |
| | —BEING CONSIDERED | — YES: UNRESTRICTED | —INDUSTRIAL | —TRANSPORTATION |
| | | —NO | —MILITARY | —OTHER: |

## 4 AGENCY

REGIONAL HEADQUARTERS: *(If applicable)*

FIRST COAST GUARD DISTRICT

STREET & NUMBER

150 CAUSEWAY STREET

| CITY. TOWN | STATE |
| --- | --- |
| BOSTON — VICINITY OF | MASSACHUSETTS |

## 5 LOCATION OF LEGAL DESCRIPTION

COURTHOUSE,
REGISTRY OF DEEDS, ETC.     REGISTRY OF DEEDS ESSEX CO.

STREET & NUMBER

32 FEDERAL STREET

| CITY. TOWN | STATE |
| --- | --- |
| SALEM    01970 | MASSACHUSETTS |

## 6 REPRESENTATION IN EXISTING SURVEYS

TITLE

DATE

MARCH 31, 1976     X FEDERAL —STATE —COUNTY —LOCAL

DEPOSITORY FOR
SURVEY RECORDS     COMMANDER, FIRST COAST GUARD DISTRICT

| CITY TOWN | STATE |
| --- | --- |
| BOSTON | MASSACHUSETTS |

SCRIPTION

| CONDITION | | CHECK ONE | CHECK ONE |
|---|---|---|---|
| __EXCELLENT | __DETERIORATED | __UNALTERED | X ORIGINAL SITE |
| __GOOD | __RUINS | X ALTERED | __MOVED   DATE_____ |
| X FAIR | __UNEXPOSED | | |

DESCRIBE THE PRESENT AND ORIGINAL (IF KNOWN) PHYSICAL APPEARANCE

First lighthouse built and illuminated in 1798.  Present tower dates
from 1821.  Dwellings originally built in 1878, improved in 1958.

Bakers Island Light Station:

Mainkeeper's dwelling, built in 1878, 2 story woodframe, 31'X28' with
workshop.

Assistant keeper's dwelling, built in 1878, 2 story woodframe, 31'X28'.

Fog signal building, built in 1907, 1 story, brick with hip roof, 18'X31

Light tower built in 1821, stone and concrete, painted white, 59' high,
13'4" diameter, conical, 111' focal plane above high water.

Present lens is 190MM rotating beacon with six sides, alternating red
and white bulls eye panes, 17864 candlepower on white, 6074 candlepower
on red, 16 miles range on white, 13 miles range on red.  Previously the
tower had a fourth order rotating lens, white and red.

The existing sound signal is an ELG 500/02 with a range of 1 mile,
previous signal was a Leslie Supertyphon 255/02.

# SIGNIFICANCE

PERIOD

AREAS OF SIGNIFICANCE -- CHECK AND JUSTIFY BELOW

__PREHISTORIC
__1400-1499
__1500-1599
__1600-1699
__1700-1799
__1800-1899
__1900-

__ARCHEOLOGY-PREHISTORIC
__ARCHEOLOGY-HISTORIC
__AGRICULTURE
__ARCHITECTURE
__ART
__COMMERCE
__COMMUNICATIONS

__COMMUNITY PLANNING
__CONSERVATION
__ECONOMICS
__EDUCATION
__ENGINEERING
__EXPLORATION/SETTLEMENT
__INDUSTRY
__INVENTION

__LANDSCAPE ARCHITECTURE
__LAW
__LITERATURE
__MILITARY
__MUSIC
__PHILOSOPHY
__POLITICS/GOVERNMENT

__RELIGION
__SCIENCE
__SCULPTURE
__SOCIAL/HUMANITARIAN
__THEATER
__TRANSPORTATION
__OTHER (SPECIFY)

SPECIFIC DATES

BUILDER/ARCHITECT

STATEMENT OF SIGNIFICANCE

A large group of Salem men erected a daytime marker on Bakers Island
July 28, 1791. Bakers Island Light was authorized by Congress in 1796.

Keeper Chapmon illuminated the light for the first time on January 3, 1798
The keeper's home was in the same building as the two lighthouse towers
which were at each end of the structure.

In the war of 1812, Keeper Joseph Perkins of the lighthouse detected the
Frigate Constitution being chased by two british warships, the Tenedos and
the Endymion. Perkins rowed out to OLD IRONSIDES and piloted the ship
to safety inside Salem Harbor.

In these days of radio communications, the outage of a light is not a major
catastrophe but in 1817, one of the lights at Bakers Island was ordered
extinguished by the government and a great ship, the UNION, crashed on
the rocks at Bakers Island followed shortly thereafter by another unfor-
tunate vessel. Notwithstanding those crashes, the government did not
restore the second light until 1820. The above illustrates how important
the beacons and lights were and are to the commerce of our nation.

In 1916, a new and brighter beacon was placed on the higher tower with the
appropriate notice to mariners.

It would not be appropriate not to mention the thirteenth and last keeper
of the regular lighthouse service at Bakers Island, ARTHUR PAYNE, who
started his duties in July 1918 and retired in April 1944.

The light has been automated and is unattended but protects many vessels
from the rocks at Bakers Island. It is considered a scenic view in outer
Salem Harbor.

# 9 MAJOR BIBLIOGRAPHICAL REFERENCES

Famous New England Lighthouses by Edward Rowe Snow

# 10 GEOGRAPHICAL DATA

ACREAGE OF NOMINATED PROPERTY   11.5 Acres +-

UTM REFERENCES

A | 1 9 | | 3 53 00 0 | | 4 71 0 500 |     B | 1 9 | | 35 3 00 0 | | 4 71 10 00 |
ZONE   EASTING         NORTHING            ZONE   EASTING       NORTHING

C | 1 9 | | 3 53 90 0 | | 4 71 0 500 |     D | | | | | | | | | | | |

VERBAL BOUNDARY DESCRIPTION

Beginning at the most southerly point of the parcel to be des-
cribed at an Iron Bolt in a large rock on the northeast side
of a pond;  thence N 85°-10'-30" W by land N/F Henry W. Morse
et, ux. 670 feet, more or less, to the mean high water line of
Massachusetts Bay;  thence northerly, easterly and south easterly

LIST ALL STATES AND COUNTIES FOR PROPERTIES OVERLAPPING STATE OR COUNTY BOUNDARIES

| STATE | | CODE | COUNTY | | CODE |
|---|---|---|---|---|---|
| STATE | | CODE | COUNTY | | CODE |

# 11 FORM PREPARED BY

NAME / TITLE

Michael F. Flaherty                              6953

ORGANIZATION                                     DATE

First Coast Guard District                       3/31/76

STREET & NUMBER                                  TELEPHONE

150 Causeway Street

CITY OR TOWN                                     STATE

Boston                                           Massachusetts

# 12 CERTIFICATION OF NOMINATION

STATE HISTORIC PRESERVATION OFFICER RECOMMENDATION

YES____     NO____     NONE____

STATE HISTORIC PRESERVATION OFFICER SIGNATURE

In compliance with Executive Order 11593, I hereby nominate this property to the National Register, certifying that the State
Historic Preservation Officer has been allowed 90 days in which to present the nomination to the State Review Board and to
evaluate its significance. The evaluated level of significance is ____National ____State ____Local.

FEDERAL REPRESENTATIVE SIGNATURE

TITLE                                                            DATE

FOR NPS USE ONLY
    I HEREBY CERTIFY THAT THIS PROPERTY IS INCLUDED IN THE NATIONAL REGISTER

                                                                DATE

DIRECTOR, OFFICE OF ARCHEOLOGY AND HISTORIC PRESERVATION
ATTEST:                                                         DATE

    KEEPER OF THE NATIONAL REGISTER

No 10-300a
10-74l

UNITED STATES DEPARTMENT OF THE INTERIOR
NATIONAL PARK SERVICE

# NATIONAL REGISTER OF HISTORIC PLACES
# INVENTORY -- NOMINATION FORM

| FOR NPS USE ONLY |
| RECEIVED |
| DATE ENTERED |

CONTINUATION SHEET                    ITEM NUMBER  10    PAGE  2

by the mean high water line of Massachusetts Bay to a point
on the mean high water line bearing N 38°-57'-30" E from
said point of beginning; thence S 38°-57'-30" W by land N/F
Henry W. Morse 600 feet, more or less, to the point first
mentioned and point of beginning.



National Maritime Initiative Preliminary Inventory of Aids to Navigation
Date of Draft: 11/09/92                              INIT # 1005

State: MASSACHUSETTS

BAKERS ISLAND LIGHT

Location: BAKERS ISLAND/SALEM HARBOR ENTRANCE
Nearest City: SALEM
County: ESSEX

Year Station Established: 1791
First Appropriation Date:

U.S.C.G. District: 1
Is Light included on the Current USCG Light List? YES
Is Light Automated? YES; Year Automated: 1944

Year Existing **Historic Tower** Constructed: 1870
   Is the Light Operational? YES; Date Inactive: N/A
   Foundation Materials: STONE
   Construction Materials: STONE/CONCRETE
   Markings/Patterns: WHITE
   Shape: CONICAL
   Relationship to Other Structures: SEPARATE
   Tower Height:   59
   Original Optic: FOURTH ORDER
      Year Original Lens Installed:
   Present Optic: FA 251
      Year Present Lens Installed:
   Focal Height:   111
   Optic Characteristics: WHITE/ALTERNATE RED
   Other Optics used in tower:

Is there a **Modern Tower**? NO
   Modern Tower Constructed:
   Foundation Materials:
   Construction Materials:
   Markings/Patterns:
   Shape:
   Relationship to Other Structures:
   Tower Height: , Focal Height:
   Original Optic:
      Year Installed:
   Current Optic:
      Year Installed:
   Optic Characteristics:

Is there an existing **Sound Signal** Building? YES
   Year Constructed: 1907
   Construction Materials: BRICK
   Architectural Style:

Signal Type: AIR HORN/ORIG. BELL, SIREN
Signal Characteristics: 1 3 SEC BLAST EV 30 SEC

Is there an existing **Keepers Quarters**? YES
   Year Constructed: 1878
   Number of Stories: 1.5
   Architectural Style: VICTORIAN
   Construction Materials: WOOD

Other Structures:   'L HOUSE

(Be sure to list any remaining oil houses, cisterns, garages, barns, bridges, tunnels, catwalks, docks, marine railways, assistant keepers dwellings, or storage buildings; include construction date, if known)

Owner/Manager: U.S. COAST GUARD LEASE TO BAKERS ISLAND ASSOCIATION

U.S. COAST GUARD, 1ST DISTRICT          BAKERS ISLAND ASSOCIATION
408 ATLANTIC AVENUE
BOSTON                MA  02210-5098
FTS-223-8338

Contact Information:


Open to the Public? NO
Type of Access: RESTRICTED
Access: BOAT/HELIOCOPTER

National Register Status: LISTED
Name of Listing: BAKER'S ISLAND LIGHT STATION
Significance Level: NATIONAL; Reference #76000289

On State List/Inventory? NO; Year Listed:

Miscellaneous:

SITE DATE REFERS TO FIRST DAYMARKER; ORIGINALLY TWIN TOWERS AT SITE


References:




**********************************************************************

This light station is included in a *preliminary* inventory of historic aic to navigation.  Please send all comments, corrections, and additions to Candace Clifford, National Maritime Initiative, National Park Service (41 P.O. Box 37127, Washington, DC  20013-7127.

# II.    PRESERVATION AND MAINTENANCE PLAN

## Introduction

A recurring factor evident throughout this proposal is the uniqueness of the Reservation in terms of its remoteness, environmental sensitivity, and the relationship this has fostered between the Coast Guard and Baker's Island inhabitants. Remoteness engenders its own set of unique and difficult challenges. For example, all preservation and maintenance supplies must be transported to the island from the mainland via boat or air. Similarly, all construction and demolition debris must be removed by similar means. The Society has a unique advantage in this as it is the only interested party with access to a pier and permission to use private paths. All others would be relegated to beach access only; a treacherous beach which has claimed many watercraft in the past. A beach that is not suitable for the erection of another pier even if Massachusetts Chapter 91 and associated environmental permits were forthcoming. The Coast Guard attempt to maintain an access ramp failed in 1954 when a hurricane destroyed the structure. The current status of the existing station's structures is broken down into two areas: licensed and unlicensed.

## Licensed structures

The Coast Guard abandoned the property when the light was automated in the early 1970's. The residences were severely dilapidated and the grounds were completely overgrown by 1980 when in March of that year the Coast Guard and the Baker's Island Association (see Management Plan, pg 26 for more on the Association.) signed a lease on the two residences. That lease required annual renewal. At that time, a three-phase plan for the property was developed and executed. Phase I involved the stabilization and protection of the residences, restoration of interior systems such as plumbing and recovery and clearing of the grounds from the heavy overgrowth of sumac, poison ivy and brush. Phase II included exterior reconditioning including replacement of 75% of side-wall materials and restoration of chimneys. Phase III included roof restoration. The lease was reviewed and renewed on an annual basis until 1988. At that point a license agreement was signed between the Coast Guard and the Association that conveyed, for a period of 30 years, the following light station structures; # 1 keeper's residence, # 2 assistant keeper's residence and the upper storage building. Targeted activities of the plan have been completed and the emphasis has shifted to continuing maintenance issues. More details of the plan including a copy thereof is available upon request. Pursuant to the thirty-year license, the Association was to preserve these structures and has successfully done so. The Baker's Island Association is an entity responsible for the preservation of the historic, cultural, and societal aspects of island life. Since conveyance, the Association has employed non-invasive stabilization techniques to conserve the historic elements of these properties. Techniques utilized have been the application of exterior paint, repairs to existing glazing systems, repair of side-wall material, and repair of roofing materials as previously noted. From 1988 to the present, the Baker's Island Association has provided all grounds maintenance services to these properties and maintains all necessary equipment on site.

Maintaining the keeper's residences requires hard work and constant vigilance. Salt air propelled by high and constant winds, means yearly touch up to the glazing and complete re-glazing every 4-5 years. Exterior painting schedules are greatly reduced from those found on shore and complete repainting as frequently as every 3-5 years is common. Physical presence is also important. Islanders actually live in these residences and maintain them on a daily basis. Even in winter, caretakers, employed by the Baker's Island Homeowners Corporation, patrol the Reservation and report any damage incurred by nor'easters or hurricanes. It would be challenging for any other organization to offer this kind of stewardship particularly without access to a pier and private transport routes.

## Structures maintained by USCG (unlicensed)

The Coast Guard undertook complete renovations to the light tower as well as to the fog signal building and upper storage building in 1998. These restorations included, but were not limited to, overall repointing and surface coating of the light tower, as well as reconditioning, roof replacement, and glazing system replacement of the fog signal building. The upper storage building also received a new roof as well as glazing system replacement. The aids to navigation are currently powered by a solar array system installed in 1999.

The reconstruction undertaken by the Coast Guard in 1998 coupled with the ongoing keepers' residences precludes the need for major capital outlays on these structures for approximately 15-20 years.

## Conservation Plan

The Reservation is unique in a myriad of ways. It is located in a remote area requiring sea transport in open North Atlantic waters to reach it. Access to all but the Society is limited to a beach, a beach considered so dangerous, the Coast Guard refused to transport interested parties to it for light station inspection. Only the Society has access to a pier and the right to utilize private paths. The Reservation cannot rely on the luxury of modern utilities and while there are no roads to contend with, islanders, and those involved in the Society, as well as others, do maintain most of the paths that lead to the Reservation. Landscaping, the planting of trees and bushes, and maintenance of the reservation is currently attended to by those islanders who inhabit the keepers' residences. Many hours of labor per week during the spring, summer, and fall season are expended on upkeep. Mowing the four acres of grass contained within the Reservation alone is a weekly undertaking. These methods of conservation would not change if the Society is awarded the deed as the current inhabitants of the residences would be asked to stay under guidelines established by the Society. As for modifications for areas of archeological significance, none are anticipated as there are no such areas. Approximately 60 per cent of the Reservation acreage remain in a natural state and as such, require no landscaping except as provided in the exhibit I environmental section.

An area of extreme importance and concern in conservation is protection against fire. Baker's Island, under the auspices of the island's Homeowners Corporation, maintains a fire department manned by island volunteers under the direction of an appointed fire chief. Special tractors equipped with radio communications and approved fire fighting hose, and pumps with both fresh water and saltwater capabilities can reach any structure on the island including those on the Reservation. Fire drills are conducted every summer. The Society would have access to this important benefit and protection that no other interested party can bring to bear. Please see the Use Plan at page 17 for additional specifics regarding this critical aspect of island life that impacts the conservation and use of the Reservation.

A comprehensive understanding of the site in an historic context will enable more substantial conservation of the existing structures. Research material has been secured from a variety of sources including the following: Coast Guard, Essex Institute, City of Salem, National Archives, and Baker's Island Historical Committee. Furthermore, if granted the property, the Society intends to engage the services of Martin Nally, the contractor responsible for the light tower restoration, to conduct an exhaustive survey of all station structures to develop a formal preservation plan and schedule.

A five-year maintenance plan has been enumerated pending Mr. Martin Nally's recommendation for longer-term preservation measures. In the meantime, the Society anticipates that the following schedule for appropriate maintenance expenditures is sufficient since island residents provide their labor for free to the Society.

### Expenditures

|  | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| Light tower | $2000 | $2000 | $2000 | $2000 | $2000 |
| Keeper Residences | 0 | 0 | 0 | 0 | 0 |
| Out buildings | $600 | $600 | $600 | $600 | $600 |
| Total | $2600 | $2600 | $2600 | $2600 | $2600 |

In summary, all relevant structures located on the Reservation are currently in a good state of preservation. Many, such as the light tower, fog signal building, and upper storage building underwent complete restoration in 1998. The keepers' residences have been restored and preserved by the Baker's Island Association through its members at their expense and it is not anticipated that this arrangement will change if the deed is awarded to the Society.

# III.  USE PLAN

## Ecology

The ecology of Baker's Island must, of necessity, play a major role in the development and implementation of any use plan for the Reservation.  The Reservation is such an integral part of the island that any activity occurring there is felt throughout the island.  Society members are keenly aware of these impacts.  Over the years, they have experienced first hand the consequences of inattention to fire hazard, water rationing, and wastewater disposal challenges.

Ecologically, Baker's Island, sustains families and visitors at some 62 cottages and has reached the maximum capacity for the ongoing viability of its ecosystem.  (See environmental analysis Exhibit 1).  A fragile balance has been reached in such ecologically sensitive areas as water consumption, wastewater generation and disposal.  For example, during summers with drought conditions the artesian wells, which islanders use for potable water are stressed requiring self-policing.  Sometimes, voluntary water rationing is required.  Such conditions can compromise water quality and the wells have been known to run dry.  "Water supplies at the Island Light Station became alarmingly short in 1962 and 1963.  The Coast Guard sent the *White Heath* to fill the station's reservoirs."[4]  This condition would certainly be aggravated by the uncontrolled public use of Reservation facilities.  In fact, in 1998, during the 200th celebration of the lighthouse, forty non-island guests attended the ceremonies.  They were given access to the keepers' residence facilities.  Midway through the celebration the Reservation well ran dry which required the facilities to be secured.  Even if water supplies were plentiful, wastewater disposal is problematic because of the large amount of granite ledge that constitutes a large portion of the island.

In the late 1980's the Coast Guard, in an attempt to upgrade the Reservation's wastewater disposal capabilities, installed a new CROMOGLASS MODEL CA-5 Sewage Treatment System.  The system serves both keeper residences.  When installed, it was a state of the art system.  It consists of a fiberglass tank of approximately 1000 gallons capacity with multiple chambers and pumps to move effluent through a four-stage treatment system including automatic chlorination, and a timing clock with micro switches to control two pumps.  The system is designed to operate at four-hour cycles.

Regrettably, when the system was installed by the contractors no orientation, training or instruction manuals were provided to the operators.  No chemicals or operating instructions were even discussed.  As a result, the system has never operated as designed but serves as a large holding tank.  In fact, the inoperative pumps have been removed.  Additionally, the fiberglass shell was cracked prior to the tank's installation and it is unknown if the crack was repaired prior to the tank's burial.  While the unit may function satisfactorily for the limited number of people it currently serves, it clearly will not support heavy continuous use by large numbers of people.

---

4 Now, Then Baker's Island, DeWitt D., Wise, pg 170, BIA, Inc., Baker's Island, Salem, MA 1964

Because of these unique circumstances, there can be no guarantee that the reservation will be able to support public use activities on an *unlimited basis*. Expert opinion indicates that such usage would cause irreparable damage to the existing island ecology. During the early 1970's, the Coast Guard flirted briefly with disposing of the property but eventually decided against such action. During the late 1970's, the Salem Sound islands and surrounding areas were considered for nomination as an Area of Critical Environmental Concern (ACEC) by the state of Massachusetts. During both these events, many reports were written, public hearings held, and expert opinions offered regarding the island. At the time, Joseph S. Larson, Ph.D., consultant in Natural Resources, offered these opinions about Bakers Island and the Reservation in his report dated December 11, 1971 prepared for the Baker's Island Association for submission to the Coast Guard and General Services Administration.

- "Disposal of Coast Guard land and buildings, to persons or agencies immune to community concern and influence would threaten the welfare of the community as a whole".

- "If Coast Guard land were disposed to users who would put added demands on either the groundwater or add septic tanks, serious health problems could arise".

- "The reservation, if disposed of to users which would place an undue demand on the water or septic systems, represents a potential threat to the community". Final disposition of the property should "Preclude any new activity which would exceed the safe limits of water supply, septic disposal systems and police protection".

Also at the time, a Massachusetts Coastal Zone Management report stated that the fragile ecology, existing on Baker's Island, cannot be restored once altered. "Such an Island," the report continues, "provides habitats and scenic qualities rare along this highly developed area of the Massachusetts coast." The State Coastal Zone Management Task Force on Salem Sound recommended in Recommendation No. 8, "If publicly owned property is to be disposed of its future use should be that of conservation or passive recreation consistent with the existing zoning restrictions and managed by a private non-profit conservation trust." Other experts concur in the opinion that further population growth cannot be supported by the natural environment of Baker's Island. Larger numbers of people means more adverse environmental impact resulting in significant ecological degradation of the island.

Also at that time, Salem Mayor Jean A. Levesque wrote to a member of the Baker's Island Association in part, "Both as an individual property owner and a member of the Baker's Island Association, you are justified in your efforts to preserve the private status of Baker's Island.....I pledge to you my full support in protecting the Island and its inhabitants against unwarranted, inappropriate governmental interference."

Fire is a major concern on Baker's Island. There have been a series of devastating fires that have affected the island over the years and heightened islanders' sensitivity to this danger. Like a ship at sea, an island community, such as Baker's must be ever vigilant because of the unique threat posed by its isolation.

Baker's Island boasted a very popular grand hotel, the Winne-Egan, of four stories in the late 1800's. In the spring of 1906 a fire destroyed the hotel. "The hotel enterprise lasted slightly less than twenty years and little remains to recall its history."[5] The hotel was not rebuilt.

In May of 1926, Misery Island, just a half mile west of Baker's was consumed by fire. A Casino and eight other buildings were lost. They were not rebuilt. A number of good sized firebrands were carried to Baker's on a northwest breeze and landed on the Reservation but did not result in a fire on Baker's because of the response by island residents.

Although not directly impacting the island itself, Salem's huge and disastrous conflagration of June 25, 1914 made a lasting impact. Seven island families watched as their homes on shore burned. That same year, the Baker's Island Association was formally incorporated and the island's first true "community hall" was built. It was a 30 x 50 foot structure built by islanders. The hall served as a community center, meeting hall, and hosted religious services until August 27, 1954 when it was destroyed by fire. "At 11:45 that night, disaster struck – the Hall burned to the ground."[6] Planning for a replacement structure began that same season and the new structure, Burnham Hall, was dedicated in 1955.

It should not be surprising that fire is such a major concern to islanders. Accordingly, great attention has been directed to fire protection. Located on island are two firehouses. Each is home to tractors equipped with fire hose and radio communications dedicated exclusively to fire protection. Pumping equipment consists of one fixed 500 gallons per minute (gpm) pump at the main station, one portable pump of 500 gallons per minute capacity, and one smaller booster pump with manifold connections supporting six attack hoses. The portable 500 gpm pump serves as a booster pump or can be used to feed salt water from the sea if necessary in drought conditions. The main source of fire fighting water is the pond located in the center of the island. Fire fighting foam is also available. Regular fire drills are held and even the island teenagers are well versed in the operation of the fire equipment. Sufficient hose is available to reach every location on the island, including the reservation. The equipment is exercised regularly during the season. Everyone, except guests, is a member of the volunteer fire department and attendance at fire drills is mandatory. Even guests get indoctrination lectures about fire hazards.

---

5 Baker's Island, Now and Then, DeWitt D. Wise, pg 37, BIA, Baker's Island, Salem, MA 1940
6 Now, Then, Baker's Island, DeWitt D. Wise, pg 127, BIA Inc., Baker's Island, Salem, MA 1964

## Public Access

Today, physical access to the Reservation remains problematic due to its remote location and lack of public docking/landing facilities. The Reservation, however, has always been visible from the water and experiences a myriad of boat tours during the summer months which provide passengers an unobstructed view of the lighthouse structure from Salem Sound without adversely affecting the island ecology.

According to Massachusetts's law, the Reservation beach is legally accessible and available to the public at any time for "fishing, fowling, and navigation". However, from a practical and realistic standpoint, it is important to remember that this beach is dotted with jagged rocks and is subject to heavy swells, breaking waves, and strong currents. Moreover, this area experiences a significant tidal range of twelve feet that presents a range of beach profiles depending on the tidal stage. Also, the geomorphology of this area as a high energy, cobble beach, sometimes presents unanticipated changes in the beach profile. All are hazards, that even in good weather conditions, present challenges to experienced boaters and in adverse weather conditions present a significant and serious safety threat. See attached photographs at pages 18a-18d for examples.

Knowledgeable and experienced boaters do not venture close to the shore in such conditions. Furthermore, it is unsafe to attempt to secure vessels directly to this cobble and rocky beachfront. The harbor master authorities with jurisdiction have classified the area as "exposed waters" for anchorage regulations. That is the most severe and restrictive classification. The Society believes that individuals should not be encouraged to approach the beach due to the concern for their personal safety. Weather in the northeast portion of the United States is unpredictable and squalls can erupt abruptly. "...the ferry *Surf City* was returning to Beverly from the island on the Fourth of July, 1898, after disembarking passengers at Salem Willows, when she was struck by one of those savage squalls that erupt so unexpectedly across Salem Bay; she swamped and sank like a stone. Though in less than seven feet of water, eight of the sixty on board--all women and children--were trapped in the cabin and drowned."[7]

Furthermore, because of its northerly exposure, the beach is often inundated by heavy swells caused by ocean storms. Pleasure boats speeding by the island also create dangerous wave actions. Storm swells enter the shipping channel from the north, break in the shallow waters rounding the light station point and crash onto the Reservation's cobble beachhead. Wakes from passing vessel traffic make a more frontal assault on the beach. These hazardous conditions have caused the capsizing of watercraft in the past. (See page 18d). Rescue resources are no longer located in the immediate vicinity making a rapid response from either the Coast Guard or a Harbormaster unlikely. Because use of the wharf has been granted exclusively to the Society, the beach remains the only access point for public egress should another organization be awarded the property.

The Society is committed to arranging public access opportunities and has secured permission from the Baker's Island Wharf Company for the use of their pier, the

---

[7] The North Shore, Joseph E. Garland, pg 218, Commonwealth Editions, Beverly, MA 1998



Above: Baker's Island Reservation looking ESE   Below: looking SSE





Above: BI, Coast Guard Beach looking N at mid-tide.  Below:  Expanded view of same





Above: BI: looking E from Coast Guard Beach at high tide.
Below: Looking NE at low tide





Baker's Island: Boating mishap--even experienced boaters have been known to have
difficulties--even in apparently relatively calm conditions.



only pier on the island. No other organization interested in securing the property can offer this. In addition, the Society can accommodate handicapped visitors. Again no other interested party can offer this advantage. The Society, however, is very sensitive to the fragile nature of the Island environment and equally committed to proceeding at a deliberate pace with due regard for the potential irreversible adverse consequences that could result from a hastily developed and ill conceived public access plan. Access should not come at the expense of the protection and preservation of the island ecosystem.

Currently, there is no public access at all. Therefore, future public access would be more than currently exists and should be developed and expanded in a deliberate and responsible manner. That is the approach the Society is committed to pursuing. Toward that end, the Society is pursuing several scenarios that address both public access as well as collaborative educational opportunities at the Reservation.

### Public Access Scenario One

The first and most promising scenario envisions partnership with interested local mainland town historical societies or other cultural organizations wherein those organizations solicit interest from their members and the general public regarding their desire to visit the Reservation. For example, preliminary contact has been made with the Executive Director of Historic Salem Inc. to gauge potential interest. Since its inception in 1944, Historic Salem Incorporated has operated as a non-profit whose mission is to ensure that the historic resources of Salem, which are the key to its identity, its quality of life, and its economic vitality, are preserved for future generations. Because the mission of Historic Salem Inc. complements that of the Society so well, there is interest by both parties in pursuing additional discussions if the Society is successful in obtaining the light station deed. Historic Salem Inc. currently sponsors such events as the annual Bowditch Initiative that offers an ideal theme focus for light station tours. The Society will seek cooperative arrangements with other organizations as well, and preliminary contact has also been made with the Manchester-By-The-Sea Historical Society.

Public access tours to the Reservation will be met at the wharf and guides will provide educational and historic background to enhance the visual experience. The occupants of the #1 keepers' residence have indicated a desire to set aside a room in the house to be utilized as a museum. The number and frequency of tours conducted would depend on cumulative ecological impact, weather, and ferry availability.

### Public Access Scenario Two

The second scenario, although highly problematic, envisions the use of the helicopter pad located adjacent to the Reservation's light tower. If feasible, commercial helicopter tours could emanate from Beverly, Massachusetts airport or any surrounding community airports that support helicopter services. As in the first scenario, tours would be individually met upon arrival and escorted with walking commentary about the grounds. Undesirable aspects of this proposal include public cost, limitations in the number of trips, noise, ecological damage to the helicopter pad, and probable objections

by Baker's Island residents. Further, liability issues could cause insurmountable obstacles. Of course, the idea could be eclipsed entirely by objections of the Coast Guard or other federal agencies. While considered a "long shot", this plan deserves some measure of consideration. The Society believes the helicopter pad would be better limited for Coast Guard and emergency access.

Should the Society succeed in its efforts to obtain the Reservation one or both of the aforementioned scenarios would be implemented. Admission to the Reservation on a per person basis would be charged. The modest revenue expected is reflected in the financials but is not relied upon as the primary source for future Reservation preservation. The Society believes that those who most cherish the property will be willing and able to fund its future maintenance rather than relying on visitors who are lighthouse enthusiasts for the primary source of funding. See the financial plan at page 22 for details.

## Educational Initiatives

In addition to the public access initiatives that are targeted at the casual visitors, the Society is committed to pursuing educational collaboratives at the elementary, secondary, and collegiate levels. The Reservation represents the ideal setting for the study of coastal and marine ecosystems as well as the maritime history of the region. Several preliminary contacts have been made and detailed discussions are currently underway to explore them all.

### *Elementary and Secondary School Collaborative Initiatives*

The Society has been in touch with educational institutions such as the Stoneridge Children's Montessori School in Beverly. Part of the Montessori curriculum entails the study of and nurturing of the global environment. As such the school is exploring field trips to the Reservation to study island ecosystems as well as the island's place in the region's maritime history. Initial contacts have been very promising and this educational aspect will be developed and implemented if the Society is awarded the property.

### *Collegiate Collaborative*

Similarly, institutions of higher education are also on the Society's radar. If the Society successfully secures the light station deed, the Society and Gordon College of Wenham, Massachusetts, have agreed to collaborate in establishing a marine biology laboratory at the lighthouse site. For several years, Gordon has offered a Marine Biology Institute during the summer months, a program that has drawn often on the people and the facilities of the Woods Hole Oceanographic Institution. Located on the North Shore of Boston, Gordon College is in close proximity to Baker's Island, and the lighthouse site would expand the work of the Marine Biology Institute by providing students a nearby base for research and study. Gordon College has one of the few marine biology programs among private colleges in the nation, and the faculty have won many grants and distinctions with their work on wetlands, environmental science, and the study of marine ecology. For instance, Gordon professor Dr. Richard Wright is the co-author of the most

popular environmental science textbook and the leading expert in the restoration of estuaries in Essex County, Massachusetts, while Gordon's marine biologist Dr. David Shull is currently administering a large NOAA grant studying harmful algae bloom in Massachusetts Bay with his students.  Through the Marine Biology Institute, Gordon and the Society would not only provide students an exceptional site for learning, but also, quite importantly, would help assess the ecological condition of Salem Sound.  The Society is delighted that the institute would conduct scientific study of Salem's marine environment by using the station facilities, and anticipates that the results that those studies can be offered as a marine ecological barometer for the region.  One of the distinctive features of the Marine Biology Institute and the biology programs at Gordon College has been the public presentation of the results of student research.  Use of the lighthouse site would increase opportunities for students to conduct research on topics of special relevance to the local community.

# IV.  FINANCIAL PLAN

## Background

   The unique nature of Baker's Island and the Reservation necessitates a financial plan grounded in the extensive experience of the Society's members in island structures' maintenance. The Reservation is in good shape with the light tower having undergone complete turnkey restoration in 1998 by the Coast Guard. The buildings currently under license to the Baker's Island Association receive routine maintenance continuously. Because of its recent rehabilitation, the expected on-going maintenance cost for the beacon over the next five years is estimated at $10,000. The contractor, Martin S. Nally, who effected the restoration has agreed to be available for future repairs and consultation.

   The two keepers' residences, which underwent restoration by the Baker's Island Association in the 1980's, are currently occupied by islanders (under sub-license) with the stipulation that the residences condition be maintained to Coast Guard specification by the occupants at their own expense. This includes carrying liability and fire insurance on the dwellings also at their expense. The 'out buildings", lower storage building (stone construction), signal house building (brick construction), and upper storage building (brick construction) are in good repair and will require mostly cosmetic (e.g. paint, shingles) improvements over the next five years at an estimated cost of $3,000. The grassy knoll abutting the lighthouse, surrounding the keepers' quarters, including the helicopter pad and adjacent field is maintained (mowed) by the residents of the keepers' quarters at no expense to the Society.

   Liability and fire insurance for the station will cost approximately $3500 per annum for a five year projected cost of $17,900. If the deed is awarded to the Society, all structures will be subjected to a thorough examination to ascertain if they are indeed being maintained to Coast Guard specifications. If they are not, appropriate steps necessary to effect repairs will immediately be implemented.

   For more than one hundred fifty years, Baker's Island residents have taken pride in restoring and maintaining their own cottages and community structures as well as their wharf. Contract labor has been occasionally utilized, but only in a few cases when specialized equipment or specific expertise has been required. Society members have demonstrated their ability to restore and maintain historic dwellings as evidenced by their membership in the Baker's Island Association, the entity that was responsible for rehabilitating the keepers' dwellings. Except for the light tower, it is anticipated that the labor necessary for the upkeep and repair of the Reservation structures will be provided by Society members free of charge.

   Current assets of the Society indicate a cash balance of approximately thirty thousand dollars. There are no liabilities and none are anticipated in the future. The most recent financial statements, un-audited, are enclosed. The cash shown on the Society's balance sheet represents unsolicited gifts received over the past three years plus accrued interest.

The following table projects income and expenses for the next five years. It is based on the premise that the Society will begin full fund-raising activity once awarded the deed to the Reservation. Fundraising strategy will follow a two pronged approach. The Society's goal is to solicit one thousand (1000) non-voting contributing memberships at fifty dollars ($50.00) per family on an annual basis generating fifty thousand dollars ($50,000). The ongoing goal will be to maintain these memberships at a minimum of one thousand (1000).

The second prong represents the initiation of a capital campaign. The goal, over a three-year time period, is to raise one million dollars ($1,000,000). The Society has already, on several occasions, been contacted by shoreline residents of north shore and Cape Ann towns (Beverly, Manchester-By-the-Sea, Gloucester) offering substantial financial donations to insure the preservation of the Reservation. It is in these areas, with sight lines of the Reservation, that our marketing efforts will be concentrated.

The following fiscal projections are based on FY 03 figures and no inflation factor has been included.

## Income

| Revenue Source | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| Memberships | $25,000 | $50,000 | $50,000 | $50,000 | $50,000 |
| Capital campaign | $300,000 | $400,000 | $300,000 | 0 | 0 |
| Admission Fees | $3,000 | $3,200 | $3,400 | $3,600 | $3,800 |
| Interest | $1,000 | $1,900 | $4,000 | $4,200 | $4,400 |
| Total(s) | $329,000 | $455,100 | $357,400 | $57,800 | $58,200 |

## Expenses

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| Lighthouse | $2000 | $2000 | $2000 | $2000 | $2000 |
| Keeper residences | 0 | 0 | 0 | 0 | 0 |
| Out buildings | $600 | $600 | $600 | $600 | $600 |
| Insurance | $3500 | $3600 | $3700 | $3800 | $3900 |
| Miscellaneous | $400 | $500 | $600 | $700 | $800 |
| Total(s) | $6500 | $6700 | $6900 | $7100 | $7300 |

| | | | | | |
|---|---|---|---|---|---|
| Endowment | $352,500 | $778,400 | $1,080,500 | $1,131,200 | $1,182,100 |

As previously noted, the lighthouse tower underwent complete restoration in 1998 and is not expected to require significant capital expenditures for approximately 15-20 years. Islanders leasing the keepers' residences from the Society similar to the way they are leased from the Baker's Island Association today are to maintain and insure the dwellings at their own expense. Upon thorough inspection of the keeper's residences by the Society, if either residence is found to be sub standard to Coast Guard specifications, then the expense for restoring them will be borne by the leasee as a condition of their prospective leases. Administrative costs such as filing fees, postage, and the like, are covered under miscellaneous expenses.

# V.    MANAGEMENT PLAN

## Baker's Island Lighthouse Preservation Society Background

The management plan assumes the Society will receive the transfer of the covenanted deed to the Reservation for the purpose of relieving the federal government of the burden of maintaining and caring for the station.

The Society was incorporated under the laws of the United States Government and Commonwealth of Massachusetts on April 6, 1999 and is recognized as a fully compliant tax-exempt 501(C)(3) organization. The corporation's sole mission is to preserve and maintain historic structures and lands on the Reservation and to engage in any and all activities in furtherance of, related to, or incidental to, these purposes.

The Society is governed by a board of directors that has the right to exercise all powers of the corporation as permitted by law. The corporate bylaws call for a minimum number of directors to be 13 and a maximum of 17. Moreover, to insure a continued link between the Society and the Association, the Society's bylaws specify that the current President of the Association is a non-voting ex-officio director. There are currently 15 directors of the Society, with the board determining the length and number of terms to be served by directors. Any vacancy occurring in the board of directors will be filled by the board of directors. The officers are elected annually by the board of directors at the annual meeting. Each officer holds office until a successor has been elected and qualified. A vacancy in any office because of death, resignation, disqualification, or otherwise may be filled by the board of directors for the un-expired portion of the term.. The current corporate officers of the Society are:

> Thomas Hallowell, President
> Linda Golden, Treasurer
> Ruth Hunter, Clerk

The Society's bylaws stipulate that the corporation shall have no corporate members, but may establish a non-voting contributing membership for fundraising and development purposes. Recruitment of non-voting members has been put in abeyance pending the outcome of the disposal process. The Society was formed solely to receive conveyance of the station and reservation and to insure their preservation and maintenance. Should its efforts not prevail, the Society would disband.

## Personnel

Many directors and advisors to the Society bring specific areas of expertise to hand in aid in the accomplishment of its mission. All directors and advisors serve on a volunteer basis with no remuneration from the Society for their services. All have held various positions on the Baker's Island Association, Baker's Island Homeowners, and/or Baker's Island Wharf Company boards at one time or another. A brief introduction to some of the directors follows. Of note is that the officers are not property owners.

- ◆ Mr. Hallowell, director and president, (non property owner) a former Baker's Island Association president, is a co-founder of the Stoneridge Montessori School located in Beverly, Massachusetts. He has been engaged in several areas of the financial services industry for 30 years. He has acted in the capacity of educator having lectured at the New England School of Law on estate investment management practices. He was employed by The First National Bank of Boston for 17 years as a senior investment counselor, a post he has held for the past 13 years at Essex Street Associates located in Beverly, Massachusetts. In addition to his fiduciary responsibilities as a Trustee, Mr. Hallowell has extensive expertise in the field of venture capital and sits on the boards of several companies some of which are: Neogenesis Pharmaceuticals, Airpacks, Inc., Thermoceramix, and Verdasys. He also serves as Chairman of Neogenesis Pharmaceuticals. Currently he is working on several initiatives in education in east Africa, particularly in Arusha, Tanzania.

- ◆ Mr. Edwin Stiles, director, (property owner) was also an Association president and prior to his retirement was the Supervisor of Buildings and Grounds in charge of all grounds, facilities, building maintenance, and custodial personnel for the North Reading, MA public school system for 25 years.

- ◆ Mr. Dan Morse, director, (non property owner) is a geographic information systems specialist for the Nature Conservancy. Mr. Morse is responsible for developing a marine and coastal conservation program spanning the North Atlantic coast from Maine to Delaware. His current work includes an integration of conservation efforts for the terrestrial, freshwater, and marine bio-diversity of the North Atlantic Coast ecoregion.

- ◆ Mr. Roy Anderson, director, (property owner) was the former head of the Danvers, Massachusetts, YMCA. He served in that capacity for 33 years where he was responsible for the overall operation of the YMCA with an average membership of 3,000. He is also a former president of the Association.

- ◆ Mr. Phil Smith, society advisor, (property co-owner) is a member of the Baker's Island Ecology Committee, serving as its chair since 1995. He is a past president of the Wharf Company. He served more than 20 years as a commissioned officer with the Coast Guard where his major responsibilities included environmental protection and emergency response. He worked on various water quality and environmental initiatives at the international level. More recently, he was the Deputy Director, Massachusetts Coastal Zone Management Office (MCZM) where he managed and directed MCZM operations including oversight of two National Estuary Programs. He supervised technical and non-technical staff, environmental program and policy development, and federal grant management. MCZM is the lead state agency for coastal policy development and implementation.

♦ Ms. Ruth Hunter, clerk and director, (non property owner) is Chief, Intermodal Logistics Systems Planning and Integration Division at the U.S. Department of Transportation, Volpe National Transportation Systems Center in Cambridge, MA. Her responsibilities include the positions of Division Chief, Senior Project Manager and multi-disciplinary technical leader of numerous emergency management, national and homeland security, environmental management, logistics, cost/benefit analysis, and automation projects for Department of Defense, Department of Transportation, Department of Energy and other federal agencies. The projects involve program planning; economic, business process, and systems analysis; communications; training; continuity of operations and configuration management planning; engineering analysis; and the application of advanced technology to enhance operations. Ms. Hunter has been a registered professional engineer in Massachusetts since 1972. Among the many awards and citations she has received is the President's Award for NASA Lunar Program in 1969. More recently she received the DOT Achievement Award for work with the Federal Emergency Management Agency moving urban search and rescue teams after the 9/11 terrorist attack on New York.

♦ Ms. Susan Smith, director, (property co-owner) has been a special needs educator for more than 11 years. She is currently employed in the Derry Cooperative School District in Derry, New Hampshire where she works with special needs students in the school system's inclusion programs. She is a former Association board member.

## Baker's Island Association

The Baker's Island Association was formed as an act of self-preservation. The genesis of the association was in 1910 when the residents recognized the need to organize. By 1914 the association was formally, and more importantly, *legally* established under the laws of the commonwealth. "Faced with languishing ferry service and a rotting pier, the islanders in 1914 organized the Baker's Island Association to advance their welfare and establish Sunday religious services. Their object was self-government, since about all they got from the city of Salem was receipts for their taxes--and for that they had to supply their own post office...As the years passed, the association ensured reliable ferry service and divine services, provided fire protection...".8 Today the Baker's Island Association is responsible for the preservation of the historic, cultural, and societal aspects of island life. Membership in the BIA is available to any person or persons owning a cottage on the island **and** to any person eighteen (18) years of age or over who is in sympathy with the objectives of the Association. Prospective new members must be proposed to the board of directors who present the applicant's name to the Association for a vote of acceptance. The association's current membership stands at 249, more than half of whom (147) do not own property on Baker's but do share a love of the island and it's objectives.

---

8 The North Shore, Joseph E. Garland, pg 218, Commonwealth Editions, Beverly, MA, 1998

A review of the Baker's Island Directory 2003 reveals that association members hail from 24 different states and one foreign country. Members include a broad mix of people with many different backgrounds and professional skills. Included are a combination of currently active and retired health care providers, including two physicians and five nurses, who are available to render first responder first aid and assessments in emergencies. They have provided "Good Samaritan" emergency treatment and advice to both islanders and guests on numerous occasions in the past.

In 1968 the Baker's Island Association established a Long Range Planning Committee and charged it with the study and exploration of problems affecting the future of the island community. The committee submitted its report in 1970. Among other things it addressed was security, conservation of natural resources, pest control and the financial capability of the island to underwrite various long range plans.

The Baker's Island Association's bylaws stipulate that a book be published every 25 years. To that end, the Association has published three books. Baker's Island Now and Then, published in 1940, Now, Then, Baker's Island, published in 1964, and A Baker's Island Chronicle 1964-1988, published in 1989, chronicle the history of the island. The association has several committees. The ecology committee is charged with the ongoing environmental protection of all areas of the island. In 1998, after several years in development, the Ecology Committee formalized some of its work and strategies by finalizing a Conservation Plan for Baker's Island. That plan identifies ecological information, targets and goals, threats, conservation strategies, and conservation zones with core and buffer areas delineated. It contains implementation guidelines and measures of progress. The plan is easily applied to the Reservation and if the Society is awarded the property this will be extended to officially include the Reservation lands. A copy of the plan is available upon request.

Baker's Island is considered by all islanders to be an important bird sanctuary as it sits directly in the North American Atlantic flyway. At any given time, there are more birds on Baker's Island than a similar sized area on the mainland. Raptors, loon, brandt, and woodcock constantly rest over, on, or around the island. The ecology committee erects and maintains birdhouses all over the island that attracts swallows, finches, and scores of other such species. It further protects the vernal pools and ponds on the island looking for invasive flora and eradicates those (such as purple loosestrife) which pose a threat.

Additional activities of the Ecology Committee include participation in the annual international coastal cleanup initiative known as Coastsweeps that is nationally sponsored by The Ocean Conservancy and locally sponsored by the Massachusetts Office of Coastal Zone Management and UMASS Boston, Urban Harbors Institute. For the past nine years the Ecology Committee has sponsored not one but two annual cleanups. The fall cleanup coincides with international efforts and an additional one is held on the island in the spring.

## Baker's Island Homeowners Corporation

The purpose of the homeowner's corporation is to provide cooperative public utility service for all Baker's Island homeowners and for the Baker's Island Association and the Baker's Island Wharf Company. The by-laws stipulate that services shall be sold or conveyed to Homeowner's Corporation members only. Membership consists of the incorporators, owners of cottages on Baker's Island, the Baker's Island Wharf Company, and the Baker's Island Association.

## Baker's Island Wharf Company, Inc.

The wharf company's primary responsibility is for the maintenance, repair, and safety of the wharf. It is also charged with authorizing the use of and stipulating the conditions under which a ferry service may utilize the pier, as well as provisioning and operating the island store and providing a tractor driver to serve the store. Owners of new, independently habitable dwellings on Baker's Island are issued shares of Wharf Company stock which entitles them to use of the pier and conveys upon them the responsibility for all assessments and fees levied by the corporation.

## Security

During the spring, summer, and fall, islanders are in residence and vigilant about unauthorized visitors. By late fall, all island homes are winterized and closed. The Baker's Island Association in conjunction with the Baker's Island Homeowner's Corporation provide security to the island from late fall through the spring by hiring caretakers who reside on the island in provided quarters. The caretakers make daily rounds of the island and are responsible for the protection of the island during the winter. They are in radio and cell phone contact with local authorities as well as the Coast Guard. Currently they have no formal responsibility relative to the Reservation but as a courtesy include the Reservation in their daily rounds. They alert the Coast Guard if the light or fog signal is not working properly or the property suffers damage. Should the Society succeed in obtaining the Reservation, it will pursue a cooperative agreement with the Homeowners Corporation to have the winter caretakers include oversight of the reservation in their responsibilities.

# VI    Qualifying Criteria

Enclosed is a copy of the approval of the Society for non-profit 501(C)(3) status. Also enclosed are copies of letters of support from various organizations (including The Norman Rockwell Museum, the Manchester-By-the Sea Historical Society, the Coast Guard, the Baker's Island Association, Baker's Island Homeowners Corporation and Baker's Island Wharf Company among others.)

## Summary

Baker's Island does not fit the traditional Coast Guard reservation scenario. It is not on the mainland or a peninsula and thus is not readily accessible via highway or footpath. It is not a lighthouse on a shoal. It is not near a town. It is a small (1/2 mile long) private island where the landowners and Coast Guard personnel have co-existed successfully to each other's benefit. As an aside, after the Coast Guard vacated its property with the automation of the light (1972), island residents and their caretakers, in turn, have kept the Coast Guard property free from vandalism and mischief with year round stewardship for the past 30 years.

As previously noted, inhabitants of Baker's Island individually and through the island's attendant governing bodies, have enjoyed a harmonious relationship for more than 200 years with the Coast Guard and its predecessors. Even seemingly small demonstrations of responsibility are important. While the Coast Guard's physical presence has been absent since 1972, islanders continue to see to it that the national ensign flies daily off the yardarm of the light tower. Prior to technology advances that allow the Coast Guard to remotely monitor the light performance, islanders routinely reported outages, malfunctions and maintenance needs to the Coast Guard. They still serve as a valuable backup to the Coast Guard's remote sensing systems.

No better demonstration of able capability and history of successful preservation management and restoration can be found than currently exists on Baker's Island. The islanders' stewardship of the Reservation with the Coast Guard, and their longstanding history of the same, is a testament to more than two hundred years of the commitment and devotion to the Reservation by Baker's Island residents and their predecessors. The children of several families on Baker's are currently fifth generation islanders. As previously noted, today there are 62 cottages, 102 property owners and 147 non-property owning members of the association. Mr. Joseph E. Garland observed in 1998, "By the mid-1920s, there were 58 snug cottages and 170 congenial summer souls on Baker's, a census and a consensus, virtually unchanged fifty-five years later. A happy and unpretentious island, an island that works, a tight little island-...".[9]

What Mr. Garland did not note is the deep love and devotion islanders have for the Island and the Lighthouse. It is that devotion that will insure the Reservation is in the best possible hands should the Society be awarded the property.

---

[9] The North Shore, Joseph E. Garland, pg 219, Commonwealth Editions, Beverly, MA, 1998

INTERNAL REVENUE SERVICE
DISTRICT DIRECTOR
P. O. BOX 2508
CINCINNATI, OH  45201

DEPARTMENT OF THE TREASURY

Date:    JUL 2 0 1999

BAKERS ISLAND LIGHTHOUSE
 PRESERVATION SOCIETY INC
BURNHAM HALL SUNSET AVE
MANCHESTER-BY-THE-SE, MA  01944

Employer Identification Number:
 31-1654146
DLN:
 17053169012019
Contact Person:
 JOSEPH LAUX              ID# 31077
Contact Telephone Number:
 (877) 829-5500
Accounting Period Ending:
 Decmeber 31
Foundation Status Classification:
 509(a)(1)
Advance Ruling Period Begins:
 April 6, 1999
Advance Ruling Period Ends:
 December 3, 2003
Addendum Applies:
 N

Dear Applicant:

     Based on information you supplied, and assuming your operations will be as
stated in your application for recognition of exemption, we have determined you
are exempt from federal income tax under section 501(a) of the Internal Revenue
Code as an organization described in section 501(c)(3).

     Because you are a newly created organization, we are not now making a
final determination of your foundation status under section 509(a) of the Code.
However, we have determined that you can reasonably expect to be a publicly
supported organization described in sections 509(a)(1) and 170(b)(1)(A)(vi).

     Accordingly, during an advance ruling period you will be treated as a
publicly supported organization, and not as a private foundation.  This advance
ruling period begins and ends on the dates shown above.

     Within 90 days after the end of your advance ruling period, you must
send us the information needed to determine whether you have met the require-
ments of the applicable support test during the advance ruling period.  If you
establish that you have been a publicly supported organization, we will classi-
fy you as a section 509(a)(1) or 509(a)(2) organization as long as you continue
to meet the requirements of the applicable support test.  If you do not meet
the public support requirements during the advance ruling period, we will
classify you as a private foundation for future periods.  Also, if we classify
you as a private foundation, we will treat you as a private foundation from
your beginning date for purposes of section 507(d) and 4940.

     Grantors and contributors may rely on our determination that you are not a
private foundation until 90 days after the end of your advance ruling period.
If you send us the required information within the 90 days, grantors and
contributors may continue to rely on the advance determination until we make
a final determination of your foundation status.

     If we publish a notice in the Internal Revenue Bulletin stating that we

Letter 1045 (DO/CG)

-2-

BAKERS ISLAND LIGHTHOUSE

will no longer treat you as a publicly supported organization, grantors and
contributors may not rely on this determination after the date we publish the
notice.  In addition, if you lose your status as a publicly supported organi-
zation, and a grantor or contributor was responsible for, or was aware of, the
act or failure to act, that resulted in your loss of such status, that person
may not rely on this determination from the date of the act or failure to act.
Also, if a grantor or contributor learned that we had given notice that you
would be removed from classification as a publicly supported organization, then
that person may not rely on this determination as of the date he or she
acquired such knowledge.

      If you change your sources of support, your purposes, character, or method
of operation, please let us know so we can consider the effect of the change on
your exempt status and foundation status.  If you amend your organizational
document or bylaws, please send us a copy of the amended document or bylaws.
Also, let us know all changes in your name or address.

      As of January 1, 1984, you are liable for social security taxes under
the Federal Insurance Contributions Act on amounts of $100 or more you pay to
each of your employees during a calendar year.  You are not liable for the tax
imposed under the Federal Unemployment Tax Act (FUTA).

      Organizations that are not private foundations are not subject to the pri-
vate foundation excise taxes under Chapter 42 of the Internal Revenue Code.
However, you are not automatically exempt from other federal excise taxes.  If
you have any questions about excise, employment, or other federal taxes, please
let us know.

      Donors may deduct contributions to you as provided in section 170 of the
Internal Revenue Code.  Bequests, legacies, devises, transfers, or gifts to you
or for your use are deductible for Federal estate and gift tax purposes if they
meet the applicable provisions of sections 2055, 2106, and 2522 of the Code.

      Donors may deduct contributions to you only to the extent that their
contributions are gifts, with no consideration received.  Ticket purchases and
similar payments in conjunction with fundraising events may not necessarily
qualify as deductible contributions, depending on the circumstances.  Revenue
Ruling 67-246, published in Cumulative Bulletin 1967-2, on page 104, gives
guidelines regarding when taxpayers may deduct payments for admission to, or
other participation in, fundraising activities for charity.

      You are not required to file Form 990, Return of Organization Exempt From
Income Tax, if your gross receipts each year are normally $25,000 or less.  If
you receive a Form 990 package in the mail, simply attach the label provided,
check the box in the heading to indicate that your annual gross receipts are
normally $25,000 or less, and sign the return.  Because you will be treated as
a public charity for return filing purposes during your entire advance ruling
period, you should file Form 990 for each year in your advance ruling period
that you exceed the $25,000 filing threshold even if your sources of support
do not satisfy the public support test specified in the heading of this letter.

                                                      Letter 1045 (DO/CG)

-3-

BAKERS ISLAND LIGHTHOUSE


If a return is required, it must be filed by the 15th day of the fifth month after the end of your annual accounting period. A penalty of $20 a day is charged when a return is filed late, unless there is reasonable cause for the delay. However, the maximum penalty charged cannot exceed $10,000 or 5 percent of your gross receipts for the year, whichever is less. For organizations with gross receipts exceeding $1,000,000 in any year, the penalty is $100 per day per return, unless there is reasonable cause for the delay. The maximum penalty for an organization with gross receipts exceeding $1,000,000 shall not exceed $50,000. This penalty may also be charged if a return is not complete. So, please be sure your return is complete before you file it.

You are not required to file federal income tax returns unless you are subject to the tax on unrelated business income under section 511 of the Code. If you are subject to this tax, you must file an income tax return on Form 990-T, Exempt Organization Business Income Tax Return. In this letter we are not determining whether any of your present or proposed activities are unrelated trade or business as defined in section 513 of the Code.

The law requires you to make your annual return available for public inspection without charge for three years after the due date of the return. You are also required to make available for public inspection a copy of your exemption application, any supporting documents and this exemption letter to any individual who requests such documents in person or in writing. You can charge only a reasonable fee for reproduction and actual postage costs for the copied materials. The law does not require you to provide copies of public inspection documents that are made widely available, such as by posting them on the Internet (World Wide Web). You may be liable for a penalty of $20 a day for each day you do not make these documents available for public inspection (up to a maximum of $10,000 in the case of an annual return).

You need an employer identification number even if you have no employees. If an employer identification number was not entered on your application, we will assign a number to you and advise you of it. Please use that number on all returns you file and in all correspondence with the Internal Revenue Service.

If we said in the heading of this letter that an addendum applies, the addendum enclosed is an integral part of this letter.

Because this letter could help us resolve any questions about your exempt status and foundation status, you should keep it in your permanent records.

We have sent a copy of this letter to your representative as indicated in your power of attorney.


Letter 1045 (DO/CG)

-4-

BAKERS ISLAND LIGHTHOUSE


If you have any questions, please contact the person whose name and telephone number are shown in the heading of this letter.

Sincerely yours,

District Director

Enclosure(s):
Form 872-C

**U.S. Department of
Homeland Security**

**United States
Coast Guard**

Commander
United States Coast Guard
Group Boston

427 Commercial Street
Boston, MA 02109
Phone: 617-223-3209
Fax: 617-223-3318

16500
October 7, 2003

Mr. Thomas Hallowell
President, Baker's Island Lighthouse Preservation Society Inc.
Salem, MA 01970

Dear Mr. Hallowell:

This letter is to acknowledge the outstanding work of your organization over the past 25 years in maintaining and preserving the historic Coast Guard property at Baker's Island. As our leaseholder for this property over these many years, it has been simply amazing to see the efforts of your organization to ensure this historic lighthouse and property have been diligently cared for and preserved for the benefit of maintaining the maritime heritage that this great country possesses.

When your organization first accepted a lease from the Coast Guard, the two existing Keeper's Dwellings were in extremely poor condition and the grounds around the lighthouse were totally overgrown and inaccessible. Today, both dwellings have been repaired and historically renovated. The work by Ruth Buck and her family on the main quarters has been remarkable and is indicative of the dedication of your organization to ensure these structures are properly preserved. The surrounding grounds about the dwellings and the lighthouse tower are better today than they ever have been. All of the overgrown areas have been cleared and cleaned allowing for a beautiful natural field of grass to grow. Having recently visited the island again, I was simply amazed at just how beautiful the site looked.

I know the accomplishments of your organization over these many years has not been easy. It takes a lot of hard work, organizational skills and commitment to properly maintain these structures and surrounding property. And New England winters on offshore islands can be quite severe, further hampering the ability to accomplish this work. Yet, the Baker's Island Association has done a superb job of this, far exceeding our best expectations of a lessee. The celebration you held to commemorate the 200th anniversary of this lighthouse site was another example of your commitment and dedication to promoting our lighthouse heritage and having everyone enjoy this beautiful island.

Thank you and your organization for being the successful group that you have been for these many years and for all of the efforts you have made in preserving this historic lighthouse and property. Well Done!

Sincerely,

D. R. MAY
Captain, U.S. Coast Guard
Commander, Coast Guard Group Boston

# NORMAN ROCKWELL MUSEUM

1 October 2003

Re: Baker's Island Light & Baker's Island Lighthouse Preservation Society

9 Glendale Road
PO Box 308
Stockbridge, MA 01262

T 413.298.4100
F 413.298.4142

www.nrm.org

A *non-profit*
*educational*
*museum*

To Whom It May Concern:

This letter is written to encourage your support of the application of the Baker's Island Lighthouse Preservation Society's stewardship of the Baker's Island Light. I am writing to recommend the Preservation Society as the best stewards of this historic Light.

I am a summertime resident of Baker's Island, an experienced museum professional dedicated to the fields of art and architectural preservation, and am well versed in non-profit stewardship. I have observed the work of the Society over the past few years and can attest to their understanding of historic preservation and issues of maintenance and public access. They are a well-run group of passionate and concerned citizens who will ensure that the Light is meticulously maintained and supported educationally.

Baker's Island is a fragile environment. The Light is situated on the island to warn seafarers of the rocky coast and shoals that surround the island. The island has a fragile ecosystem that sustains a delicate balance of plant, animal and human life. Water systems are in careful balance with the ecology of plant and human usage. Transportation to the island is precarious most seasons of the year under certain weather and seasonal conditions.

The board and membership of the Baker's Island Lighthouse preservation Society understand the importance of the Light and its relationship with the island habitat and community. They will do an excellent job of providing appropriate public access consistent with preservation stewardship. This letter strongly endorses their application for ownership of the Light.

Please feel free to call me with any questions you may have.

Most sincerely,

Laurie Norton Moffatt
Director



**BAKER'S ISLAND WHARF COMPANY**

BAKER'S ISLAND, SALEM, MA  01970

September 16, 2003

Mr. Thomas Hallowell
President
Baker's Island Lighthouse Preservation Society
26 Pleasant St.
Wenham, Massachusetts 01984

Dear Mr. Hallowell:

As president of the Baker's Island Wharf Company, I have been authorized by the Wharf Company board of directors to write this letter of support for the Baker's Island Lighthouse Preservation Society. The Wharf Company strongly supports the Society's efforts to become the official owners of the Coast Guard property that was recently declared excess to the Coast Guard's needs.

As you know, the Wharf Company's primary responsibility is for the maintenance, repair, and safety of the wharf. It is also responsible for authorizing the use of and stipulating the conditions under which a ferry service may use the wharf. Membership in the Wharf Company is restricted to owners of cottages on Baker's Island. Membership entitles members to use the pier and conveys upon them the responsibility for all assessments and fees levied by the corporation. The wharf is privately owned by the Wharf Company, and unauthorized use of it is strictly prohibited.

By separate letter, the Wharf Company has previously authorized the Society to use the wharf in support of the Society's public access initiatives relative to the Society's efforts under the National Historic Lighthouse Preservation Act. The Baker's Island Wharf Company is very happy to offer this endorsement of the Society's efforts.

Sincerely,

Peter Golden
President
Baker's Island Wharf Company

Cc: Baker's Island Association
     Baker's Island Homeowner's Corporation

*Baker Island Homeowners Corporation*

September 19, 2003

Thomas Hallowell
President
Baker's Island Lighthouse
Preservation Society
26 Pleasant Street
Wenham, MA 01984

Dear Mr. Hallowell:

On behalf of the Baker's Island Homeowners Corporation, I would like to formally pledge our full support to your efforts to acquire and preserve the Baker's Island Light Station.

The Baker's Island Homeowners Corporation (BIHC) exists to provide cooperative public utility services for all Baker's Island homeowners, the Baker's Island Association, and the Baker's Island Wharf Company. BIHC will extend these services, including security and fire protection, to cover the property acquired by the Baker's Island Lighthouse Preservation Society.

Please let me know if there is anything further that the Baker's Island Homeowners Corporation can do to help your organization acquire and protect Baker's Island's historic landmark.

Sincerely,

Russell H. Stiles
President
Baker's Island Homeowners Corporation

*Salem Harbor, Salem, MA 01970*

September 30th, 2003

     As stated in the bylaws, the purpose of the Baker's Island Association is to conserve and promote the interests of Baker's Island and its residents and to promote the religious and social welfare of the islanders.

     As a fourth generation islander and as President of the Baker's Island Association I write this letter of support for the Baker's Island Lighthouse Preservation Society in their effort to gain control of the Baker's Island Coast Guard Reservation presently being excessed by the General Services Administration. I feel that the Baker's Island Lighthouse Preservation Society will best recognize the fragile ecology present on Baker's Island and will provide the best opportunity for conscientious stewardship of the property into the future.

Respectfully,

Christopher H. Haynes
President
Baker's Island Association

48R Monument Street
Wenham, Massachusetts 01984

September 23, 2003

Mr. Thomas B. Hallowell, President
Bakers Island Lighthouse Preservation Society, Inc.
26 Pleasant St.
Wenham, MA 01984

Dear Tom,

I write this letter because I am concerned about the future of Bakers Island and especially because I am concerned about how the disposition of the Coast Guard property will affect the future of Bakers Island. I thought that perhaps the point of view of a resident of nearly seventy years might help to enlighten those who will decide the fate of the Coast Guard property including the Bakers Island Light.

First, let me tell you a little about myself. It may help to understand my concern for what is happening if you know who I am and that I represent a large group of islanders who share my concerns. I came to Bakers Island the year I was born with my father and mother, and have enjoyed the island both summers and winters ever since. Unlike many islanders, I have spent at least five winters on the island as an unofficial caretaker assisting both my daughter and oldest son who were the official caretakers. I know from firsthand experience how vulnerable the island is to those who would vandalize, burn, deface and otherwise destroy what is there. I have personally assisted in discouraging potential vandals from landing during the winter months when we are most vulnerable to unwanted visitors. Many years ago when it became clear that the Coast Guard was going to automate Bakers Island, I was on the committee that worked with the Coast Guard and the GSA to secure the use of the Coast Guard houses for occupancy by our own caretaker. That led to the present arrangement we now have for the use and preservation of the property on the Coast Guard Reservation.

Over the years I have served on the organizations that were formed for the sole purpose of preserving Bakers Island. Those organizations include The Bakers Island Association, The Bakers Island Homeowners Corporation, The Bakers Island Wharf Company and The Bakers Island Resident Trust which was dissolved and combined with The Bakers Island Association a number of years ago. I have been involved with the writing of two of the three books about the island and presently serve as the treasurer of the next book to be written in the future.

Now, having said all of the above, perhaps the best way to convey my concerns for the future is to list those concerns and support them with some facts and first hand observations.

1. It is no accident that Bakers Island survives today, because its residents have gathered together over the years to be stewards for the preservation of island interests, beginning with the formation of The Bakers Island Association in 1914 to the present day. We have been organized and funded for the purpose of continuing a way of life and preserving a beautiful island from the fate that has visited other islands such as Misery, Children's, Tinkers and even Little Coney Island in the form of total destruction. No such fate has visited Bakers Island ever, and we are more determined than ever that it shall not.

2. We discovered many years ago that reliance on The City Of Salem or outside interests would not work to preserve Bakers Island. I would venture to say that not a single visit has ever been made to Bakers Island by the Salem Police or anyone else from Salem for the purpose of preventing vandalism. In fairness Salem has responded when asked to, when we have had a bad fire or medical emergencies, but not to prevent anything such as vandalism from happening. The facts are simple. We provide our own caretakers. We have our own fire department with some funding for equipment from Salem from our tax dollars. We control access to Bakers because we pay for and maintain our own wharf with our own money, and all property on Bakers Island is privately owned and maintained. Consistent tight control of our interests is key to our success. That must continue not only for our own interests, but for the preservation of the lighthouse property.

Perhaps the most compelling arguments for the control of the Coast Guard property by the Bakers Island Lighthouse Preservation Society are as follows:

1. The society is comprised of members who have served on the various island organizations with distinction and have helped to preserve Bakers Island, including the Coast Guard property for future generations. They have been one hundred percent successful in their efforts.

2. We know what stewardship means and how to achieve it. Our first steward was Capt. Joseph Perkins who as harbor pilot rowed out to our nations beloved U.S.S Constitution and saved her from almost certain destruction by the British. Down through all of the ensuing years we have demonstrated our ability to preserve what is precious. We have been consistently successful. Ask the Coast Guard about vandalism in other locations!

3. We don't have to claim that we might be able to succeed in preserving Bakers Island and the Coast Guard property. We have already done that and clearly no learning curve comes into play because we have been successful for all the years the island has been inhabited.

4. Because the Bakers Island Light Station is so much a part of the Bakers Island community and because as a community we provide year round protection for the island interests at our own expense, it makes sense that a well funded and well

organized group, which is already in place, should be able to best serve the long range goal of preserving this piece of history for future generations to come.

5. We know, because we have long since made the effort to explore the issue, that Bakers Island has just about reached the saturation point in human terms. Where there are people, pollution exists. More people in terms of unlimited access to Bakers Island will destroy a natural habitat for birds and waterfowl. Bakers Island enjoys a position as a natural stopping off point for a wide variety of migrating creatures. I have witnessed this because I have been there year round for so many years. Human waste and further exploitation can only serve to bring about the destruction of an already fragile balance of nature.

It is my intention to support the efforts to grant stewardship of the Bakers Island Coast Guard property to the Bakers Island Lighthouse Preservation Society. Common sense, not politics or selfish short term interests must prevail here and you have my total support in achieving this goal.

Sincerely,

Ronald H. Arthur

17 PROSPECT ROAD
MANCHESTER, MASSACHUSETTS 01944

Oct 7 2003

Dear Tom:

I have not yet passed this
by John Hoss, President of the Manchester
Historical Society, but I will shortly.

Your comments in the proposed letter to
the Interior Dept are fine by me.
You could, if you wish, mention that
(about 35 members of)
the MHS enjoyed a very nicely organized
visit and tour of the island several years
ago and would welcome the opportunity
to do it again — but perhaps you
don't even want to suggest to the
Department of Interior that island
residents would welcome regular tours

ly this general public would
would oppose any such activity
for several reasons.

#1. Private property rights of the residents.

#2 The ever-present risk of fire which
would be devastating to a small
island community with only primative
fire apparatos

#3. The expense of creating and maintaining
a public dock, handicap access etc
to accommodate very seasonal visits
by the public. Restrooms, water and
sewerage treatment would be also
be necessary and expensive

#4. The probability that Interior would
want the station manned.
I'm sure there are many more reasons to
oppose this pie in the sky idea.

Sincerely, Yours Reg

# Baker's Island
## Salem, Massachusetts



Environmental Analysis to Accompany Proposal

Submitted by Baker's Island Lighthouse Preservation Society, Inc.

**31 October 2003**

# ENVIRONMENTAL ANALYSIS

## Baker's Island Light Station
## Baker's Island
## Salem Harbor Approach
## Essex County, Salem, MA 01970

## Exhibit 1 to
## Baker's Island Lighthouse Preservation Society, Inc.
## Proposal to the National Park Service
### GSA Control No. 1-U-MA-822

## 31 October 2003

Prepared by    Dan Morse
               The Nature Conservancy, Eastern Resource Office
               11 Ave. de Lafayette, 5th floor
               Boston, MA 02111-1736
               phone: (617)542-1908 ext.238
               fax: (617)542-1620
               email: dmorse@tnc.org



# Baker's Island

Scale 1 : 3,000
(1 inch = 250 feet)

Baker's Island Lighthouse Station boundary
5' Contour

General vegetation:
Trees
Shrubs
Old field
Mowed grass
Marsh
Open water
Rock ledge
Rocky shore

This map shows vegetation types
from a color infrared airphoto taken
in March 1991.
    Contours were interpreted from a
1995 survey of houses' elevations.
Contour interval: 5 feet.
    Houses: Salem tax map, 1991.

Copyright (c) 2002, BIAS.



BAKER'S ISLAND

# Baker's Island
# Light Station



Gloucester

BAKER'S
ISLAND ★

Salem

Boston





# ENVIRONMENTAL ANALYSIS

## Baker's Island Light Station
### GSA Control No. 1-U-MA-822

Baker's Island Lighthouse Preservation Society,
Proposal to National Park Service
31 October 2003

## EXHIBIT 1

**ENVIRONMENTAL ANALYSIS OF PROBABLE IMPACTS:**
The National Environmental Policy Act of 1969 (NEPA) (P.L.91-190) requires an analysis of the probable environmental effects of the proposed project. The applicant shall provide information responsive to the environmental questionnaire found at the end of the application packet. The Applicant must furnish sufficient information to demonstrate that it has considered all environmental impacts cited in the questionnaire. Processing of applications will be deferred pending receipt of such information, since required assessment of the environmental impact of any particular project cannot be initiated without prior submission of such data by the applicant. Applicants are cautioned that conformance with these procedures shall not obviate the need for compliance with applicable State and local environmental use and review requirements. The GSA will examine the information and determine whether the analysis is acceptable. In the event that preparation of further documentation is necessary, the applicant may be requested to furnish additional materials to the GSA in order to prepare an Environmental Assessment or Environmental Impact Statement.

Provide a narrative explanation of the probable environmental effects of the proposed program of use and preservation occurring in each of the following 12 areas of importance. The environment should be considered as the area that the proposed project would both impact and serve. The greatest detail should concern the probable environmental impact of the project on the particular property and its surrounding community, both in the short and long term. This section should broadly and briefly discuss the geography of the area, wildlife, water and air quality, area population, and potential users of the service to be provided, the economy of the area, and any current environmental concerns.

**1.** Please describe the specific property that will be directly affected in terms of its current use and proposed use. If the land is in a natural state, please provide a brief description with respect to plant and animal life.

The property comprises approximately 10 acres on the northwest sixth of Baker's Island, the southernmost bedrock island of its size in New England, and the fourth largest south of Maine. Baker's and its neighbor Misery Island (the third largest, already in conservation) are a refuge for native plants and animals against heavy development pressure along Boston's North Shore. Located at the northern edge of the USDA's plant hardiness Zone 6, a heavy maritime influence moderates extreme temperatures, so some species with more southerly ranges (Carolina wren, sweetbay magnolia) mingle with others more typical of northern areas (common loon, snowy owl).

The lighthouse tower commands the Salem ship channel from an outcrop of Beverly syenite that is thinly overlaid by unconsolidated glacial till. Jagged cliffs rise from a depth of 40 feet from the ocean floor to an elevation of 60 feet. This ancient pluton withstood glaciation to become an island, while other nearby outcrops formed the dangerous ledges around Salem Sound.

The island's unique ecology requires particular environmental sensitivity. For example, a lack of surface water in its rocky, acid topsoil subjects flora to potentially serious degradation, particularly when exposed to heavy foot traffic. To avoid over-burdening this fragile ecosystem, the Society proposes to calibrate public access to the reservation to achieve a proper environmental balance. The proposed program of use and preservation includes no changes to the environment or structures, and carefully monitored levels of public access to the property, so the short- and long-term environmental impact of the project is negligible.

The property is in a primarily natural state, and supports a healthy mosaic of terrestrial, freshwater and marine natural communities:

- The station is largely covered by an early-successional woodland of staghorn sumac, eastern red cedar and bayberry. Although a century has passed since animals grazed here, exposure to salt spray and strong northwest winds have limited the growth of tall trees. The successional climax expected for this area is a mixed deciduous forest of oak and maple, mountain-laurel, and ferns, berries and sedges on the forest floor.[1]

- A shallow marsh straddles the property's southeast corner. Its watershed covers approximately 20% of the reservation, and runoff flows through this basin into the Island's main pond. Spring high water supports a shrub swamp around its perimeter, but by the end of summer this water usually evaporates completely, exposing sedge tussocks. Ducks, herons, rails and red-winged blackbirds feed on diverse amphibians and invertebrates adapted to changing water levels.

- North of the lighthouse promontory, the land plunges into the Salem shipping channel, and is especially exposed to strong prevailing winds in winter. The stunted vegetation of this cliff is favored by nesting shorebirds.

- The property's coastline resembles Maine more than Massachusetts. On the exposed north shore is a rocky inter-tidal community of crustaceans and mollusks living among rockweed and sea moss. Ocean swells surging around the island's northwest corner have created a large-cobble beach on the western shore, which is untenable for sea life and human structures alike.

---

[1] Sutton, Ann and M. Sutton. 1992. Eastern Forests, pp. 58-70. Alfred Knopf Inc, New York.

The property's location along the Atlantic Flyway makes it a critical stop for migrating and nesting birds. Seagulls dominate the shoreline, but leave inland areas to more than one hundred other avian species, including migratory and nesting freshwater birds, passerines, ground birds and raptors. Birds (and bats) are especially suited to island life because of the lack of terrestrial predators. While humans and their pets affect birds to some degree, their impact would not increase under the proposed program of use.

2. Describe the surrounding area. Is it primarily residential, industrial, agricultural, etc.? Is the property in a rural, urban, or suburban area? Has the area been formally zoned for specific uses? Please provide a map of the immediate area covering approximately one square mile.

The remainder of Baker's Island is essentially rural, and privately owned. Sixty-two (62) summer cottages with their attendant, albeit seasonal, population are spread across the island. They are vacant from fall to spring, and winter brings an eerie calm. There are no roads, electricity, or telephones on the island, and it is subject to the zoning regulations of Salem, MA. Vehicular traffic is limited to golf carts and garden tractors. Much of the island remains undeveloped, and there is a refreshing lack of litter. Fire protection is limited to a volunteer fire brigade comprised of island residents, drawing water from the island's only freshwater pond.



3. If the proposed action is in a floodplain or affects a floodplain, please list all pertinent restrictions (with citations) on land use under Federal, State, and local laws and regulations, and any actions applicant proposes to mitigate foreseeable adverse effects.

The proposed action is not in a floodplain and does not affect a floodplain.

4. Will the proposed action directly or indirectly affect a wetland? Please list any pertinent Federal, State, and local wetland regulations and any actions applicant proposes to mitigate foreseeable adverse effects.

The property contains a wetland, but the proposed action does not include any changes to the wetland. A storage shed exists within the 100-foot wetland buffer designated by the Massachusetts Department of Environmental Protection in 310 CMR 10. The storage shed preceded the wetland designation and buffer regulations. The storage shed contains only consumer commodity quantities of material and no change of use is anticipated.

5. Will the proposed action have a direct or indirect effect on any Federally or State-listed endangered species? If so, please describe any impacts as well as any actions applicant proposes in order to mitigate foreseeable adverse effects.

There are no Federally- or State-listed endangered species known on the property.

6. Is it reasonably foreseeable that the proposed activity will have a direct or indirect effect on natural resources, land uses, or water uses in the coastal zone? If so, describe how the applicant will comply with the State's enforceable and mandatory coastal zone policies. Please describe any impacts as well as any actions applicant proposes in order to mitigate foreseeable adverse effects.

The property lies entirely within the coastal zone, and the existing (and proposed) uses are within the state's coastal zone policies. See # 8 for a description of water usage. In particular the proposed use is specifically in alignment with the following Coastal Zone Management Program Policies and/or Management Principles: Coastal Zone Management Program Habitat Policy #1 and #2, Protected Areas Policy #3, Public Access Policy #1, and Public Access Management Principle #4.

7. Approximately how many visitors will be introduced to the area on a daily basis during operations? Approximately how many vehicles will be introduced into the area on a daily basis as a result of the operation of the facility? Will there be any identifiable increased traffic in the surrounding area as result of the proposed use of the property?

As an existing feature known by all island residents, only a small number visit the lighthouse on a given day. This number varies seasonally and weekly, but is less than twenty-five visitors per day and usually restricted to weekends. On weekdays anywhere from five to ten people per day may visit the grounds. Many of these people will merely be passing through the grounds. A few of these visitors may be expected to arrive by golf cart or garden tractor. There will not be a drastic increase over current numbers of visitors and any increased visitations will be carefully calibrated to spread them over time to minimize the impact.

**8.** How much water will the applicant use on the property in a normal day? What system will provide the water (name and address of system)? How much sewage will the applicant generate on a daily basis? Will the sewage be handled by a sewage treatment facility? If so, please provide the name and address of the system.

Water availability is an unavoidable constraint on Baker's Island. A thorough and exhaustive analysis noted that "knowledge of the basic hydrologic nature of the island should form a basis for a management scheme to protect the water resources [and] serve as a guide to future land use and development planning for the island."[2] Indeed that work has formed the basis for many of the long range planning initiatives on the island.

Current water usage is estimated at less than 140 gallons per day[3], during the summer season only. This volume, in the form of brown- and gray-water, is handled by the existing septic systems on site. In the late 1980's the Coast Guard, in an attempt to upgrade the Reservation's wastewater disposal capabilities, had installed by a contractor a new Cromoglass Model CA-5 Sewage Treatment System. The system is shared by both keeper residences and was, at the time of installation, state of the art. It consists of a fiberglass tank of approximately 1000 gallons capacity with multiple chambers and pumps to move effluent through a four-stage treatment system, including automatic chlorination and a timing clock with micro-switches to operate two pumps at four-hour cycles.

Regrettably, when the system was installed by the contractors no orientation, training or instruction manuals were provided to the operators. No chemicals or operating instructions were even discussed. As a result, the system has never operated as

---

[2] McKenna Jack M. 1984. Hydrogeology of Baker's Island, Salem Harbor, Salem, Massachusetts. Master of Arts thesis, Boston University Graduate School.

[3] This water usage estimate was derived independently of traditional figures of 100 gallons or more per person per day, which assumes inclusion of devices such as washing machines and dishwashers, and external uses like car washing and landscaping that are not applicable here. There is no municipal or commercial usage or supply at present and none anticipated. A more reasonable estimate for existing conditions (assuming eight bathroom trips per person per day, using a non-low flush toilet and a prudent allowance for bathing, food preparation and cleanup) would be 50 gallons. Note that the lack of water heating equipment reduces the amount of water used for bathing. If the five bedrooms on the property were filled by two people each weekend, they would consume 1000 gallons, which averages out to 143 gallons per day of the week. For reference, the dug well on the property is approximately three feet in diameter by ten feet deep. A well of this size would contain 720 gallons of water, not including recharge.

designed but serves as a large holding tank. In fact, the inoperative pumps have been removed. Additionally, the fiberglass shell was cracked prior to the tank's installation and it is unknown if the crack was repaired prior to the tank's burial. While the unit may function satisfactorily for the limited number of people it currently serves, it clearly will not support heavy continuous use by large numbers of people.

Water is drawn from a dug well and a bedrock well on the property. The capacity of the bedrock well is unknown. However, experience has demonstrated the necessity for husbanding water carefully. For example, in August 1998 during the celebration of the 200th anniversary of the lighthouse kindling, there were approximately forty (40) non-island resident guests in attendance. Since there are no public facilities or amenities on island, the bathroom facilities of the #1 keeper's residence were made available to nonresident guests as part of the open house tours. Midway through the day's events, the reservation wells ran dry and the facilities had to be secured. Island residents graciously shared their facilities with guests for the remainder of the day. As noted, there are no public facilities or amenities on island and there are no plans to add any. Water supplies are finite and wastewater disposal is likewise problematic, hence the cautionary approach to increasing access and doing so on a carefully calibrated basis. Due to limitations on available supplies no increase is anticipated in water usage and thus disposal.

Experience during the 200th Anniversary Celebration demonstrated very emphatically that 40 people for 5 hours with a meal exceeds the existing capacity of the island's ecology. However, shorter duration tours and no food consumption during the visit should not require changes in the existing systems. With that in mind, the introduction of visitors will be closely monitored and environmental impacts will be continually assessed to establish acceptable levels within the tolerance of the existing ecosystem.

**9.** Will the proposed use of the property likely result in the use, storage, release and/or disposal of toxic, hazardous, or radioactive materials, or in the exposure of people to those materials? If so, please describe these proposed activities.

The proposed use of the property will involve the use and storage of small quantities of common household materials such as paint, motor oil and fuel for small engines, and batteries to power the light station. Storage tanks for home heating oil in each dwelling are empty and no longer used.

**10.** Will the proposed use of the property destroy or decrease access to any known or potential archeological sites? If so, please describe any impacts as well as any actions applicant proposes in order to mitigate foreseeable adverse effects.

There are no known archeological sites on the property. The proposed use of the property does not include any projects that would impact any potential archeological sites.

11. Will the proposed use of the property violate or require a variance from any Federal, Tribal, State or local laws pertaining to the visual environment, odors, public health, and noise? If so, please describe any impacts as well as any actions applicant proposes in order to mitigate foreseeable adverse effects.

The proposed use of the property will not require a variance from any Federal, State or local laws pertaining to the visual environment, odors, public health, or noise.

12. Will the proposed use of the property violate or require a variance from any Federal, Tribal, State or local laws pertaining to land, air or water pollution or land use? If so, please describe any impacts as well as any actions applicant proposes in order to mitigate foreseeable adverse effects.

The proposed use of the property will not require a variance from any Federal, State or local laws pertaining to land, air or water pollution or land use.

**Summary**: This analysis responds to the above questions specifically regarding the reservation, but every action there is felt throughout the Island from an environmental and ecological standpoint, so the approach herein is with great caution. As noted in a late 1980's Massachusetts Coastal Zone Management report, the fragile ecology existing on Baker's Island cannot be restored once altered. "Such an Island provides habitats and scenic qualities rare along this highly developed area of the Massachusetts coast." Other experts concur in the opinion that further population growth cannot be supported by the natural environment of Baker's Island. Joseph S. Larson, Ph.D., consultant in Natural Resources, offered these opinions about Bakers Island and the Reservation in a December 1971 report to the Baker's Island Association: "The reservation, if disposed of to users, would place an undue demand on the water or septic systems which represents a threat to the community. Any new activity cannot exceed the safe limits of water supply, septic disposal systems and police protection." These observations are even more applicable now than when made twenty and thirty years ago. Larger numbers of people means more adverse environmental impact, resulting in significant ecological degradation of the island.

This exhibit was prepared by Dan Morse, a geographer with The Nature Conservancy in Boston. Mr. Morse's current work includes an integration of conservation efforts for the terrestrial, freshwater and marine bio-diversity of the North Atlantic Coast ecoregion. He can be contacted at:

The Nature Conservancy, Eastern Resource Office
11 Ave. de Lafayette, 5th floor
Boston, MA 02111-1736
phone: (617)542-1908 ext.238
fax: (617)542-1620
email: dmorse@tnc.org

EXHIBIT C

## Bakers Island Light Station
## Bakers Island
## Salem, Massachusetts



*Bakers Island Light Station*

- **Applicant:**          Essex National Heritage Commission, Inc.
                          Contact: Annie C. Harris, Executive Director
                          email annieh@essexheritage.org

- **Transferee:**         Essex National Heritage Commission, Inc.

- **Daytime telephone:**  978-740-0444
- **Mail address:**       140 Washington Street, Salem, MA 01970

- **Name of Property:**   Bakers Island Light Station
- **GSA Control No.**     GSA # 1-U-MA-822
- **Address:**            Bakers Island, Salem Harbor, Salem, MA 01970

# Table of Contents

1. **Title Page**

2. **Covenant Agreement**

3. **Executive Summary**

4. **Property Description and Planning Documents**
   A. **Property Description/Baseline Data**
   B. **Preservation and Maintenance Plan**
   C. **Use Plan**
   D. **Financial Plan**
   E. **Management Plan**

5. **Resolution/certification of Authority to Acquire Property:** Exhibit I

6. **Environmental Analysis of Probable Impacts:** Exhibit II

**Photographs**

**Attachments**
- Attachment A: Maps of Bakers Island
- Attachment B: National Register of Historic Places
- Attachment C: Financial records and audited financial statements
- Attachment D: Essex National Heritage Area Unigrid
- Attachment E: Heritage Plan
- Attachment F: ENHC Presidents Report
- Attachment G: Letters
  - National Park Service
  - Gordon College
  - Salem Sound Coastwatch
  - City of Salem
  - Massachusetts Audubon Society
  - Essex County Greenbelt
  - The Trustees of Reservations
- Attachment H: Tax-exempt status/Articles of Incorporation
- Attachment I By-laws
- Attachment J: Floodplain map and notes

1

## PART 3: EXECUTIVE SUMMARY

**Applicant:** Essex National Heritage Commission (ENHC) is the lead applicant. ENHC is the designated management entity for the Essex National Heritage Area. The Commission is affiliated with the National Park Service and performs work under a cooperative agreement with NPS. The Commission is incorporated in the Commonwealth of Massachusetts as a tax-exempt, 501-c3 corporation.

**Project Plan:** ENHC goals for the Bakers Island Light Station are:
1) To preserve the historic resources on the site: the lighthouse, the two keepers' houses and the ancillary buildings;
2) To develop educational and interpretive programs on the site – with an emphasis on the unique history of the island and the environment of Salem Sound;
3) To conduct ranger guided tours from National Park Service's Salem Maritime National Historic Site to Bakers Island Light Station for the purpose of expanding the story of the Salem maritime experience;
4) To provide public access to the site while respecting the privacy of the summer colony.

**History:** Bakers Island Light Station has played a pivotal role in the history of Salem Sound for more than 200 years. The first light station was erected in 1791, and there have been three other lighthouse structures since then. In addition to the role that the station played as a navigational aid, Bakers Island was also home to the harbor pilots who guided ships in and out of Salem Harbor, including saving *USS Constitution* from British warships during the War of 1812. The property is listed on the National Register of Historic Places.

**Project Cost:** ENHC estimates that the renovation program will cost $150,000. These funds will be used to stabilize the exteriors of the two keepers' dwellings, to perform basic repairs on these houses, to prepare plans, including a preservation survey and a strategic plan (for public access and educational programs), and to renovate/install restroom facilities on the property. The capital expenses will be covered by ENHC and supplemented by payments from Gordon College. The annual expenses will paid from revenue generated by program fees and rental income. ENHC has the financial means and personnel to restore and preserve the property and is prepared to invest additional funds should the anticipated revenue fall short of projections.

**Project Management:** ENHC will manage the property in cooperation and with the technical assistance of the National Park Service (as authorized in the Omnibus Parks and Public Lands Management Act of 1996). ENHC has partnered with the National Park Service on a number of projects, including "Building *Friendship*" (the construction of a tall ship at Salem Maritime National Historic Site) and the "Living Classrooms" directory that we are adapting as an on-line, searchable resource guide. The partnership between ENHC and NPS is directed by a cooperative agreement established in 1998 and continued by amendment every year thereafter. ENHC will lease the keeper's house to Gordon College for their Marine Biology Institute. ENHC intends to sign agreements with other environmental and educational organizations, such as Salem Sound Coastwatch, Massachusetts Audubon and The Trustees of Reservations, for limited use of the property. ENHC will establish the Bakers Island Light Station Management Committee to oversee the management and operations of this property. The committee will be composed of ENHC Commissioners and organizations, such as Gordon College, who will operate programs at the site.

**Reasons for applicant to be recipient of the property:** ENHC is a quasi-public organization dedicated to preserving and interpreting the historic, cultural and natural resources of Essex County, Massachusetts. Bakers Island Light Station is a significant regional historic and natural resource. The property is currently inaccessible to the public and several of the historic structures are deteriorating. The current condition of this property is unfortunate, especially considering the great potential this site offers for public education, historical and ecological research, and environmental monitoring. ENHC will restore the property and open the site to supervised public access, thus ensuring the public use and enjoyment of this important resource.

3

## PART 4: PROPERTY DESCRIPTION AND PLANNING DOCUMENTS

### Section A.  Property Description/Baseline Data:
*Physical description, historic value, access, and relationship to surroundings*

Bakers Island has a rich and varied history. Bakers Island is located five miles out to sea from
Salem, in Salem Sound, and the closest harbor is Manchester-by-the-Sea, approximately 3/4 mile
away.  From prehistoric times to the present, Bakers Island has served as a fishing station, a
source of framing timbers and paving cobblestones, the location of several seventeenth century
residences, and, since 1791, a light station. The island was annexed to Salem in 1630 and has
played an important role in the maritime history of Salem and the adjacent seaport communities
of Marblehead, Beverly and Manchester-by-the-Sea ever since.  The island is one of a group of
15 islands called "The Miseries."  These islands have been the location of many ship wrecks
over the years.

Bakers Island has a rich natural history as well.  Its relative isolation has allowed its marine
ecological communities to escape some of the degradation that has occurred in other parts of
Salem Sound.  Since colonial times, Salem has been one of the most active seaports on the
Eastern Seaboard.  These industries have left a legacy of contaminated sediments and degraded
biological communities especially in the western portion of the Sound.  Nevertheless, recent
underwater surveys sponsored by Salem Sound Coastwatch indicate that the waters near Bakers
Island harbor a diverse collection of animal life including colorful anemones, sponges, eels, and
sea stars.

Bakers Island is 55 acres in area with approximately 60 summer homes for seasonal residents.
The Light Station property occupies approximately 20% of the island along the northern
shoreline.  There are six structures on the Light Station site.  The grounds are covered in part by
sumac, poison ivy and a few scrub trees.  A mowed lawn surrounds the main buildings and
tower.

1.  Historic value (Photographs page 1):
Bakers Island Light Station is listed on the National Register of Historic Places.  The property
was listed in 1976 (NRHP listing: Attachment B).

The light station began with the Salem Marine Society constructing the first day-beacon on the
site in 1791.  The prolific chronologer of Salem, Reverend William Bentley, wrote, "the intended
beacon was raised by a large and Jovial party of Mariners."  In 1796, three marine disasters in
one week prompted the Society to lobby Congress for a better beacon.  Congress authorized
$6,000 for the construction of twin lighthouses on the island, and on January 3, 1798, two new
lights were illuminated for the first time.  They both stood on the current site – one light at each
end of the keeper's house.  Nicknamed "Ma" and "Pa" Baker, they were of different height, with
the taller being close to the current 59 feet.  Originally they were wooden structures, but these
were replaced by stone towers in 1821.  The smaller lighthouse, "Ma," was razed in 1916.  The

4

light was fueled first by lard oil, then by kerosene, then electrified, and now is powered by solar energy.

There are two other principal buildings on the site: the main keeper's house and the assistant keeper's house. They were constructed in 1878 and 1907, respectively. The other outbuildings on the property are: (1) the fog signal building; (2) a small work room next to the tower, built in the same year as the keeper's house and referred to as the lantern house; and (3) a small stone building called the oil house. There was a dock that was constructed in the early 20th century, but it was destroyed during a storm in the 1950s.

In addition to the historic structures, the Bakers Island Light Station and the island have been important to the history of the region for the past 200 years. Initially forested, by the 19th-century nearly all of the trees had been removed for use as framing timbers. Most of the cobbles for historic Salem's streets were collected from the shore of Bakers Island. Besides serving as a critical aid to navigation, the island was home to harbor pilots for many years. Harbor pilots played a key role in guiding vessels into the port of Salem – especially during Salem's heyday as one of America's great international trading ports immediately after the American Revolution. During the War of 1812, harbor pilot Joseph Perkins was responsible for saving *U.S.S. Constitution* from almost certain destruction when she was being chased by two British warships. Seeing that *U.S.S. Constitution* was in trouble, Perkins rowed out to the vessel and guided her into Marblehead Harbor, where she was able to hide out until the danger passed. In 1998, when *U.S.S. Constitution* sailed again for the first time in 100 years, Marblehead was made host of this historic sail in remembrance of this earlier event.

The island has also had a large summer community for many years. Where once, many of the islands off the Massachusetts and New Hampshire coastline had large hotels and summer colonies, Bakers is one of the last of this long tradition, and it currently has the largest resort community north of Boston during the summer months, numbering about 60 families. In the winter, only a caretaker lives on the island.

2.  Access to the site (Photographs page 2):

The island is currently accessible by a private pier, by beach landing or by the helicopter pad adjacent to the lighthouse. At the present time, the private pier is owned by the Bakers Island Wharf Company, and they represent that they will not let any other party – especially one that would seek to own the light station – use this pier. However, this is not an insurmountable obstacle to getting ashore on the island because the light station property has excellent beachfront access. Directly landing on the beach on the west side of the island (within the boundaries of the light house property) is easily accomplished in most conditions. For example, on August 26, 2003, when the GSA invited interested parties to the island for an on-site assessment, none of the parties (with the exception of the GSA and USCG personnel) were allowed to use the private pier, and therefore all had to access Bakers Island via the beach. This was easily accomplished by all of the interested applicants.

There is also an excellent precedent for public access via a beach landing on the neighboring islands, Great Misery and Little Misery. These two islands are reached by the public daily during the warmer months via the *Island Star*, which provides a regular ferry service as well as

tours around the islands. Sunline Cruises *Island Star* runs from the Willows Pier in Salem to the western beach on Great Misery and the trip takes approximately 20-25 minutes in each direction. The boat uses a built-in gangway to provide direct access onto the beach. The Trustees of Reservations (TTOR), one of the nation's oldest conservation organizations, owns and manages Great Misery and Little Misery (despite their names, these islands are truly wonderful). TTOR brings their maintenance staff and supplies, such as building materials and mowing machines, out to the island aboard a smaller landing craft.

There are several docks on the mainland that are suitable for departures to Bakers. The Bakers Island Association utilizes docks at Manchester-by-the-Sea and Beverly. The Salem Willow Pier is the home port for Sunline Cruises, and their tours to Misery Island and Salem Sound all leave from it. However, ENHC plans to use the newly installed docks at the NPS Salem Maritime National Historic Site's Central Wharf as the main departure point to Bakers Island. NPS has agreed to provide interpretive, ranger-guided tours from this site. The experience of the maritime resources that compose SMNHS – the Custom House, Derby House, West India Goods Store and the tall ship *Friendship* – will be expanded to include Salem Harbor and Bakers Island. For the first time, visitors to Salem will be able to experience the harbor as so many people did 200 years ago.

Bakers Island has the added advantage that for larger loads of building supplies the lighthouse station is also accessible by helicopter on the helio pad next to the lighthouse, and there are several staging areas on the mainland that are in easy reach.

For the purposes of this proposal, public access will be provided by Sunline Cruises. Access for maintenance personnel and staff will be provided by private boat and dinghy which is common practice for these islands.

3. Relationship to surrounding uses and adjacent properties (Photographs page 3):
The island is home to about 60 families during the summer months. The private homes date from the late 1800s to the early 1920s for the most part, although there has been considerable expansion and remodeling during the past decade as younger families have inherited their family's summer camps.

According to the U.S. Coast Guard's real property division, the Bakers Island Association has had a revocable license on the two keepers' houses for many years. It appears from the records that the license was first issued by the U.S. Coast Guard in 1973 and it was then extended approximately every seven years thereafter. As a condition of the license, the Association was required to protect and maintain the two houses and to make no substantial alterations to these properties without first obtaining authorization from the U.S. Coast Guard. In exchange, the Association was allowed to use the property without paying any fees or rent. Therefore, the Bakers Island Association has been responsible for maintaining the dwellings for the last 30 years. Although the open space around the houses, lighthouse and out-buildings has been mowed and the brush has been cutback, the buildings show considerable signs of deterioration.

The light station is on the northern side of the island. While the property abuts the land owned by the Association and by individual residents, there is enough acreage in the light station that

6

the public can access the site without walking past or through any of the privately owned parcels and the paths owned by the Association.

It is very clear that the Bakers Island Association would prefer not to have anyone from "outside" become owners at the light station. Bakers Island has been off-limits to visitors for many years. Residents evict trespassers and restrict use of the island's only pier. Their stated reasons for this are concerns about fire and safety (mainly, they say, from break-ins by random people landing on the island).

This proposal seeks to address both of these concerns by proposing that all public access to the island be only by escorted tours, or as part of supervised educational programs or by those organizations that are under agreement with the Commission to perform water monitoring, bird counting or other environmental management programs.

4. Supporting documentation includes:
   - **Maps:** Attachment A
   - **Exterior and interior photographs:** Photographs pages 1-7
   - **National Register of Historic Places nomination form:** Attachment B


**Section B. Preservation and Maintenance Plan** (Photographs pages 4-7):
*Plan for the preservation and maintenance of the historic Light Station.*

ENHC's preservation plan will focus on preventing further deterioration of the dwellings, providing for the ongoing maintenance of the entire property, and establishing a long term program for renovating the historic structures and opening them to supervised public access. Our preservation and maintenance plan will follow the guidelines of the *Secretary of the Interior's Standards for the Treatment of Historic Propertie*s.

The historic fabric, materials, and significance of structures on the site will be ascertained from historic photos of the site and from several texts describing lighthouses of similar historic time period (Morrison, 1921, *The Maritime History of Massachusetts*; Willoughby, 1929, *The Lighthouses of New England*; Snow, 1973, *The Lighthouses of New England*; Gleason, 1991, *Kindly Lights: A History of the Lighthouses of Southern New England*; and others). We will use these resources, along with advice from our historical consultants, to determine the most authentic materials and methodology necessary for appropriate preservation

1. The elements of the property:
The property consists of 10.02 acres of land with structures. The principal structures are the lighthouse, the adjacent lantern room, the fog signal building and two keepers' houses.

   - **Lighthouse:** The light tower is a granite masonry structure standing 59 feet tall. The shaft is a truncated cone, approximately 20 feet in diameter at the base. There are wood casement windows on the east and north sides. A cast iron lantern house, which houses the lens and optic, tops the tower. There is a small outdoor walkway surrounding the

lantern house. The lens is lit by a modern optic (VRB-25). The lantern house has a conical metallic roof topped by a black ball. The shaft is coated with a modern breathable protective coating, called *Thermoseal*, applied in 1996. The lighthouse was fully restored at this time by the US Coast Guard at a cost of $250,000. The tower is in excellent condition.

- **Work room/Lantern room:** The work room is adjacent to, and southeast of, the light tower. It is a single-room brick structure with one door and four windows. Historic photographs of the property indicate that the room had once been connected to the main keeper's house by an enclosed passageway. The building is currently used as a store room for water skis, tools, paint, and construction materials. This small building was renovated in 1993 by the US Coast Guard, and it is in good condition.

- **Fog Signal Building:** This building houses the mechanism for the fog signal. It is a brick building and its window openings have been bricked over. It was renovated by the U.S. Coast Guard in 2000. It is also appears to be in good condition.

- **Keeper's House:** The main keeper's house, built in 1878, is structurally sound. The dwelling has been leased for $1.00 per year by members of the Bakers Island Association for the last 30 years. Is it still occupied by them during the summer months, but its condition is fair-to-poor.
  - o  Interior: The house has eight rooms. On the first floor, there is a kitchen and dining room, two first-floor living areas, and an enclosed porch. Heat is provided by two wood-burning stoves on the first floor. The second floor has three bedrooms and one bathroom. The bathroom shower needs repair. Existing drywall in the hallway at top of stairs to the second floor is in need of repair because the roof leaks. Windows are in reasonable condition but would need replacement if the building were to be used in late fall or early spring. Cold, potable water is available from the kitchen sink, but has an unpleasant taste. Although the structure is heated by wood-burning stoves, working fire alarms or fire extinguishers were not observed in the building and would need to be installed. The basement requires cleanup of debris.
  - o  Exterior: The roof is leaking, especially on the north side, the direction of the harshest winter weather. This has caused damage in the interior. Exterior paint is peeling from the clapboards. Some clapboards show signs of rot, and the stone foundation needs to be patched in places. The exterior of this house has had some unfortunate changes made to it over the years. The most notable is the addition of "French" doors to an enclosed porch on the front façade. To the north side, the house was originally attached by a long, one-story ell to the work room/lantern room so that the keeper could reach the lighthouse during the winter. Only a small portion of this original passageway exists, and it does not seem advisable to restore this as it would not serve any useful purpose and would just interfere with the open access around the light.

- **Assistant Keeper's House:** The assistant keeper's house, built in 1907, is a two story structure, approximately 36' x 26' in size. This house has also been occupied for many years by members of the Island Association. On the date of inspection, we were not allowed enter the building to inspect the interior. However, its exterior appears to be in

much the same condition as the keeper's house – the roof needs to be repaired or replaced, some clapboards need to be replaced, exterior painting should be done and some foundation repair is needed. The yard surrounding the structure is littered with debris. Assuming that the interior condition is similar to the keeper's house, it will also needs some repairs to ceilings and walls because of water damage as well as general wear and tear. Otherwise the building appears to be fairly intact and not to have undergone any drastic alterations since it was built.

  o Both houses are using the septic system that was installed by the U.S. Coast Guard in 1961. This applicant was told that the septic system – the tank and the drain field - were overhauled sometime within the last 10 years, but we were not able to ascertain exactly when. However, we were told that the tenants have not allowed access for maintenance of this system for several years so its current condition is not known.

- **Oil Building:** The oil building is a small stone structure, measuring 12' x 15', located near the pathway from the beach. Its purpose is for storage. Structurally sound, its wooden doorframe needs paint, and its roof requires some repair but otherwise it appears to be in good condition for the present.

- **Summary of General Current Condition:** The lighthouse and its two principal outbuildings are in good-to-very good condition and do not appear to need much it the way of improvements. However, the two keepers' houses need immediate intervention to prevent further damage from on-going neglect. The exterior envelopes of the buildings must be secured and repaired – with the most immediate work being to repair or replace the roofs, repair the rotted clapboards, and paint. Further work needs to follow but should not be undertaken until a conservation survey and preservation plan are prepared for the property.

- **Summary of Existing and Proposed Utilities (electricity, septic, water):** The lighthouse was powered for many years by electricity provided by an underwater cable. The U.S. Coast Guard records show that the cable blew three times in 1999, indicating a serious break in the cable sheathing. In the summer of 2000, the U.S. Coast Guard converted the light's power source to solar power, and we are told that, shortly thereafter, the cable was removed. Power to the two houses is provided by propane, kerosene lanterns and generators. Both houses are using the septic system installed by the Coast Guard. However, these days it is much more common on island properties to use solar power and composting toilets. The septic system for the houses will need to be inspected to see if it is still functioning properly and if it can be repaired. If it is beyond reasonable repair, then composting toilets will be considered instead as this technology is more appropriate for remote sites. Solar panels can easily be installed adjacent to the houses and will provide all the necessary power for summer occupancy. Water for the houses currently comes from a well on the property, but we are told that the tenants do not use it for drinking. The current tenants purchase drinking water from the Island Association which maintains a potable well. However, it cannot be assumed that the Association will agree to sell water to a new owner so drinking water may need to be carried to the island; but as this is customary on the other islands in the harbor, it is not a hardship.

- **Parking and access:** There will be no parking and no need for new roads or paths. There is good beach access via a grassy pathway and the only motorized vehicles on the island are golf carts. Handicapped access is difficult because this is a remote island. However, the Sunline Cruises boat can accommodate wheelchair visitors provided they are helped on and off the vessel and can maneuver on grassy slopes. For active handicapped persons, the site should be accessible if a ramp is constructed for the transition from the beach to the pathway. The feasibility of this will be studied as part of the strategic use plan. On the mainland, parking for visitors to the site can be accommodated in the South Harbor Garage and the Museum Place Mall Garage, where current visitors to Salem and to NPS Salem Maritime National Historic Site currently park.

2. Archeological areas:

There are no documented archeological areas on the island. Furthermore, as this plan does not propose excavation or new construction on the property, it is not anticipated that there will be problem. However, in the future, if some excavation becomes necessary (perhaps as part of the septic repair), ENHC agrees that the proper steps will be taken to professionally survey the area and monitor projects to ensure that any archeological resources will be protected and documented with the technical assistance of the National Park Service.

3. Cyclical maintenance plan:

There are two components to the maintenance for this property. The first is the need to do immediate capital repairs and stabilize the historic structures that have been neglected for so many years. The program for these immediate repairs and stabilization is described below and the costs are outlined in Section D: Financial Plan.

The second component is the need to perform regular, on-going, yearly maintenance for all the structures and the grounds. This requires following four distinct maintenance phases each year: winterization, spring start-up, summer maintenance and improvements, fall close-up. The winter climate in New England is far too harsh for most maritime activities to be practical so the buildings will be closed for the winter months and it is unlikely that the grounds will be used by anyone even those interested in environmental monitoring. Therefore, this plan assumes that property will be occupied from mid-to-late April to mid-to-late October – typical of the operations on other islands in Salem Sound.

- Fall: In late fall of each year, the structures will be closed and secured from the elements, to the extent feasible. The windows and doors will be sealed, pipes will be drained, and all equipment stored away. The grounds will be cleared to remove dead wood and plant materials that might blow around during the winter storms.

- Winter: No activity will take place on the island, but this is the time to prepare plans, to apply for permits, and to obtain estimates for the next season.

- Spring: The weather is this region typically improves enough by April so that island properties can be re-opened in early-mid April. At this time, the maintenance priorities

will be: (a) to inspect for winter damage to the structures and repair as necessary, (b) to remove the winter protection from doors and windows, (c) to inspect and restart the systems, and (d) to clear the pathways and beach from winter debris.

- <u>Summer maintenance</u>:  Late May to late September is the best time for repairing the exteriors of the buildings, painting and clapboard repair.  Once the exteriors of the keepers' houses are stabilized, these structures as well as the lighthouse and outbuildings will be put on a regular cycle of scrapping, calking, painting, and masonry repair every year.  It is estimated that the harshness of the island climate will require the wooden structures and wood components of the other buildings be repainted every 5-7 years.  We will establish a regular painting and repair cycle each summer so that portions of the property will be under repair every year.  In this way, the maintenance on these properties does not build up but is done regularly as part of the on-going operation of the property.

  The interior of the two dwellings will need regular maintenance as well.  These repairs are important but will typically take place in the later part of the summer, after Gordon College's programs and the more critical exterior maintenance have been completed.  They will consist of cleaning, painting, and miscellaneous repairs to walls, ceilings and doors.

4.  <u>Increments and schedules for phased work</u>
The capital priorities for the Bakers Island Light Station are twofold:
  a.  To repair the neglected structures so that they do not deteriorate further
  b.  To improve the property so that the public can use the site for educational programs and environmental monitoring programs

To accomplish these two objectives, ENHC proposes to do the following:
  a.  Phase I:  Immediate stabilization (year 1 - $60,000):
    - Prepare a preservation survey for the historic dwellings
    - Repair damage to the exteriors of these dwellings – roof and clapboards
    - Repair interior damage
    - Install composting toilets
    - Repair water systems
    - Purchase equipment

  b.  Phase II:  Prepare further renovation and restoration work (year 2 - $30,000)
    - Prepare a preservation survey of the remaining historic structures
    - Prepare a strategic use plan for the property
    - Continue to renovate dwellings
    - Install solar power for dwellings

  c.  Phase III:  Continue historic restoration  (year 3 - $20,000)
    - Remove "French doors" and restore historic integrity of structures
    - Repair outbuildings

11

d. Phase IV: (year 4 - $20,000)
  - Complete repair and renovation of dwellings and other structures as required

e. Phase V: Construct new public facilities (year 5 - $20,000)
  - Install new composting toilets for the public
  - Construct other public facilities as determined by use plan and program needs

The ultimate schedule for the work will be conditioned by the contingencies of weather and access, the short construction season, and the need to complete a preservation plan before full renovation (other than the immediately needed critical repair work) proceeds.

The immediate work will focus on repairing the exterior building envelopes of both houses – namely repairing or replacing the roofs, repairing or replacing clapboards, painting and repairing the foundations. The highest priority is the roof repair to prevent further deterioration of the historic structures.

5. Note about utilities:
- Public toilets: It is proposed that toilet requirements will be accommodated initially by the facilities located in the existing dwellings, augmented with a port-o-potty, if necessary. However, a more permanent solution will need to be developed and installed at the site. Following the experience of the Trustees of Reservations on Great Misery Island, we are planning to install Clivus Multrum or Sun-Mar composting toilets on-site. It appears that any of the three existing outbuildings may be suitable for conversion to this purpose. The preferred location is to renovate a portion of the fog signal building, provided that access to the fog signal equipment can be maintained to the satisfaction of the U.S. Coast Guard. Fortunately, the Trustees of Reservations established the process for permitting a composting toilet in the City of Salem, and the Salem building inspector has indicated that such a facility would be permitted on Bakers as well.
- Solar power: We plan to install solar panels to augment the existing sources of power at the site.
- Existing septic system: The existing common septic system will be repaired if practical. Otherwise, composting toilets will be installed in the dwellings.

6. Describe experience:
ENHC has considerable experience working with historic properties and has a good understanding of the *Secretary of the Interior's Standards for the Treatment of Historic Properties*. ENHC oversees an annual grant program that gives historic preservation grants for the rehabilitation and restoration of National Register properties throughout the Essex National Heritage Area. ENHC staff monitor these grants to ensure that they are in compliance with the Secretary of the Interior's Standards. ENHC works cooperatively with the NPS at Salem Maritime National Historic Site and Saugus Iron Works National Historic Site. NPS oversees the maintenance of many historic properties at these park units and is authorized to provide technical assistance to ENHC as needed. Also, the ENHC Executive Director renovated many NRHP properties for more than 15 years before joining the non-profit sector and served from 1979-1990 on the Salem Historical Commission, the last six years of which, as its chairman. The offices of ENHC are in an historic structure in downtown Salem. ENHC employs a staff person

12

who formerly worked as a preservation specialist for the Massachusetts Historical Commission. Members of ENHC's Board of Commissioners also include preservationists and architectural historians.

ENHC also has experience working in marine environments. Many of the historic resources of this region regularly face the rigors of water, salt and weather. The National Park Service has a great deal of first-hand experience at its Salem Maritime Site. The logistics of boats, weather proofing for stormy conditions, transporting materials across the water, and working in the difficult marine environment are well understood by ENHC, members of the Commission, NPS and by our partners and supporters. Building and maintaining structures on an island is not easy, and the applicant has first hand experience building and maintaining property under these conditions.

## Section C. Use Plan
*Plan for the use of the Light Station*

Bakers Island Light Station is one of few island sites left in Massachusetts where the public can get access. The 10-acre site is significant in the history of this region, and it is also a remarkable vantage point from which to study the environment of Salem Sound. The applicant proposes to use the site to present and interpret the history and environment of the region. The site is also an excellent vantage point from which to monitor animal migrations and water quality.

1. Proposed educational, park, recreational and/or cultural use of the property:
The plan proposes to use the site for the purposes of interpreting and teaching Maritime History, Environmental Education, Marine Studies and Recreation. ENHC will provide these programs in cooperation with other partnering organizations.

**A. Maritime History with National Park Service Ranger-Guided Tours of Salem Maritime National Historic Site (SMNHS) and Bakers Island Light Station:** The National Park Service will conduct ranger-guided tours of the island during the summer and fall seasons. These programs will enhance the program of visitor and school tours that currently take place at SMNHS. The current interpretative programs conduct visitors through the historic buildings and the tall ship *Friendship*. The addition of the Bakers Island site to the education and visitor programs at SMNHS will add immeasurably to the interpretation of this important NPS site. SMNHS is the premier site in the United States that tells the story of the commercial maritime history of our nation -- the history that laid the foundation for the United States to become the world power that it is today. The heyday of the SMNHS was the period from the American Revolution to the War of 1812, when our nation established new trading relationships around the world and Salem became one of the richest ports in the nation. This period of history is not as well known as it should be, partly because there are so few operational structures remaining from this period. The sea is a very harsh and demanding environment. By connecting Bakers Island Light Station to SMNHS through interpretive programs -- ranger-escorted tours -- visitors and residents will have the unique experience of an active land-to-sea connection. Visitors will have the experience of leaving and returning to the historic port of Salem; they will be exposed to the excitement (and harshness) of the sea. This unique experience will bring home the remarkable

13

fortitude of our hardy ancestors who settled in this difficult climate and had to rely principally on the sea for their livelihood. The highways of 200 years ago were the sea and not the internal roadways, and these islands were often settled long before the interior areas. The experience of visitors (as well as residents and the thousands of school children that annually visit SMNHS) will be profoundly expanded by the new interpretive opportunities that will come from linking Bakers Island to the Salem Maritime National Historic Site.

**B. Marine Biology Institute with Gordon College:**  Gordon College plans to conduct its Marine Biology Institute on the island in May and June each year. The Marine Biology Institute is a four-week summer program. It gives students the opportunity to study New England marine communities in-depth, and to conduct research projects. This course is part of the Gordon College Department of Biology curriculum, but remains open to non-Gordon students. Gordon's Institute has long had a relationship with the Woods Hole Oceanographic Institute, and students in the program have conducted research projects on the local ecology. The program will be taught for four weeks in May and June. The focus of the course will be the natural history of New England marine organisms, their biology and ecology. The plan is to house students and faculty in the main keeper's house and to utilize the first floors of this building as classroom space and meeting rooms.

The program will include conducting research projects on Salem Sound and will make these results available to the leadership of the towns and the local communities. Massachusetts Bay, including Salem Sound, is now part of the National Estuary Program (NEP). Established in 1987 as part of the Clean Water Act, the mission of the NEP is to protect and restore the health of estuaries while supporting economic and recreational activities. Given the relative isolation of the shoreline communities of Bakers Island, the Bakers Island Light Station property would be an ideal site for ecological monitoring, education, and recreation as part of the NEP.

One of the few private colleges with a marine biology major, Gordon has several biology professors with a keen interest in the local ecology. Professor Dick Wright has long been involved in the studies of local marshlands and estuaries, and he is the author of one the most widely-used textbooks at American colleges on environmental science. Dorothy Boorse is an aquatic ecologist with interests in invertebrates, community ecology, and invasive species. Her current research on vernal pools involves conservation of wetlands and surrounding upland management practices. David Shull, who currently directs the Marine Biology Institute, has won several grants for the study of harmful algal bloom in Massachusetts Bay as well as marine species on New England shorelines.

**C. Summer Institute of Maritime History (proposed):**  Gordon history professor David Goss has proposed administering a Summer Institute in Maritime History. Professor Goss has taught maritime history for many years and has extensive experience in historic site preservation. Previously, he served as the director of Bicentennial Programs at Salem Maritime National Historic Site, developing programs in Salem maritime history and marine archeology for the general public. During a decade of service at the Essex Institute as director of education, he wrote the text for *Maritime Salem in the Age of Sail*—the National Park Service Handbook for Salem's maritime history and winner of an AAM Publications Award. He has also been the museum director of two waterfront historic sites: The House of the Seven Gables and Pioneer

Village. The Summer Institute of Maritime History would plan to utilize the keeper's house for classroom and study facilities and, if practical, will consider some residency options as well. This Institute will be taught by Professor Goss along with other maritime historians, archeologists and curators from Gordon College, Salem State College, Salem Maritime National Historic Site and the Peabody Essex Museum of Salem. Participation in the Bakers Island Summer Maritime Institute would be open to undergraduate college students for academic credit as well as interested maritime history enthusiasts. Session I of the Institute could take place during two weeks in July and Session II during two weeks in early August. The focus of the course would be the study of New England's maritime history from the seventeenth century to the present. Classes would be limited to twenty persons per session, and would take place at key maritime sites along the New England coastline with occasional visits to Bakers Island itself.

In addition to the Institute's teaching activities, Gordon College would like to establish a reading library of maritime materials which could be installed on Bakers Island as a learning resource available for Institute participants as well as island residents and visitors. In this way, Bakers Island would serve the public as an important maritime resource, providing a unique perspective on the life and history of the New England coastline.

**D. Maritime History Education Programs:** In addition to these programs, ENHC runs educational programs and workshops as well. ENHC regularly partners with environmental organizations and historic resources around the National Heritage Area to produce collaborative programs for teachers and students. ENHC plans to use the site for special programs, especially one-day, on-site programs in maritime history and environmental education. For example, ENHC annually presents the ENHC Summer Institute for Teachers. This institute is produced in collaboration with the Area's institutes for high learning and the historic resources and museums in the region. It would be appropriate to use the Light Station for this program.

**E. Environmental Education Programs:** ENHC also partners with local organizations to produce environmental education programs. ENHC recently prepared an on-line directory of environmental resources and programs throughout the National Heritage Area in partnership with NEEP, a coalition of more than 20 environmental organizations in Massachusetts. To prepare for this proposal, ENHC discussed potential partnership programs on the island with the Massachusetts Audubon Society, Essex County Greenbelt, The Trustees of Reservations and YMCA of the Greater North Shore. It is clear that there is a great deal of interest in one-day and week-long programs at the Bakers Island Light Station, but it is also necessary to recognize that these programs must be controlled so as not to overburden the site and the island's summer residents. Therefore, we propose to develop a use plan for the site that will manage the various interests and potential programs in the best ways before committing to the exact number and type of educational programs that will be offered at the site.

**F. Environmental Monitoring and Coast Watch:** Bakers Island site offers an excellent opportunity for environmental monitoring. Marine ecologists at Gordon College and at other institutions in the region have already expressed interest in opportunities to carry out ecological research along the rocky shoreline. With the help of Salem Sound Coastwatch and Gordon College, we would look to establish a marine ecological monitoring station on Bakers. This will enable regular data collection to occur, including gathering census of marine organisms and

indicators of environmental problems (e.g., pollution-indicating species or invasive species) if present. The data collected from this monitoring site would be combined with data collected as part of the Massachusetts Bays Comprehensive Conservation and Management Plan, which seeks to identify threats to marine coastal communities in the Commonwealth. The Area's colleges along with Gordon College have suggested that they could also provide student volunteers to assist Salem Sound Coastwatch, which conducts regular programs of public education and outreach around Salem Sound, including Wetland Health and Assessment Toolbox (WHAT), Adopt-a-Tidepool Program, Coastal Water Quality Monitoring, and beach clean-ups.

**In Summary:** This is a partial list of organizations that have partnered with ENHC in the past and that may partner with ENHC on Bakers Island, listed under the areas of programming for educational and interpretive programs for the Bakers Island Light Station:

- **History:**
    National Park Service *
    ENHC Heritage Education Program
    Salem State College
    Gordon College *
- **Marine Studies:**
    Gordon College *
    Salem State College
- **Environmental studies and conservation:**
    Massachusetts Audubon *
    Essex County Greenbelt *
- **Recreation:**
    YMCA
    ENHC Trails & Sails
    The Trustees of Reservations *
- **Coast Monitoring and Migration Studies:**
    Massachusetts Audubon *
    Salem Sound Coastwatch *

*NOTE: Letter of interest attached; the other organizations are either already joint- venturing with ENHC or have begun preliminary discussions with ENHC*

2. <u>The suitability of the property for the proposed uses:</u> The property is suitable for a variety of activities during the summer and fall months. It is almost inaccessible during the winter and early spring months due to the harshness of the weather and the fact that most boats either leave the region or are put on land for the winter months.

The keeper's house will be renovated so that it can be rented to Gordon College for meeting and some living space for the Marine Biology Institute. Other programs will use this building in the months that Gordon College is not in residence. Many of the daily programs will use the grounds of the property as the visitors and students on NPS ranger guided tours will be coming to the site only for a few hours. We do not anticipate altering the site or the historic structures in

any significant way to accommodate the proposed activities. Beyond restoring the buildings, the only modifications that are proposed will be to develop public toilet facilities in one of the three outbuildings.

3. Differentiate between public-use activities and revenue-producing activities:

Due to the concerns of the Bakers Island Association, the public will not be allowed free, unrestricted access to the island. All public use on the site will require an escort. Therefore, to cover the cost of escorted tours and educational programs, as well as to generate some operating revenues, there will be a fee for all public use of the site.

Escorted tours will charge a fee. SMNHS already has a fee system in place so this will be added as an additional offering to their regular programs. The fees that are currently charged for water-base tours and access to Misery Islands are approximately $12/pp with children at $8.00. ENHC will make every effort to keep the public programs within this price range.

Educational programs, institutes and workshops typically also charge program fees. Gordon College's programs will be open to the public if someone enrolls in the program.

The main keeper's house will be leased to Gordon College and to other organizations for educational programs  The assistant keeper's house will be leased to a private party to increase the revenue to the site. Occasionally, the site will be rented for a private function associated with ENHC or one of our partnering organizations. These functions will be infrequent and, generally, not at peak times for visitors, but they will be used to generate additional income for the site.

4. Identify any portions of the property to which public access will be denied or restricted:

The applicant intends to make the property available to the public during the warmer seasons for educational, environmental and history programs. Because of the private nature of the remaining island, the public will need to be escorted at all times so that the Bakers Island summer colony will not be adversely affected. The public will be denied access to the interior of the keepers' houses when there are programs in process or they are rented to private persons. Otherwise these properties are likely to be included on the tours and educational programs at the site. The lighthouse may be made available as part of the NPS ranger-escorted tours provided the U.S. Coast Guard approves. The outbuildings will be used for storage and, therefore, they will not be open to the public except if new toilet facilities are developed in one.

5. Compare the planned use of this site with work your organization has performed in the past:

- ENHC Program Management: ENHC runs event and educational programs around the Essex National Heritage Area. The biggest of these is ENHC's annual *Trails & Sails* program which attracts more than 3,000 people for two days of tours and educational opportunities. ENHC also conducts a number of workshops, institutes and conferences every year.

- ENHC Real Estate Management: This is a more extensive piece of real estate than ENHC has managed to date, but members of ENHC Board of Trustees and several of the ENHC staff have a great deal of experience in property management. For example, the

ENHC Executive Director has 15 years of experience in real estate development and property management.

- NPS SMNHS Program Management: The Salem Maritime National Historic Site and Visitor Center hosts more than 700,000 visitors annually. Also, SMNHS has extensive experience providing interpretive programs for school groups as well as general visitors. SMNHS will conduct the interpretive programs for visitors to Bakers Island.

- NPS at SMNHS and Saugus Iron Works National Historic Site (SIWNHS) Property Management experience: NPS has in-house both the technical expertise and the staff to maintain both of these sites according to the *Secretary of the Interior's Standards for the Treatment of Historic Properties*. NPS is authorized under the National Heritage Area legislation to provide this technical expertise to ENHC. NPS will ensure that the Bakers Island Light Station is properly maintained by ENHC and that all work on the property meets the Secretary's Standards.

- Gordon College Educational Program Management Experience: Gordon College will provide educational programs for this site under contract to ENHC. Gordon College has years of higher education experience and is one of the few private colleges with a marine biology major. Gordon College is a private educational institution located in Wenham, Massachusetts, approximately four miles from Bakers Island. Gordon's Department of History has four full-time faculty and four part-time or adjunct faculty. David Goss of the history department has taught maritime history for many years and has extensive experience in historical site preservation. The Department of Biology has five full-time faculty and three adjunct or part-time faculty. David Shull and Dorothy Boorse of the Department of Biology are ecologists with expertise in the fields of marine ecology and wetlands ecology.

## Section D: Financial plan:
*Financial ability to acquire, develop, maintain and operate*

1. Projected Restoration Expenses and Projected Income:
ENHC anticipates investing $150,000 in restoration projects at Bakers Island Light Station. This will be spent over five years (Phase I-V) at approximately $60,000 during the first year and $20,000 to $30,000 per year thereafter. This money is available in our current operating budget and through a long-term lease agreement with Gordon College. ENHC annually dedicates $150,000 for the Partnership Grant Program. Due to the regional significance of Bakers Island Light Station, ENHC plans to dedicate approximately 10% from these funds for five years.

In addition, if ENHC acquires the property, we plan to launch a fund-raising campaign for the site to raise additional funds for any unanticipated expenses, for interpretive and educational programs and as a reserve fund for the future repair of the lighthouse tower.

18

ENHC regularly works with 200 volunteers and partners throughout the National Heritage Area. We anticipate that volunteers will donate approximately 250 hours of time per year for path maintenance, brush clearing and beach clean-up.

*Table 1: Description of Bakers Island Light Station Capital Improvements*

Repair of structures
- o Roof repair/replacement:
  - Keeper's house                                    $8,000
  - Assistant keeper's house                          $6,000
  - Outbuildings                                      $2,000
- o Composting toilets                                $4,000
- o Foundation repairs                                $2,000
- o Exterior repairs (remove French doors,
  repair dormer, window repair, etc.)                 $6,000
- o Clapboard repair, paint and trim                 $14,000
- o Trash and debris removal                          $5,000
- o Repairs outbuildings                              $5,000
- o Solar power                                       $2,000
- o Water system repair                               $2,000
- o Interior renovations                             $25,000

Public amenities
- o Construction of public facilities               $18,000

Equipment:
- o Mower                                             $4,000
- o Mooring                                           $2,000
- o Dinghy                                            $2,000
- o Generator                                         $3,000

Planning and design
- o Preservation plan                               $10,000
- o Strategic use plan                              $10,000
- o Engineering and permits                          $5,000

Contingency (10%)                                   $15,000

**TOTAL**                                          $150,000

2. Past financial records and audited financial statements (Attachment C):
     As a designated National Heritage Area, ENHC receives nearly $1.0 m per year through the Department of the Interior. These funds are matched annually by donations, in-kind contributions, state, and other non-federal matching funds at an average ratio of $1.8 non-federal to $1.0 federal funding.

3. Budget Summary for five years:

*Table 2: Projected Revenue and Expenses for Five Years:*

|  | year 1 | year 2 | year 3 | years 4 | year 5 |
|---|---|---|---|---|---|
| **REVENUES** | | | | | |
| Operations and maintenance | | | | | |
| Marine Biology Institute | $0 | $5,000 | $5,000 | $5,000 | $5,000 |
| NPS Ranger Guided Tours | $9,375 | $9,500 | $10,000 | $10,500 | $11,000 |
| Maritime History Education Prg | $6,000 | $6,500 | $7,000 | $7,500 | $8,000 |
| Environmental Monitoring Prg. | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 |
| Rentals | $10,250 | $11,000 | $11,500 | $12,000 | $12,750 |
| | | | | | |
| *Allocated from Capital Account* | | | | | |
| Restoration funds | $59,000 | $24,000 | $13,000 | $12,100 | $11,000 |
| | | | | | |
| **Total Revenue** | $85,625 | $57,000 | $47,500 | $48,100 | $48,750 |
| | | | | | |
| | | | | | |
| **EXPENSES** | | | | | |
| Building Maintenance | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 |
| Grounds | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 |
| Site and Program Management | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 |
| Insurance | $5,500 | $5,500 | $5,700 | $5,700 | $5,900 |
| NPS Tours | $7,250 | $7,500 | $7,750 | $8,000 | $8,250 |
| Maritime Education | $2,000 | $2,500 | $3,000 | $3,500 | $3,500 |
| Environmental Monitoring | $875 | $875 | $875 | $875 | $875 |
| | | | | | |
| Restoration | $60,000 | $30,000 | $20,000 | $20,000 | $20,000 |
| | | | | | |
| **Total Expenses** | $85,625 | $56,375 | $47,325 | $48,075 | $48,525 |
| | | | | | |
| Excess (deficiency) revenue/exp | $0 | $625 | $175 | $25 | $225 |

**Section E.  Management plan:**
*Description of ENHC, organizational structure, management committee for Light Station:*

1. <u>Legal authority and Mission:</u>  ENHC is the designated non-profit management entity for the Essex National Heritage Area.  ENHC is incorporated in the Commonwealth of Massachusetts. The corporation was established in 1997 as a result of federal legislation that established the Essex National Heritage Area.  The legislation establishing the Area was the Omnibus Parks and Public Lands Management Act of 1996 (Public Law 104-133;110 Stat. 4257).  Refer to the enclosed "Unigrid" for a better understanding of the extent of the heritage area (Attachment D).

The mission of ENHC is to preserve and promote the historic, cultural and natural resources of the Essex National Heritage Area, Essex County, MA.  Bakers Island Light Station is a significant historic and natural resource within the Essex National Heritage Area (the Area).  It

fits with the mission of ENHC to seek to acquire this site for the benefit of the residents and visitors to the Area, especially since the alternative is to see the site closed forever to public access.

ENHC provides a number of interpretive and educational programs based on the three themes of the Area as determined by the National Park Service *Study of Alternatives* and the ENHC *Heritage Management Plan* (see Attachment E). These themes are: Early Settlement, American Maritime History and the Industrial Revolution in Textiles and Shoe Manufacturing. Bakers Island Light Station is an important site for the interpretation of American Maritime History and its proximity to another major maritime site - SMNHS – and the feasibility of linking these two important sites by water creates a compelling reason for ENHC to seek to acquire the property from the U.S. Coast Guard. In anticipation of the announcement that this property would be declared surplus, NPS SMNHS and ENHC have followed the process for many years. We are very pleased to see it finally come to pass and to have an opportunity to submit a proposal.

2. Organizational Structure: To fulfill its mission of preserving and promoting the historic, cultural, and natural resources of Essex County, ENHC employs a staff of 11 and partners with more than 200 organizations throughout Essex County to produce a variety of educational, preservation and recreational programs. ENHC works in cooperation with the National Park Service through cooperative agreements. ENHC has formal and informal agreements with other organizations as well.

ENHC is governed by a Board of Trustees composed of 24 business and community leaders. The Trustees oversee the operations of the Commission and its staff. In addition, there are 114 Commissioners, who act as ambassadors for ENHC. Commissioners are elected annually to the Commission for terms of 3 years. There are also 63 elected officials who serve as Ex-Officio representatives to the Commission. They are the state senators, state representatives, mayors, town managers, and heads of the boards of selectmen from the 34 cities and towns within the Area. The superintendent of the two NPS units in the Area represents the NPS to the Board and Commission.

ENHC activities include: Heritage Preservation, Heritage Education and Heritage Tourism. Examples of some of our projects are: (1) *Trails & Sails*: an annual county-wide event held at more than 50 sites in the Area during the last weekend in September; (2) An educators' resource directory and an extensive web-based guide that links environmental resources and historic resources to educators, (3) teacher workshops and summer institutes, (4) an Historical Records Initiative, (5) Visitor Centers program for 10 cooperating ENHC visitor centers, (6) Trails programs, (7) History in the Making, and others. For more information on ENHC, please refer to the annual President's Report (Attachment F) and the ENHC web-site www.essexheritage.org .

3. Management Committee for Bakers Island Light Station: ENHC plans to establish the Bakers Island Light Station Management Committee to oversee the management and operations of this property. This committee will be created as an ENHC standing committee, and it will be composed of not less than seven members and not more than twelve. It will be composed of the Executive Director of ENHC, the President of ENHC, and the Superintendent of Salem Maritime National Historic Site. At least one board member will be chosen from each of the following

partnering organizations or areas of interest: Gordon College Marine Biology department, Salem Sound Coastwatch, an expert in maritime history and education, and a natural resource manager, and an expert in the management and preservation of historic properties. The committee will be charged with overseeing the management and programming at the Bakers Island Light Station and preparing an action plan for the long-term preservation and use of the site in keeping with the program outlined in this proposal. The committee will meet regularly and no less than 4 times per year. It will also review legal issues associated with the site, oversee the annual and capital budgets and create a long-range financial plan. The committee will consult as necessary with other experts in the fields of historic preservation, resource management and maintenance and fundraising.

The committee will be supported with staff from ENHC and technical assistance provided by NPS SMNHS. The day-to-day management of the property will be overseen by ENHC's Executive Director and her staff. The ENHC Director of Preservation will have primary responsibility for guiding the preservation and maintenance efforts.

4. Description of relationship with supporting agencies, municipalities, or other organizations: Under the legislation that created the Essex National Heritage Area, the National Park Service is authorized to provide technical assistance to ENHC. In addition, there is a Cooperative Agreement with annual amendments that governs the relationship between ENHC and the National Park Service. The Agreement will be amended to include ranger-guided tours of Bakers Light Station. Gordon College has agreed to sign a long-term lease on the Keeper's House with ENHC for the purpose of establishing a Marine Biology Institute during the months of May and June. Gordon College is also interested in offering additional programs at the site. Agreements will be negotiated for each of these programs as well. In addition, ENHC has investigated partnership agreements with several other organizations that are interested using the site. As agreements are reached with these organizations, contracts will be written to define the scope of work and responsibilities for each case.

5. Insurance: The insurance agent for the Commission is: Robert J. Cappadona Insurance Agency, 25 Summer Street, Watertown, MA 02472. The agency has the necessary information to provide a binder at the appropriate time.

6. Letters of support (Attachment G)
   a.    National Park Service
   b.    Gordon College
   c.    Salem Sound Coastwatch
   d.    City of Salem
   e.    Massachusetts Audubon Society
   f.    Essex County Greenbelt
   g.    The Trustees of Reservations

7. Additional information that non-profits must provide:
   o  Non-profit Status (Attachment H)
   o  Corporate By-laws (Attachment I)

8. <u>Corporate officers by name and title:</u>
   o President:  Thomas M. Leonard
   o Vice President:  Laurence C. Harrington
   o Treasurer: Donald Gill
   o Assistant Treasurer:  Joseph Gibbons
   o Clerk:  William J. Tinti
   o Assistant Clerk:  Malcolm F. MacLean, III

9. <u>Description of Succession Plan</u>
   The Essex National Heritage Area and the Commission are designated to exist in perpetuity by US Congress.  The Essex National Heritage Area was established by the US Congress in 1996 in the Omnibus Parks and Public Lands Management Act of 1996 (Public Law 104-133; 110 Stat. 4257).  There is no sunset on the Area.  The Essex National Heritage Commission is the management entity for the Essex National Heritage Area.  The management entity is required under the legislation, and, as such, is also created in perpetuity.  Therefore, there is no reason to suppose that either the Heritage Area or the management entity will disappear.

   Additionally, ENHC receives federal, corporate, foundation and individual financial support for its operations and special projects.  The diversity of funding sources that support the organization is a source of great strength.

   However, in the event that ENHC should decide that it no longer deems it desirable to support the Bakers Island Light Station, there are at least three options for succession.  These are:

   1. Seek a boundary change for SMNHS to include Bakers Island within SMNHS's unit boundary. ENHC and its predecessor, The Salem Partnership, have successfully assisted the NPS in expanding the SMNHS twice before – once to include St. Joseph's Polish Club within the boundaries and the second time to include the Salem Armory/Regional Visitor Center in downtown Salem, a location that is not contiguous to the park site
   2. Establish a comprehensive agreement with Gordon College to operate the entire property either under a long term lease or via a gift
   3. Lease or donate the property to The Trustees of Reservations who manage the adjacent Misery Islands and who have expressed interest in Bakers

   ENHC understands these options and is prepared to develop them further as part of the strategic planning process that it will undertake.

10. <u>Number of existing members:</u>
    • Board of Trustees: 24 trustees
    • Board of Commissioners: 114 commissioners
    • Ex officio Commissioners: 48 representatives

**Exhibit I**

### Resolution/Certification of Authority to Acquire Property

Whereas, certain real property owned by the United States of America, located on Bakers Island of Salem, County of Essex, Commonwealth of Massachusetts, has been declared surplus at the discretion of the General Services Administration, and the National Historic Lighthouse Preservation Act (16 U.S.C. § 470w-7) and policies promulgated pursuant thereto, more particularly described as follows:

Bakers Island Light Station

10.02 acres +/-

General Services Administration Control Number:   I-U-MA-822

Whereas, the Essex National Heritage Commission, Inc. (ENHC) needs and will use said property in perpetuity for the purposes as set forth in its application and in accordance with the requirements of said Act and any regulations and policies promulgated thereunder;

Now, Therefore, Be It Resolved, that the Essex National Heritage Commission shall make application to the National Park Service acting for the Secretary of the Interior for, and secure the transfer to, the above-mentioned property for said use and subject to such exceptions, reservations, terms, covenants, agreements, conditions, and restrictions as the National Park Service and the Federal disposal agency may require in connection with the disposal of said property under said Act and the regulations and policies issued pursuant thereto.

Be It Further Resolved that the Essex National Heritage Commission has legal authority, and is willing and able, to properly develop, maintain, operate, and assume liability of the property, and that Annie C. Harris, Executive Director, is herby authorized, for and on behalf of the Essex National Heritage Commission to do and perform any and all acts and things which may be necessary to carry out the foregoing resolution, including the preparing, making, and filing of plans, applications, reports, and other documents, the execution, acceptance, delivery, and recordation of agreements, deeds, and other instruments pertaining to the transfer of said property, including the filing of copies of the application and the conveyance documents in the records of the governing body, and the payment of any and all sums necessary on account of the purchase price thereof or fees or costs incurred in connection with the transfer of said property for survey, title searches, recordation or instruments, or other costs identified with the acquisition of said property.

Name and address of applicant:

Essex National Heritage Commission, Inc.
140 Washington Street
Salem, MA 01970

I, Annie C. Harris, hereby certify that I am the Executive Director of the Essex National Heritage Commission; and that the foregoing resolution is a true and correct copy of the resolution adopted by the vote of a majority of the members of said Board of Trustees of the Essex National Heritage Commission, present at meeting of said body on the 4th day of November, 2003, at which a quorum was present.

_____
(Signature)

# Environmental Questionnaire Response

## to the

# Preservation of Bakers Island Light Station

### located in

### Salem Sound, Massachusetts

## Essex National Heritage Commission



*Photo: United States Coast Guard*

**EXHIBIT II: Environmental Questionnaire**

The Essex National Heritage Commission (ENHC) proposes to preserve the existing buildings and adjacent open space at Bakers Island Light Station. The light station and surrounding buildings are situated on approximately ten acres of land and are located on the north side of Bakers Island. Bakers Island is approximately 55 acres in size and is located on the eastern edge of Salem Sound, northeast of the community of Marblehead and south of the communities of Beverly and Manchester-by-the-Sea. The island is located within the political boundary of Salem (Figures 1 and 2).

1. **Describe how the property will be directly affected in terms of its current use and proposed use:**
   - **Current Use:** The United States Coast Guard currently operates the Bakers Island Light Station composed of 10 acres of land, one 59' lighthouse structure, two keepers' dwellings and three outbuildings. The remainder of the island is a summer resort community of approximately 60 private homes along with a recreation building, a small store and land owned in common by the homeowner's organization, the Bakers Island Association. Under a revocable license agreement with the U.S. Coast Guard, the Association manages the two keepers' dwellings and leases the buildings for seasonal occupancy.

   - **Proposed Use:** This proposal will not affect the property in any significant way. ENHC will invest the funds necessary to preserve the structures that are currently located on the property and will seek to avoid further deterioration by preventive measures. The objective of ENHC is to preserve the character and history of the landscape and structures while enabling the public, in a supervised manner, to enjoy and appreciate the beauty of this unique property. ENHC is proposing to increase public access to the light station and adjacent land by conducting NPS ranger guided tours, a Marine Biology Institute with Gordon College and some other limited educational and environmental monitoring programs. ENHC will lease the keepers' houses for these educational programs and for seasonal occupancy. Any renovations to the keepers' dwellings will occur within the existing structures.

2. **Describe the surrounding area:** Most of the surrounding land has been manipulated and developed over the last three centuries. However, plants and animals can be found throughout the land associated with the light station. Many species of birds can be found inhabiting the cliff areas on the north side of the island. These cliff areas are also suitable habitat for marine mammals and invertebrates. The area south of the light station is a private residential summer island community. Although the island is relatively isolated from mainland Massachusetts, the housing density can be classified between rural and suburban, depending on the location of homes on the island (Figure 2). The island is zoned for residential purposes.

3. **Floodplain:** The Bakers Island light station and surrounding structures and grounds are located within a coastal floodplain based on the Federal Emergency Management Agency (FEMA) Flood Insurance Rate Map (FIRM) (See Attachment J). All of the structures

and the majority of the property are located in areas subject to minimal coastal flooding (Zone C). Only the cliff areas and rocky shoreline to the north and west of the light station are within the 100-year floodplain (Zone V2). Zone V2 areas are also subject to coastal wave action with base flood elevations ranging from 12 feet on the west side of Bakers Island to 30 feet on the east side of the island. Development of the light station property will comply with all federal, state, and local laws and regulations related to floodplain and coastal zone management.

4. **Wetlands:** Based on information provided by the National Wetlands Inventory and Massachusetts Geographic Information System (GIS), no wetlands are currently present within the Bakers Island Light Station property. On the southeast boundary of the property there is a small, vegetated wetlands area that abuts the island's fresh water pond. If future work is planned that might affect this area (no work is planned at present), an environmental consultant will be used to identity jurisdictional upland/wetland resource areas for protection and to limit public access.

5. **Endangered species:** No known federal or state threatened, endangered, or rare species of organisms are known to exist within the light station property. If found to be present, natural wildlife nesting habitat will be secured from the public during nesting season(s) and other precautions will be taken as necessary and in compliance with federal and state laws.

6. **Effect on natural resources, land uses or water uses in the coastal zone:** ENHC does not propose to build new structures or alter the property in any significant way except for the arrival and departure of visitors that will take place on the gravel beach on the westerly side of the property.

7. **How many visitors on a daily basis and how many vehicles?** Between 15 and 25 visitors will be introduced to the Bakers Island Light Station property on a daily basis during the principal months of operation May-September. In addition there may be 4-8 people in residence from time-to-time. The number of visitors to the property will increase as facilities and programs are developed -- although it is anticipate not to exceed more than 40-50 people per day at peak season. Access to Bakers Island is solely by boat transportation. Therefore, the visiting public will not introduce additional vehicles to the property. Boat traffic will increase slightly on a daily basis in order to transport a limited number of visitors to the light station property. Pedestrian or foot traffic between the beach and the lighthouse will increase moderately as the visitors are given the opportunity to tour and enjoy the light station and surrounding grounds.

8. **How much water will the applicant use in a normal day? How much sewage?** Water usage and sewage generation at the Bakers Island Light Station will increase. It is estimated that between 25-150 gallons of water per day will be consumed with 70 percent to be disposed of on site. Water currently is provided from a well, but its capacity is not known. The water supply may be supplemented by catching roof water as some of the residents currently do. Day visitors will be encouraged to bring (and take away) their own bottled drinking water. Program participants will use the current septic system on

the property to handle their sewage and educated to the environmental benefit of proper resource management. Prior to the limited opening of this property to the public, the system will be inspected, and maintained to ensure proper operation. For the long term use of the property, it is anticipated that the development plan will call for a new composting toilet system to be designed, permitted, and installed.

9. **Will the use result in toxic, hazardous or radioactive materials release?** The proposed use of the Bakers Island light station and surrounding grounds will not result in the use, release and/or disposal of toxic, hazardous, or radioactive materials, or in the exposure of people to such materials. Small quantities of propane and kerosene are currently being stored and used for heating and lighting and will continued to be used for these purposes.

10. **Will any known or potential archeological sites be affected?** Although little information is known about possible archeological resources on Bakers Island, all activities and development conducted within the Light Station property will ensure that any archeological site present will not be destroyed and access to any archeological site within the property will not decrease. If any resources are discovered, a qualified archeologist will be hired to prepare an analysis and a plan for the proper preservation of these resources.

11. **Will the proposed use violate or require any variances pertaining to visual environment, odors, public health, or noise?** None required. The proposed use of the Bakers Island Light Station property will not violate any Federal, state, or local law pertaining to the visual environment, odors, public health, noise. The activities planned by ENHC are not in contrast to the natural surroundings of the island. No significant changes are planned that would trigger the need for relief from regulations. The intended use of the property will be in harmony with the natural surroundings.

12. **Will proposed use violate or require any variances for land, air or water pollution or land use?** None required. The proposed use will not violate any Federal, state, or local law pertaining to pollution (land, air, and water), and land use.

Qualifications of the preparers and contact information:
This questionnaire was prepared by:

**National Park Service: Salem Maritime National Historic Site staff**
Daniel Noon
Biological Science Technician
174 Derby Street
Salem, MA 01970
Phone: 978-740-1680
Fax: 978-740-1685
daniel_noon@nps.gov

**And**

**Meridian Associates, Inc.**
*Civil Engineers, Land Surveyors, Landscape Architects, Transportation Planners & Engineers*
Don Bowen, TLS, Principal
98 High Street
Danvers, MA 01923-3189
Phone: 978-739-9130
FAX: 978-739-9140
dbowen@meridianassoc.com

**In consultation with:**

**City of Salem Building Inspector**
Frank DiPaolo, Local Building Inspector
120 Washington Street
Salem, MA 01970
Phone: 978-745-9595
Fax: 978-740-9846

**City of Salem Conservation Commission**
120 Washington Street
Salem, MA 01970
Phone: 978-745-9595

**EXHIBIT D**



# United States Department of the Interior

**NATIONAL PARK SERVICE**
1849 C Street, N.W.
Washington, D.C. 20240

IN REPLY REFER TO:

L58 (0120)

OCT - 6 2004

Ms. Betsy Ware
84 Federal Street
Newburyport, MA 01950

Dear Ms. Ware:

Thank you for your e-mail request for a copy of the map for the Essex National Heritage Area.

I have enclosed a copy of the map referred to in section 503 of Title II of the Omnibus Parks and Public Lands Management Act of 1996, P.L. 104-333. This is the final map for the Essex National Heritage Area and is on file in our Boston regional office as well as our Northeast regional lands office in Philadelphia.

I understand you recently sent a further request under the Freedom of Information Act for additional information about the heritage area. That information is being gathered at this time and will be sent to you as soon as possible.

Sincerely,

Fran P. Mainella
Director

Enclosure



**Essex Heritage District - Boundary**
**Essex County, Massachusetts**

National Park Service
U. S. Department of the Interior

EXHIBIT E



# United States Department of the Interior

NATIONAL PARK SERVICE
1849 C Street, N.W.
Washington, D.C. 20240

IN REPLY REFER TO:

H30(2280)                               JUL 14 2004

Mr. Thomas B. Hallowell
President
Baker's Island Lighthouse Preservation Society
26 Pleasant Street
Wenham, Massachusetts 01984

Subject: Application for the Acquisition of the Baker's Island Light Station Pursuant to the National
Historic Lighthouse Preservation Act (NHLPA)

Dear Mr. Hallowell:

The National Park Service has completed a review of the applications submitted for the acquisition of the
Baker's Island Light Station pursuant to the National Historic Lighthouse Preservation Act (NHLPA). The
applications submitted by your organization and others were carefully evaluated against the four
application criteria outlining your organization's proposed maintenance and preservation plan, use plan,
financial plan, and management plan for the operation of the property. Based upon our review and
evaluation, the National Park Service has concluded the application submitted by the Essex National
Heritage Commission represents a superior program for the preservation and public use of the Baker's
Island Light Station. The National Park Service will recommend that the Secretary of the Interior select
the Essex National Heritage Commission as the recipient of the Baker's Island Light Station in accordance
with NHLPA.

The National Park Service encourages cooperation and coordination between your organization and the
Essex National Heritage Commission in the preservation and public use of the Baker's Island Light
Station. As I am certain you are aware, there are significant opportunities for collaboration with the Essex
National Heritage Commission in meeting the preservation needs of the historic light station.

The National Park Service's selection recommendation is subject to administrative review. To petition for
review, forward a letter of the request within 15 days of the date of this letter to:

Mr. Craig Manson
Assistant Secretary for Fish, Wildlife and Parks
United States Department of the Interior
1849 C Street NW
Washington, DC 20240

If the Society does not request a review, then the Secretary will forward the recommendation to the
Administrator of the General Services Administration. If the Society requests a review, then a new
committee made up of staff from the Department of the Interior's Washington Office, including two subject
matter experts and two appointees – one by the National Park Service Director and one by the Assistant

Secretary for Fish, Wildlife and Parks — will review both applications and submit their recommendation to the Assistant Secretary.

If you have any questions or require further information, please contact P. Daniel Smith, Special Assistant to the Director at 202/219-1688 or p_daniel_smith@nps.gov. The National Park Service appreciates your organization's interest in the preservation of our nation's maritime heritage.

Sincerely,

Janet Snyder Matthews, Ph.D.
Associate Director, Cultural Resources

cc:     Ms. Saundra Robbins, Realty Specialist
        US General Services Administration
        Property Disposal Division
        10 Causeway Street, Room 925
        Boston, MA 02222

        Ms. Lisa McCann
        National Park Service
        Philadelphia Support Office
        U.S. Custom House
        200 Chestnut Street
        Philadelphia, PA 19106

        Ms. Cara Metz
        State Historic Preservation Officer
        Massachusetts Historical Commission
        220 Morrissey Boulevard
        Boston, MA 02125

EXHIBIT F

Baker's Island Lighthouse Preservation Society

July 27, 2004

Mr. Craig Manson
Assistant Secretary for Fish, Wildlife and Parks
United States Department of the Interior
1849 C Street NW
Washington, DC 20240

Subject:    Application for the acquisition of the Baker's Island Light Station
Pursuant to the NHLPA

Dear Mr. Manson,

Receipt of this letter represents the Baker's Island Lighthouse Preservation Society's request to petition for review of the National Park Services recommendation that the Secretary of the Interior select the Essex National Heritage Commission as the recipient of the Baker's Island Light Station.

The Society continues to feel that it has submitted the superior proposal.  It is important to keep in mind our relationship with the Light Station since its inception.  Islanders have aided the Coast Guard in protecting the station when it was occupied by Coast Guard personnel and after the light was fully automated in the 1970's.  It was islanders who petitioned the Coast Guard to rebuild and preserve the two keeper's cottages after they fell into disrepair when the Coast Guard pulled its personnel.  It was the Baker's Island Association who negotiated a 30 year license with the Coast Guard so that a keeper's cottage could be occupied and preserved. Islanders have maintained the light station for 25 years now, devoting ten hours per week to mow the lawns and trim the flora.  It is difficult to believe that any other organization could effectively compete with our proven success.

Additionally, solid plans for use, maintenance, and financials were put forth.

We would like the Department of the Interior to release the scores from the first round demonstrating the differences in the applicant's appraisals.

This petition for a review letter has been duly posted within the 15 day grace period.

Sincerely,

*Thomas B Hallowell*

Thomas B. Hallowell, President
Baker's Island Lighthouse Preservation Society

EXHIBIT G

385 Magnolia Avenue
Gloucester, MA. 01930


July 26, 2004
BY U.S. Mail (RRR) and E-Mail


Mr. Craig Manson
Assistant Secretary for Fish, Wildlife and Parks
United States Department of the Interior
1849 C. Street NW
Washington, DC. 20240

RE:    Request for Review of Decision of the National Park Service Pertaining to the
       Acquisition of the Baker's Island Light Station Pursuant to the National Historic
       Lighthouse Preservation Act (NHLPA)


Dear Mr. Manson:


In response to Cultural Resources Associate Director Janet Snyder Matthews' July 14, 2004 letter to the Baker's Island Lighthouse Preservation Society, I am submitting the following supplemental information to be included with BILHPS' president Thomas Hallowell's formal request for review of the above noted decision. As an abutter and BILHPS Director I am disappointed in the recent decision to recommend that the Baker's Island Light Station be given to the Essex National Heritage Commission. In that Baker's Island has overseen the preservation and the protection of the light station property for over thirty years, the Baker's Island Light House Preservation Society (BILHPS) believes that it is the better conservator and caretaker of the property and it is for the below noted procedural and factual reasons we are requesting a review of the application process. Depending on the outcome of this review, we may be requesting further reviews and appeals should they be deemed necessary for BILHPS to prevail.

In a 2002 press release, Secretary Norton noted, *"Sometimes private groups can do more than the federal government. They bring their enthusiasm and willingness to work endless hours to restore something they love"*. BILHPS believes Secretary Norton's statement to be true and would continue to be true should BILHPS be granted the light station. As indicated in the BILHPS proposal, BILHPS has worked with the Coast Guard in maintaining the light station property for over thirty years and has a number of islanders who are trained in preservation planning, preservation carpentry, environmental assessments, professional fundraisers, financial planners and other professions which directly relate to present and future needs of the light station.

1

Given that BILHPS does not have a full understanding of the procedural process for the review, we have outlined below our concerns as they relate to the BILHPS proposal and that surmised generated from the Essex National Heritage Commission (ENHC). To some degree BILHPS believes that the request for review may be fruitless but due to a number of serious concerns relating to the possible proposal of ENHC we believe we must speak out on these issues.

It should be noted that on the May 11th visit of Dan Smith, the Special Assistant to the Director, he stated publicly that any decision made by him would remain throughout any review or appeal process. This statement that the review process was basically moot, coupled with the lack of guidelines on the review process, secrecy (or lack of public process) in the decision making and the lack of review/appeal related information on the above noted decision letter, have resulted in some confusion in what any formal request for review should include. While we may have included more than necessary, we continue to believe that the below noted concerns are viable and valid concerns relating to the de-accessioning of the Baker's Island Light Station and the NPS recent determination to award the light station to the Essex National Heritage Commission.

Our request for review includes the following procedural and factual concerns:

1.      **Eligibility of ENHC to Apply for the Baker's Island Light Station:** BILHPS does not believe that the ENHC is eligible to apply under this program. True, the ENHC is a non-profit (501-C-3) organization, however it was created by the *"Omnibus Parks and Public Lands Management Act of 1996"* to:

a.      *"recognize, preserve, promote, interpret and make available for the benefit of the public the historic, cultural and natural resources of the North Shore and lower Merrimack River valley in Essex County……….*

b.      *implement the appropriate alternative as described in the document entitled "The Salem Project: A Study of Alternatives", dated January 1990, within the boundaries of Essex County; and*

c.      *to provide a management framework to assist the Commonwealth of Massachusetts and its units of local government in the development and implementation of an integrated cultural, historical and land resource management program in order to retain, enhance, and interpret the significant values of the lands, waters and structures located in the Essex National Heritage Area.*

**BILHPS does not believe that the ENHC is eligible for three reasons that relate to the Congressional legislation that created the ENHA.** These are as follows:

a.      The legislation states that *"The Area shall comprise the lands generally depicted on the map numbered NAR-51-80,000 and dated August 1994. The map shall be on file and available for public inspection in the office of the Director of the National Park Service".* Under the Freedom of Information Act, we are requesting a copy of this map and are willing to pay for any reproduction costs in providing it to us.

Until the boundary map referenced within the legislation can be located, there can be no confirmation that Baker's Island is within the jurisdiction of the ENHA. To further add to the confusion on the actual delineation of the ENHA, the ENHA website maps differ from the maps included in the written plan and the written description of the district discusses it being "a 500 square mile area between the Atlantic Coast and the Merrimack Valley." (If the intention was to include all of Essex County, it could have been clearly written in the legislation that the ENHA boundaries were to include all of Essex County.)

b.    The Congressional legislation does not anticipate that the ENHC could own real property. The legislation sets the priorities noted in Section 504, however none of these note the ownership of real property. Furthermore, in Section 505, subsection (3), it is noted that "the Secretary may occupy, utilize, and acquire easements or leasehold interests in resources as required to implement the programs and purpose of this title" however no rights appear to be noted in either the legislation or in the subsequent ENHA management plan to own real property. The ENHA management plan specifies (see page 13) that "Accordingly, despite the fact that there are few limitations placed on these federal funds (they cannot be used for land acquisition), ... ... ...

At present the ENHC does not own any real estate (it has rented offices, etc.). Based on the ENHC's lack of history in managing real property, it is difficult to imagine the ability of this group to own and manage an island light station that has no water, sewer, or electricity and can only be accessed from a rocky shoreline beach. Subject to the whims of Mother Nature, it would clearly be a very challenging first property to own and manage;

c.    In accordance with Congressional legislation, the ENHC would have limited funds with which to preserve and maintain the Baker's Island Light Station. In 1996 Congress stated that the ENHC would be entitled to a maximum of $1M per year for a maximum of $10M. Furthermore, "the Secretary may not make any grant or provide any assistance under this title after September 30, 2012." To date, the ENHC has used up to $7M since it's inception and has a remaining $3M to be used within the next eight years. While we are in the process of reviewing the ENHC's annual non-profit reports from the Commonwealth of Massachusetts Attorney General's office, it would appear that the private fund raising completed by ENHC has not been as successful as originally projected, resulting in limited resources to

fund the ongoing maintenance and capital improvements required for the continued preservation and upkeep of the light station.

It should be noted that there is a recent bill (HR-4492) in Congress to increase some National Heritage Area funding to a total of $20M to the year 2027, however it is not clear that this amendment applies to the ENHA. Even if this amendment were to apply to the ENHA, the NPS funds actually decrease on an annual basis.

Additionally, with the Management Plan for the ENHA stating that the federal funding authorized by Section 508 of the Act can not be used for land acquisition, our attorneys are working to explore the source of that limitation and whether it would also apply to matching funds under the Act.

2........**The Acquisition of the Baker's Island Light Station Is Not Included within the ENHC Approved Management Plan:** The *"Omnibus Parks and Public Lands Management Act of 1996"* required that, within three years after the date of the designation of the National Heritage Area, the ENHC prepare a management plan for the area. The only mention of the Baker's Island Light Station (BILS) in the ENHC's plan is within Appendix D, with the erroneous information that the Baker's Island Light Station being a resource that is open to the public by appointment.

The fact that the ENHC now wants to include the Baker's Island Light Station in their management plan poses certain issues and/or violations of compliance with the ENHC management plan. These include, but are not limited to, the following:

a.      The ENHA Management Plan specifies (see page 13) that "Accordingly, despite the fact that there are few limitations placed on these federal funds (they can not be used for land acquisition),..... One could argue just the act of using federal funds for staff time to prepare the ENHC application to the NPS for the acquisition of the BILS may not be eligible. As stated above, our attorneys are presently reviewing whether matching funds also apply to these limitations (see 2.c. above);

b.      The plan does not include an appropriately scaled map of the ENHA. The maps within the plan vary – several indicate Baker's Island, several do not. There is question as to whether Baker's Island is within the jurisdiction of the ENHA (see prior statement requesting the official ENHA boundary map);

c........There is no statement within the plan that anticipates that the ENHC would own real estate. Throughout this document (and the enabling legislation) their priorities are to: *1) provide heritage programming, interpretation, and education; 2) provide resource stewardship and*

4

*preservation; 3) provide heritage development and outreach; 4) provide public outreach and marketing; and 5) provide planning and design assistance.* None of these priorities mention the ownership of real estate nor does the federal legislation enable them to do so;

d.   The BILS is not included in the ENHC's financial plan for the ENHA. If private funds are diverted from other projects to fund the light station, then projects included in the plan would go without. With private funding levels not up to the anticipated amounts noted in the management plan, the expense of operation and ongoing maintenance of the BILS could be prohibitive.

**3.   The ENHC proposal cannot comply with a number of requirements noted within the Application and/or as noted elsewhere within the regulations:** While BILHPS does not have access to the ENHC's application, BILHPS has reviewed these same issues for their application. While there are a number of areas where both candidates cannot comply with the application process, BILHPS believes that it, or potentially a private owner, would be better equipped to comply with the regulations and requirements relating to the ownership of the BILS. Our concerns relative to compliance with the requirements of the program are included, but not limited to, the following provisions:

a...**Access:**   No entity can provide safe access over the shoreline. The concept of running daily tours to the beach compromises the health, safety and welfare of any visitors to Baker's Island as well as to existing cottage owners. The Coast Guard beach is rocky, located in an area prone to ocean swells and squalls and is in an unlikely location for installation of a pier or boat rail installation. The Coast Guard has continually refused to land its boats on the beach (even for Dan Smith's May 2004 tour of the island, the Coast Guard refused to land on the beach!) and has publicly stated that landing on the beach as a means of access to the BILS is untenable.

It is only a matter of time before someone is seriously injured or killed via these beach landings. In this situation who is liable for any injury or damage? (The general terms and conditions of the Application, (e) specify that the grantee shall hold harmless the United States from any suit, claim, demand or action etc. for personal injury or property damage, etc.). Additionally, with weather in the area being unpredictable, it is likely that visitors may be pinned down or stranded on the island due to inclement weather. (There is not one seasoned boater on the island who has not been stranded for anywhere from hours to days, based on the unpredictable weather.) If such stranding were to take place, would ENHC be prepared to feed, house and/or provide the support systems required to keep its visitors comfortable and safe? This issue of access over the shoreline is not any easy issue to address............neither ENHC nor BILHPS has the capability of providing safe, viable, daily access to the BILS from the shore.

While there is a privately owned pier on the island, this pier is privately maintained and insured. Not only is the facility not constructed and/or equipped to handle the additional capacity of daily visitors to the BILS (although it is better equipped to address the issues and requirements of ADA compliance than the sole beach access to be used by ENHC), the privately held wharf company does not have the capacity to address the already cost prohibitive insurance costs of maintaining and insuring such a facility.

This being said, BILHPS and the Baker's Island Wharf Company have entered into discussions on allowing limited access over the pier. This access would not be daily, year 'round access but would be considered for a number of weekend days throughout the summer season, when the weather is likely to be the calmest and most conducive to the safe transit of visitors to the island.. The critical points in these discussions have included: 1) limited access; 2) event liability insurance; 3) ferry service liability insurance; 4) the potential of limited improvements to the pier; and 5) assurances that visitors would not stray onto private property (therefore threatening the quiet enjoyment of cottage owners and their properties). BILHPS and the Wharf Company remain committed to working together to try to address the access issue for visitors to the BILS.

There has been some conjecture relative to the construction of a new pier to address the public access at the BILS. There are several problems with this concept. They are as follows:

1. The land to be transferred from the GSA to the grantee does not include "submerged lands". The submerged lands would have to be released by the two communities that own them, resulting in a morass of red tape, time delays and exorbitant expense;

2. There is no adequate or "good" location for a pier on the Coast Guard beach. The former boathouse, boat rail and other improvements were swept away in various storms. Experts in the area of pier construction have been consulted and based on their comment and the experiences of the BI Wharf Company, it is unlikely any pier constructed on the Coast Guard beach would be outrageously expensive and would last less than ten years;

3. The costs for permitting and construction of a pier would be prohibitive.

**b. Seasonal Access:** It should be noted that the BILS is only practically available during May to September of any given year. Unlike light stations such as the Currituck Beach Light, which is accessed both by ferry and automobile, there is no automotive access to the island and shore landing is untenable during the off-season. With the exception of caretakers, who are on the island for all but two summer months, the island is rarely inhabited from September to April of each year. To encourage visitors during the off-season would jeopardize the health and safety of visitors and islanders alike;

c. **Fire Protection:** There is no water, telephone or electricity at the BILS. This poses certain difficulties when it comes to fire protection and the safety of the inhabitants of the light station as well as those on the island. Islanders are constantly aware of the issues relative to fire and fire safety on the island (Most cottages are limited to the use gas or kerosene lights on the first floor and flashlights on the second floors.) There are two fire ponds within the center of the island that are manned by volunteer "firefighters", who run training exercises a couple of times a season. Should the BILS be fenced off from the remainder of the island, the access to the island fire-fighting system would be limited, therefore creating difficulty to control fires within the 10-acre BILS property. Since many private properties on the island can not obtain homeowner's insurance (due to unavailability or cost), cottage owners are extremely cognizant of the issue of fire and the lack of protection afforded on the island. A stray cigarette or out-of-control brush fire could devastate the entire island.

Based on the experience and history of the property owners with issues of fire safety, BILHPS believes that it is better able to address the issues relative to fire safety than ENHC.

d. **Title V- State Sanitary Code/Exec. Order 11288 Prevention, Control and Abatement of water pollution:** There is no sewer system on Baker's Island. As indicated in the BILHPS application, there is poorly installed wastewater system installed on the BILS, however it was never properly installed nor was there any training on the operation of this system. Both light keepers homes are served by cesspools that do not comply with either Title V- the Massachusetts State Sanitary Code and/or Executive Order 11288, which addresses the Prevention, Control and Abatement of water pollution. Should either party be successful in gaining title to the property, this issue would need to be addressed. With access only over the shoreline, new systems would either have to be installed from the water via barge with crane or materials would need to be flown in via helicopter. The costs would be prohibitive!

e. **Financial Viability of the BILS:** As indicated above, the tourist/visitor season is limited, therefore resulting in limited revenues generated by visitor admission fees. With the Congressional legislation not anticipating that the ENHC would own property and federal funds dwindling, there are limited means to fund the BILS. Coupled with the access issues, there are limited opportunities for financial growth at the BILS. Creative thinking and fundraising are required in order to insure the light station's ongoing maintenance and preservation;

f. **Emergency medical attention:** Baker's Islanders have an "unofficial medical staff" of retired nurses and doctors, who attend to the needs of cottage owners and visitors on the island. Residents with allergic reactions, congestive heart failure, swimming accidents, and boating accidents are all

7

common on the island. As necessary the systems have been established (on land and on the island) to remove island residents to the mainland to seek appropriate medical attention. ENHC visitors to the island would not be afforded immediate medical help (on the island) and, due to landing delays on the beach, may not be afforded the immediate opportunity to get off the island to appropriate and necessary medical help. With lack of telephone service playing a part in this issue, BILHPS has strong concerns relative to the public safety of ENHC visitors to the BILS and the ENHC's ability to address public safety to all its visitors;

g.  **Existing year 'round security:**  The Baker's Island Homeowner's Association (BIHA) annually hires caretakers who live on the island for 10 months out of the year. The caretaker's presence on the island insures the protection and security of the island, particularly during the off-season. If the ENHC were to prevail in the ownership of the BILS, BIHA would require that the BILS have year 'round security to protect the entire island, particularly during the off-season.

Based on the concerns noted above, we believe that ENHC may not be the best available candidate for the Baker Island Light Station. Obviously, given the thirty years experience in overseeing the light station the BILHPS believes that it is better qualified to handle the unique and often times difficult issues relating to this unique property.   In the event that the review committee seriously question (as we have) the limitations of the ENHC in their ability to oversee the BILS property, we propose the following alternatives:

1.  consider granting the BILHPS the BILS, with the provision that it coordinate with the ENHC on limited public access to the property. This might include coordination on the "Trails and Sails" weekends as well as a number of other appropriate times during the season (similar to the Thatcher's Island visitation schedules);

2.  consider granting the BILHPS the BILS, with the provision that it lease the BILS to the ENHC and/or to various college programs for marine studies. The ENHC would be able to coordinate its educational programs, public access programs and comply with their charter, with BILHPS owning the property and attending to some of physical improvements required on the property. ENHC would not own the property (because by one reading of the legal facts of the matter they can not own real estate) and would not be saddled with the difficulties and obstacles of owning an island property;

3.  consider the fact that both BILHPS and ENHC may not be the ideal candidates for this property and revert the BILS to the public bidding process. While under the Lighthouse Preservation Act, no lighthouse has been subject to this process, it may be the first candidate that warrants the public bidding process. A private

8

owner may have the skills and financial "pockets" to address the concerns and idiosyncrasies of this unique island property.

While there may be other options to the ownership of the BILS, the above noted options are just several thoughts we have regarding the property and how to address the unique situation of the BILS.

The arguments we have put forth here have certain merit according to best legal counsel available to us. Based on our limited time for research and review, we are confident that there are a number of valid and viable concerns relating to the de-accessioning process and the facts involved in this process. To this end, we are committed to diligently and persistently review and pursue every avenue to come to end that is fair and equitable to all parties.

I invite all reviewing agents to contact Thomas Hallowell or me to visit the property to understand the unique challenges facing the BILS and any potential owner of the property. Thomas Hallowell can be contacted at thallowell@essex400.com (or 978-921-0452). I can be contacted at 978-879-9499 (or 978-281-2441).

I thank you for your consideration in this review and please be assured that we would like to come to a fair and equitable resolution of the disposition of the Baker's Island Light Station.

Sincerely,


Robert T. Leavens

Baker's Island Lighthouse Preservation Society Director


cc:    Thomas Hallowell, BILHPS President
       Fran Mainella, NPS Director
       Janet Snyder Matthews, Asst. Director, Cultural Resources
       Dan Smith, Special Assistant to the NPS Director
       Saundra Robbins, GSA
       Lisa McCann, NPS
       Cara Metz, Massachusetts SHPO
       Stephen Anderson, Anderson and Kreiger

**EXHIBIT H**



# United States Department of the Interior

OFFICE OF THE SECRETARY
Washington, D.C. 20240

[JAN 1 8 2005

Mr. Thomas Hallowell
Baker's Island Lighthouse Preservation Society
26 Pleasant Street
Wenham, MA 01984

Subject: Review of the National Park Service (NPS) Recommendation for the Selection of a Recipient of the Bakers Island Light Station Pursuant to the National Historic Lighthouse Preservation Act (NHLPA)

Dear. Mr. Hallowell:

In response to your request, my office has conducted a review of your organization's application for the acquisition of the Bakers Island Light Station as well as the application submitted by the Essex National Heritage Commission. The NPS evaluation of the application was also considered in the review.

The review included an independent assessment of the Preservation and Maintenance Plan, Use Plan, Financial Plan, and Management Plan contained within your organization's application and that of the Commission. The conclusion of the review is that the NPS fairly assessed the relative merits of both applications. While the commitment of your organization is to be commended, the historic preservation expertise reflected in the Commission's application, as well as their multiple partnerships with other organizations for a fully articulated plan of use for the light station, and access to funding sources, supports tile NPS recommendation.

Therefore, I affirm the NPS recommendation and find the Essex National Heritage Commission is the most qualified entity to provide for the continued and enhanced preservation, maintenance and public use of the Bakes Island Light Station. Under the authority of the NHLPA, the Secretary of the Interior will recommend to the Administrator, General Services Administration, transfer of the Bakers Island Light Station.

I hope your organization will consider working with the Essex National Heritage Commission in addressing the challenges of providing for the restoration and use of the Bakers Island Light Station.

Sincerely,

Craig Manson
Assistant Secretary for Fish and Wildlife and Parks

cc: MA-SHPO