UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BAKER'S ISLAND LIGHTHOUSE PRESERVATION SOCIETY, INC. And ROBERT LEAVENS<br>      Plaintiffs,<br>v.<br><br>UNITED STATES DEPARTMENT OF INTERIOR, SECRETARY OF THE INTERIOR, NATIONAL PARK SERVICE, DIRECTOR NATIONAL PARK SERVICE, CRAIG MANSON, As He Is Assistant Secretary Of Fish, Wildlife And Parks, JANET SNYDER MATTHEWS, As She Is Associate Director, Cultural Resources, National Park Service, BRIAN SWEATLAND, As He Is Special Assistant to the Office Of The Director, National Park Service, ADMINISTRATOR OF GENERAL SERVICES, GENERAL SERVICES ADMINISTRATION, and JOHN KELLY, As He is Acting Director of Property Disposal, General Services Administration<br>      Defendants | C.A. No. 05-10855 PBS |

## AFFIDAVIT OF ROBERT T. LEAVENS

I, Robert T. Leavens, being duly sworn, depose and say as follows:

1) I am one of the plaintiffs in the above-entitled action. I submit this affidavit in support of the plaintiffs' request to permit discovery beyond the "administrative record" certified by the National Park Service ("NPS") in this lawsuit.

2)   On August 15, 2005, Jennifer Perunko, of the NPS, certified an "administrative record" for the January 18, 205 decision of the Department of the Interior, Assistant Secretary of Fish, Wildlife and Parks, confirming the recommendation of the NPS to convey the historic light station on Baker's Island to the Essex National Heritage Commission.

3)   I believe the "administrative record" as certified by Ms. Perunko is an insufficient basis for the Court's decision in this case and that it would be unjust to rely solely on the so-called "administrative record" in resolving the issues in this case.

4)   The grounds for my belief are:

(a)   While the complaint in this case challenges "preliminary, procedural and intermediate agency action" that underlies the January 18, 2005 decision, the "administrative record" produced fails to include any of the government's documents or communications regarding the preliminary agency action which is challenged in the complaint:

(b)   The government has acted in bad faith in its dealings with the co-plaintiff, Baker's Island Lighthouse Preservation Society ("BILPS"), and me throughout the decision making process and in the litigation. Some of the examples of bad faith include:

(i) failing to respond to numerous Freedom of Information Act requests submitted by me and on behalf of BILPS to the government defendants seeking basic information about the decision making process;

(ii) conducting the decision making without the Congressional mandated policies and process required to be developed years before the decision making process began;

(iii) inventing the idea that the required policies and process are embodied in its application and on its website flow chart and designating these as such <u>after</u> the decision was made and <u>after</u> the litigation commenced;

(iv) answering the complaint and defending the case on the basis of these policies and process designated solely for purposes of the litigation; and

(v) certifying an administrative record that is incomplete, that omits highly relevant documents concerning the decision at issue, that omits basic documentation and communications concerning the administrative action complained of in this lawsuit and that omits documentation that is damaging to the government's position on key issues raised in the case.

5) The following facts form the basis for my belief that the government acted in bad faith in its dealings with BILPS and me:

(a) For over the past year, on behalf of the Baker's Island Lighthouse Preservation Society (BILPS) I, or my representative, have submitted a number of written requests for information to the NPS and the GSA under the Freedom of Information Act (FOIA). To date several requests made to the NPS have gone unanswered. Other requests have been only partially

answered. In fact, in a letter, dated April 4, 2005, from Darrell R. Strayhorn, the FOIA Appeals Officer, Office of the Solicitor, Mr. Strayhorn stated that "we hope that you will delay filing a lawsuit so that the Department can thoroughly review the issues in your appeal and make a determination.".

(b) I, or those representing me, have had several telephone discussions with Ms. Perunko, Brian Sweatland, Brenda Barrett and Suzanne Copping of the NPS as well as Saundra Robbings of the Boston GSA office regarding the selection of an eligible entity to own the Baker's Island light station. No notes from these conversations have been included in the "administrative record".

(c) On December 7, 2004 my representative had a telephone conversation with Brenda Barrett, the NPS Program Director for the National Heritage Areas Program. In that conversation, the management plan of the Essex National Heritage Commission's (ENHC) was addressed as was the Commission's financial ability to make its federally-legislated "match" of NPS funding. In that conversation, Ms. Barrett stated that the ENHC "could change their plan tomorrow and can do anything they want" without approvals from any federal entity. She further stated that she did not deal with the financial oversight of any of the Heritage Areas nor could she direct me to any representative within the NPS who did oversee the financial operations of Heritage Areas, since there are no internal regulations or CFRs on the operations of Heritage Areas.

(d) On December 31, 2004 my representative spoke with Brian Sweatland of the NPS. While it had been represented by other NPS officials that Mr. Sweatland assumed the responsibilities of P. Daniel Smith, the Special

Assistant to the Director, Mr. Sweatland disavowed any knowledge of Mr. Smith's actions and/or professional responsibilities. Mr. Sweatland was asked to respond to the November 2, 2004 letter from my representative regarding questions on the NHPLA process sent to P. Daniel Smith. No responses were ever forthcoming from P. Daniel Smith, Brian Sweatland or other NPS officials who were provided copies of the letter.

(e) I have provided a number of documents to defendants Craig Manson and Janet Snyder Matthews regarding the appeal process. No notes from either of these defendants have been included in the "administrative record".

(f) I, individually or through my representative, have made countless requests for information and/or clarification of the NHLPA process for over the last year and, for the most part, my requests have either not been answered or were passed on to another party for action. My requests under FOIA were copied to FOIA compliance officer Diane Cooke. Her correspondence is not included in the "administrative record".

(g) From April 10 to April 13, 2005 I attended the Northeast Lighthouse Conference in Newport, Rhode Island. The conference was sponsored by the National Park Service, the General Services Administration, the U.S. Coast Guard and others to inform interested parties about the National Historic Lighthouse Preservation Act and to assess whether the program has been successful to date. During this conference the following occurred:

(1) During Session I, Kebby Kelly from the U.S. Coast Guard, John Kelly and Saundra Robbins from the GSA and Lisa McCann of the NPS talked and

even joked about the fact that the three agencies had not been able to work together to assemble regulations on the NHPLA process. In the last session, on April 13, 2005, a question was asked about when regulations would be adopted. Jennifer Perunko of the NPS responded that draft regulations were being reviewed by the NPS Solicitor and that once they were reviewed and commented on, revisions would be made. She did not provide a timetable for such adoption, even though federal legislation that created the NHLPA states that guidelines and procedures were to be adopted within one year of NHLPA being approved by Congress or by February 2001.

(2) During Sessions I and IV it was admitted that the first two light house de-accessioning processes were not subject to the present application and review process requirements. The "national" and "pilot" programs were subject to "evolving applications and requirements" and that "the bugs need to be worked out between agencies". In Session IV, the current application and review materials were distributed to conference participants.

(3) Throughout the conference there was question as to whether there would be a transcript of the conference that conference attendees could use in preparing their applications, etc. The conference was recorded and then posted on a teleprompter within the room. GSA officials, who were responsible for the recording of the conference, assured conference attendees that a full record of the conference would be made available to

ID # 449036v01/14457-2/ 11.03.2005

all attendees. In a later discussion with Saundra Robbins of the GSA, Ms. Robbins stated that the GSA had used this specific technology in prior conferences and that it was very accurate in capturing the contents of a meeting or conference. To date, the GSA cannot provide the "promised document" as it claims that it had "technical difficulties" in the recording of the conference. In reviewing what I have received from the GSA, only about one-tenth of the contents of the conference have been made available and that information is spotty at best;

(4) During Session IV, which discussed the application process, Lisa McCann and Jennifer Perunko of the NPS stated that they did not read the attachments to NHLPA applications. They stated that they did not have time to read the entire applications, let alone the attachments;

(5) During the conference there was extensive presentation and discussion on the issues of hazardous materials at light stations and the need of the NPS to condition transfers of light stations to address any contamination on a site. These conditions are based on environmental reports conducted for each light station. To date no environmental report for the Baker's Island Light station has been included in the "administrative record";

(6) In Session III of the conference, an extensive discussion addressed the question of who would review and enforce the Secretary of the Interior's Standards, which would be a requirement at each light station. Lisa McCann of the NPS stated that the NPS did not have the time or staff to oversee the light stations. While a number of options for oversight were

discussed, it appeared that the State Historic Preservation Officer (SHPO) would likely be the designated entity to oversee compliance; however "monitoring was not determined yet."

(7) In Session III, John Kelly of the GSA addressed the requirement that light stations be sold in the event the competitive process is not successful. He stated that "the terms of the sale would be developed by GSA through a competitive bid process", that it "would be posted on the web" and that there would be "an invitation to bid or on-line auction." He did not delineate how the GSA made the determination as to which process would be followed for each light station and did not indicate that there was an established process or procedure for the sale of light stations as required by Congress.

(h) I have provided my attorney with copies of dozens of documents which are relevant to the decision making process, but were not included within the "administrative record". This leads me to believe that there are many more.

(i) I have conducted extensive deed research on the U.S. Coast Guard's title to the property in question. In order to be included in NHLPA, the light station must be eligible for the National Register. In order to be included on the National Historic Register of Historic Places, ownership must be described. The U. S Coast Guard claimed in its National Register Nomination that the deed to the property was on record at the South Essex District Registry of Deeds. I have thoroughly searched the South Essex District Registry of Deeds and no deed is recorded there. This was the first taking of land by the United

States of America pursuant to a policy that was prescribed by the Massachusetts Legislature. However, the prescribed procedure was never concluded and no deed, bill of sale, or cancelled check exists to prove the government's ownership of this parcel of land. I also know that what the government will use to attempt to prove ownership is an erroneous analysis of title made in 1977 by a U.S. Coast Guard employee. In this analysis, there is a clear misreading of what took place. Under the FOIA, I requested that the Boston GSA provide all deed information and analysis on the title to the Baker's Island Light station. David Stinson, formerly of the Boston GSA, conducted deed research as well and has admitted that he could not provide clear title or ownership documents to me.

(h) I, individually or through my representative, have made requests of the Essex National Heritage Commission (ENHC), ENHC Commissioners, the NPS, the Office of Management and Business (OMB), Congressman Tierney's and Senator Kennedy's office and other applicable parties regarding the ENHC's federally-mandated requirement to match its federal NPS funds dollar for dollar. To date, the NPS and the ENHC have not provided documentation that supports that the Commission has ever made its match. Some of these requests have been under FOIA and have been ignored.

(i) I have a copy of the *Draft NHLPA Regulations*, which includes the exhibits. Exhibit 17 b. consists of several letters to the DOI Solicitor's Office regarding the NHLPA program. One letter, dated October 10, 2003, asks the Solicitor to determine whether direct transfer of light stations to the National Park Service

9

can take place. This memo was copied to several of the defendants and NPS officials including Manson, Smith and Perunko. A letter, dated September 22, 2003, from Acting Associate Director of Cultural Resources to DOI Solicitor's Office asks for assistance on definitions and asks for a determination regarding the legislation that requires the General Administrator and the Secretary to "establish a process and policies". In the letter, it was stated that the three agencies (NPS, GSA, USCG) "are interpreting the phrase 'establish a process and policies' to require us to develop mutually agreed upon procedures for executing the intentions of the act, but not require us to develop formal regulations. Do you agree with this interpretation?" I can only believe that based on the fact that the NPS, GSA and USCG have now adopted draft NHLPA regulations, indicates that the DOI Solicitor's answer is that a process and policies did have to be adopted and hadn't been to date.

(j) There are a number of additional documents that have been requested either by me or by my representative over the past year that have not been provided and/or are in violation of the FOIA. The "administrative record" is woefully inadequate in that it does not provide information on the process and any and all information, notes, minutes, drafts, etc. that lead up to the government's decision and subsequent appeal/review of the decision.

For the above reasons I believe that a review of the merits of the Plaintiffs claims based exclusively on the government's defective production of the "administrative record" would be an injustice in this case.

SIGNED AND SWORN UNDER THE PAINS AND PENALTIES OF PERJURY THIS _2_

DAY OF NOVEMBER, 2005

_____
Robert Leavens

ID # 448782v01/14457-2/ 11.02.2005