UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BAKER'S ISLAND LIGHTHOUSE PRESERVATION SOCIETY, INC. And ROBERT LEAVENS<br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF INTERIOR, SECRETARY OF THE INTERIOR, NATIONAL PARK SERVICE, DIRECTOR NATIONAL PARK SERVICE, CRAIG MANSON, As He Is Assistant Secretary Of Fish, Wildlife And Parks, JANET SNYDER MATTHEWS, As She Is Associate Director, Cultural Resources, National Park Service, BRIAN SWEATLAND, As He Is Special Assistant to the Office Of The Director, National Park Service, ADMINISTRATOR OF GENERAL SERVICES, GENERAL SERVICES ADMINISTRATION, and JOHN KELLY, As He is Acting Director of Property Disposal, General Services Administration<br>Defendants | C.A. No. 05-10855 PBS |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION TO REVERSE THE DECISIONS AND TO ENLARGE THE ADMINISTRATIVE RECORD

## (VOLUME I)

The Plaintiffs[1] have filed a motion to reverse the two decisions that are the subject of this

appeal, namely, the decision of the National Park Service ("NPS") dated July 14, 2004 by

Defendant Janet Snyder Matthews, Associate Director, Cultural Resources recommending the

---

[1] The Plaintiffs are Baker's Island Lighthouse Preservation Society, Inc. ("the Society" or "BILPS") and Robert Leavens ("Leavens").

Essex Heritage National Commission, Inc. ("the Commission") as the recipient of the Baker's Island Light Station ("the Light Station") under the National Historic Light House Preservation Act ("NHLPA") and the January 18, 2005 decision of Craig Manson of the Department of Interior, Assistant Secretary of Fish, Wildlife and Parks, confirming the recommendation of the NPS to convey the Light Station to the Commission.  Plaintiffs have also challenged the preliminary, procedural and intermediate agency action of the NPS and the General Services Administration ("GSA") underlying the decisions appealed from.

Plaintiffs now move to reverse the decisions on the grounds of numerous legal errors committed by the government defendants in placing the Light Station in the NHLPA process, implementing NHLPA and in making the decisions.  Plaintiffs also move to reverse and to enlarge the record on the basis of the bad faith and improper conduct of the government in conducting its decision-making and in its dealings with the plaintiffs as detailed herein.

The legal errors which justify reversal of the decision are:

1)   The decisions were made without "a process and policies for identifying, and selecting, an eligible entity" to which the Light Station could be conveyed. NHLPA specifically requires that such a process and policies be developed no later than October 24, 2001.  The decisions appealed from in this case were made on July 14, 2004 and January 18, 2005, years after the process and policies were required to be developed by Secretary of the Department of the Interior and the Administrator of the General Services Administration.  The decisions made without the required process and policies being in place, are unlawful and subject to reversal;

2)   The selection of  the Commission as the "eligible entity" is unlawful because:  (i) the Commission was created by an act of Congress and its physical jurisdiction does not extend to Salem Sound in which Baker's Island is situated;  (ii) in creating the Commission, Congress did not empower it to own real estate;  and (iii) the Commission's Management Plan required by Congress does not permit the Commission to undertake construction projects or to conduct facilities maintenance.

2

3) The government has no deed to the real estate, no valid legal descriptions of the real estate and no good title to the real estate; therefore, the Light Station cannot legally be conveyed through the NHLPA process rendering the process invalid.

4) Jurisdiction over the Light Station has reverted to the Commonwealth of Massachusetts and the federal government, having no further jurisdiction over the Light Station, cannot transfer the Light Station through the NHLPA process.

5) In order for a Light Station to be conveyed through the NHLPA process, it must be "excessed" by the USCG in accordance with the definition of "excess" in the Administrative Services Act. This definition specifically qualifies government lands to be excessed only in situations where the agency no longer needs the property. Here, since the Coast Guard requires use of the Light Station as an aid to navigation, the property was not legally excessed under Congress' chosen definition and therefore does not qualify to be transferred through the NHLPA process.

In addition to legal errors, the decision is subject to reversal, and the administrative record should be enlarged, because of the government's bad faith and improper conduct rendering the decisions arbitrary and capricious and an abuse of discretion. The following summarizes the instances of bad faith and improper conduct of the government defendants:

1) Prior to making the decision, the NPS preselected the winning applicant, deliberately misrepresented the status of its evaluation to the plaintiffs and, in announcing its preselected winner, a NPS official threatened the plaintiff, BILPS, against an appeal.

2) In order to cover up that the decision was made without a process and policies mandated by Congress, after months of failing to identify the process and policies as requested in numerous Freedom of Information Act requests submitted by the plaintiffs, the government officials decided to defend this case by inventing the idea that the process and policies required by Congress were contained in the NPS application form and in a flow chart on the NPS Website. The information in the application form and on the website is woefully inadequate to meet the definition of "process and policies" intended by Congress and, moreover, never once before the litigation commenced did any government official point to these as the source of the required process and policies; in fact, government officials from NPS and GSA have publicly admitted that they did not develop the process and policies required by the law because the agencies were "not getting along".

3) The defendants have refused to respond to numerous Freedom of Information Act Requests submitted over a one and half year period of time regarding the

3

procedures it employed in making the decision, the appeals process and the Congressional mandate that the Commission meet its match of one million dollars in annual funding it receives from the NPS.

4)    After being sued, the government produced a "cleansed" administrative record which omits numerous highly relevant documents in the plaintiffs' possession including documents which are, in fact, harmful to the government's positions in this case.

5)    In selecting the Commission as the eligible entity, the government defendants were biased in favor of the Commission and did not treat the two applicants, the Commission and the Preservation Society, on an equal footing as required by NHLPA.  Examples of bias and unequal footing include but are not limited to:

a)  the NPS did not give its reviewers who participated in the decision making a full copy of the Society's application submissions while the reviewers were given full application submissions of the Commission.

b)  The Society's proposal was downgraded because the Society does not have voting members, while the Commission, who also does not have voting members, did not receive a similar downgrade;

c)  NPS, who is the decision maker, grants the Commission approximately $900,000 to one million dollars annually and was also the co-applicant with the Commission in submitting its proposal to acquire the Light Station, while the Society receives no federal funding and did not have NPS as a co-applicant;

d)  the Commission and NPS, as allowed by the Commission's enabling legislation, have entered into cooperative agreements so that NPS can assist the Commission in carrying out its programs while the Society has no such cooperative agreement with NPS;

e)  an NPS employee prepared a portion of the Commission's application while no such assistance was made available to the Society;

f)  the NPS reviewers recommended that the Commission be given the opportunity to modify its application to increase its chances of being selected while the Society was given no such opportunity.

The government's bad faith and misconduct as detailed above amply justifies consideration of matters outside of the so-called "administrative record" submitted by the government in this case and justifies a determination that the decisions are arbitrary and capricious and subject to reversal.

4

Finally, NPS officials responsible for the selection have admitted that they did not have time to review the appendices attached to the applications and did not have time to carefully read the applications themselves. As a result, numerous misrepresentations, omissions and errors in the Commission's application concerning matters of high importance under NHLPA, such as access to the Island, insurance, security and transportation, were given scant or no attention by the government defendants and rendered the decision arbitrary, capricious, an abuse of discretion and subject to reversal.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

### 1.     The Baker's Island Light Station

On April 8, 1796, the United States Congress approved an act authorizing the erection of the lighthouse on what was privately owned land located on Baker's Island, a 60 acre island situated in Salem Sound, Essex County, Massachusetts ("The Congressional Act") (Leavens Aff. ¶5, Ex. A, BILPS0491). On June 18, 1796, the Commonwealth of Massachusetts passed an act that ceded state jurisdiction over the land found "necessary and convenient for the light house" that Congress had authorized to be built on Baker's Island and established a procedure to be followed to take the land (Leavens Aff. ¶6, Ex. B, BILPS 0492-0494). Although jurisdiction over the land was ceded to the United States, the actual fee in the land remained in private ownership. (Id.) Although the United States had no title to the land, a lighthouse was built on the property in the summer and fall of 1797 (Leavens Aff., ¶8). Thereafter, efforts were made to

---

[2] The background facts are drawn from the Affidavit of Robert Leavens ("Leavens Aff."), the Affidavit of Elizabeth M. Ware ("Ware, Aff."), the Affidavit of Thomas Hallowell ("Hallowell, Aff."), the Affidavit of Steve Adelson ("Adelson Aff."), the Administrative Record produced by the National Park Service, ("AR---") and the documents produced by the General Services Administration ("GSA ----"). The four affidavits submitted in support of the plaintiffs' motion contain detailed factual statements which are incorporated herein by reference. Two of the Affidavits (Ware and Leavens) attach numerous Bates stamped exhibits which are identified as "BILPS0001-0490 and BILPS0491-0516" Since page limitation constraints prevent repeating the verbatim factual statements contained in the affidavits, they will be summarized herein.

5

follow the procedure set forth in the Act of 1796 for taking the land. The appraisers reported to the court that the land had been appraised at five hundred dollars and the court accepted the report and the award (Leavens Aff. ¶10, Ex. D, BILPS 0497-0499). However, there is no evidence that this amount was ever paid to the owner, nor is there any deed recorded, nor any order of taking recorded made by the Court or recorded, nor any other form of conveyance in spite of the fact that as of that time, 1797, a recording system had been well established in Massachusetts for nearly one hundred years (Leavens Aff. ¶11). Despite extensive research by plaintiff Robert Leavens at the Essex South Registry of Deeds, at the Federal Archives in Waltham and at the U.S. Coast Guard Civil Engineering Unit (CEU) Providence, and Leavens' numerous letters to and telephone calls with the Supreme Judicial Court archivist in Boston, no deed, order of taking or any other conveyance has been located (Leavens Aff. ¶12). Of significance is the fact that on February 8, 2005, Leavens received an email from a GSA official, Sandra Robbins, stating that there was no further information regarding a deed to the Light Station and requesting that Leavens "please share" any further information he finds (Leavens Aff. ¶15; Ware Aff., Ex. 14(O), BILPS 0477).

The Light Station consists of 10 acres more or less and contains a 59 foot high granite light tower constructed in 1816, a two story wood frame keepers dwelling, a two story wood frame assistant keepers dwelling, a one story oil house, a one story fog signal building and several other assessory structures (Leavens Aff. ¶3). Throughout its history, Baker's Islanders have played an important role in preserving, guarding, and maintaining the Baker's Island Light Station and Reservation. In the early 1970's the Coast Guard abandoned the property when the light became automated. After the Coast Guard's abandonment the Baker's Island Association, an association of home owners on Baker's Island, assumed maintenance and repair of the

6

buildings through a license agreement with the Coast Guard (Leavens Aff. ¶18, Ex. F, BILPS 0504-0508). On or around November 12, 1997, the Light Station was designated a National Register Historic Site by the National Park Service (Leavens Aff. ¶19, Ex. G, BILPS 0509-0510). Except for the light reservation, virtually all of the remaining property on Baker's Island has been privately owned since 1731.

In 1980 and in 1988, license agreements were granted by the Coast Guard to the Association for the maintenance, restoration and preservation of the two lighthouse keepers' residences. The association has faithfully restored, preserved and managed the residences continuously since 1980, and, under its current license, plans to continue to do so until 2017 (Leavens Aff. ¶ 21-23).

The Plaintiff, Baker's Island Light House Preservation Society ("The Society" or "the Preservation Society" or "BILPS") was formed in 1999 in anticipation of the eventual disposal of the Light Station by the Coast Guard (Leavens Aff. ¶24). Due to the remote location of the reservation and the lack of public docking or lighting facilities, physical access to the reservation is not readily available. The beach is dotted with jagged rocks and is subject to heaving swells, breaking waves and strong current. In addition, the area experiences a significant tidal range of 12 feet that presents a range of beach profiles depending on the tidal range. In adverse weather conditions, access to the island poses a significant and serious safety threat (Leavens Aff. ¶25-27).

2.    **The National Light House Preservation Act And the Application Process.**

a.    **NHLPA**

In 2000, Congress amended the National Historic Preservation Act of 1966 by adding provisions known as the National Historic Lighthouse Preservation Act of 2000, 16 U.S.C. 470

7

w-7, et seq. ("NHLPA").  NHLPA authorizes the disposal of historic lighthouses and stations,

contemplating a multi-agency process in the disposition of lighthouses.  Id.[3] First, the Secretary

of the Interior ("the Secretary") and the Administrator of the General Services Administration

("the Administrator") shall "not later than one year after October 24, 2000. . . establish a process

and policies for identifying, and selecting, an eligible entity to which a historic light station could

be conveyed for education, park, recreational, cultural or historic preservation purposes, and to

monitor the use of such light station by the eligible entity."   16 U.S.C. 470 w-7(b)(1).  The

statute contemplates that the agency with administrative jurisdiction over the historic light

station, in this case the Coast Guard, identifies and reports "excess" light stations to the General

Services Administration ("GSA").  16 U.S.C. 470 w-7 (b)(2).[4]  In practice, according to

Defendant Craig Manson ("Manson") Assistant Secretary of Fish and Wildlife and Parks,

eligible lighthouses and stations will be announced by GSA through a Notice of Availability,

sent directly to interested parties, published in local newspapers and posted on the Internet[5].  The

National Park Service ("NPS") issues applications to interested parties, reviews and evaluates

applicants, and selects a grantee. (BILPS 0453)  According to Manson, "a group's financial

ability to maintain the historic light station and adhere to historic conveyance and other terms of

conditions with the transfer will be given significant consideration in the review process."  Id.

GSA then develops and executes conveyance documents.  The statute specifically requires that

---

[3] There were at least five agencies involved in the decision making process regarding Baker's Island Light Station; General Services Administration, Department of Interior, National Park Service, The United States Coast Guard, and the Department of Fish and Wildlife and Parks.

[4] The statute refers to the definition of "excess" used in the Administrative Services Act, and that definition includes only property no longer required to be used by the agency, here, the Coast Guard. In fact, the Coast Guard continues to use the Light Station as an aid to navigation.

[5] See, Decision, Assistant Secretary of Fish and Wildlife and Park regarding the Currituck Beach Lighthouse, Corolla, North Carolina (Ware Aff. Ex. 13, BILPS0452-0453).

"the Administrator shall convey, by quitclaim deed, without consideration, all right, title, and interest of the United States in and to the historic light station, subject to [certain] conditions. . ." 16 U.S.C. §470 w-7 (b)(3).  The statute is silent with regard to a situation in which the United States has no "right, title, and interest" in an historic light station.

Manson has admitted that, under NHLPA, "For the first time, non-profit entities are on equal fooling with federal agencies and other public bodies to obtain historic lighthouse properties" (Ware Aff., Ex. 13, BILPS 0453).

### b.    The Absent Process and Policies

Although NHLPA requires that no later than October 24, 2001, the Secretary of the Interior and the Administrator of the General Services Administration must establish a process and policies for identifying and selecting an eligible entity to which a historic light station could be conveyed, and for monitoring the use of the light station by the entity, as late as November , 2004, Robert Leavens was informed that no such process and policies existed (Leavens Aff. ¶30).  Although the government subsequently produced a "draft National Park Service Regional Handbook for implementing NHLPA", the government has admitted repeatedly that this handbook was not utilized during the decision making process with regard to the Baker's Island Light Station challenged herein (AR 0676, AR0680, AR0681) (Leavens Aff. ¶31)[6]

### c.    The Decision-Making Process Re: Baker's Island

Notwithstanding that no process and policies were established under NHLPA, and that the GSA did not have a valid deed or good title or the power to convey the light station, on or around May 23, 2003, a Notice of Availability under NHLPA for Baker's Island Light Station was issued by the GSA  (AR0002; Leavens Aff. ¶32; AR002-004).  According to the Notice of

---

[6]Under NHLPA, the GSA was also required to develop a process for the sale of a lighthouse in the event that a lighthouse is not conveyed through NHLPA, which GSA also failed to do (Ware Aff. ¶45).

Availability, only shoreline access to the island is available because the only pier providing access to the island is privately owned and operated (Leavens Aff. ¶33).

In response to the Notice of Availability, the Preservation Society prepared and submitted an application to the Department of Interior, National Park Service on October 31, 2003 (Leavens Aff. ¶34; AR0127-01230). Sometime after November 10, 2004, the Essex National Heritage Commission ("the Heritage Commission" or "the Commission" or "ENHC") submitted an application to become transferee of the Baker's Island Light Station. While the Heritage Commission's application did not meet the required 90 day time frame for submission of an application pursuant to the Notice of Availability, the application was nevertheless accepted by the NPS (AR0235-0459).

### (i) The Heritage Commission

The Heritage Commission is the designated management entity for the Essex National Heritage Area and is incorporated as a tax-exempt, 501 (c)(3) Corporation (AR0439; Leavens Aff. ¶36). The Heritage Commission was created as a management entity for the Essex National Heritage Area pursuant to the Omnibus Parks and Public Land Management Act of 1996 (AR0396-0399). Pursuant to this legislation, the Area "shall comprise the land generally depicted on the map numbered Nar-51-80, 000, dated August, 1994" (AR0397) (Ware Aff., Ex. 14(A), BILPS 0461-0462). However, Baker's Island is not on the map designating the boundaries of the Essex National Heritage Area (Id.) The Boundaries shown on the map referred to in the legislation do not include Salem Sound in which Baker's Island is situated (Id.). In addition, the Heritage Commission's application for the Baker's Island Light Station includes a map which designates the Heritage Area. (Ware Aff. ¶64; AR0328) The map is attached as

10

"Attachment D" to the Heritage Commission's application, but does not show Baker's Island Light Station within the area (AR0324-0328).

The authority of the Heritage Commission is established in Section 504 (a)(b) of the Omnibus Parks and Public Land Management Act of 1996 which sets forth the powers of the Commission.  Ownership of land is not included as a power of the Commission granted by the statute (AR0397-0398).  Under its Enabling Act, the Heritage Commission may receive appropriations of not more than one million dollars in any fiscal year and the federal funding provided may not exceed 50% of the total costs of any assistance or grant provided or authorized under the statute (AR0399). The Heritage Commission is required to match funding dollar for dollar in order to conduct its activities (Leavens Aff. ¶45, AR0399).  Although the Heritage Commission has continually accepted funding for the Area, it is has not been able to establish that it has met its requirement of matching funds for any of its activities, or that it has ever met its requirement of matching nearly one million dollars in funding per year (Leavens Aff. ¶45; Ware Aff. ¶¶17-36).

The Commission is required to develop a Heritage Area Plan by its enabling legislation (AR0398).  The Heritage Plan specifically provides:  "The Commission does not seek, nor does it have the capability for direct construction projects or facility maintenance." (AR0380) One of the chief purposes of the Commission's application is to acquire the light station for the purpose of renovating and of maintaining the facilities thereon (AR0245).

### (ii) The Government's May 19, 2004 Site Visit to Baker's Island.

On May 19, 2004, a group of government officials representing the Department of the Interior, the General Services Administration, the National Park Service and the Coast Guard visited Baker's Island to meet with the two entities who had submitted applications for the

acquisition of Baker's Island Light Station, the Heritage Commission and the Preservation Society (Hallowell Aff. ¶4).  The government entourage arrived on a special flat boat or low drop boat owned by the Trustees of Reservations and piloted by one of its captains (Hallowell Aff. ¶5).  Also accompanying the government officials was Annie Harris, the Executive Director of the Heritage Commission (Hallowell Aff. ¶6).  The group gathered at one of the keeper's cottages on the Light Station and Mr. Daniel Smith, identifying himself as a Special Assistant to the Director of the National Park Service, delivered the introductory remarks (Hallowell Aff. ¶7). He stated that he would be writing the official decision determining which of the two contestants would be the recipient of the deed and that he would write the decision in such a way that it would be acceptable to the Secretary of the Interior and would be impregnable to an appeal (Hallowell Aff. ¶8).  He also announced that, while the two contestants' proposals were very close upon evaluation, ENHC would be the selected applicant if the decision were to be made on that day  (Hallowell Aff. ¶9).

According to the Administrative Record subsequently produced by the NPS, Smith's statement that the two contestants' proposals "were very close upon evaluation" was false.  As the Administrative Record reveals, as of May 19, 2004, the government had already preselected the Commission as the successful applicant and the scores for the two competing entities were nowhere close (compare AR0513 with AR0535).  The recommendation that the Commission receive the lighthouse had at that point in time been made and tentatively approved, as Smith was well aware (Ware Aff., Ex..9, BILPS 0203-0211).

ID # 463014v04/14457-2/ 03.15.2006

**(iii)  The Competing Applications of The Commission and The Preservation Society Were Not Treated Equally by NPS.**

Throughout the process, there were numerous examples of the NPS bias in favor of the application submitted by the Commission.[7]  It is clear that NPS had a close working relationship with the Commission and a compelling self-interest in awarding the Light Station to the Commission as demonstrated by the facts that:

a) NPS gives the Commission approximately $900,000 to $1,000,000 annually, but it does not provide any funding to the Society (Ware Aff. ¶ 47(a));

b) NPS participated as the co-applicant with the Commission in the proposal to acquire the Baker's Island Light Station and, in fact, an NPS employee wrote the environmental questionnaire response on behalf of the Commission, while NPS was not a co-applicant with the Society and did not provide assistance in preparing the Society's application (Ware Aff. ¶47(d));

c) NPS reviewers did not receive from the NPS full copies of the Society's application submissions, and as a result the Society's application was downgraded due to incompleteness; on the other hand, NPS reviewers were sent full applications of the Commission's application proposal (Ware Aff., ¶47(f));

d) the Commission was invited to modify its proposal to make it stronger while the Society was given no such invitation by NPS (Ware Aff. ¶47(g));

e) the Society's proposal was downgraded because the Society does not have voting members while the NPS did not downgrade the Commission who also does not have voting members (Ware Aff. ¶47(h));  and

---

[7] The specific instances of unequal treatment are set forth in detail in the Ware Affidavit, ¶¶17-20.

ID # 463014v04/14457-2/ 03.15.2006

f)   the NPS has admitted that it has an interest in acquiring the Baker's Island Light

Station (GSA0001).

According to the Commission's enabling legislation, the Commission and the NPS are

authorized to enter into cooperative agreements (AR0398-0399) and the Commission has

admitted in its application that such cooperative arguments are in place (AR0245).  The NPS bias

towards the Commission is obviously motivated by its cooperative agreements with the

Commission, its close working relationship with the Commission, its funding of the Commission

and its admitted desire to itself acquire the Baker's Island Light Station -- all of which evidently

influenced its decision in this case.  The NPS itself has admitted that, in a situation where the

NPS reviews applications submitted by an NPS unit in competition with other interested parties,

the NPS is acting in a conflict of interest (Ware Aff., Exhibit 9, Sept. 22,2003 memo to DOI

Solicitor's Office, BILPS 0238-0240).  This admission was not included in the Administrative

Record certified by NPS.

   **(iv)  Erroneous Information Within the Heritage Commission's Application**

Misrepresentations, omissions and errors in the Commission's application to acquire the

Light Station were never checked or verified by NPS reviewers since, as subsequently admitted

by NPS officials, the reviewers "did not have time to review the appendices to the application for

light stations" (Ware Aff. ¶63).  These include the following:

1)    The Commission, through its application, held itself out as having the legal
      capability to become the transferee of the light station and submitted a plan, as
      Attachment D, to its application showing the extent of the Essex National
      Heritage Area which it manages.  The attachment does not include Baker's Island
      within the Area (Ware Aff. ¶64; AR0324-328).

2)    Although the Commission represented in its application that it would be able to
      secure insurance for the Light Station from the Robert Cappadonna Insurance
      Company, Mr. Cappadonna has informed the plaintiffs that the insurance market

14

had changed and that today "no one would write such a policy" (Ware Aff. ¶65).
He also stated that when he spoke to Annie Harris, the Executive Director of the
Commission, Ms. Harris had not fully informed him of the uses proposed for the
Light Station including the lack of fire protection and the questionable beach
landings. Based upon these and other factors, he would not be able to provide the
insurance the Commission represented in its application (Id.)

3)    The Commission represented that Sun Line Cruises would provide transportation
      for the ranger guided tours conducted by the NPS to the beach at Baker's Island
      Light Station.  The plaintiffs have learned that Sun Line Cruises has not been in
      operation for over four years and that information has been confirmed by The
      Trustees of Reservations Property Managers who in the past used Sun Line
      Cruises, as well as by friends of the owner of  Sun Line Cruises and other industry
      representatives. (Ware Aff. ¶66).

4)    Under NHLPA, according to the application, the Federal Government and the
      NPS are to be relieved from any and all personal injury or property damage
      liability relative to the light station (AR0241).  Since the Commission's
      application is a co-application with the NPS and the NPS is proposing to run
      ranger guided tours from the shore to the island, the Commission has no means to
      comply with the NHLPA application requirement to relieve the Federal
      Government from insurance liability related to the operation of visitors trips to the
      island by NPS (Ware Aff. ¶67).

5)    GSA's notice of availability indicates that the sole access to the light station is
      over the beach.  However, beach access is "unreliable at best" according to NPS,
      and dangerous at worst (AR0708; Ware Aff. ¶69).  In addition, the island has no
      telephones, no doctor and no immediate helicopter service (Ware Aff. ¶68).

6)    The Commission was given points in its application for its plan to install solar
      panels to provide power to the keeper's house and the Commission budgeted
      $2000 for installation of the solar collection system.  The actual costs of a solar
      system range from $5000 to $50,000.  Should propane be used as an alternative,
      150 lb tanks will be filled on shore, landed on the beach, and dragged over to the
      beach to the keeper's cottage.  Since the typical household on Baker's Island goes
      through 3 to 5 tanks per season, the beach access for hauling the tanks is
      unrealistic and dangerous (Ware Aff. ¶69)

7)    There are only modest fire fighting facilities on the island (Ware Aff. ¶71).
      Increased visitation to the island via ranger-guided tours will increase the risk of a
      fire due to tour participants who smoke.  The Commission's proposal does not
      address fire protection, even though the Commission was given points by
      reviewers for having done so.

8) The Commission's application does not address security of the Island while the Society has caretakers to monitor and protect the Island on a year round basis.

9) The Commissions' proposal claims that alternative composting toilets could be used at the Light Station on the basis of statements made by the City of Salem Assistant Building Commissioner. In fact, the Salem Board of Health and Health Agent, not the Building Commissioner, have jurisdiction under Title V, the state sanitary code, over the use of alternative toilet facilities (Ware Aff. ¶74; AR0254).

10) The Commission's application estimates that the costs for renovating the structures on the Light Station will be approximately $150,000 (AR0245). The Heritage Plan required by Congress very clearly states that "the Commission does not seek, nor does it have the capability for direct construction projects. . ." (AR0380)

11) Finally, the Commission states in its application that "it has the financial means and personnel to restore and preserve the property and is prepared to invest additional funds should the anticipated revenue fall short of projections". In fact, the Commission is not able to establish that it has funding and fund raising to match dollar for dollar the money it receives from the NPS, which is estimated to be between $900,000 and $1,000,000 per year.

### 3.    The Bad Faith of the Government.

Throughout the application process, and throughout their dealings with the plaintiffs, the government defendants have acted in bad faith, the factual details of which are laid out extensively in the Ware Affidavit, paragraphs 7-64, and are merely summarized here for the convenience of the Court. First, NPS preselected the eligible entity, misrepresented the status of its evaluation in May of 2004 to the plaintiffs and then threatened the plaintiffs against an appeal (Ware Aff. ¶¶6-9, Hallowell Aff.). Second, both the NPS and the GSA acted in bad faith by failing to adequately respond to numerous Freedom of Information Act requests submitted over a one and one half year period of time by the plaintiffs, seeking fundamental information about the policies and procedures, the appeal and the Commission's funding. The information sought by

16

the plaintiffs was never adequately provided and their questions were never meaningfully answered.

Though the plaintiffs filed an FOIA appeal, the appeal was never acted upon as it was buried under 599 other appeals  (Ware Aff. ¶¶41-42).  During the course of their efforts to gain information about the process and about the Commission, the plaintiffs were given a copy of the draft National Park Service Regional Handbook for Implementing NHLPA, revised in July 2004 ("the Handbook")  (Ware Aff. ¶40).  The Handbook was provided to the plaintiffs nine months after the initial request was submitted ( Id.)  The Handbook included numerous exhibits in an appendix which are described in detail in the Ware Affidavit (Ware Aff. ¶¶47-52).  Many of the exhibits contain admissions that directly undermine the positions the government has taken in this litigation  concerning such crucial issues as the  requirement to develop a process and policies under NHLPA and  the need for  the government  to have an effective policy defining reasonable public access required under NHLPA (Id.; see also, Ware Aff., Ex. 9). Notwithstanding that these exhibits were produced to the plaintiffs, when the government filed its administrative record in this case, it included the handbook (AR 0629-0645) but did not include any of the exhibits in the appendix containing admissions which undermine the government's defenses in this case.  Finally, the government filed an administrative record that omits documents pertaining to the preliminary and intermediate agency action complained of in this lawsuit and numerous highly relevant documents collected in Exhibit 14 of the Ware Affidavit.

### 4    The Lighthouse Conference

On April 10-14 , 2005 the government sponsored a conference in Newport, Rhode Island entitled "The Northeast Lighthouse Conference".  The purpose of the conference was to provide

ID # 463014v04/14457-2/ 03.15.2006

information to participants and for the government agencies assess their success in the operation of the NHLPA program (Ware Aff. ¶53).  During the conference, agency representatives spoke of the inability of the agencies to adopt policies and procedures, the inability of the agencies to work together to comply with the law, the inability of the agencies (particularly the U.S. Coast Guard) to clean up the environmental hazards at the light stations and the incongruity between the fact that the U.S. Coast Guard was "excessing" abandoned lights, yet they were still keeping many as aids to navigation  (Ware Aff. ¶56).  At the lighthouse conference, NPS officials admitted that even though they were required to develop policies and procedures within a year after the enactment of NHLPA, or in October 2001 at the latest, the draft regulations were then (in 2005) being reviewed by the DOI Solicitor's office and the NPS officials stated that they did not know when the regulations would either be released in draft form for review, or become finalized  (Ware Aff. ¶55).  NPS officials also admitted at the conference that when reviewing applications under NHLPA they did not read the attachments to the applications because they did not have time to read the entire applications, let alone the attachments (Ware Aff. ¶59).  While the NPS officials discussed the need for the NPS to condition transfers on the clean up of hazardous materials and/or clean up the light stations prior to transfer, to date, no environmental report for Baker's Island Light Station has been produced by the defendants (Ware Aff. ¶60). Finally, even though the full transcript of the lighthouse conference was promised to the participants, only a partial, illegible transcript, containing approximately one-tenth of the proceedings was ever produced (Ware Aff. ¶61, Ex. 11).  Predictably, none of the above-cited admissions were included in the transcript (Id.).

18

## ARGUMENT

1. **The Government Committed Numerous Legal Errors Invalidating the Decisions.**

    A. **The Decisions were Made Without the Statutorily Mandated Procedures and Policies.**

    Clearly, the selection of the Commission as the entity to receive the Baker's Island Light Station occurred in the absence of procedures and policies required by Congress that were years overdue. As the affidavit of Elizabeth M. Ware amply demonstrates, NPS and GSA officials have publicly admitted that they were unable to comply with the statute because the agencies did not get along. Although the defendants now contend that they were not required to develop any detailed policies and procedures, in fact, they did develop the "draft handbook" in 2004 (three years late, and yet still in draft form). The draft handbook itself is evidence that the agencies well understood that they were required to do more than issue an application and publish a flow chart on a website, as they disingenuously now contend.

    Following no consistent guidelines or established procedures, government officials were free to run roughshod over the process and execute the decisions, not guided by a set of agreed upon standards, but rather by the biases of the NPS officials, who had a keen interest in ensuring that the Commission, funded and controlled by NPS, would be the winning applicant. Compounding their errors, the government officials eventually produced a handbook supposedly containing the policies and process required by Congress which they admit was not followed in the Baker's Island decisions. The handbook itself is inadequate to meaningfully address Congress's requirement for policies and procedures as it utterly fails to address crucial procedural and substantive issues most likely to arise (and which in this case did, in fact, arise)

19

under the NHLPA competitive bidding process (Ware Aff. ¶44)[8].  Even if the handbook was

adequate to satisfy Congress's directive, since it was not followed in the Baker's Island

decisions, its <u>only</u> significance in this case is as an admission by the government that such a

handbook was in fact required by Congress and that the agencies' responsibilities in this regard

plainly are not satisfied by an application form and a single flow chart on a website.

While agency decisions are normally entitled to substantial deference, the decisions must

not collide directly with substantive statutory demands and procedural corners must be squarely

turned.  <u>Puerto Rico Sun Oil Co</u>. v. <u>U.S. EPA,</u> 8 F. 3d, 73 (1st Cir. 1993).  Here, the decisions

challenged collide directly with the statutory demand that they be guided by established

procedures and policies and not by agency whim.  Since there were no procedures in place, there

are no standards by which the decision making can be measured.  The NPS and the GSA should

not be permitted to evade meaningful judicial review of their conduct simply by ignoring the

statutory mandate that they develop procedures to guide and govern their conduct.  <u>See Nelson v.</u>

<u>I.N.S.</u>, 232 F.3d 258, 262 (C.A.1 2000) (agency has duty to follow federal regulations and failure

to do so can lead to reversal of decision).  Although an administrative agency need not

promulgate detailed rules for every statutory provision – it must do so when, as in this instance,

the enabling statute has imposed such a requirement.  <u>See Pulido v. Heckler</u>, 758 F.2d 503 (C.A.

10 (Colo). 1985).

---

[8] For example, a critical issue in all NHLPA decisions is safe public access to the lighthouse in question.  This is an issue required in NHLPA to be addressed in the application process.  A review of all the decisions made to date under NHLPA, however, demonstrates that there is no consistent policy on access (Ware Aff. ¶51-52).  The Handbook provides no such policy and fails to provide any definitions, standards or requirements to guide the applicants, or the decision makers, with regard to ensuring safe public access to the lighthouses.  Safe public access to the Baker's Island Light Station is a critical issue with regard to the decisions challenged here, since the only access is beach access which even the NPS reviewers admit is uncertain at best and which, given the shoreline conditions, is unpredictable and often quite dangerous.  (Leavens Aff. ¶46; Ware Aff. ¶68).
Other glaring omissions are detailed in the Ware Affidavit, paragraph 44.

ID # 463014v04/14457-2/ 03.15.2006

This Court should not condone such blatant disregard of the statutory demand and the decisions should therefore be vacated.

**(END OF VOLUME I GO TO VOLUME II)**



**BAKER'S ISLAND LIGHTHOUSE**
**PRESERVATION SOCIETY, INC. AND**
**ROBERT LEAVENS**
By their attorney,


/s/Catherine Savoie
Catherine Savoie, BBO #544599
Ian Moss, BBO #658557
POSTERNAK, BLANKSTEIN & LUND, L.L.P.
The Prudential Tower
800 Boylston Street
Boston, MA  02199
(617) 973-6100

ID # 463014v04/14457-2/ 03.15.2006