UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BAKER'S ISLAND LIGHTHOUSE PRESERVATION SOCIETY, INC. And ROBERT LEAVENS<br>　　　　　Plaintiffs,<br>v.<br><br>UNITED STATES DEPARTMENT OF INTERIOR, SECRETARY OF THE INTERIOR, NATIONAL PARK SERVICE, DIRECTOR NATIONAL PARK SERVICE, CRAIG MANSON, As He Is Assistant Secretary Of Fish, Wildlife And Parks, JANET SNYDER MATTHEWS, As She Is Associate Director, Cultural Resources, National Park Service, BRIAN SWEATLAND, As He Is Special Assistant to the Office Of The Director, National Park Service, ADMINISTRATOR OF GENERAL SERVICES, GENERAL SERVICES ADMINISTRATION, and JOHN KELLY, As He is Acting Director of Property Disposal, General Services Administration<br>　　　　　Defendants | C.A. No. 05-10855 PBS |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION TO REVERSE THE DECISIONS AND TO ENLARGE THE ADMINISTRATIVE RECORD**

**(VOLUME II)**

ID # 463884v01/14457-2/ 03.15.2006

**B.      The Commission is Not an "Eligible Entity" To Receive the Light Station as a Matter of Law**

      **1.      In Creating the Commission, Congress Did Not Empower It To Own Real Estate.**

When Congress enacted the Omnibus Parks and Public Land Management Act of 1996 ("Omnibus Act") it chose to enumerate an exclusive list of the powers and duties of the management entity (Omnibus Act, §504(b), AR0396-0399). The Commission, having been established as that management entity, is therefore bound and controlled by this enabling legislation. Nowhere in these powers and duties can any semblance of authority be found to support the contention that the Commission can acquire or hold title to the Baker's Island Light Station or any other form of real property (Id.) Nor is it necessary to presume or imply such authority when it is clear from the legislative language used that no such authority is needed for the Commission to effectively perform the duties that Congress assigned to it (Omnibus Act, 504(b), AR0397-0398).

Where, as here, Congress has expressly enunciated the powers of the management entity (omitting the ability to acquire or hold real property), and where the Commission has clearly adopted this omission (though the total lack of any reference to any authority to acquire property in the management plan) the well-weathered maxim of *expressio unius est exclusio alterius* must be held to apply. See Smart v. Gillette Co. Long-Term Disability Plan, 70 F.3d 173, 179 (C.A.1 (Mass.), 1995) ([t]he maxim of the expression of one thing is the exclusion of another "instructs that, when parties list specific items in a document, any item not so listed is typically thought to be excluded."); see e.g., FDIC v. Singh, 977 F.2d 18, 22-23 (1st Cir.1992). It is not appropriate for this Court to engage in judicial legislation when the language used by Congress was clear. See e.g., Cox v. Boston Consol. Gas Co., 67 F.Supp. 742, 745 (D. Mass. 1946) ("[t]he judicial

function to be exercised in construing a statute is limited to ascertaining the intention of the Legislature therein expressed, and an event or contingency for which no provision is made does not justify judicial legislation"); see also Iamele v. Asselin, 444 Mass. 734, 739 (2005) ("we will not add words to a statute that the Legislature did not put there, either by inadvertent omission or by design.")

    **2.    The Commission Was Created By an Act of Congress and Its Physical Jurisdiction Does Not Extend to Salem Sound in Which Baker's Island is Situated.**

In addition to omitting to provide the authority to acquire real property Congress also established firm boundaries for the designated Essex National Heritage Area by express reference to a map numbered NAR-51-80,000 and dated August 1994 (AR0328)[1]. Despite adopting these geographical limitations in its management plan, the Commission now seeks to claim jurisdiction over the Light Station in blatant disregard of the fact that the map does not include Baker's Island or any of the Islands in Salem Sound. Indeed, the Commission admits on its website that its jurisdictional area is: "550 square miles between the Atlantic Coastline and the Merrimack Valley". Neither the verbal nor the pictorial boundaries utilized by the Commission include offshore islands.  It would be manifestly unjust for this Court to condone this self-imposed dominion by the Commission over Baker's Island by accepting this impermissible and arbitrary redrawing of the geographic boundaries that have been established by Congress. See e.g., U.S.A. v. Natural Resources Defense Council, 467 U.S. 837, 842-843(1984) ("[i]f the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress); Com. of Mass. by Dept. of Public Welfare v. Yeutter, 947 F.2d 537 (C.A.1 (Mass.), 1991); Shamban v.

---

[1] Also, attached to the Ware Aff. as Exhibit 14(A), BILPS0461) is a letter from the Director of NPS referring to the map as "This is the final map for the Essex National Heritage Area…".

Masidlover, 705 429 Mass. 50, (Mass., 1999) (accepting general rule of statutory interpretation that court must follow statutory language when it is plain and unambiguous, unless to do so would lead to an absurd result, or be contrary to the Legislature's manifest intention.)

### 3.   The Commission Management's Plan Required by Congress Does Not Permit the Commission to Undertake Construction Projects Or To Conduct Facilities Maintenance.

The lack of any reference in the Commission's management plan to any form of authority, or intention to acquire or hold real property, would suggest that the Commission understands and accepts the Congressional limitations established in the Omnibus Act. Indeed, on page 44 of the plan the Commission admits that it "does not seek, nor does it have the capability for direct construction projects or *facility maintenance*." (AR0380). Similarly the Commission acknowledges on page 13 of the management plan that the federal funds that the it obtains under the Omnibus Act, cannot be used to acquire real property (Omnibus Act, §508 at AR0399; AR0349 (Specifying that there are limitations on the federal funds including "land acquisition")).

However, the Commission now wishes to disavow these public representations and states in its application under the NHLPA process that its main purpose is to acquire Baker's Island Light Station with the view to renovating and maintaining it – and openly admits that it intends to spend some $150,000 on these renovations (AR0245).

### C.   The United States Cannot Convey Marketable Title To Baker's Island Light Station Through The NHLPA Process Because It Cannot Prove That It Has Title To The Property.

### 1.   The United States Does Not Have A Deed, Order Of Taking, Grant Or Any Other Such Document To Evidence Marketable Title.

4

The Preservation Society participated in the NHLPA process in good faith and in the belief that the GSA had the title that it claimed in its Notice of Availability (AR002-004). In reliance on that representation, the Preservation Society expended considerable resources, both in time and money, in the preparation of their application for submission and consideration under the NHLPA process (Leavens Aff. ¶34, AR0127-0230). That reliance extended to the belief that the GSA would "convey all rights, title and interest of the United States in and to the historic light station" as statutorily required under NHLPA. See 16 U.S.C. 470W-7(b)(3)(A). However, it now appears that the GSA has absolutely no evidence to suggest that it can convey good marketable title (Robert Leavens Affidavit ("Leavens Aff.") ¶11-15).

This fact has subsequently been confirmed by Robert Leavens, a director of the Preservation Society, after he undertook an exhaustive search of the Southern Essex Registry of Deeds and CEU Providence as well as both state and federal archives to try and determine the legal status of the title to Baker's Island Light Station. Despite his valiant efforts - no deed, grant, order of taking or any other evidence of title could be found (Leavens Aff.), ¶¶5-16, Ex A,B,C,D, BILPS0491-0499).

In an attempt to circumvent this failing the Preservation Society anticipates that the United States will contend that it acquired the property by award of the Court of the General Sessions of the Peace in October 1797 (Defendant's Answer, ¶7). However, this blind allegation, without more, lacks merit. It is true that the Commonwealth of Massachusetts, by legislative enactment on June 18, 1796, established a procedure for the land to be taken if the United States

ID # 463884v01/14457-2/ 03.15.2006

could not acquire it by negotiation[2] (Leavens Aff. ¶P6-10, Ex. B,C,D, BILPS0492-0499). It is also true that the evidence suggests that this procedure was started[3] (Id.).

However, and conspicuous by its absence, is the total lack of evidence that this process was ever completed (Leavens Aff. 5-16, Ex.A,B,C,D,E, BILPS0491-0503). For example, there is no evidence of a declaration of taking or any other such document (Leavens Aff. ¶11). This lack of any documentary evidence of the completed "taking" is further compounded by the fact that a review of letters written by the United States Superintendent of Lighthouses for the District of Massachusetts, contemporaneously with this "taking", demonstrates that the United States was well aware of the requirement to record a document in the relevant Registry of Deeds (Leavens Aff. ¶13).

The GSA internally acknowledges this flaw in their title. For example, Ms. Angela Kalkhoran of the GSA in an email, dated November 26, 2002, admits that the procedure "should have led to something like a Declaration of Taking, which should have been recorded" (GSA0096). Despite this knowledge, and despite numerous discovery and Freedom of Information requests, the GSA has never been able to produce any such evidence to suggest they have valid title (Leavens Aff. At ¶11).

In addition to this serious flaw in title it also appears that the GSA is confused as to the exact dimensions and the metes and bounds of the Light Station to which it alleges it holds title.

---

[2] Specifically an Act of the Commonwealth of Massachusetts on June 18, 1796 ceded jurisdiction to the land and established a procedure for a "taking" of the land if it could not be acquired. Although, arguably, the Federal government had the ability to take property under the Federal Constitution, no federal taking statutes were enacted until some ninety-two years later in 1888. As such, it was common for such federal "takings" to be undertaken using specific enactments of the state legislature. See Kohl v. United States, 91 U.S. 367, 373 (1879).

[3] It is evident that these negotiations were doomed to fail when one considers the circumstances and likely bad blood between the negotiating parties. Benjamin Lincoln, the superintendent of lighthouses in the District of Massachusetts whom had been tasked with the negotiation on behalf of the United States was a former General in the revolutionary war. Unfortunately, George William Erving, the fee owner, was a descendant from a strong line of staunch English Tories then living in London, England. It is also understood that George William Erving was an educated Oxford lawyer.

ID # 463884v01/14457-2/ 03.15.2006

For example, the description submitted by the United States Coast Guard to the National Register of Historic Properties on March 31, 1976 erroneously includes approximately 12,000 square feet of land that the United States conveyed in a land swap in 1901 (Leavens Aff. ¶16, Ex. E, BILPS0500-0503); (Affidavit of Stephen Adelson, Esq., ("Adelson Aff.") ¶8).

The Preservation Society has been informed that the only way that the legal status of the title to the Light Station can be accurately and definitively resolved is through a confirmation or registration procedure at the Land Court (Adelson Aff. ¶¶1-10).

**2.     Even If The United States Held The Fee It Was As A Fee Simple Defeasible That Would Revert To The Former Fee Owner After The Tract Was No Longer Used For The Purposes Of A Light Station.**

As discussed in more detail in section C.1., *supra*, there is no doubt that the June 18, 1796 Act of the Commonwealth of Massachusetts ceded jurisdiction over this tract of land only for so long as it continued to be used by the United States as a Light Station (Leavens Aff. ¶6, Ex. B, BILPS0492-0494). It is likely, therefore, that even if there was a "taking", such taking would only have created a fee simple determinable conditioned on this continuation of use (Leavens Aff. ¶6, Ex. B, BILPS0492-0494). As such, the fee would subsequently, and automatically, revert to the heirs of the former owner[4] when the land was no longer used for that purpose. The trigger for this reversionary interest would have been May 23, 2003, when the GSA sent out the Notice of Availability (AR002-004) and/or when the drafted a document that purportedly excesses the Baker's Island light station (GSA001-060).

Such a reversionary interest was common, and support for such an interpretation can be found in the conveyance of another former Massachusetts Light Station - Sequin Island Light

---

[4] These heirs would be the Heirs of George William Erving who had acquired title to the entire island by the probate of his uncle, who had acquired title to the entire island by virtue of the probate of his father, John Erving.  John Erving had acquired title by virtue of a mortgage foreclosure in 1787.

7

Station, located in Sagadahoc County, Maine.[5] This property was ceded two years earlier by enactment of the Commonwealth of Massachusetts in 1794 in what appears to be an almost identical manner. In that instance the attorney advisor to the United States Coast Guard, John F. Aronson, and Lieutenant L.M. Kenney, a United States Coast Guard law specialist, relying on United States v. Beals both concluded that a fee simple determinable was created. See United States v. Beals, 250 F. Supp. 440 (D.C.R.I. 1966) (automatic reversion to prior owners when use of the light station was discontinued).

Based on this circumstantial evidence, and without the clarity of a deed, grant, or a declaration of taking, the ownership of the fee by the United States is, at best, highly questionable and must be resolved by the Land Court (Adelson Aff. ¶9).

D.   **Baker's Island Light Station Cannot Be Conveyed Under The National Historic Light House Preservation Act Because It Is Not Excess Property As Required By The Act.**

It is a statutory requirement of the National Lighthouse Preservation Act that the property be considered "excess property" before the Secretary of the Interior can review applications for conveyance of the historic lighthouse. See 16 U.S.C. § 470W-7(b)(2). By express reference to 40 U.S.C. §102(3) "Excess property" is defined to mean: "property under the control of a federal agency that the head of the agency determines is *not required to meet the agency's needs or responsibilities*." See id; see also 40 U.S.C. §102(3) (emphasis added).

This statutory requirement, however, is directly adverse to the undisputed fact that the United States Coast Guard has every intention to continue to operate Baker's Island Light Station as an ongoing federal aid to navigation. This fact is expressed on the Notice of Availability. (AR003) which reserves full rights for the United States Coast Guard to: "maintain, operate,

---

[5] This transfer was undertaken under the Maine Lights program, which served as the model for the later National Historic Lighthouse Preservation Act.

service, repair and install equipment as necessary to aid navigation and/or make changes to any portion of the property as may be necessary for navigation purposes." It is clear, therefore, that Baker's Island Light Station continues to serve the not only the needs of the United States Coast Guard but also that this federal agency retains considerable responsibility over it.

Having failed to meet the statutory requirement that the property be "excess property" pursuant to 40 U.S.C. 102(3), the Baker's Island Light Station cannot be conveyed under the National Historic Lighthouse Preservation Act process. See 16 U.S.C. § 470W-7(b)(2).

E.  **The Jurisdiction Over The Baker's Island Light Station Has Reverted To The Commonwealth Of Massachusetts And Hence Cannot Be Transferred Under The National Historic Light House Preservation Act Process.**

Ironically, and notwithstanding the claim above, even if, *arguendo*, Baker's Island Light Station is considered "excess property" it still cannot be transferred under the National Historic Lighthouse Preservation Act. This is because a determination that the Light Station is "excess property" would trigger the retrocession requirement of the June 18, 1796 enactment of the Commonwealth of Massachusetts. Specifically, this enactment ceded jurisdiction to the United States only for so long as the tract of land was used by the United States for the purposes of a Light Station (Leavens Aff. ¶6, Ex B, BILPS0492-0494).

This automatic reversion of jurisdictional control is clearly stated in the 1796 enactment by the Commonwealth and remains in accord with the modern statutory requirement that "exclusive jurisdiction over any such tract shall revest in the commonwealth if such tract ceases to be used by the United States for such public purpose." Mass. Gen. Laws. ch. 1 §7 (enacted in 1871 and valid through the 2006).   Therefore, if, as the United States contends, the Light Station was "excessed" by virtue of the report of excessing from the U.S. Coast Guard (GSA0001-0060), all Federal jurisdiction would cease and revert to the Commonwealth and the

ID # 463884v01/14457-2/ 03.15.2006

United States would no longer have the jurisdictional control to dispose of the property through the National Historic Lighthouse Preservation Act.

## II. PLAINTIFFS HAVE DEMONSTRATED COMPELLING JUSTIFICATION FOR ENLARGEMENT OF THE ADMINISTRATIVE RECORD, AND REVERSAL OF THE DECISIONS

Among the circumstances in which a reviewing Court may, in its discretion, consider evidence outside of the Administrative Record are when the plaintiff specifically alleges bad faith and provides a reasonable factual basis for that contention, when evidence either confirming or denying agency predictions made in the original decision subsequently becomes available, when the plaintiff seeks to show factors that the agency should have considered but did not, or when evidence is necessary to explain an unclear or technical record. Strahan v. Linnon 966 F. Supp. 111 (D.C. Mass. 1997); Apex Construction Co., Inc. v. United States, F. Supp. 1144 (D.C. Mass. 1989). All of these justifications for enlarging the Administrative Record are present here.

In this case, the Leavens, Hallowell and Ware Affidavits provide a reasonable factual basis for the plaintiffs' contention that the government officials acted in bad faith in the preliminary agency action leading to the decisions challenged herein, and in making the decisions. Moreover, the Ware Affidavit includes evidence contradicting NPS assumptions as to the truthfulness of the Commission's application and also demonstrates factors that NPS should have considered, but did not – all of which provides ample justification for this reviewing court to consider evidence outside of the Administrative Record in deciding this case.

When such evidence is considered, the task of this Court under the arbitrary and capricious standard is to determine whether the NPS has examined the pertinent evidence, considered the relevant factors and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made. Penobscot v. FAA, 164 F. 3d, 713 (1st

Cir. 1999). The reviewing court must look to see if the agency decision, in the context of the record is too unreasonable, given its statutory and factual context, for the law to permit it to stand. (Id.) The reviewing court should not attempt itself to make up for the agency's deficiencies and the court may not supply a reasoned basis for the agency's action that the agency itself has not given. (Id.) While the arbitrary and capricious standard is a highly deferential standard of review, it is not a rubber stamp, and, although the ultimate standard of review is a narrow one, the Court must undertake a thorough, probing, in-depth review and a searching and careful inquiry into the record (Id.)

### The Government's Bad Faith

First, the government preselected the winning applicant, the Commission, through ad hoc procedures, ignoring fundamental flaws in the Commission's application while not even reviewing a complete version of the Society's application with the decision-maker, the NPS, itself participating as a co-applicant in the Commission. Then, an NPS official, P. Daniel Smith, met with both applicants and misrepresented to them that the evaluations were close at a point in time when it is clear that the Commission had already been pre-determined to be the winning applicant. In that conversation, Mr. Smith threatened the Society against an appeal, by assuring the Society's directors he would see to it that such an appeal would be futile.

Next, when the plaintiffs learned that the Commission was the selected entity, they filed a series of Freedom of Information Act Requests and spent over one and one half years in a futile effort to learn about the process governing the decision and the appeal of the decision, and to learn basic information concerning the legality of the Commission's funding – information which the NPS must have known and realized was not in its interest or the Commission's interest to disclose. Although the plaintiffs had been assured by the Office of Management and Budget

that evidence of the Commission's dollar for dollar matching funding was in the public domain, no governmental agency was able to supply it (Ware Aff. ¶¶17-36)

Most egregiously, the NPS made the decision without the Congressional mandated policies and process which were required to have been developed years before embarking on the decision and, only after being sued, did the NPS invent the idea that the required policies and guidelines were there all along - - contained in its application form and on its website. It designated these as the policies and process only <u>after</u> the decision was made and <u>after</u> the litigation commenced; obviously for the sole purpose of defending the litigation.  Finally, the NPS certified an Administrative Record that is incomplete, omits highly relevant documents concerning the decisions at issue, omits documentation and communications concerning preliminary and intermediate administrative action complained of in this lawsuit and omits specific documents in the plaintiffs' possession that are damaging to the government's position on key issues raised in the case.

Moreover, the decision to select the Commission as the eligible entity in itself was made in bad faith.  The two applicants were in no way treated equally as required by NHLPA.  NPS' close relationship with the Commission was evident throughout the Commission's application, which contains admissions that the NPS was actually the co-applicant, fatally tainting the process.  To make matters worse, since there were no defined procedures to be followed, and no articulated policies to be furthered through the decision- making, NPS was free to indulge its bias in favor of the Commission and to ignore serious misrepresentations and glaring omissions in the Commission's application.  Clearly, the plaintiffs have satisfied the requirement that they provide a reasonable factual basis for their contention of bad faith to justify the Court's consideration of evidence outside of the Administrative Record as certified by the NPS.

**B.     The Misconduct of the Government Constitutes an Abuse of Discretion and Warrants Reversal.**

When this Court undertakes a thorough, probing, in-depth review and a searching, careful inquiry into the entire record, as it is required to do, Penobscot Air Services, Ltd., supra, the Court will see that in the context of the expanded record, the decisions challenged are too unreasonable, given their statutory and factual context, to be permitted to stand.  Id. The entire expanded record provides abundant examples of how the NPS abdicated its duty to treat the plaintiffs fairly under the NHLPA process: pre-selecting the Commission, misrepresenting the status of the applications in May, 2004, threatening the Society against an appeal, arbitrarily downgrading the Society's application while upgrading the Commission's application despite glaring omissions, assisting the Commission's application, proceeding without the mandated procedures and policies, ignoring the plaintiffs' legitimate Freedom of Information Act Requests for additional information, admittedly failing to read the applications and the appendices to the applications,  failing to distribute to the reviewers the entire application of the Society, ignoring inconsistencies within the Commission's application, and  sidestepping the fundamental legal flaws in the Commission's ability to own and maintain the lighthouse – flaws that the NPS must have known given its close association with the Commission and its granting of nearly one million dollars in annual funding to the Commission.  Taken as a whole, the government's conduct from beginning to end was infected with self-interest, bias and whim.  The judicial review provisions of the APA were designed to correct precisely this injustice which the plaintiffs pray will be given due consideration by this Court, resulting in the reversal of the decisions.

**BAKER'S ISLAND LIGHTHOUSE PRESERVATION SOCIETY, INC. AND ROBERT LEAVENS**
By their attorney,


/s/Catherine Savoie
Catherine Savoie, BBO #544599
Ian Moss, BBO#658557
POSTERNAK, BLANKSTEIN & LUND, L.L.P.
The Prudential Tower
800 Boylston Street
Boston, MA  02199
(617) 973-6100