UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| |
|---|
| BAKER'S ISLAND LIGHTHOUSE PRESERVATION SOCIETY, INC. And ROBERT LEAVENS<br>                    Plaintiffs,<br>v.<br><br>UNITED STATES DEPARTMENT OF INTERIOR, SECRETARY OF THE INTERIOR, NATIONAL PARK SERVICE, DIRECTOR NATIONAL PARK SERVICE, CRAIG MANSON, As He Is Assistant Secretary Of Fish, Wildlife And Parks, JANET SNYDER MATTHEWS, As She Is Associate Director, Cultural Resources, National Park Service, BRIAN SWEATLAND, As He Is Special Assistant to the Office Of The Director, National Park Service, ADMINISTRATOR OF GENERAL SERVICES, GENERAL SERVICES ADMINISTRATION, and JOHN KELLY, As He is Acting Director of Property Disposal, General Services Administration<br>                    Defendants |

C.A. No. 05-10855 PBS

**AFFIDAVIT OF ELIZABETH M. WARE**

I, Elizabeth M. Ware, being duly sworn, depose and say as follows:

1.   I am the Treasurer and a Director of the Baker's Island Lighthouse Preservation

Society (BILPS), one of the plaintiffs in the above-entitled action. I submit this affidavit in

support of the plaintiffs' Motion to Reverse the Decisions of the Department of the Interior,

1

National Park Service and Fish, Wildlife and Parks and to Enlarge the Administrative Record.[1]

2.   On August 15, 2005, Jennifer Perunko, of the National Park Service ("NPS") certified an "administrative record" for the NPS decision, dated July 14, 2004, by Defendant Janet Snyder Matthews, Associate Director, Cultural Resources recommending the Essex National Heritage Commission ("ENHC") as the recipient of the Baker's Island Light Station in accordance with the National Historic Light House Preservation Act ("NHLPA")  and for the January 18, 2005 decision of Craig Manson of the Department of the Interior, Assistant Secretary of Fish, Wildlife and Parks, confirming the recommendation of the NPS to convey the historic light station on Baker's Island to the Essex National Heritage Commission in accordance with the National Historic Light House Preservation Act ("NHLPA").

3.   On or around December 6, 2005, the GSA produced an "administrative record" containing documents the GSA deemed relevant to the July 14, 2004 decision of  Defendant Janet Snyder Matthews and the January 18, 2005 decision Defendant Craig Manson.

4.   I believe that the "administrative record" as certified by the NPS and as supplemented by the GSA is an insufficient basis for this Court's decision and that it would be manifestly unjust for the Court to rely solely on the so-called "administrative record" in resolving the issues in this case because: a) neither agency has included a complete record regarding the agency action challenged in this law suit;  and b) both agencies have acted in bad faith in making decisions and in their dealings with the plaintiffs and with me.

5.   The specific grounds for my belief are:

---

[1] I attach to this affidavit exhibits number 1 through 14 which are described in the affidavit and referred to by their exhibit numbers and also by Bates Stamped designations "BILPS".

2

a.   While the complaint in this case challenges "preliminary, procedural and intermediate agency action" that underlies the January 18, 2005 decision, the "administrative record" produced fails to include any of the government's documents or communications regarding the preliminary agency action complained of; and

b.   The government has acted in bad faith throughout its dealings with the co-plaintiff, Baker's Island Lighthouse Preservation Society ("BILPS"), and me by:

i.       pre-selecting the winning applicant through ad hoc procedures and then threatening to make the decision "appeal-proof";

ii.      misrepresenting the status of BILPS' application in May, 2004;

iii.     engaging in a conflict of interest by serving as a co-applicant with ENHC and also as the decision-maker ;

iv.      failing to respond to numerous Freedom of Information Act requests submitted by Robert T. Leavens and myself on behalf of BILPS.  These requests sought basic information about the decision making process. I have spent over a year and a half (since July 2004)  trying to obtain information on the NHLPA process and related information on the ENHC, the selected entity for the Baker's Island Light Station;

v.       conducting the decision making without the Congressional mandated policies and process required to be developed years before the decision making process began;

vi.      inventing the idea that the required policies and process are contained in its application and on its website and designating these as its policies and process only _after_ the decision was made and _after_ the litigation commenced;

3

vii.     answering the complaint and defending this case on the basis of " policies and process" obviously designated solely for purposes of defending the litigation;

viii.     and by certifying an administrative record that is incomplete, that omits highly relevant documents concerning the decision at issue, that omits basic documentation and communication concerning administrative action complained of in this lawsuit and that omits documentation that is damaging to the government's position on key issues raised in the case.

### NPS' Pre-Selecting the Eligible Entity and Threatening  Against An Appeal

6.  In May 2004, two months before the NPS decision recommending that ENHC be selected as the entity to own the Baker's Island Light Station,  P. Daniel Smith, Special Assistant of the Office of the Director of the National Park Service, made a visit to the Baker's Island Light Station for the purported purposes of:  (a) reviewing the beach access to the property and (b) meeting with the two applicants (the plaintiff, Bakers Island Lighthouse Preservation Society ("BILPS") and ENHC) to determine if they could work together on the restoration and operation of the Baker's Island Light Station.

7.  Escorted by the U.S.Coast Guard and accompanied by Annie Harris, the Executive Director of the Essex National Heritage Commission (ENHC), Mr. Smith announced to several BILPS directors that, while the evaluations of the two candidates were close, the ENHC would be awarded the Baker's Island Light Station.   This announcement was made over two months prior to the decision being officially made, but over two months after decision was actually made. (See, Affidavit of Thomas B. Hallowell filed in support of the Plaintiff's Motion; Exhibit 9 attached hereto, BILPS 0203-0211.).

4

8.   Mr. Smith also announced to several BILPS directors that the ENHC would be awarded the Light Station and that he would make the NPS' decision so strong that it would withstand any appeal or review of that decision. (See, Hallowell Affidavit).

9.   Given that the NHLPA process is supposed to be a competitive process, with every party on equal ground, Mr. Smith's comments indicated that the NPS was predisposed to making a decision in favor of the ENHC, a federally-created, non-profit agency that receives one million dollars in funding by NPS annually.

**Both agencies failed to adequately respond to numerous Freedom of Information Act Requests submitted over a one and one half year period of time.**

10. For the last year and a half  I have made repeated Freedom of Information Act ("FOIA") requests to both the National Park Service and General Services Administration to obtain fundamental information  about the NHLPA process.  For the most part, my requests have either not been answered, or were passed on to another party for action, which party took no meaningful action.  My FOIA reguests include, but are not limited to, the following:

    a.      September 27, 2004 letter: E. Ware to B. Barrett, NPS
    b.      January 6, 2005 letter: E. Ware to B. Barrett, NPS
    c.      March 9, 2005 letter: E. Ware to NPS FOIA Appeal Office
    d.      March 19, 2005 letter:  E. Ware to J.S.Matthews, NPS, with
            attachment letter of February 10, 2005 letter from NPS Joe Wallis
    e.      March 26, 2005 letter: E. Ware to J.S.Matthews, NPS

(Attached as Exhibit 1 (A) through (E) are true and accurate copies of the Freedom of Information Act requests  as described above,  BILPS 0001 through BILPS 0019)

11. On July 19, 2004, in an effort to obtain basic information and an understanding of the NHLPA process generally and, specifically, the appeals process,  I made several telephone calls to P. Daniel Smith of the NPS.   Mr. Smith never returned my calls.

5

12. On September 27, 2004 I had a telephone conversation with Alisa McCann of the Northeast Regional office of the NPS in Philadelphia in which I requested information about any draft guidelines and procedures relating to the NHLPA process. Ms. McCann stated that the NHLPA program was being transferred to the NPS regional offices but the Pilot and National Pilot programs, the first two rounds of the NHLPA program, were generated out of the Washington, D.C. office. She suggested that I contact Jennifer Perunko and Kevin Foster in the Maritime division of the Washington, D.C. NPS office. I contacted them via e-mail and by telephone. (AR0670, AR0671, AR0672, AR0673, AR0674, AR0675).

13. In response to my e-mails to the NPS (AR0670-0675) Defendant P. Daniel Smith wrote me on October 26, 2004 (AR0680-0681). He provided a simplistic explanation of the NHLPA process:

> "Please find enclosed a copy of our handout on the NHLPA program. This includes further information on the new application evaluation guidelines… Please note that the evaluation guidelines are dated May 1, 2004 and therefore were not used for the Baker's Island Light Station applications".(emphasis added).

14. On November 2, 2004 I sent a letter to Mr. Smith which included a series of questions relating to the NHLPA process. Both he and his successor, Brian Sweatland, refused to respond in writing. This letter was sent to Janet Snyder Matthews, Brenda Barrett, Fran Mainella (NPS Director), Craig Manson (Fisheries and Wildlife) and the FOIA officer, Diane Cooke, for response. The letter was never answered. (AR0695- 0697).

15. On December 31, 2004 I had a telephone conversation with Brian Sweatland of the NPS. I had learned from other NPS officials that Mr. Sweatland assumed the responsibilities of P. Daniel Smith, the Special Assistant to the Director who had, before the decision, guaranteed an appeal-proof decision from NPS. Mr. Sweatland disavowed any

6

knowledge of Mr. Smith's actions.  I asked Mr. Sweatland to respond to the November 2, 2004 letter from my representative regarding questions on the NHPLA process sent to P. Daniel Smith.   Neither Mr. Sweatland nor Mr. Smith ever responded.    Mr. Sweatland furthermore disavowed any responsibility to reply.

16. On January 7, 2005 I spoke with Brian Sweatland again regarding the de-accessioning of the Baker's Island Light Station.  He would not or could not provide me information on the financial operations of the ENHC, could not provide me information on the NPS' administration of the NHLPA and disavowed any knowledge or information on P. Daniel Smith's prior work as it related to the Baker's Island Light Station, specifically, or the NHLPA process generally.

## Efforts to Obtain Information on the Financial Viability of ENHC

17. The financial capability of an applicant was a significant factor in the NPS' selection of the designated entity, the ENHC, for the award of the Baker's Island Light Station.  AR0503-554 indicates that the ENHC "presents a more rounded financial plan".  I am informed and believe that there is no documentation available to establish that:

 1)  the ENHC has or will continue to meet its federally-mandated "match" of federal funds,  as required in its enabling legislation, in AR0396-0399;

 2)  that the ENHC has the ability to fundraise within the ENHA; and

 3)  the ENHC has the ability to secure funds to restore the Baker's Island Light Station.

18. On August 13, 2004 I had a telephone conversation with Elizabeth Philips of the Federal Office of Management and Budget (OMB) regarding the financial information I was seeking regarding the ENHC "match" of federal funds.  She stated that this information was

7

public information and should be requested in writing through the federal funding agency, the NPS. As a result of this telephone discussion, I made several written requests to the NPS, culminating in my FOIA appeal for the requested information. (See, Exhibit 1(C) attached, BILPS 0005**.**)

19. Based on my discussions with OMB, in July 2004 I tried to secure a copy of the ENHC Management Plan and financial "match" information. I went directly to the ENHC office and was informed by Allison Lytle that the Management Plan was not available to me. Furthermore, I contacted the financial manager of the ENHC, requesting a copy of the financial "match" information. She indicated to me that financial information was not public information and that she had been advised by the legal counsel to the ENHC not to make the information available to me. I ultimately received a copy of the ENHC Management Plan by contacting the NPS Heritage Area office and requesting that office to contact the ENHC office to release the management plan. (Attached as Exhibits 2 (A) (B) (C) and (D) are true and accurate copies of a series of e-mails, dated July 20, 2004 and October 15, 2004, between me, Brenda Barrett and Suzanne Copping of the NPS Heritage Area office and Allison Lytle of the ENHC office, BILPS0020-0023.)

20. On September 27, 2004, I wrote to Brenda Barrett, the Program Director for the National Heritage Area Program, to request information regarding the operation of the Essex National Heritage Area and its related Commission. I specifically asked for financial information on how the Commission fundraises 50% of its operational budget and what constitutes "a match" of federal funds. The ENHC had noted in the local newspapers that it was matching its $1 million in federal funds by $1.5 to $2.2 million. Since this "match" information is not included in the ENHC audits or in the Form 990s, which are filed with the

8

Commonwealth of Massachusetts, I wanted to know how it made its declared "matches". She refused to respond, either in writing or verbally, with any specific information about how the ENHC satisfied its requirement to match, dollar for dollar, one million dollars in funding annually by the NPS.

21. In September, 2004 I again telephoned Elizabeth Philips of OMB to obtain information regarding the requirement of the ENHC to demonstrate "in-kind services" and "match". Ms. Philips stated that the information should be requested of the NPS, the federal agency that oversees the ENHC, as the federal funds were "pass-through" funds, and that the NPS by law should provide them to me.

22. In September and October, 2004 I had several telephone conversations with Hampton Tucker, a grants manager within the NPS. Mr. Tucker told me that this financial information on the ENHC's "match" should be made available to me through the NPS.

23. In September 2004 I submitted a written request (which I followed up with a telephone call) to Brenda Barrett, the NPS Director of the Heritage Area Programs, to obtain a copy of the revised Management Plan of the ENHC, which I understood was required to include the ENHC's goal of acquiring the Baker's Island Light Station. The Secretary of the Interior approved the ENHC's Management Plan in November 1999 and it nowhere indicated in the proposed goals, objectives and programming that the ENHC would seek to acquire the Baker's Island Light station or any property. I did receive a response from Janet Snyder Matthews, who stated that the ENHC Management Plan did not need to be changed. The goal of acquiring the Baker's Island Light Station is still not included in any ENHC document.

9

24. On November 30, 2004 Janet Snyder Matthews responded to my inquiry as to why the Baker's Island Light Station acquisition by the ENHC was not included in its approved Management Plan.  Ms. Snyder Matthews stated that the Management Plan was a guidance document and not binding on any party. (AR0716-AR0717).

25. In her letter (AR0716), Ms. Matthews stated:

> **"**The independent audit prepared by Parent, McLaughlin and Nangle found that the ENHA had demonstrated the necessary matching contributions meeting the requirement in OMB Circular A-110 for each of the years in question".

However, in the year ended June 30, 2002 audit (AR0321), the auditors state that:

> "Our audit does not provide a legal determination of Essex National Heritage Commission, Inc's compliance with those [OMB] requirements."

26. The Management Plan for the ENHA states that the federal funding authorized by its enabling legislation cannot be used for land acquisition (AR0349) and that the "Commission does not seek, nor does it have the capability for direct construction projects or facility maintenance". (AR0380).

27. In a September 2004 telephone conversation with Ms. Barrett, I questioned whether the ENHC's application for the Baker's Island Light Station was prepared using federal funding and, given that the ENHC does not keep separate books on their operations, questioned whether the ENHC's federal funding could be used to prepare an application to own real estate. She did not respond.

28. In the Fall of 2004 and in the Spring of 2005 I spoke with several ENHC Commissioners about the Commission's vote to acquire the Baker's Island Light Station and how the ENHA was funded and fundraised its 50% matching funds.  Of the four Commissioners with whom I spoke, not one could tell me how the ENHC operated,

10

fundraised, met its match or budgeted to preserve and maintain the Baker's Island Light Station.

29. On December 7, 2004 I had a telephone discussion with Brenda Barrett regarding the financial and administrative operations of the ENHC. As Ms. Barrett is the NPS Director of Heritage Area Programs, I anticipated that she would be able to provide me with some answers to my questions. In our telephone discussion, Ms. Barrett indicated that the Heritage Area audits were provided to the NPS, but she did not review or make determinations of their financial obligations to "match" federal funding. She stated that she did not "deal with the detailed financials of the Heritage Areas" and "was not knowledgeable of the rules".

30. During this telephone conversation Ms. Barrett also indicated that she believed that the Heritage Area Management Plan was a "guidance document" and that the ENHC "could change their plan tomorrow and can do anything they want" without approvals from any federal entity.

31. I submitted subsequent Freedom of Information Act (FOIA) requests regarding the financial operations of the ENHC to the NPS. My questions relative to the financial, management and administrative operations of the ENHC were never answered by either the ENHC or the NPS. (AR0693, AR0694, AR0716-0717, AR0719-0720) (Attached as Exhibit 3(A) is a true and accurate copy of the January 15, 2005 letter to Craig Manson from R.T.Leavens, regarding Mr. Leavens concerns about the NHLPA process and the ENHC's ability to own real estate and fund the preservation of the Baker's Island Light Station (BILPS 0024-0026; see, also, Exhibit 1, BILPS 0001-0002.)

32. Not receiving the requested information from the NPS and related parties, I filed a Freedom of Information Act appeal on March 9, 2005, which was received by the Department on March 11, 2005 and docketed as Appeal Number 2005-081. (See Exhibit 1 (C) BILPS0005-0014)

33. On March 19, 2005 I again sent another letter to Janet Snyder Matthews, the Associate Director for Cultural Resources regarding the issues relating to the financial operations of the ENHC. Again, I explained that OMB, as well as the grants group of the NPS, stated that the financial "match" information that I had requested should be requested of the NPS for the ENHC and that this information should be readily available under FOIA. I further explained that this information had not been included in the audits and/or Form 990s filed with the Commonwealth of Massachusetts, should be included in these tax documents according to OMB Circulars A-110 and A-133, and that my request for financial information relates to the ENHC's ability to meet their federally mandated financial responsibilities as well as their ability to financially support the Baker's Island Light Station. (See Exhibit 1(D), BILPS 0015-0018)

34. In my telephone conversations with OMB and in correspondence with Janet Snyder Matthews (AR0716), I was referred to OMB Circulars A-110 and A-133. Neither document provides detailed information on what constitutes a "match". (Attached as Exhibit 4 is a true copy of OMB Circular A-110, BILPS0029-0079; attached as Exhibit 5 is a true copy of OMB Circular A-133, BILPS0080-0117)

35. On March 29, 2005 Janet Snyder Matthews sent me a letter, in response to my January 27, 2005 letter to the NPS financial administrator Joe Wallis regarding the issue of the "match" requirement of Heritage Area funding. While she elaborated on what types of

12

funding qualified as a "match of federal funding under OMB Circular A-110 for grants of non-profit organizations", she did not answer how the ENHC actually made its federally mandated "match". (Attached as Exhibit 6 (A)is a true and accurate copy of the letter from Janet Snyder Matthews (BILPS0018); attached as Exhibit 6(B) is a true and accurate copy of my January 27, 2005 letter to financial administrator Joe Wallis (BILPS0121.)

36. In her March 29, 2005 letter to me (Exhibit 6(A), BILPS0018), Matthews confirmed to me in writing that "The National Park Service has no internal regulations or other regulations relative to the financial operations of national heritage areas."

### Efforts to learn about the appeal process

37. I have provided a number of documents to defendants P. Daniel Smith, Craig Manson and Janet Snyder Matthews regarding the appeal process. No notes from either of these defendants have been included in the "administrative record". (AR0680, AR0680); (See, also, see Exhibits 1, 3, 6, 7, 14, etc., BILPS0001, 0024, 0118, 0123, 0461).

38. In a letter, dated March 10, 2005 from Janet Snyder Matthews to me, Ms. Matthews stated:

> "Specific to the question you posed in your reply to Mr. Smith, there is no further appeal process after that conducted by the Assistant Secretary's office. After the petition for review process is completed and the applicants are notified, the Assistant Secretary makes his decision known to the Secretary in the form of a memorandum. Next, a letter is sent from the Secretary to the Administrator of the General Services Administration (GSA) providing the name of the recommended applicant, in this case the Essex National Heritage Commission."

(Attached as Exhibit 7, is a true and accurate copy of the letter of March 10, 2005 from Janet Snyder Matthews to me, BILPS0123).

13

39. The letter referenced in paragraph 38 has not been included in the Defendants' "administrative record".

40. On May 7, 2005 I received a copy of *the Draft National Park Service Regional Handbook for Implementing NHLPA*, *revised in July, 2004.* (The Handbook was included in the Administrative Record, AR0629-0645; the Appendix to the Handbook, however, containing 17 Exhibits, BILPS 0127-0241) was not included in the Administrative Record. Although I had requested this document nine months earlier in my November 2, 2004 letter to P. Daniel Smith (AR0695-0697), it was finally sent to me by Brian Sweatland, the Special Assistant to the Director.

41. I submitted a FOIA appeal in March 2005 and on April 4, 2005 I received a letter from Darrell R. Strayhorn, a FOIA Appeals Officer for the United States Department of the Interior, Office of the Solicitor.  Ms. Strayhorn acknowledged that she had received my FOIA appeal regarding the NPS' "alleged" failure to respond to my FOIA requests and stated that "we hope that you will delay filing a lawsuit so that the Department can thoroughly review the issues in your appeal and make a determination." (Attached as Exhibit 8 is a true and accurate copy of the April 4, 2005 letter from Strayhorn to me, BILPS0126).

42. Since April 2005 I have made several telephone calls to Ms. Strayhorn in the hopes that my appeal would be decided by the DOI Solicitor's office and that I would be able to obtain the requested information relating to the ENHC financial operations.  No information has been forthcoming and in a December 2005 telephone conversation with Ms. Strayhorn, she indicated that her office had 599 appeals before mine and that she would welcome my lawsuit so that she "could get the case off my desk and up to the litigation department".

ID # 462177v02/14457-2/ 03.15.2006

**The Government's Failure to Adopt Required Policies**

43. The NHLPA requires the adoption of "a process and policies for identifying and selecting an eligible entity to which an historic light station could be conveyed for education, park, recreation, cultural or historic preservation purposes and to monitor the use of such light station by the eligible entity." AR0608, a letter to NPS regional directors from NPS Director Fran Mainella, indicates that in 2003 and 2004 the NPS worked on drafting such policies. To date no process and policies have been adopted in final form.

44. The Secretary and the Administrator's draft policies as set forth in the Handbook fail to address crucial issues regarding the decision making process, or to state any policies which guide the process. The omitted issues include, but are not limited to, the following:

1) review of competing proposals;

2) modification of proposals (either by the applicants and/or the selection committee);

3) co-applicants in the submission of a proposal;

4) appointment of the selection committee;

5) confirmation of accuracy of application submissions;

6) definitions and standards as to what are "reasonable times and reasonable conditions" under NLHPA for public access and standards for safety regarding public access;

7) potential impacts on abutting property owners;

8) hazardous material clean-up (such as mercury, lead paint, asbestos, etc.);

9) confirmation of property boundaries;

15

10) establishment of easements for the Coast Guard's purposes (in most situations the U.S.C.G. retains an easement to the conveyed lighthouse so that they may maintain ATON on the property);

11) direct transfer of the light station to the NPS or other federal agencies;

12) monitoring of the specified use;

13) definitions as to what constitutes "commercial activities";

14) compliance with the Secretary of the Interior's Standards for the Treatment of Historic Properties, 36 CFR part 68 and other applicable laws; etc.

45. In addition, NHLPA requires the Administrator of the GSA to adopt a process and policies in the event that the light station property is not conveyed through a competitive process and is to be sold outright. To date, no such policies and process have been developed, nor were they provided in the GSA's documents.

46. In a memo (AR0676) from Jennifer Perunko to D. Pitcaithey, K.Foster and L. McCann, all of the NPS, Ms. Perunko notes that

**"the draft guidelines were really not applied to the Baker's Island applications".**

## The Two Proposals Were Not on Equal Footing

47. The Baker's Island Lighthouse Preservation Society was not on an "equal footing" with the Essex National Heritage Commission in the competition to secure the Baker's Island Light Station, as required by NHLPA, for the following reasons:

16

a.  The ENHC receives approximately $900K to $1M annually from the National Park Service (NPS).  The Baker's Island Lighthouse Preservation Society (BILPS) does not receive any federal funding from the NPS (AR0399, AR0310, AR0311);

b.  The ENHC and the NPS were co-applicants in the proposal to acquire the Baker's Island Light Station (AR0245, "[the] Commission I the lead applicant .. .  The Commission is affiliated with National Park Service.")  BILPS did not have the NPS as a co-applicant;

c.  The legislation creating the ENHC allows for the ENHC and the NPS to enter into cooperative agreements so that the NPS can assist the ENHC in carrying out it's goals and programs (AR0398-0399).  BILPS does not have such a cooperative agreement with the NPS;

d.  AR0277-281 is *The Environmental Questionnaire Response to the Preservation of the Baker's Island Light Station* of the ENHC application for the Baker's Island Light Station.  AR0280 indicates that the preparer of the questionnaire was a biological science technician, Daniel Noon, of the Salem Maritime National Historic Site staff, National Park Service (NPS), in conjunction with others (AR0281).  NPS, through its cooperative agreement with ENHC, has the ability to assist the ENHC in carrying out its goals and did assist ENHC in the preparation of its application.  This assistance was not made available to BILPS;

e.  The Secretary of the Interior and the Administrator of the GSA have not adopted policies or procedures for the operation of NHLPA generally and specifically have not addressed the issue of co-applications or any policy or procedures as to whether the NPS has the ability to award the Baker's Island Light Station to an agency which is funded and

17

overseen by the NPS and with whom the NPS was a "co-applicant" in the application (GSA0128- 0129);

      f.   The NPS oversees the selection of the entity who will be awarded the light station.  In the competition for the Baker's Island Light Station, the NPS staff person responsible for the selection process did not send the NPS reviewers full copies of the BILPS application submission and subsequently the application was downgraded due to incompleteness. (AR0502, AR0523, AR0530, AR0556, AR0557).   NPS reviewers were sent full applications of the ENHC application proposal;

      g.  The NPS reviewers noted that the ENHC proposal was too intense for the environment and have suggested that the ENHC modify its proposal to lessen the impacts on the Baker's Island Light Station.  The BILPS proposal was not asked to be modified nor is there any regulation, guideline or procedure that allows the modification of an application proposal either by the applicant or by the National Park Service. (AR0503, AR0554, AR0535, AR537, AR0615)**;**

      h.  There were a number of inconsistencies in the grading during the initial review of the proposals.  One example of this is that the BILPS proposal was downgraded for not having voting members while the reviewers were silent on that issue in evaluating the ENHC proposal, even though the ENHC does not have voting members.   (AR0521, AR0448);

      i.  In a November 8, 2004 e-mail from P.Daniel Smith to J. Perunko and K.Hall, all of  the NPS (AR0704), regarding the appeal of the Baker's Island Light Station decision, P. Daniel Smith writes:

18

"Secondly, there is really no public use considered under the Society's application.  The dock has been denied.  ..... I believe that once the deed is transferred, the Heritage group will work with its neighbors on the island, to develop a true middle ground of use.  Eventually, I see a program like that envisioned by the Trustees of Reservation successfully being implemented by the Essex Heritage partners.

I do not believe that scoring is necessary on these applications, and I support the original National Park Service review in the Region on all sections of the applications.  For the record, I did not participate in the original review by the NPS."

The GSA's Notice of Availability (GSA0177-0179) for the Baker's Island Light Station clearly stated that the successful applicant must accept the property with shoreline access only.    Furthermore, Mr. Smith's comments imply that there is no formal written review process. There are no notes or correspondence of P. Daniel Smith in the Defendants' Administrative Record.

j.   GSA0001, an October 4, 2002 letter to Glenn Rotondo of the GSA from T.P. Dernago of the U.S. Coast Guard states:

"Please note that the "National Park Service" and "The U.S. Fish and Wildlife Service" have expressed interest in the acquisition of the Baker's Island Site."

Given the admission that the NPS is interested in the acquisition of the Baker's Island Light Station, it is no wonder to me that the NPS favored that candidate with whom it has entered into cooperative agreements, with whom it has a close working relationship and who it funds accordingly.

## The Missing Appendix

47.   The 2004 *draft NHLPA Handbook*, as sent to me on May 7, 2005 by Brian Sweatland, included an appendix of 17 exhibits.  This ***appendix was not provided in the***

19

*documents produced by either the GSA or NPS.*   (Attached as Exhibit 9 is a true and accurate copy of the Draft NHLPA Handbook Appendix (BILPS0127-0241).

48. The Appendix includes a September 22, 2003 letter from de Teel Patterson Tiller, the Acting Associate Director of Cultural Resources of the NPS to the DOI Solicitor's office (BILPS0238-0241) requesting clarification as to the required process and policies need to be adopted.  He specifically stated:

> **Interpretation of "establish a process and policies".**  The law states that "not later than 1 year after the date of the enactment of this section, the Secretary and the Administrator shall establish a process and policies for identifying and selecting, an eligible entity to which a historic light station could be conveyed for education, park, recreation, cultural or historic preservation purposes and to monitor the use of such light station by the eligible entity".  We (the three agencies involved) are interpreting the phrase "establish a process and policies" to require us to develop mutually agreed upon procedures for executing the intentions of the act, but not to require us to develop formal regulations. Do you agree with this interpretation?"
> (BILPS 0239)

Neither this letter, an Exhibit within the NHLPA draft guidelines, nor the response from the Solicitor was included in the so called "administrative record".

50. The Appendix of the *Draft NHLPA Handbook* also includes a memo, dated October 10, 2003, from John Robbins, asking the Solicitor to determine whether the direct transfer of light stations to the National Park Service can take place[2].   Several of the defendants, including Manson, Smith, Perunko were copied on this memo. Neither the memo nor the Solicitor's response was included in the "administrative record".  (Exhibit 9, Draft NHLPA Handbook, Appendix (BILPS0235).

---

[2] Since the application by the ENHC for the Baker's Island Light station was partially prepared by a NPS employee and also includes the NPS as a co-applicant (see GSA0128 - a March 17, 2003 e-mail from ENHC Executive Director A. Harris to GSA realty specialist S. Robbins, admitting that the proposal for the light station was submitted by the National Park Service/ENHC), the issue of whether NPS can use NHLPA to transfer a lighthouse to itself through an entity it controls is highly relevant to the decision to transfer.

51. The Draft NHLPA Handbook Appendix (BILPS0194-0197) demonstrates that there is no consistent policy on public access to conveyed lighthouses.  According to a September 5, 2003 letter on the Conimicut Shoal Lighthouse from Kevin Foster, the Chief of the Maritime Heritage Program,

> "Because of the size of the lighthouse, its offshore location and limited docking facilities, it is unlikely that much revenue could be generated to support the costs of the lighthouse . . . The proposed visitor center has the potential to have high construction costs and may negatively affect the preservation and maintenance of the lighthouse.   Shoreside exhibits could prove just as effective and far less costly." (BILPS 0195)

In the subsequent transfer of this light station (as well as a number of other light stations under the NHLPA process) public access was not required.  Clearly, the NPS has no policy on what defines reasonable public access available at reasonable times.  The NHLPA application forms (AR0238) require a provision for public access; however exceptions have been made to providing actual physical public access to a light house as detailed below.

52. Of the 28 lighthouses that have been conveyed by NHLPA in the Pilot and National Pilot programs, 12 lighthouses have both land and water access, 7 are not open to the public, 4 have a dock for boat and/or ferry access with limited public access, 4 have been removed from the program, are located within a National Park or have had no applicants and one, the Baker's Island Light Station, has beach access only. This information is based on data available on the NPS website and data available for each transferred light house. (Attached as Exhibit 10 are true and accurate copies the NHLPA Pilot and National Pilot Lighthouses from the NPS website and further information on each lighthouse, BILPS0242-0312.)

21

### The Northeast Lighthouse Conference

53. Robert T. Leavens and I attended the Northeast Lighthouse Conference, which was held on April 10-14, 2005 in Newport, Rhode Island.  This conference was sponsored by all three federal agencies tasked with implementing the NHLPA.  The purpose of the conference was to not only to provide information to participants but to have the Federal Government agencies assess their success to date in the operation of the NHLPA program. The conference was held after the final agency action challenged in this lawsuit; however the defendant agencies officials made many admissions during the conference which directly pertain to the decision-making which constitutes the agency action challenged in this suit.  I took extensive notes on a laptop computer during the entire three-day conference.

54. During this conference I heard representatives of the agencies discuss the NHLPA process, the inability of  the agencies to adopt policies and procedures (in fact they joked about their inability to work together to comply with the law),  the inability of the agencies (particularly the U.S. Coast Guard) to clean up the environmental hazards (both interior and exterior lead paint, asbestos, petroleum hydrocarbons, and other hazardous materials and contaminants) at the light stations, and I heard  extensive discussion of the fact that the U.S. Coast Guard was "excessing" these abandoned lights, yet they were still keeping many as aids to navigation (ATON).

55. At the Northeast Lighthouse Conference (NELC) I asked the NPS officials when the policies and procedures, which were required within a year after the enactment of the NHLPA, in 2001, would finally  be made available to the participants.  While NPS representative Jennifer Perunko was  initially evasive about this question, she finally

22

responded that the draft regulations were being reviewed by the DOI Solicitor's office. She further stated that she did not know when they would either be released in draft form for review, or become finalized.

56. At the conference, serious questions were raised by the participants as to the ability of the three agencies to operate the NHLPA. Examples cited of their inability to address the law included, but was not limited to:

    a.  lack of adoption of written policies and procedures;

    b.  no determination as to which agency will oversee the selected entity's use and compliance with the Secretary of the Interior's Standards for Preservation of an Historic Property;

    c.  inability to address site clean up of hazardous and/or toxic materials;

    d.  lack of detailed information and legal documentation of the easements that would be required by the U.S. Coast Guard to operate ATON (aids to navigation) on each light station property.

57. During Sessions I and IV of the NELC Lisa McCann of the NPS noted that the first two light house de-accessioning processes were not subject to the present application and review process requirements. The "national" and "pilot" programs were subject to "evolving applications and requirements" and that "the bugs need to be worked out between agencies".

58. Throughout the conference, participants questioned whether there would be a transcript of the conference that conference attendees could use in preparing their applications. The conference was recorded and then posted on a teleprompter within the room. GSA officials, who were responsible for recording the conference, assured conference

ID # 462177v02/14457-2/ 03.15.2006

attendees that a full record of the conference would be made available to all attendees.  In a later direct discussion with Saundra Robbins of the GSA, Ms. Robbins stated that the GSA had used this specific technology in prior conferences and that it was very accurate in capturing the contents of a meeting or conference.  To date, the GSA can not provide the "promised document" as they had "technical difficulties" in the recording of the conference. I requested the transcript from Saundra Robbins of the GSA, who sent me a document (attached as Exhibit 11(B), BILPS 0319-0446) including  only about a tenth of the contents of the conference, most of which is garbled and incomprehensible. (Attached as Exhibit 11(A) is a true copy of the 2005 Northeast Lighthouse Conference Seminar Program, BILPS 0313 to 0318 and as Exhibit 11(B) is a true copy of the Northeast Lighthouse Conference "transcript" as provided to me from the GSA, BILPS 0319-0446.)

59. During Session IV of the NELC, which addressed the application process, Lisa McCann and Jennifer Perunko of the NPS stated that they did not read the attachments to NHLPA applications.  They stated that they did not have time to read the entire applications, let alone the attachments.

60. During the NELC conference there was extensive presentation and discussion on the issues of hazardous materials at light stations and the need for the NPS to condition transfers and/or clean up light stations prior to transfer.  These conditions and/or remediation are based on environmental reports conducted for each light station.  To date no environmental report for the Baker's Island Light station has been produced by the defendants or included in the "administrative record".

61. In Session III of the NELC one of the more extensive discussions addressed which agency would review and enforce the Secretary of the Interior's Standards, which

24

would be a requirement at each light station.  Lisa McCann of the NPS stated that the NPS did not have the time or staff to oversee the light stations.  While a number of options for oversight were discussed, it appeared that the State Historic Preservation Officer (SHPO) would likely be the designated entity to oversee compliance; however she admitted that "monitoring was not determined yet."

62. In Session III of the NELC, John Kelly of the GSA discussed the GSA's sale of light stations in the event that the competitive process is not successful.  He stated that "the terms of the sale would be developed by GSA through a competitive bid process" and that it "would be posted on the web" and that there would be "an invitation to bid or on-line auction."  He did not delineate how the GSA made the determination as to which process would be followed for each light station and did not indicate that there was an established process or procedure for the sale of light stations.

### Erroneous Information within ENHC application

63. There are a number of deficiencies, misrepresentations and errors in the ENHC's application to acquire the Baker's Island Light Station.  These errors, omissions and/or misrepresentations were never checked or verified by the NPS reviewers, as confirmed by NPS representative Alisa McCann at the April 10-14, 2005 Northeast Lighthouse Conference since the reviewers "did not have time to review the appendices to the applications for Light Stations" let  alone confirm any of the data within the applications.

64. AR0324-328 – Section E. of the ENHC Management Plan includes a "unigrid" for a better understanding of the extent of the Essex National Heritage Area (Attachment D). This attachment does not include Baker's Island within its area of jurisdiction.

ID # 462177v02/14457-2/ 03.15.2006

65. The ENHC has represented in their NHLPA application that they will be able to secure insurance for the Baker's Island Light Station.  In March 2005 I had a telephone conversation with Robert Cappadonna, of Robert Cappadonna Insurance Co. in Watertown, the agency secured by the ENHC to issue an insurance policy for the Baker's Island Light Station.  Mr. Cappadonna, informed me that ENHC's executive director, Annie Harris, had not contacted him since his original quote to her in the fall of 2003.  He indicated that the insurance market had changed and that today "no one would write such a policy".  He further indicated that Ms. Harris had not fully informed him of the uses proposed for the Baker's Island Light Station, the lack of fire protection, the beach landings, and that he "can't go with that quote now".

66. The ENHC indicated that Sunline Cruises would be secured to provide transportation for NPS ranger-guided tours to the beach at the Baker's Island Light Station.  As is widely known on the North Shore, Sunline Cruises has not been in operation for over four years.  I recently confirmed this fact in telephone discussions with the Trustees of Reservations property managers, who had used Sunline Cruises in the past for transportation to Misery Island.  I further confirmed this fact by speaking with representatives and personal friends of the owner of Sunline Cruises from Desmond Yacht Yard and Double Eagle Charter d/b/a Baker's Transport.

67. The NHLPA application for the Baker's Island Light Station requires that the Federal Government/NPS be relieved from any and all personal injury or property damage liability relative to the light station**.** (AR0241).  Given that the NPS is a co-applicant and is proposing to run ranger-guided tours from the shore to the island, I believe ENHC cannot

26

comply with the NHLPA application requirement to relieve the federal government from insurance liability related to the operation of the visitation to the island.

68. One of the most important issues relating to the access to the Baker's Island Light Station, as made clear in the GSA's Notice of Availability, is that the sole access to the light station is over the beach. As a sea kayaker I have landed on the beach on many occasions, several of which have been dangerous. To land paying passengers on a rocky beach, which is subject to ocean swells, is dangerous and could cause serious injury to the public. Given that the island has no telephones, no doctor, no immediate helicopter service, even a minor injury on the island is cause for concern. AR0708, a memo from Kym Hall to J. Perunko and P.Daniel Smith, all of the NPS, indicates that shoreline access only "seems unreliable at best". In response to ENHC proposal pertaining to the seasonal rental of the assistant keeper's cottage, one reviewer notes that "not sure that this is a sound idea especially when the only access is beach" (AR0503-554).

69. In the reviews of applications for the Baker's Island Light Station (AR0503-554). NPS reviewers noted that ENHC's "plan to install solar panels to provide power to the house – would provide a better alternative to propane and kerosene currently being used". This conclusion resulted in the ENHC being given points in the application review process. The ENHC has budgeted $2,000. for the installation of a solar collection system to provide for the energy needs for both keepers' cottages. Based on the experience of the Baker's Islanders in the area of energy needs, propane for cooking and refrigeration is most efficient and meeting other energy needs through solar comes at a cost ranging from  $5,000. to $50,000. per cottage. The reviewers, as well as the ENHC,  demonstrate a lack of expertise in this area.

27

70. If ENHC determines that propane will be needed in the keeper's cottages, 150 lb. tanks will have to be filled on shore, landed on the beach and dragged over the beach to the keepers' cottages since the GSA has mandated shoreline access only. With most cottages going through 3-5 tanks a season, the beach access for hauling materials such as 150 lb gas tanks is unrealistic and dangerous.

71. The NPS reviewers do not understand the lack of fire fighting facilities on Baker's Island. One reviewer (AR0523) claims "These people are obsessed by fire. If the lighthouse goes to another party – will they let it burn down?" This reviewer fails to understand that Baker's Island has limited fire fighting personnel (island volunteers) and limited equipment to prevent any fire from spreading. With increased visitation to the island via ranger-guided tours, there is an increased probability of fire due to tour participants who smoke. The ENHC proposal does not address fire protection, even though the application was given points by reviewers for having done so.

72. The Baker's Island Association has caretakers to monitor and protect the island on a year round basis. The ENHC does not address security, which could seriously impact the homes on the remainder of the island.

73. To date, of the 28 lighthouses that have been conveyed in the pilot and national pilot NHLPA programs, no lighthouse has been conveyed that has been located on an island with a 100+ year old summer colony. This conclusion is based on NPS website data for the pilot and national pilot programs and on information for each light station excessed under those programs. Most of the light stations that have been conveyed have either been on remote islands with few or no other inhabitants or have been on shore. (See Exhibit 10, BILPS0242-0312).

74. The ENHC proposal states that the Assistant Building Commissioner in Salem has indicated that alternative composting toilets could be used at the Baker's Island Light Station. It is the Salem Board of Health and Health Agent, not the Building Department that authorizes under Title V., the State's Sanitary Code, the use of alternative toilet facilities. (AR0254).

### Government Contention that Policies/Process was in the Application/On the Web

75. As detailed above and demonstrated in the attached exhibits, I made many repeated inquiries to the NPS and the GSA and other agencies and officials to obtain copies of the process and policies required by Congress to be developed to govern the process of selecting an eligible entity to own a light station under NHLPA. .

76. No government official ever told me that the process and policies required by Congress were contained in the application itself and in the flow chart on the NPS website.

77. The most I was told is that draft policies were being developed and after nine months of making requests for the draft policies, I was finally provided with a copy of the draft policies. The government has admitted that the draft policies were not used in making the decision regarding the Baker's Island light station. (AR0676, AR0680, AR0681)

78. It was not until the government answered the complaint in this lawsuit that I learned for the first time that the Congressionally mandated process and policies were allegedly in the application and on the website. As detailed above and below, the absence of meaningful policies and procedures was prejudicial to BILPS.

79. In July 2004 the NPS made its preliminary award of the Baker's Island Light Station to the ENHC. Within the 15-day required time period, BILPS requested a review/appeal of the preliminary decision made by the NPS. The letter of decision, dated

29

July 14, 2004, did not specify in detail what information could be included in the request for review/appeal and there was no other guideline available (AR0652- AR0653).

80. The flowchart of the NHLPA process appearing on the NPS website does not include the review/appeal process and/or what the criteria of appeal/review are considered. (Attached as Exhibit 12 is a true copy of the NHLPA "flowchart" as it appears on the NPS website, BILPS 0447).

81. According to the then (and now still evolving) guidelines, the review process is supposed to be completed by a review agency of three persons and is to be completed within 60 days of request for review. The final decision should have been made and forwarded to BILPS in late September 2004; however, the decision was made January 18, 2005 and provide to BILPS on February 9, 2005.

82. In a memo (AR0704) pertaining to the review of the decision on the Baker's Island Light Station from P. Daniel Smith to Jennifer Perunko and Kym Hall, all of the NPS, Mr. Smith notes "I do not believe that scoring is necessary on these applications and I support the original NPS review in the Region on all sections of the applications". There was no protocol on the review and scoring of the appeals of decisions nor was this information in the application forms or on the web.

83. On February 9, 2005 the Department of Fisheries, Wildlife and Parks Deputy Secretary Craig Manson sent a letter to BILPS stating that his review was final and formally designated the ENHC to be awarded the Baker's Island Light Station. He did not complete his decision within the required timeframes, nor did he address any of the issues raised by BILHPS regarding the unfair process employed in making the selection, the process, safety

30

of landings on the dangerous beach or other issues related to the public safety and operation

at the B.I. Light Station (AR0721).

84. Mr. Manson provided no detail of his decision, as he did in his review of the

Currituck Lighthouse decision for the Currituck Light Station in North Carolina (Attached as

Exhibit 13, is a true copy of The Currituck Light Station decision by Craig Manson, BILPS

0449-0460.)

**The "Administrative Record" contains no documents or communications regarding
the preliminary agency actions which are challenged in this appeal.**

85. The National Park Service's so called "Administrative Record" does not include

any of the following documents all of which relate to preliminary agency action challenged

in this appeal and all of which were requested in document requests filed by the plaintiffs:

a.   The NHLPA guidelines, which Congress required to be developed by NPS and
GSA to govern the selection of an eligible entity to whom to convey the lighthouse.  Neither
the guidelines themselves, nor any drafts and/or versions in effect from November 2001 to
2003 were included.  One set of "draft" NHLPA guidelines, dated July 2004, were included,
but they were incomplete in that the exhibits to the document, which I had obtained from a
previous Freedom of Information Act Request, were not included;

b.   Documents relating to the decision itself including drafts, revisions, amendments,
negotiations, minutes of meetings, internal memoranda and emails;

c.   Documents relating to the application process, including notes, memos, drafts,
negotiations, internal memoranda and emails, transcripts, reports or other documents
regarding the applications process;

d.   Unredacted transcripts of the Northeast Lighthouse Conference which was held
on April 10-14, 2005 including any notes, correspondence, e-mails, and the like relating to
the transcript of the conference;

e.   Documents relied upon, considered or consulted by the NPS in the review of the
applications submitted for the acquisition of the Baker's Island Light Station;

f.   Documents concerning the determination by the NPS that the ENHC had met its
federally mandated match of federal funds;

31

g.   Any internal guidelines, regulations, CFRs and other documents within NPS regulating the operation of Heritage Areas pursuant to the Omnibus Parks and Public Lands Management Act of 1996.

86. Similarly, the documents produced by the GSA do not include several categories of documents that pertain to the preliminary agency action that is the subject of this lawsuit and which have been requested in a document request filed by the plaintiffs including the following:

h.   any communications by GSA relative to the required NHLPA guidelines themselves or draft guidelines from 2001 to the present;

i.   transcripts from the Northeast Light House Conference (the GSA was the agency responsible for the transcription of the conference);

j.   all deeds and documents establishing ownership to the 10 acres known as the Baker's Island Light Station;

k.   GSA guidelines regarding the sale of light stations as required by Congress;

l.   Environmental Reports relative to the Baker's Island Light Station;

m. A report on environmental conditions including hazardous materials, lead paint, asbestos, and the like, anticipated being included in the transfer of the light station.

## Other Omissions of Key Elements of the Administrative Record

87. The "Administrative Record" did not include a large number of documents that I wrote to or received from the NPS, FWP, GSA, ENHC, and others.  (Attached as Exhibit 14 are true and accurate copies of  the "missing" documents of which I am aware, BILPS 0461-0490.)

ID # 462177v02/14457-2/ 03.15.2006

SIGNED AND SWORN UNDER THE PAINS AND PENALTIES OF PERJURY THIS <u>14th</u>

DAY OF MARCH, 2006.


<u>/s/Elizabeth M. Ware</u>
Elizabeth M. Ware

ID # 462177v02/14457-2/ 03.15.2006