IN THE DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

BAKER'S ISLAND LIGHTHOUSE ) 
PRESERVATION SOCIETY, INC., ) 
and ROBERT LEAVENS, ) 
 ) 
            Plaintiffs, )      Civil Action No.: 05-10855-PBS
 ) 
      v. ) 
 ) 
UNITED STATES DEPARTMENT OF ) 
INTERIOR, *et al.*, ) 
 ) 
           Defendants. ) 
 ) 

**DEFENDANTS' CONSOLIDATED MEMORANDUM IN OPPOSITION TO "MOTION TO REVERSE DECISIONS AND ENLARGE THE ADMINISTRATIVE RECORD," AND IN SUPPORT OF MOTION TO AFFIRM DECISION AND TO STRIKE EXTRA-RECORD DOCUMENTS AND RENEWAL OF MOTION TO DISMISS UNNECESSARY DEFENDANTS**

MICHAEL J. SULLIVAN
United States Attorney

BARBARA HEALY SMITH

Assistant U.S. Attorney
John Joseph Moakley U.S. Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3100

**Table of Contents**

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATUTORY FRAMEWORK . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    The National Historic Lighthouse Preservation Act, 16 U.S.C. § 470w-7 . . . . . . . . . . . 2

    The Administrative Procedure Act (APA),  5 U.S.C. §§ 701, *et seq*. . . . . . . . . . . . . . . 3

    Division II of the Omnibus Parks and Public Lands Management Act of 1996,
    Pub. L. No. 104-333 (listed at 16 U.S.C.A. § 461 note) . . . . . . . . . . . . . . . . . . . . . . . . . 3

AGENCY PROCEEDINGS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    Baker's Island Light Station . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    The NHLPA Application Process for Baker's Island Light . . . . . . . . . . . . . . . . . . . . . . 5

    Administrative Appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    A.  THE SECRETARY'S DETERMINATION THAT THE HERITAGE COMMISSION'S APPLICATION
        WAS SUPERIOR WAS REASONABLE, FULLY SUPPORTED BY THE RECORD, AND NOT
        ARBITRARY OR CAPRICIOUS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        1.  The Administrative Record Supports the Secretary's Decision That the
            Heritage Commission Be Awarded the Light Station . . . . . . . . . . . . . . . . . . . . . . 13

        2.  The Heritage Commission is an Eligible Entity . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    B.  PLAINTIFFS' NUMEROUS OTHER ARGUMENTS ARE RED HERRINGS THAT WERE NOT RAISED
        DURING THE ADMINISTRATIVE PROCESS AND ARE WITHOUT MERIT . . . . . . . . . . . . . . . . . . . . 19

        1.  Plaintiffs' Argument Regarding an Alleged Failure to Establish a Process and
            Policies Is Not Reviewable under the APA and Ignores the Detailed Process
            and Policies Evident In the Administrative Record . . . . . . . . . . . . . . . . . . . . . . . . 20

        2.  Plaintiffs' "Title Challenge" Is Likewise a Red Herring and Irrelevant; it Was Not
            Raised During the Administrative Process, it Is Outside the Scope of the APA,
            Plaintiffs Lack Standing to Bring Such a Claim, and it Is Demonstrably Untrue
            That the United States Cannot Convey its Interest in the Light Station. . . . . . . . 25

        3.  Plaintiffs' Claim That the Light Station Has Not Been "Excessed" Because the
            Coast Guard Will Continue to Use it as an Aid to Navigation Should Not Detain
            the Court, Since the NHLPA Expressly Contemplates Such Use . . . . . . . . . . . . 27

4. Plaintiffs Have Not Made the Requisite Strong Showing of Bad Faith to Justify Expanding the Record Or "Reversing" the Secretary's Decision . . . . . . . . . . . . . . 28

    a. FOIA requests are not part of the application process and decision . . . . . . . . 28

    b. Plaintiffs have failed to demonstrate any exceptional circumstances that would support expanding the record, and the Court should strike their extra-record documents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

C. BECAUSE NO CLAIMS AGAINST GSA HAVE BEEN STATED, GSA AND ITS OFFICIALS SHOULD BE DISMISSED AS DEFENDANTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

# INTRODUCTION

Understandably disappointed that they were not selected as the entity to which the Lighthouse on Baker's Island would be conveyed under the National Historic Lighthouse Preservation Act, plaintiffs have sued ten defendants at three agencies to have that decision "reversed."  In doing so, plaintiffs ignore principles of sovereign immunity and subject matter jurisdiction, and have included in their Complaint and the present "Motion to Reverse Decisions and Enlarge the Administrative Record" a jumble of claims, four affidavits, and over 500 pages of extra-record exhibits in an emotion-charged attempt to find grounds for overturning the decision.  The attempt fails.  Plaintiffs ignore that the agency's decision can only be challenged under the Administrative Procedure Act (APA), and the record shows that the selection was solidly based on the merits of the applications themselves, and that the decision was well reasoned and fully supported by the record.  Rather than acknowledge the deficiencies of their own application, and ignoring the terms of the very federal statutes they invoke, plaintiffs instead focus on far-ranging theories and red herrings that are simply irrelevant to the decision being challenged, and not cognizable in this APA action.  By any measure, plaintiffs' application was inferior to that of the selected entity, and fell short of meeting the statutory goals.  The record therefore demonstrates a rational basis for the agency's decision, and plaintiffs' motion should be denied.  In addition, the Court should reject plaintiffs' attempt to enlarge the record to include affidavits as well as extraneous documents that postdate the decision at issue, that apply to other lighthouses, or that otherwise were not considered by the agency decision makers in the administrative process at issue.  In sum, the Court should deny plaintiffs' motion, affirm the Secretary's decision, strike the extra-record documents,[1] and dismiss the unnecessary defendants.

---

[1]Should the Court nonetheless decide to consider the affidavits, defendants request the opportunity to submit affidavits of their own, particularly from the employees whom plaintiffs purport to "quote" throughout their Brief and Affidavits.

**STATUTORY FRAMEWORK**

**The National Historic Lighthouse Preservation Act, 16 U.S.C. § 470w-7**

The National Historic Lighthouse Preservation Act of 2000 (NHLPA), codified at 16 U.S.C. § 470w-7, authorizes the Secretary (Secretary) of the Department of the Interior (Interior), to select "eligible entities" to which to convey historic light stations, at no cost.  Id., § (b)(1).  The purpose of the NHLPA is "to provide a national historic light station program."  16 U.S.C. §470w-7(a).  The statute provides for conveyance of light stations subject to conditions for ensuring, *inter alia*, that "the eligible entity to which the historic light station is conveyed . . . shall make the historic light station available for education, park, recreation, cultural, or historic preservation purposes for the general public at reasonable times and under reasonable conditions."  Id., § (c)(1)(E); AR0063.  Under the statute, responsibility for the process is divided between two agencies:  Interior, through the Secretary, and the General Services Administration (GSA), through its Administrator (Administrator).  Id.  Pursuant to the NHLPA, the Secretary reviews applications and forwards a "single approved application" to the Administrator, and GSA then carries out the actual conveyance to the entity selected by the Secretary.  Id., §(b)(3); AR0060.  The National Park Service (NPS), as representative of the Secretary, is designated to "conduct a review of applications" and to "forward a recommendation to the Secretary."[2]  AR0060.  Under the statute, as plaintiffs seem to concede, Plaintiffs' Memorandum (Pls. Brief) at 8, Interior is the agency that makes the decision; GSA has no input into the selection of an eligible entity.

---

[2] Plaintiffs claim they are also challenging the recommendation by NPS to the Secretary, but that recommendation was advisory only, not a final agency decision, as plaintiffs were informed.  AR0652-653.

**The Administrative Procedure Act,  5 U.S.C. §§ 701, *et seq*.**

Plaintiffs challenge the decision by the Secretary to select an entity other than theirs to which to convey the Baker's Island Light Station (Baker's Island Light, or the Light Station). Plaintiffs have brought the claim under the APA, alleging violations of the NHLPA.  See Amended Complaint at p. 1.  There is no independent cause of action or waiver of sovereign immunity provided in the NHLPA.  Plaintiffs' right of action to challenge the Secretary's decision therefore arises out of the APA.

Under the APA, a final agency decision can only be set aside if the decision was "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law or if the action failed to meet statutory, procedural or constitutional requirements."   Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 414 (1971) (citations and quotations omitted); see 5 U.S.C. § 706(2).  The task of a court reviewing agency action under the APA's 'arbitrary and capricious' standard is a narrow one: "to determine whether the agency has examined the pertinent evidence, considered the relevant factors, and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  Airport Impact Relief v. Wykle, 192 F.3d 197, 202 (1st Cir. 1999) (citations and quotations omitted). Where a dispute primarily involves issues of fact, it must be resolved in favor of the expert agency as long as the agency's decision is based on a reasoned evaluation of the relevant data. See  Marsh v. Oregon Natural Res. Council, 490 U.S. 360, 378 (1989).   The court may not substitute its own judgment for that of the agency.  Overton Park, 401 U.S. at 416.

**Division II of the Omnibus Parks and Public Lands Management Act of 1996,**
**Pub. L. No. 104-333 (listed at 16 U.S.C.A. § 461 note)**

The other federal law implicated in this action is Division II of the Omnibus Parks and Public Lands Management Act of 1996 ("the Act"), which established the Essex National

Heritage Area (ENHA, or Heritage Area), along with eight other heritage areas.   The Essex

National Heritage Commission (ENHC, or Heritage Commission), a Massachusetts 501(c)(3)

corporation, is the management entity for the Heritage Area, as provided for in Section 504 of

the Act.  Pub. L. No. 104-333 (listed at 16 U.S.C.A. § 461 note).  For the Court's convenience, a

copy of the Act is attached as Exhibit A.

AGENCY PROCEEDINGS

**<u>Baker's Island Light Station</u>**

Baker's Island Light comprises approximately ten acres on the northwest corner of Baker's

Island, a 60-acre island located in Salem Sound, AR0282; the remaining 50 acres are privately

owned.  AR0149, GSA0036.  Ownership of the land now composing the Light Station was

vested in the United States of America on the first Tuesday of October, A.D. 1797, by award of

the Court of General Sessions of the Peace, begun and holden at Newburyport within and for the

County of Essex, Massachusetts, recorded on pages 39 and 53 of record book entitled "Sessions

Records July 1796-March 1803."  GSA0009, 96.  The existing light tower was completed in

1821.  GSA0080.  In addition to the lighthouse itself, the Light Station includes two keeper's

cottages and two other small outbuildings.  GSA0004.  The Light Station was listed in the

National Register of Historic Places in November 1976.  AR0164-68, 0295-305.   In the 1980s,

the United States Coast Guard (USCG), entered into a license agreement with the Baker's Island

Association (Association), which gave the Association the use and occupancy of one of the

residential buildings.  In 1988, a 30-year revocable license for both the Keeper's Dwelling and

the Assistant Keeper's Dwelling was granted by the Coast Guard to the Association for a period

of thirty years, allowing the Association to use and preserve the residences.  Am Compl. ¶¶ 13,

14.

**The NHLPA Application Process for Baker's Island Light**

On October 11, 2002, the USCG filed with GSA a Report of Excess, notifying GSA that Baker's Island Light was excess to USCG needs. GSA0001-0059. On May 23, 2003, GSA issued a Notice of Availability (NOA) for Baker's Island Light. AR0002-04. In response to the NOA, the GSA received ten "letters of interest" in August 2003, including from plaintiff Baker's Island Light House Preservation Society (BILPS, or the Society), and from the Heritage Commission, AR0005, 38-39, all of which GSA forwarded to NPS. AR0005-58. On August 14, 2003, NPS sent a 20-page "Application to Obtain Historic Light Station Property" (Application) to the ten entities. AR0060-82. GSA arranged for an official site visit on August 26, 2003, for interested entities. AR0247, GSA0263. Those attending landed directly on a beach because the Baker's Island residents' Wharf Company refused access via the private pier. AR0612; GSA0250, 252.

The Application included detailed descriptions of the application procedures, the evaluation process, and the requirements of specific application sections. AR0065. The Application Guidelines, AR0074-AR0077, listed six required sections, and provided an explanation for each: Title page; Covenant Agreement; Executive Summary; Property Description and Planning Documents (to include a narrative description of the property and the strategy to meet specific elements, including a Preservation and Maintenance Plan, Use Plan, Financial Plan, and Management Plan); Corporate Resolution/Certification of Authority to Acquire Property; and Environmental Analysis of Probable Impacts. AR0074-AR0077.

The Application described requirements and provided guidance for five key subsections within Section Four, the Property Description and Planning Documents section, as follows:

a  Property Description/Baseline Data. This section must "*provide a physical description of the property being requested, including key geographic features (topography, vegetative cover, water bodies, natural features*[,]" and the text must identify cultural,

-5-

and natural property features, including historic structures, buildings, and general landscape."  AR0074-75 (emphasis in original).

b   <u>Preservation and Maintenance Plan</u>.  This section must "*provide plans for the preservation and maintenance of the historic light station property in graphic and narrative form*."  AR0075 (emphasis in original).  The application noted that although detailed plans and specifications are not expected, "it must be clear that the applicant has fully recognized areas of historic significance and will plan proposed work to minimize the impact on these significant areas."  AR0075.

c   <u>Use Plan</u>.  This section must "*describe in detail the planned use of the light station*."  AR0075-76 (emphasis in original).

d   <u>Financial Plan</u>.  This section must "*demonstrate the financial ability to acquire, develop, maintain, and operate the property for the proposed use*," including "analysis of current assets and cash flow – **identify projected income** from all sources, including income from fundraising, specific grants, cash and in-kind matching funds with specific dollar amounts and **projected expenses** for repair, rehabilitation, recurring maintenance, insurance, and administration operation."  AR0076 (emphasis in original).

e   <u>Management Plan</u>.  This section must "*provide a management plan that includes organizational structure, stewardship history and capability, and administrative procedures*."  AR0076 (emphasis in original).

The Application explained that each application would be judged on the merits of the Preservation and Maintenance, Use, Financial, and Management Plans (AR0064); explained that each of these plans would be scored up to 25 points per plan; and indicated  that "successful applicants will be those best able to demonstrate their ability to preserve and maintain these historic sites and make them available for education, park, recreation, cultural or historic purposes to the general public."  AR0065.  The Application also indicated that applicants would be given higher priority, in each of the four subsections, under certain circumstances:

1.  <u>Preservation and Maintenance Plan</u>.  "Higher priority will be given to applicants that best demonstrate comprehensive planning for long-term preservation of historic features of the property and competency in developing treatment and maintenance plans."  AR0065.

2.  <u>Use Plan</u>.  "Higher priority will be given to proposals that will reach large public audiences; raise funds in ways compatible to the character of the property; provide adequate revenue for preservation, operation, and education; and provide for safe,

enjoyable, educational, park, recreational, cultural, or historic preservation uses of the property."  AR0065.

3. <u>Financial Plan</u>.  "Higher priority will be given to proposals that demonstrate reasonable, well-founded estimates of the financial needs to accomplish the organization's plans and its capabilities to meet those needs.  Secondary priority considerations will include past financial support of this and similar sites."  AR0065.

4. <u>Management Plan</u>.  "Higher priority will be given to those organizations that demonstrate a strong capability and history of successful preservation management.  Other considerations include demonstration of successful management of educational, conservation, and recreational programs and projects; and the success of past, present, and planned partnerships between the applicant and other government or non-profit organizations."  AR0065.

Although ten entities had requested applications for Baker's Island Light, only two entities submitted completed applications:  plaintiff BILPS, AR0127-230, and the Heritage Commission.  AR0235-459.  On November 26, 2003, NPS internally distributed copies of the two applications to a review committee.  AR0468.  The review committee consisted of five NPS employees representing the Maritime Heritage Program, the Federal Land to Parks Program, and the Historic Surplus Property Program.  AR0574.  Each committee member completed an individual assessment of the applications according to criteria set forth in the Application for the four scored application subsections (Preservation and Maintenance Plan; Use Plan; Financial Plan; and Management Plan), AR0513-554, 574, 575, assigning a numerical score, of up to 25 points for each section, based on the applicant's ability to meet the "legal requirements and goals of the NHLPA."  AR0613.  BILPS's application received an average score of 6.35 points out of 25 per plan (or an average of 25.4 points out of the possible 100); the Heritage Commission received an average score of 19.1 points per plan (or an average of 76.4 total points).  AR0513-554.  BILPS's application was incomplete in some respects.[3]  More importantly, however, the

---

[3] For example, while the Property Description/Baseline Data section of BILPS's application described the relationship of the property to the surrounding uses and adjacent properties, it did not include a discussion of the structures on the property, or their condition.  AR0149-AR0172, AR0618.  In

reviewers found BILPS's application did not meet the goals of the NHLPA in many key

respects.  The committee evaluations and review comments for BILPS's application indicate

that: (1) "the application from [BILPS] is one of exclusion rather than inclusion, which runs

contrary to the purpose of the NHLPA program" (AR0618); (2) one of the "letters of support"

attached to the application "actually opposes tours to the general public" (AR0620), and reflects

"poorly on [BILPS's] commitment to providing public use"[4] (AR0516); (3) the application offers

an "unsubstantiated financial plan"[5] (AR0614); (4) the emphasis of the application was on "how

or why other groups could not manage the property rather than describing what they will do and

why their plan would be the best for the future of the lighthouse"[6] (AR0618); and (5) the

application did not include any formal agreements with partner organizations to offer educational

---

addition, a full set of interior and exterior photographs of each structure was not provided.  AR0149-
AR0172, AR0618.  The section did include a table setting forth potential obstacles for competitors,
however.  AR0152.  The Management Plan did not explain how the applicant would manage preservation
of the light station, or interact with other supporting organizations and agencies that have an interest in
the light station, AR1099-AR0203, AR0621, did not include a succession plan, as requested, AR1099-
AR0203, and did not include the lease agreements between the society and the current renters (which
were relevant because BILPS indicated it intended to continue to lease the two cottages if it were granted
the Light Station).  AR0199-AR0203, AR0621.

[4] The letter of support asserts that "perhaps" BILPS does not "even want to suggest to the
Department of Interior that island residents would welcome regular tours by the general public."
AR0217, 218.  The author further states that he "personally would oppose any such activity."  AR0218.

[5] The Financial Plan improperly indicated that the structures would be inspected to meet United
States Coast Guard specifications, rather than the Secretary of the Interior's Standards for the Treatment
of Historic Properties, AR0621, as required.  16 U.S.C. § 470w-7(c)(1)(D), AR0082.  The Financial Plan
section also did not include detailed discussion of how the estimated future assets, "contributions," and
"admission fees" would be obtained.  AR0620-AR0621.

[6] For example, a member of the review committee observed that "[e]ssentially there is no 'plan'
here, rather it is a statement of what has been done to date with the added threat that only by ownership of
the Society will the station be safe from fire."  AR0515.  Another committee member noted that the
application seemed to stress that BILPS would have access to the single island wharf, "but no one else
will."  AR0527.  The latter statement presumably refers to assertions in BILPS's application that no other
applicant could offer access to the only pier.  AR0183-184.

programs or provide preservation assistance.[7]  AR0621.

By contrast, the committee evaluations and review comments for ENHC's application indicate that: (1) the application was "strong" (AR0615); (2) ENHC has "extensive experience with historic preservation projects in a marine environment" (AR0616); (3) the application "indicates a well-managed, financially capable organization that will provide extensive public information about, and access to, the light station, including establishing a partnership with Gordon College to develop a maritime education program" (AR0614); and (4) ENHC has "demonstrable experience developing and implementing educational programs and managing real estate" (AR0616).  The committee did not consider ENHC's application to be perfect however; it noted that "the number of proposed uses might be too intense for this property," and that ENHC had not demonstrated the ability to access the island by beach landing without use of the association-owned wharf.  (AR0557, AR0562, AR0619).

The committee convened a conference call on January 22, 2004, to collectively review the applications.  AR0613.  Between February 4, 2004, and February 27, 2004, the committee drafted a recommendation memorandum with supplemental review comments, and revised the memorandum through an iterative process by circulating multiple drafts to members for review and comment.[8]  AR0557-AR0585.

---

[7] Specifically, review comments state that "[s]even letters of support were included but none are from organizations that will be partners in the preservation and use of the light station. AR0621.  As noted by the reviewer, the letters of support were from the "Coast Guard, Norman Rockwell Museum in Stockbridge, MA - whose director is an island resident, Baker's Island Wharf Company, Baker's Island Homeowners Corporation, Baker's Island Association, and two individuals - one representing a mainland historical society." AR0621.

[8] During this same time frame, the State Historic Preservation Officer provided consultation feedback to NPS on January 22, 2004, as required by the NHLPA, finding "both application proposals indicated no major changes or construction projects and both outlined the need for cyclical maintenance and basic repairs. . . and are thus sensitive to the Secretary of the Interior (SOI) standards." AR0555.

On February 27, 2004, consistent with the evaluation, the committee issued a final memorandum from Janet Snyder Matthews, Associate Director for Cultural Resources, through P. Daniel Smith, then Special Assistant to the NPS Director, to Fran Mainella, NPS Director, recommending that the Light Station be transferred to the Heritage Commission.[9]  AR0613.  Mr. Smith signed off on the recommendation to transfer the Light Station to ENHC on May 5, 2004. AR0613.  He did not immediately forward the recommendation, however.  Instead, on May 19, he first visited the island and met with both applicants.  AR0704.  Subsequently, on June 26, 2004, Director Mainella concurred with the recommendation.  AR0614.  Plaintiffs were notified of the recommendation by Associate Director Matthews on July 14, 2004.[10]  AR0652, AR0654.

**Administrative Appeal**

On July 27, 2004, BILPS formally petitioned for administrative review of the recommendation.  AR0668.  Plaintiff Leavens also submitted a letter which challenged the eligibility of the Heritage Commission under the NHLPA.[11]  AR0659.

An appeal panel consisting of four members individually reviewed the applications.

---

[9] In summary comments accompanying the committee's memorandum of recommendation, it noted three areas of concern with the ENHC recommendation: "ENHC will need to look at less intense usage at least initially"; "a letter from the boat company ENHC plans to use indicating that beach landings are feasible would be appropriate prior to transfer as this would greatly affect their ability to preserve and use the light station"; and ENHC "should seek to include Baker's Island residents, possibly as a member of the management committee, in implementing the plans for the light station."  AR0615.

[10] The letter noted that "[i]f the Society does not request a review, then the Secretary will forward the recommendation to the Administrator of the General Services Administration."  AR0652  The letter also stated that "[i]f the Society requests a review, then a new committee made up of staff from the Department of the Interior's Washington Office, including two subject matter experts and two appointees - one by the National Park Service Director and one by the Assistant Secretary for Fish, Wildlife and Parks - will review both applications and submit their recommendations to the Assistant Secretary."  AR0652.

[11] There was some confusion as to whether the Leavens letter was authorized by BILPS.  See GSA0362, 0363.

AR0679, AR0711. On or about November 18, 2004, the committee unanimously affirmed the recommendation, concluding that "the prior NPS review fairly assessed the merits of each application," AR0701-713, and recommended that then Assistant Secretary for Fish, Wildlife, and Parks, defendant Craig Manson, affirm the NPS recommendation of the Heritage Commission for selection as the entity to receive the Light Station. AR723. Plaintiffs were notified on January 18, 2005, that the Secretary would recommend transfer to ENHC. AR0721. On March 9, Manson formally recommended to the Secretary that the Heritage Commission be the recipient of the Light Station. AR0723. On April 22, 2005, culminating the NHLPA process, the Secretary forwarded ENHC's name to GSA as the single approved entity "for conveyance of the historic light station." AR0724; see 16 U.S.C. § 470w-7(b)(2).

On a separate but related matter, at the same time their appeal was pending plaintiffs were also conducting a campaign to disqualify their competitor and invalidate the process. In September 2004, Elizabeth Ware, who represented herself as a preservation consultant hired by "a private entity" she did not identify, contacted the NPS seeking information about ENHC and the "regulations/internal guidelines" pertaining to the selection and "review/appeal process." See, e.g., AR0670, 672, 714. NPS provided Ms. Ware with a map of the ENHA as requested, and noted that additional information was being gathered. AR0691. P. Daniel Smith further replied to Ms. Ware on October 26, 2004, and attached handouts related to the NHLPA process. AR0680. Ware responded to Smith on November 2, challenging the eligibility of ENHC to receive the Light Station and requesting the "regulations" that had been adopted for the NHLPA process. AR0688. Associate Director Matthews also responded on November 30, 2004, to a November 6 Freedom of Information Act (FOIA) request by Ware, individually addressing the issues raised by Ware questioning ENHC's eligibility. AR0716-17.

The application process itself was not without incident. On July 20, 2003, prior to

submitting its letter of interest, BILPS alleged that two NPS employees had trespassed on the island under false pretenses and requested that NPS affiliates be disqualified from the NHLPA process. AR0611. The Baker's Island Wharf Company similarly wrote to the Mayor of Salem, accusing him of using their wharf under false pretenses. GSA0250. And, on November 21, 2003, when the NPS forwarded to both applicants what it believed to be new information from GSA regarding the on-site septic system, AR0461, BILPS responded by accusing the NPS of providing false information and purposely delaying the excess process. AR0462.

Plaintiffs filed a Complaint on April 27, 2005, and an Amended Complaint on August 24, 2005.

## ARGUMENT

Although they have raised a hodge podge of claims in their brief, Plaintiffs ignore that in order to invoke this Court's jurisdiction they must have a cognizable claim under a recognizable legal theory, not just a host of accusations about how they believe they have been wronged. It is axiomatic that a plaintiff is obliged to set forth in his Complaint "factual allegations, either direct or inferential, regarding each material element necessary to sustain recovery under some actionable legal theory." Roth v. United States, 952 F.2d 611, 613 (1st Cir. 1991); see Berner v. Delahanty, 129 F.3d 20, 25 (1st Cir. 1997); Gooley v. Mobil Oil Corp., 851 F.2d 513, 515 (1st Cir. 1988). Moreover, "[c]ourts have no jurisdiction over claims against the federal government, except where the government has expressly waived its immunity." Rakes v. U.S., --- F.3d ----, 2006 WL 726683 (1st Cir. 2006), citing United States v. Kubrick, 444 U.S. 111, 117 (1979). Here, under the single claim for which there is a waiver of sovereign immunity – a challenge to final agency action under the APA – plaintiffs have failed to satisfy their burden to show arbitrary or capricious decision making. The remaining "claims" – arguments that are not delineated by any counts in the Complaint or identified by any statutory cause of action

providing an express waiver of sovereign immunity – should be ignored.  On the single

cognizable claim, the record demonstrates that the decision at issue was well-reasoned, based on

careful evaluation of the two applications, and completely supported by the record.

**A.** **THE SECRETARY'S DETERMINATION THAT THE HERITAGE COMMISSION'S APPLICATION WAS SUPERIOR WAS REASONABLE, FULLY SUPPORTED BY THE RECORD, AND NOT ARBITRARY OR CAPRICIOUS**

**1. The Administrative Record Supports the Secretary's Decision That the Heritage Commission Be Awarded the Light Station**

The record in this case demonstrates plaintiffs' fundamental misunderstanding of the goals

behind establishing a national lighthouse program through the NHLPA.  The NHLPA requires

that the Secretary select an entity that will, *inter alia*, 1) "at its own cost and expense, use and

maintain the historic light station in accordance with . . . the Secretary of the Interior's Standards

. . ." and 2) "make the light station available for education, park, recreation, cultural, or historic

preservation purposes for the general public. . . ."  16 U.S.C. §§ 470w-7 (c)(1)(D) - (E).  The

record shows that the Heritage Commission's application was superior with respect to both of

these important NHLPA goals and that, notwithstanding the Heritage Commission application's

superiority, BILPS's application fell short.  As such, the Secretary's conclusion that the Heritage

Commission receive the Light Station was not arbitrary or capricious, and should not be vacated.

The record demonstrates that the reviewers reasonably concluded that ENHC met the

qualification and resource requirements necessary to satisfy the preservation goals of the

NHLPA.  Based on the applications submitted, the reviewers fairly concluded that the Heritage

Commission had agreed to follow the Secretary's Standards for the Treatment of Historic

Properties, and had the requisite experience and staffing to restore and preserve the facilities in

compliance with the NHLPA.  AR0249, 0253, 0254, 0408.  Equally important, the record shows

that the ENHC had the financial resources to implement a sophisticated preservation program.

AR0260, 0306, 0435. By contrast, BILPS's plan failed even to reference the Secretary's Standards, AR0174, and while the occupants of the keeper's house currently maintain the property, there was an inadequate showing that BILPS had the skills, resources, or experience to properly preserve and maintain the Light Station. AR0173, 0515, 0519, 0525, 0529.

While the record shows ENHC was the superior applicant in terms of historic preservation and financing, the telling distinction between the two applications is seen in their Use Plans. ENHC proposed a comprehensive plan which, in conjunction with its established partnerships and experience, would achieve the educational, park, recreation, and cultural goals of the NHLPA. AR0255-261. BILPS's Use Plan, on the other hand, focused far less on the public access and education goals of the NHLPA, and instead devoted substantial space to arguing why the goals could not be met by any other applicant, while revealing that it preferred not to meet those goals itself. See, e.g., AR0152, 174, 175, 179. It was permeated by exclusivity, even observing that since there is no current public access, any "future public access would be more than currently exists." AR0176-186.

The Supreme Court has made clear that an agency decision should be "set aside only for substantial procedural or substantive reasons as mandated by statute . . . , not simply because the reviewing court is unhappy with the result reached." Vermont Yankee Nuclear Power Corp. v. Natural Resources Def. Council, Inc., 435 U.S. 519, 558 (1978). Instead, a reviewing court must determine whether the agency's decision "was based on a consideration of the relevant factors and whether the agency made a clear error of judgment." Airport Impact Relief, Inc. v. Wykle, 192 F.3d 197, 202 (1st Cir.1999) (internal punctuation and citations omitted). Here, the decision was based on detailed evaluations of both applications, using the criteria specified, and on the policy goals of the NHLPA. As another court has observed, "use of the lighthouse for the general public is mandated by the NHLPA." See January 10, 2006, *Order* in County of

-14-

Currituck v. Outer Banks Conservationists, Inc., (E.D. N. Car.) No. 2:05-CV-17-BO (attached as
Ex. B). Rather than offer a concrete plan for reasonable public access, perhaps with some off-
site educational programs, AR0520, BILPS instead offered sketchy, undeveloped "scenarios,"
AR0184, and allusions to some "initial contacts" with one private elementary school and one
local college, AR0185, but did not provide a letter of support from any potential "partner," and
devoted much more space to articulating potential problems with public access. See AR0176-79,
183, 210, 211, 213, 216-18. ENHC's application was demonstrably superior in addressing how
it would achieve the education and access goals of the NHLPA. Thus, the Secretary's decision
that ENHC should receive the Light Station was reasonable and fully supported by the record.

### 2. The Heritage Commission is an Eligible Entity

In an effort to disqualify its only competitor in the process, plaintiffs charge that ENHC is
not an eligible entity because 1) it has no "physical jurisdiction" over Baker's Island, 2) it is not
"empowered" by Congress to own real estate, and 3) its management plan does not permit it to
undertake "construction" projects or facilities maintenance. Pls. Brief at 2, 11, II:4. The first
two claims are improper readings of the Act creating the ENHA, and the last is simply incorrect.
As an initial matter, ENHC, as a  nonprofit 501(c)(3) corporation, is an eligible entity as defined
by the NHLPA. 16 U.S.C. § 470w-7(e)(3)(B). It was not "established" or "created" by
Congress, as plaintiffs assert, Pls. Brief at 2, 11, II:3, but rather is the management entity
selected under §504 of the Act to manage the Heritage Area that was created by the Act. The
ENHC is incorporated under state, not federal, law.

Plaintiffs' reliance on the map showing the general boundaries of the Heritage Area,
AR0699, to support their argument that the Light Station is outside of ENHA, is misplaced.
Plaintiffs suggest the map must specifically depict Baker's Island. On the contrary, the language
of the Act indicates that "historic and cultural lands, natural waterways, and structures within the

-15-

County of Essex" were intended to be part of the ENHA, which plainly includes Baker's Island and the other harbor islands of Essex County.  It is axiomatic that "rather than culling selected words [or sentences] from a statute's text and inspecting them in an antiseptic laboratory setting, a court engaged in the task of statutory interpretation must examine the statute as a whole, giving due weight to design, structure, and purpose as well as to aggregate language."  Cablevision of Boston, Inc. v. Pub. Improvement Commn. of the City of Boston, 184 F.3d 88, 101 (1st Cir. 1999) (citing O'Connell v. Shalala, 79 F.3d 170, 176 (1st Cir. 1996)).

When read properly, the Act unambiguously expresses the intention of Congress to include harbor islands such as Baker's Island in the Heritage Area.  Section 503(b) states that ENHA "comprises lands *generally* depicted on the map" (emphasis added).  Plaintiffs ignore the term "generally" and rigidly interpret a map which is neither detailed nor scaled.  Because the term "generally" is not defined in the statute, the court "can look to the dictionary for clarification of the plain meaning of the words selected by Congress."  Perez-Olivio v. Chavez, 394 F.3d 45, 49 (1st Cir. 2005) (citing United States v. Lachman, 387 F.3d 42, 50 (1st Cir. 2004)  ("Dictionaries of the English language are a fundamental tool in ascertaining the plain meaning of terms used in statutes and regulations.")).  While defendants were unable to find a First Circuit case construing the term "generally," other courts have cited dictionaries when interpreting the word in a statutory context.  E.g., Greenberg v. Compuware Corp., 889 F.Supp. 1012, 1018 (E.D. Mich. 1995) (citing Webster's Seventh New Collegiate Dictionary to define "generally"); Felker v. Pepsi-Cola Co., 899 F.Supp. 882, 890-91 (D.Conn. 1995).  Webster's Ninth New Collegiate Dictionary defines "generally" as meaning "in a general manner . . . in disregard of specific instances and with regard to an overall picture."  Congress' selection of the words "generally depicted" when referencing the map evidences an intention that the map be just that – a general representation of the ENHA.  The map expressly encompasses the City of Salem and all of Essex

County, both political entities of which Baker's Island is a part. When the map is viewed as an "overall picture" of the ENHA, the inclusion of harbor islands such as Baker's Island satisfies the plain language of the law.[12]

Moreover, inclusion of the island is entirely consistent with the underlying policies of the Act. While "[g]eneral policy concerns do not overcome the unambiguous meaning of a statute's text," Committee to Stop Airport Expansion v. F.A.A., 320 F.3d 285, 290 (1st Cir. 2003), "[t]he wiser methodology . . . is to interpret Congress's words in light of the goals and underlying policies of the statute as a whole."  In re BankVest Capital Corp., 360 F.3d 291, 297 n.11 (1st Cir. 2004).   Section 503(a) states that the purpose of the Heritage Area designation is to preserve "the unique and significant contributions to our national heritage of certain historic and cultural lands, natural waterways, and structures within the County of Essex . . . ."   Due to its maritime and cultural importance, Baker's Island Light is the quintessential Essex County preservation site envisioned under the Act.  The absence or technical inaccuracy of a specific geographic feature on the Map should not be interpreted to exclude those portions of Essex County which satisfy both the express qualifications and the underlying policies of the Act. Finally, there is no Congressional limitation in the Act that prohibits the selected management entity from performing additional activities -- inside or outside of the ENHA.

Nonetheless, plaintiffs assert that the ENHC does not have the authority to acquire property because Congress did not "empower it to own real estate." Pls. Brief at 2.  That argument ignores the plain language of the Act:  what plaintiffs assert is an "exclusive list" of "powers and

---

[12] Plaintiffs point out that Baker's Island is not shown on a map attached to ENHC's application, Pls. Brief at 10-11, but Baker's Island is included, albeit only visible on the original.  AR0328.  Plaintiffs also fail to point out that harbor islands, including Baker's and Misery Islands, are included on other maps and outlines of ENHA resources and landscapes. AR0358, 0360.

duties," that "Congress chose to enumerate," Pls. Brief at 11, II:2, is instead a list of "Priorities."

See Sec. 504(b)(2).   This argument also ignores the general principle of statutory construction

that "when Congress includes particular language in one section of a statute but omits it in

another section of the same Act, it is generally presumed that Congress acts intentionally and

purposely in the disparate inclusion or exclusion."  Goncalves v. Reno, 144 F.3d 110, 129 (1st

Cir. 1998) (citations omitted).  The Act established the ENHA along with eight other heritage

areas; three of the nine are expressly barred from using certain federal funds to acquire property;

ENHA's management entity is not so restricted.  See §§ 406(c), 807(e), and 907(c),

"PROHIBITION ON THE ACQUISITION OF REAL PROPERTY" ("The management entity

may not use Federal funds received under this title to acquire real property or an interest in real

property").   Plaintiffs' argument also does not acknowledge express prohibitions against

ownership of property that Congress did impose on certain other heritage commissions.[13]  By

omitting this proscription against property ownership for the ENHA, Congress is presumed to

have acted purposely to exempt ENHC from the same prohibition.  See General Motors Corp. v.

Darling's, — F.3d —, 2006 WL 964739 (1st Cir. 2005) at *9 (agreeing that courts should

interpret statutes narrowly and not impose prohibitions not supported in the statute).  Application

of this settled rule of construction illustrates that the ENHC is not prohibited from acquiring

---

[13] For example, some heritage commissions are expressly prohibited from acquiring "any real property or interest in real property," except by gift or purchases where money was given to the heritage area by gift or bequest "on the condition that such money would be used to purchase real property."  In the latter case, the Commission is required, "as soon as practicable after such acquisitions," to convey the property interest "to an appropriate public agency."  P.L. 100-692, Sec 7(g) (1988) (Delaware and Lehigh Navigation Canal Commission); see PL 100-698, Sec. 103(h)(1988) (Southwestern National Heritage Area; PL 106-291, Title I, Sec. 157(e)(5) (2000)) (Wheeling National Heritage Area).  The law creating the ENHA is silent on the issue of the ENHC's acquiring or owning property.

property.[14]  Nor does the "omission" of property acquisition in the ENHC management plan

prove anything.  The 1999 management plan that guides the work of ENHC is just that – a <u>plan</u>,

not a set of prohibitions, and not ENHC's "adoption" of a comprehensive, exclusive list of the

activities Congress authorized in "enabling legislation."  Pls. Brief at II:2-4.  ENHC's

application does not propose a "direct construction project," as plaintiffs suggest, Pls. Brief at 2,

11, and any representations in the 1999 management plan about facilities maintenance is not a

binding "acceptance" of a "Congressional limitation."  <u>Id.</u> at II:4.  ENHC is not a federal entity;

as a separately incorporated nonprofit, it may lawfully pursue any appropriate activities

permitted for a charitable corporation.[15]  <u>See</u> AR0443; M.G.L. c. 180, § 6 (2006).

### B.  PLAINTIFFS' NUMEROUS OTHER ARGUMENTS ARE RED HERRINGS THAT WERE NOT RAISED DURING THE ADMINISTRATIVE PROCESS AND ARE WITHOUT MERIT

Plaintiffs have raised a number of claims that are tangential to their challenge of the

Secretary's decision, but only those issues presented and considered in the agency proceedings

can be appropriately reviewed by the Court in this APA action.  The Court "may not hear or

consider arguments that were not raised before the administrative agency."  <u>Harvard Pilgrim</u>

<u>Health Care of New England v. Thompson</u>, 318 F. Supp. 2d 1, 12 (D.R.I. 2004) (<u>citing</u> <u>Pleasant</u>

---

[14] In support of their argument, plaintiffs cite a scant four cases.  Pls. Brief II at 2-3.  One is a Massachusetts case, and two concern construction of <u>contract</u> provisions, one of those applying state law.

[15] Plaintiffs' suggestion that ENHC is not an "eligible entity" because it has not met its matching funds requirement is likewise misguided.  The relevant issue for the review committee was whether ENHC was financially stable and could provide for the continued maintenance and care of the Light Station.  ENHC submitted audited financial statements.  AR0306-323, 0435.  It was not arbitrary or capricious for NPS to rely on those as supporting ENHC's eligibility.  Plaintiffs' other allegations about the "misrepresentations" and "omissions" in ENHC's application merit little response, because they are simply not central to the APA claim.  For example, if the boat company and insurance company ENHC said it would use do not come through, for any reason, as plaintiffs claim to have learned when they made their own inquiries, ENHC will have to make other arrangements.  Likewise, if composting toilets require different approvals, or solar panels cost more than estimated, ENHC will have to adjust its budget.  None of these post-hoc quibbles are relevant to the merits of the NPS selection decision.

Valley Hosp. Inc. v. Shalala, 32 F.3d 67, 70 (4th Cir. 1994)); see Bradley v. Weinberger, 483

F.2d 410, 415 (1st Cir. 1973).  Simply put, "matters not considered by the agency are outside the

record evaluated by the district court, legally irrelevant, and not discoverable under Rule 26."

Harvard Pilgrim, 318 F.Supp. at 9 (citing Exxon Corp. v. Dept. of Energy, 91 F.R.D. 26, 33

(N.D. Tex. 1981).  Here, plaintiffs' post-hoc arguments, in addition to being without merit, as

detailed below, were not raised during the administrative process, nor developed in the record,

and hence are outside the scope of review of the decision in this case.

**1.  Plaintiffs' Argument Regarding an Alleged Failure to Establish a Process and Policies Is Not Reviewable under the APA and Ignores the Detailed Process and Policies Evident in the Administrative Record**

In their Complaint and Brief, plaintiffs argue for the first time that Interior and GSA failed

to establish a process and policies, as required by the NHLPA.[16]  On the contrary, the record

shows that plaintiffs were well aware of the process, and that their post hoc complaint is

disingenuous.  See, e.g., AR0462 ("[w]e expect all other applicants to abide by the same rules"),

AR0611 (claim by BILPS President that visit to Baker's Island by alleged NPS employees was

"clearly was not sanctioned under the [NHLPA] *process* . . . .") (emphasis added).  Indeed,

plaintiffs now criticize NPS for supposedly not following its procedures.  See e.g., Pls. Brief at

10.  ("While [ENHC's] application did not meet the required 90 day time frame for submission

of an application pursuant to the [NOA], the application was nevertheless accepted by the

---

[16] "[T]he Secretary and the Administrator shall establish a process and policies for identifying, and selecting, an eligible entity" for the conveyance of historic light stations.  16 U.S.C. § 470w-7(b)(1). While plaintiffs are correct that the language is mandatory, it is not at all clear that Congress intended that a failure by the agencies to "establish" a process and policies would even be actionable.  See, e.g., Alexander v. Sandoval, 532 U.S. 275, 289 (2001) (observing that since "private rights of action to enforce federal law must be created by Congress," when the language of a statute is "phrased as a directive to federal agencies engaged in the distribution of public funds," then "[t]here [is] far less reason to infer a private remedy in favor of individual persons.") (citations omitted).

NPS.").[17]  Only after they were not selected did plaintiffs complain that there were "no

procedures."  Pls. Br. At 20.  That claim, not raised before the agency, is not reviewable here.

Nor, since plaintiffs' application was considered and reviewed according to the criteria stated in

the Application, can plaintiffs show an injury from any alleged agency inaction.  The APA is

clear that in order to bring a suit under the Act plaintiffs must have suffered a sufficient injury in

fact.[18]  See 5 U.S.C. § 702; U.S. Const. art. III.  They thus lack standing to bring this claim.

In any event, the claim is demonstrably incorrect and without merit.  The policy goals of

the program were spelled out in the materials provided to plaintiffs, e.g., AR0061, 0063-82, and

the process was made equally clear.  While the terms "policy" and "process" are not defined in

the statute, the process and policies here, manifest in the record, satisfy both the plain meaning

of the words and the statutory intent of the NHLPA.  A "process" is defined as: "a series of

actions or operations conducting to an end . . . ."  Webster's Ninth New Collegiate Dictionary

(1983).  Similarly, policies are "a definite course or method of action selected . . . to guide and

determine present and future decisions." Id.  In keeping with this, courts have noted that an

"internal agency 'practice or procedure' is primarily directed toward improving the efficient and

effective operations of an agency . . . ." Batterton v. Marshall, 648 F.2d 694, n. 34 (D.C. Cir.

_____

[17] According to the procedures set out in the August 14, 2003, cover letter to interested parties,
"the application must be received . . . not later than ninety (90) days following the date of this letter . . .
Extensions may be granted for special circumstances." AR0060, 0162.  Such an extension was granted to
ENHC as it did not receive the application packet until August 26, AR 0100, while others received theirs
between August 16 and 19.  AR0083-98.  Elsewhere in their Brief, plaintiffs seem to concede that there
was a process.  E.g., Pls. Brief at 7 ("The [NHLPA] and the Application Process"), 9 ("The Decision-
Making Process Re: Baker's Island"), 13 ("Throughout the process, there were numerous examples" of
NPS bias), and 16 ("Throughout the application process. . .")

[18]The APA imposes a prudential standing requirement in addition to the requirement, imposed by
Article III of the Constitution, that a plaintiff have suffered a sufficient injury in fact.  Nat'l Credit Union
Admin. v. First Nat'l Bank & Trust Co., 522 U.S. 479, 488 (1998).

1980).  A "policies and procedures" requirement generally requires that an agency "provide written plans of those functions that are necessary" to achieve the statutory goal.  <u>Cobell v. Babbitt</u>, 91 F. Supp. 2d 1, 42 (D.D.C. 1999).  Here, the record shows that the agencies indeed developed "written plans" for carrying out the identification and selection of eligible entities.[19]

Section A of the application, entitled "Application Procedures," details the administrative process for submitting an application.  AR0064.  In order to "identify" entities that can comply with the terms of conveyance, nonprofit entities were required to submit a copy of their Articles of Incorporation, AR0002, and a Resolution/Certification of authority to acquire property.  AR0076.  Applicants also were required to provide four detailed plans and a Covenant Agreement.  AR0075-76.  This documentation ensured that the entity selected would be able to meet the "education, park, recreation, cultural, and historic preservation purposes" of the NHLPA, and helped to "identify" those applicants that have sufficient financial resources, "to acquire, develop, maintain, and operate the property."  AR0076.  Plaintiffs in fact submitted the required documentation.  AR0127-230.

Section B of the Application expressly described how applications would be evaluated (<u>e.g.</u>, "[s]uccessful applicants will be those best able to demonstrate their ability to preserve and maintain these historic sites and make them available for education, park, recreation, cultural or historic purpose for the general public" AR0065).  It then explained how applicants would be scored on a 100 point scale with respect to the various elements of the application.  <u>Id.</u>  In

---

[19] Of course, there is no requirement in the NHLPA that the "process and policies" be written and published, and courts certainly have recognized the existence of <u>unwritten</u> policies and procedures as well, in several contexts.  <u>See, e.g.</u>, <u>Johnson v. California</u>, 543 U.S. 499 (2005) (challenge to California Department of Corrections' unwritten policy of racially segregating prisoners for 60 days each time they enter a new correctional facility); <u>Wells v. City and County of Denver</u>, 257 F.3d 1132, 1150 (10th Cir. 2001) (considering facial challenge to informal city display policy).

addition, the Application outlines the roles of the federal agencies involved and notes that the

NPS "reviews and evaluates applicants, and recommends a suitable no-cost approved applicant

to GSA." AR0063.  While this documentation alone is more than sufficient to describe the

"functions that are necessary" for "selecting" an entity, the NPS website also explains that the

NPS Review Committee consists of at least: one expert in cultural resource management, one

expert in maritime history and/or preservation, and one expert in parks and recreational

programs, and explains that the NPS Review Committee will evaluate the applications for, *inter*

*alia*, completeness, past performance, ability to carry forward the goals of the NHLPA, and

compliance with the Secretary's Standards for the Treatment of Historic Properties (36 C.F.R

Part 68).  See www.cr.nps.gov/maritime/nhlpa/programataglance.htm.   The record amply shows

that a process and policies were developed pursuant to the NHLPA.[20]

Plaintiffs also have latched on to a document entitled "Draft National Park Service

Regional Handbook for Implementing NHLPA" dated July 2004 ("Draft Handbook"), AR0629-

645, as support for their claim that the document itself is the "policy and procedures" that should

have been but were not in existence at the time of the Baker's Island Light process.   That

---

[20] That Plaintiffs have continued to assert this argument despite abundant evidence to the contrary
might arise in part from a fundamental confusion between "regulations" and "process and policies."  E.g.,
AR0663. "Regulations" are what Ms. Ware several times asked for in her FOIA requests.  See, e.g.,
AR0672, 675, 688 ¶2.  The term "regulations" has a distinct meaning, connected to "rulemaking"
requirements, in administrative law.  Any effort to correlate a lack of regulations to a lack of "process and
policies" is legally and factually misguided.  Unfortunately, plaintiffs disregard the legal distinction even
in their Brief.  Pls. Brief at 18 ("the draft regulations were then [ ] being reviewed"and "NPS officials
stated that they did not know when the regulations" would be released for review), 20 (agency must
"promulgate detailed rules" when enabling legislation requires).   And the only two cases cited as support
for this argument are both inapposite:  the first is an immigration case cited for the principle that an
agency is obliged to follow its own regulations, Nelson v INS, 232 F.3d 258 (1st Cir. 2000); the second is
a class action seeking to compel the Secretary of Health and Human Services "to engage in notice and
comment rulemaking" under a statute that specifically required the agency to promulgate regulations.
Pulido v. Heckler, 758 F.2d 502 (10th Cir. 1985).  The NHLPA does not authorize or require the agencies
to promulgate regulations.  16 U.S.C. § 470w-7.

argument is meritless.  First, plaintiffs do not point to any relevant information in the Draft

Handbook that was not made available to them either through the NOA, the Application, the web

site, or written correspondence from the NPS.   Even if there were, however, the Draft Handbook

is merely a written iteration of the policies and procedures as they existed at the time the

Handbook was put together; it is not "proof" that there were no policies or procedures

previously.[21]   Nor is there <u>any</u> requirement, statutory or otherwise, that, once adopted, the

policies and process can not be modified.  Thus, even if the Draft Handbook <u>did</u> contain some

different requirement, this would not establish that no process or policies existed before.  The

record demonstrates that the agencies developed, provided plaintiffs with, and followed, a

process and policies in selecting a recipient for Baker's Island Light.  Plaintiffs' own

participation in the NHLPA process, and the successful implementation of the program during

the past five years, AR0631, belies any claim of "absent process and policies."[22]

---

[21] Again, plaintiffs confuse the terms on which they base their argument, using the term "process and policies," interchangeably with "handbook."  Pls. Brief at 19 ("Although the defendants now contend that they were not required to develop any detailed policies and procedures, in fact, they did develop the 'draft handbook' in 2004 (three years late, and yet still in draft form)"), 20 ("even if the handbook was adequate to satisfy Congress's directive. . . its <u>only</u> significance in this case is as an admission by the government that such a handbook was in fact required by Congress").  As noted above, the agencies were not required  to promulgate regulations; they certainly were not required to produce a "handbook."

[22] Plaintiffs also claim that the explanation that the Application and other available material evidence the process and policies, was "invented" "for the sole purpose" of defending this litigation.  Pls. Brief at 20, Vol II at 12.  This claim is plainly false.  The DOI recommendation dated February 27, 2004 (at least a year before this action commenced), states what was self-evident: that the "application provided the criteria and listed the requirements that the applicant was required to address," and that the "application is used as the principal document in determining the conditions under which a successful applicant will manage the property for the purposes of meeting the requirements of the NHLPA." AR0613.  The October 26, 2004, letter to Ware from P. Daniel Smith explained the same thing.  AR0680.

**2.    Plaintiffs' "Title Challenge" Is Likewise a Red Herring and Irrelevant; it Was Not Raised During the Administrative Process, it Is Outside the Scope of the APA, Plaintiffs Lack Standing to Bring Such a Claim, and it Is Demonstrably Untrue That the United States Cannot Convey its Interest in the Light Station**

Plaintiffs assert that GSA does not hold a valid deed to the Light Station, and they request that the court declare the same and direct the GSA to take steps to "establish good title." Am. Complaint, ¶ 56, ¶ F. Plaintiffs cannot show an injury, as required by the APA, from a supposed lack of "good" title. Nor did plaintiffs previously raise the issue[23] and, as noted above, "[the] Court may not hear or consider arguments that were not raised before the administrative agency." Harvard Pilgrim, 318 F. Supp. 2d at 12. Even if the claim had been timely raised, however, the Court should disregard the argument for a number of other reasons. First, in neither their Brief nor the Amended Complaint do plaintiffs invoke any statute containing an express waiver of sovereign immunity establishing the Court's subject matter jurisdiction over a title dispute involving the United States.[24] The APA can not be invoked in a title challenge because 28 U.S.C. § 2409a is "the exclusive means of challenging United States title." Mafringe v. U.S., 893 F.Supp. 691, 699 (S.D.Tex. 1995), aff'd. 189 F.3d 466, cert. denied, 529 U.S. 1053 (2000) (judicial appeals under the APA are not available where the Quiet Title Act applies).

---

[23] On the contrary, plaintiffs stated in their application that "[t]he ten acre parcel was ceded shortly thereafter by the Commonwealth of Massachusetts to the United States at a cost of $500.00." AR0150. Plaintiff Leavens, a BILPS Director, suggested to DOI that both applications be rejected and the property sold via a public bidding process. AR0666. In addition, plaintiffs frequently refer to the Association's 30-year license to use and preserve the property which was accepted without objection as to the United States' title. AR0148, 0668. Even now, plaintiffs assert that the Association "plans to continue" managing the keeper's cottages, Pls. Brief at 7, pursuant to the license which, under plaintiffs' current theory, the United States had no right to issue.

[24] An action against the United States is permissible under 28 U.S.C. § 2409a, which states that the "United States may be named as a party defendant in a civil action under this section to adjudicate a disputed title to real property in which the United States claims an interest . . . ." While this Court would have exclusive jurisdiction of such an action under § 2409a per 28 U.S.C. § 1346(f), the Amended Complaint does not invoke this jurisdiction nor plead standing.

-25-

Second, there is no merit to the idea that GSA should be ordered to "confirm" its title in Massachusetts Land Court. The APA only permits courts to "compel agency action unlawfully withheld." 5 U.S.C. § 706(1). A claim under § 706(1) can proceed "only where a plaintiff asserts that an agency failed to take a discrete agency action that it is required to take." Norton v. S. Utah Wilderness Alliance, 124 S.Ct. 2373, 2379 (2004). This limitation "rules out judicial direction of . . . agency action that is not demanded by law." Id. at 2380. Because GSA is not required by law to "establish good title" to the Light Station, the relief plaintiffs seek falls outside the APA.[25]

Moreover, plaintiffs do not have standing to contest title because they do not have an interest in the Light Station (nor do they even suggest that anyone has superior title). Rule 17 of the Federal Rules of Civil Procedure requires that "[e]very action shall be prosecuted in the name of the real party in interest." State property law applies to determinations of interest in property. See United States v. 79.31 Acres of Land, More or Less, Situated In The Towns of Truro, Wellfleet and Eastham, 717 F.2d 646, 648 (1st Cir. 1983) (courts looks to the law of Massachusetts in deciding the parties' property interest in locus); Lombard v. United States, 2002 U.S. Dist. LEXIS 16095 at **13-14 (D. Mass. Aug. 28, 2002), aff'd, 356 F.3d 151 (1st Cir. 2004) (finding that a dispute involving title to land is the "quintessential" type of case in which a federal court would apply state law to the issue). Massachusetts courts have interpreted the parallel state rule of civil procedure (Mass. R. Civ. P. 17) as requiring a challenging party in a title dispute to have standing through a valid claim to the property. In keeping with this interpretation, "everyone must be deemed a stranger who can show no title or no older possession." Rowley v. Mass. Elec. Co., 438 Mass. 798, 807 (2003) (citing Bon v. Graves, 216

---

[25] In any event, the United States cannot be ordered into state court.

Mass. 440, 445 (1914)).  Here, plaintiffs have no property interest in the Light Station, and

therefore lack standing to challenge whether GSA has "marketable" title.[26]

Finally, the title issue is irrelevant in any event, and plaintiffs' argument fails to account for

the express terms of the statute they invoke.  Under the NHLPA, GSA can convey whatever

interest the United States has in the Light Station, irrespective of whether there is a "valid deed,"

or "evidence" of "marketable" title, as plaintiffs insist.  Pls. Brief at II:4-7.  The statute provides

that once an eligible entity is selected by the Secretary, the Administrator shall convey "by

quitclaim deed, without consideration, all right, title, and interest of the United States in and to

the historic light station" subject to the conditions specified.  16 U.S.C. § 470w-7(b)(3)(A).  A

quitclaim deed is "a deed that conveys a grantor's complete interest or claim in certain real

property but that neither warrants nor professes that the title is valid."  Black's Law Dictionary

(8th ed., 2004).[27]  Under the express terms of the NHLPA, then, the United States conveys

whatever "right, title, and interest" it has in the light station; there is no requirement that it have

"good," "marketable," or "insurable" title.

   3.   **Plaintiffs' Claim That the Light Station Has Not Been "Excessed" Because the
        Coast Guard Will Continue to Use it as an Aid to Navigation Should Not
        Detain the Court, Since the NHLPA Expressly Contemplates Such Use.**

Again in contravention of the express terms of the statute they invoke, plaintiffs also argue

---

[26]Plaintiffs' only arguable claim in the Light Station is their desire of future ownership and a present revocable license, neither of which are cognizable property interests sufficient to grant standing.  Massachusetts' courts have rejected "possible eventual interest" as a  basis for standing, finding it "insufficient" to sustain an action to quiet title.  Jenkins v. McIntyre-Fields, 11 LCR 259 (Mass. Land Ct. 2003) (citing Mass. R. Civ. P. 17)(a)).  Similarly, a "license merely excuses acts done by one on land in possession of another . . . [and] conveys no interest in land."  Pratt v. Mass., 13 LCR 75, 79 (2005) (citing Baseball Pub. Co. v. Burton, 302 Mass. 54, 55 (1938)).

[27]Black's quotes Robert Kratovil, *Real Estate Law* 49 (6th ed. 1974) that since a quitclaim deed "purports to convey whatever interest the grantor has at the time, its use excludes any implication that he has good title, or any title at all."  In Massachusetts, the United States conveys "without covenants" or "without warranty."  See Watkins v. Otis, 2 Pick. 88, 100, 19 Mass. 88, 1824 WL 1871 (1824).

-27-

that the Light Station was improperly put into the NHLPA program because the USCG will continue to use it as an aid to navigation.  On the contrary, the NHLPA provides that once an entity is selected, a historic lighthouse shall be conveyed "subject to any conditions, including the reservation of easements and other rights on behalf of the United States," deemed necessary to ensure that, *inter alia*, "the Federal aids to navigation located at the historic light station . . . remain the personal property of the United States and continue to be operated and maintained by the United States for as long as needed for navigational purposes."[28]  16 U.S.C. § 470w-7(c)(1)(A).  Moreover, plaintiffs were notified of this condition in August 2003, before they submitted their application, AR0060, yet never raised the issue.

### 4.  Plaintiffs Have Not Made the Requisite Strong Showing of Bad Faith to Justify Expanding the Record Or "Reversing" the Secretary's Decision

#### a.  FOIA requests are not part of the application process and decision

Plaintiffs attempt to enlarge the record to include FOIA requests made after the scoring of applications and original recommendation of ENHC.  They argue that the FOIA correspondence shows "bad faith" because it was not made part of the certified administrative record, and because the agency was not forthcoming in response to the requests. Pls. Brief at 3-4, 16-17.  The attempt fails.   The Secretary did include in the administrative record some FOIA requests and responses that pre-date notification to plaintiffs of the result of the appeal, AR0721, but only because they were in the files of the agency personnel responsible for review of applications and recommendations to the Secretary.  FOIA requests are part of a discrete process, however; they simply do not constitute part of the review and selection process for the Light

---

[28] This express statutory provision likewise disposes of plaintiffs' arguments that ownership of the Light Station has reverted to the heirs of the former owner, and "jurisdiction" has "reverted" to the Commonwealth.  Pls. Brief at II:7-8, 9-10.

Station. The record was not "cleansed" of these documents, as plaintiffs assert. Pls. Brief at 4.

Indeed, Ms. Ware coyly did not even identify her connection to BILPS when she began her

telephone, letter, and e-mail campaign. <u>See</u>, <u>e.g.</u>, AR0669, 0670, 0672. The record shows the

defendants in fact responded to the FOIA requests; but the requesters simply did not agree with,

understand, or like the responses they got. Moreover, the agency properly hesitated, <u>see</u>, <u>e.g.</u>,

AR0624, 626-628, 677, 680 ¶4, to provide ENHC's application or comment on the review

process to plaintiffs during the pendency of the administrative appeal, because the

recommendation was considered pre-decisional (and exempt from disclosure under FOIA) until

the Secretary's final selection. <u>See</u> <u>NLRB v. Sears, Roebuck & Co.</u>, 421 U.S. 132, 150 (1975)

(recognizing privilege for predecisional documents); <u>American Federation of Government</u>

<u>Employees, AFL-CIO, Local 1164 v. U.S. Dept. of Health & Human Services</u>, 63 F.Supp. 2d

104 (D. Mass. 1999). There is no evidence of bad faith.[29] In any event, this is not a FOIA case,

nor have plaintiffs brought such an action.

> **b. Plaintiffs have failed to demonstrate any exceptional circumstances that would support expanding the record, and the Court should strike their extra-record documents**

It is axiomatic that in an APA case "the focal point for judicial review should be the

administrative record already in existence, not some new record made initially in the reviewing

---

[29] Moreover, Plaintiffs' inclusion of the argument that further evidence of the agencies' bad faith is their "failure" to include the exhibits to the Draft Handbook (provided to Ms. Ware in response to a FOIA request), Pls. Brief at 17, is both disingenuous and unfair. Counsel for defendants previously explained to plaintiffs' counsel that the inclusion of the Draft Handbook in the record was a mistake, since it post-dates the Baker's Island Light process and was not used or "considered" by the agency in the course of the Baker's Island Light selection process. In light of defendants' mistake, however, counsel for defendants offered to assent to plaintiffs "adding" to the record those exhibits from the Handbook that plaintiffs wanted to use for their arguments, and asked plaintiffs' counsel to let defendants know if there were any such exhibits. Plaintiffs' counsel never did so, apparently preferring instead to use counsel's mistake as fodder for an argument that the agencies were playing dirty pool. This tactic should not be sanctioned by the Court.

court." <u>Camp v. Pitts</u>, 411 U.S. 138, 142 (1973).   Consideration of affidavits and extra-record

documents in this case is inappropriate because plaintiffs have not met the requisite burden of

showing that exceptional circumstances surrounded the selection of ENHC.  Instead, plaintiffs

offer hearsay, conclusory assertions, speculation, unsupported allegations, argument, and

nonexpert legal opinions that are insufficient to overcome the presumption of good faith which

attaches to administrative decisions.  "A fundamental premise of judicial review of agency action

is that, absent certain exceptional circumstances, the review is to be based solely on the record

before the agency at the time of the decision, and, therefore, no evidence outside the agency

record is usually admissible." <u>Apex Construction Co., Inc. v. United States</u>, 719 F. Supp. 1144,

1146-47 (D. Mass. 1989) (citing <u>Camp v. Pitts</u>, 411 U.S. at 142); <u>Bradley v. Weinberger</u>, 483

F.2d 410, 415 (1st Cir. 1973) (observing that the court's proper role is a "re-view, a second look

at the same material, not a re-doing.").  While the First Circuit has identified "limited

exception[s] to the rule against record supplementation," <u>Olsen v. United States</u>, 414 F.3d 144,

155 (1st Cir. 2005), plaintiffs have not shown that such exceptions are present here.  Even where

courts have found such "exceptional circumstances," the decision to allow discovery still

remains "wholly discretionary." <u>Id.</u> (citing <u>Town of Norfolk and Town of Wadpole v. U.S. Army

Corps of Engineers</u>, 968 F.2d 1438, 1458-59 (1st Cir. 1992)); <u>see</u> <u>Geer v. Federal Hwy. Admin.</u>,

973 F. Supp. 39, 41-42 (D. Mass. 1997).

The "burden on the plaintiff asserting [bad faith] is heavy," <u>Strahan v Linney</u>, 966 F.

Supp. 111, 114 n.4 (D. Mass 1997), and the conclusory allegations and unsupported assertions

offered by the plaintiffs in this case are insufficient to warrant consideration of extra-record

documents.  They simply have not made "a strong showing of bad faith or improper behavior"

by the agency decision makers.  <u>Id.</u> (citing <u>Citizens to Preserve Overton Park, Inc. v. Volpe</u>, 401

U.S. 402 (1971)).  Allegations of bad faith require a reasonable factual basis, <u>Apex</u>, 719 F. Supp.

at 1147 (citing <u>Overton Park</u>, 401 U.S. at 420), and "mere allegations of impropriety 'must not

-30-

serve to allow those disappointed by the regulatory activity to invoke all the benefits of the rules of civil procedure for an extensive search into the agency's decisional processes.'" Id. (quoting Environmental Defense Fund, Inc. v. Blum, 458 F. Supp. 650, 663 (D.D.C. 1978)). A plaintiff must furnish "admissible evidence necessary to create a genuine dispute concerning any material fact concerning [the agency's] motives or conduct." Id. at 1150-51. That is because the agency is entitled to a presumption of administrative regularity and good faith "that must be overcome with evidence." Beverly Enterprises, Inc. v. Herman, 130 F. Supp. 2d 1, 8 (D.D.C. 2000).

The "evidence" of bad faith plaintiffs offer here is less than or, at best, comparable to that offered in cases where courts found the plaintiffs failed to make a strong showing of bad faith. Plaintiffs have filed four affidavits with their Brief, and draw their summary of "facts" largely from those affidavits. The Ware and Leavens affidavits -- which focus on the post-selection FOIA requests, title research (which plaintiffs have no standing to raise, see above), and ENHC application and qualifications -- contain hearsay, argument, legal "opinions," and the affiants' "beliefs." Both those and the Hollowell affidavit concern plaintiffs' claim that the ENHC was "pre-selected" because when P. Daniel Smith visited the island on May 19, 2004, he supposedly said something to indicate that the two applications were "close," and the decision would be impregnable to appeal.[30]

Such allegations fall far short of demonstrating bad faith. First, plaintiffs' argument that ENHC was "pre-selected" is utterly unsupported. There is no evidence that a decision was made before the applications were received, reviewed, and scored in accordance with the stated application criteria. In Apex, the court found that an affidavit submitted by the plaintiff alleging

---

[30] The fourth affidavit offers expert opinion by a Massachusetts conveyancing attorney who does not claim to have any expertise with property conveyed by the United States, does not address plaintiffs' standing to raise the issue, does not opine as to whether the United States can convey its interest in the Light Station "without warranty," and apparently was not even directed to or provided a copy of the NHLPA. His affidavit also should be stricken as irrelevant.

personal animosities contained hearsay and failed to create a genuine dispute as to bad faith. 719

F. Supp at 1150. Similarly, discovery was denied where the plaintiff relied on three affidavits

asserting the appearance of bad faith by the agency. <u>James Madison, Ltd. by Hecht v. Ludwig</u>,

82 F.3d 1085, 1095 (D.C. Cir. 1996) (observing that "[u]nsupported by other evidence, . . .

conclusory statements fall short of the strong showing of bad faith required . . . ."). Even where

plaintiffs offered a letter, a memo, and five emails between the United States Attorney and the

Army Corps intimating improper political influence which the court noted "certainly make

interesting reading," the evidence still fell "short of indicating the type of bad faith that would

require expanding review beyond the administrative record." <u>Town of Norfolk</u>, 137 F.R.D. at

189. In the present case, plaintiffs' own affidavits asserting bad faith are similar to those

considered and rejected by the courts in <u>Apex</u> and <u>James Madison, Ltd.</u> and far less compelling

than the compilation of evidence ultimately rejected as insufficient in <u>Town of Norfolk</u>.

Apart from the title issue, plaintiffs' allegations rely almost exclusively on post-decision

dealings with the agency in the context of the FOIA requests and a Lighthouse Conference that

took place in mid-April 2005 – nine months after the recommendation by NPS of ENHC, and

<u>after</u> the Secretary had already been notified of the recommendation upon plaintiffs' appeal.

AR0723. They simply do not compare with the type of evidence courts have found sufficient to

expand the record. In <u>Texaco Puerto Rico, Inc. v. Dept. of Consumer Affairs</u>, 60 F.3d 867, 880

(1st Cir. 1995), the First Circuit affirmed a finding of bad faith where the lower court cited

veiled threats by government officials, orders issued without appropriate hearings, litigation

tactics meant to forestall court action, targeted enforcement, and unannounced press conferences.

The court noted "pervasive evidence of bad faith . . . directly related to the core elements of the

dispute." <u>Id.</u> Here, plaintiffs' allegations of FOIA lapses, occurring <u>after</u> the recommendation of

ENHC, supposed "omissions" from the administrative record filed in this litigation, and the

purported "pre-selection" of ENHC are unfounded, far short of pervasive and, for the most part,

unrelated to the core element of the dispute, i.e., the applications themselves. In another case, Maine Care Serv., Inc. v. U.S. Dept. of Agriculture, No. Civ. 00-358-P-H, 2001 WL 261558, 3 (D. Me. March 15, 2001), extra-record discovery was permitted where *ex parte* communications between a hearing officer and the state agency "raise[d] a serious question whether the integrity and the fairness of the result were irrevocably tainted by the communications." Even assuming that an *ex parte* meeting between NPS and the Heritage Commission occurred, as plaintiffs intimate, Ware Aff. at ¶7, Pls. Brief at 12, it could not have "irrevocably tainted" the process because it would have transpired after the review committee overwhelmingly recommended the Heritage Committee as the eligible entity based on the applications themselves.

Likewise there is no merit to plaintiffs' allegations that NPS was a "co-applicant" with the Heritage Commission, who helped prepare ENHC's application, Pls. Brief at 4, 13, and so was biased in its review. Pls. Brief at 4, 13-14. First, under the NHLPA, a light station can only be deeded to a single entity. The Salem Maritime National Historic Site sent a letter of interest in response to the NOA, but did not ultimately apply for the Light Station. It did, however, send a letter of support for ENHC's application. AR0267. Since i) the (extra-record) documents plaintiffs cite for the argument that there is a conflict of interest refer to light stations within the boundaries of national parks and wildlife refuges, 16 U.S.C. § 470w-7(3)(B), and Baker's Island Light is not so situated, and ii) no NPS unit was applying for the light station, this argument is a red herring and irrelevant.

**C.    BECAUSE NO CLAIMS AGAINST GSA HAVE BEEN STATED, GSA AND ITS OFFICIALS SHOULD BE DISMISSED AS DEFENDANTS**

As defendants have previously argued, the decision at issue was made by the Secretary of the Interior; GSA, by the express division of responsibility set forth in the NHLPA, had no role in the review of applications or the recommendation of a selected entity. There is no cognizable claim stated against GSA for which there is a waiver of sovereign immunity or for which

plaintiffs have standing under the APA through an injury in fact.  GSA and the GSA officials named in the Complaint should be dismissed for lack of subject matter jurisdiction, and defendants hereby renew their previous motion.[31]

## CONCLUSION

For all of the foregoing reasons, Plaintiffs' Motion should be denied.  The Court should grant defendants' Motion to Affirm the Secretary's Decision and To Strike Extra-Record Documents, and enter an order affirming the decision, striking the affidavits and the exhibits thereto, and dismissing the unnecessary defendants.

Respectfully submitted,
By their attorney,
MICHAEL J. SULLIVAN
United States Attorney

By:    /s/ Barbara Healy Smith
Barbara Healy Smith
Assistant U.S. Attorney
Dated:  27 April 2006        John Joseph Moakley U.S.  Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3263

---

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

  /s/ Barbara Healy Smith
Dated: 27 April 2006          Barbara Healy Smith
Assistant United States Attorney

---

[31] Nor are the NPS, NPS officials, or DOI officials necessary defendants.  The only appropriate defendant is the Secretary, and so the Court should dismiss all unnecessary defendants.

-34-

DIVISION II

<< 16 USCA § 461 NOTE >>

TITLE I--NATIONAL COAL HERITAGE AREA

SEC. 101. SHORT TITLE.

This title may be cited as the "National Coal Heritage Area Act of 1996".

SEC. 102. FINDINGS.

(a) FINDINGS.--The Congress finds as follows:
(1) Certain events that led to the development of southern West Virginia's coalfields during the latter part of the 19th Century and the early part of the current century are of national historic and cultural significance in terms of their contribution to the industrialization of the United States, the organization of workers into trade unions, and the unique culture of the Appalachian Region.
(2) It is in the national interest to preserve and protect physical remnants of this era for the education and benefit of present and future generations.
(3) There is a need to provide assistance for the preservation and promotion of those vestiges of southern West Virginia's coal heritage which have outstanding cultural, historic, and architectural value.

SEC. 103. ESTABLISHMENT.

(a) IN GENERAL.--For the purpose of preserving and interpreting for the educational and inspirational benefit of present and future generations certain lands and structures with unique and significant historic and cultural value associated with the coal mining heritage of the State of West Virginia and the Nation, there is hereby established the National Coal Heritage Area (hereafter in this title referred to as the "Area").
(b) BOUNDARIES.--The Area shall be comprised of the counties in the State of West Virginia that are the subject of the study by the National Park Service, dated 1993, entitled "A Coal Mining Heritage Study: Southern West Virginia" conducted pursuant to title VI of Public Law 100-699.
(c) ADMINISTRATION.--The Area shall be administered in accordance with this title.

SEC. 104. CONTRACTUAL AGREEMENT.

The Secretary of the Interior (hereafter in this title referred to as the "Secretary") is authorized to enter into a contractual agreement with the Governor of the State of West Virginia, acting through the Division of Culture and History and the Division of Tourism and Parks, pursuant to which the Secretary shall assist the State of West Virginia, its units of local government, and nonprofit organizations in each of the following:
(1) The development and implementation of integrated cultural, historical, and land resource management policies and programs in order to retain, enhance, and interpret the significant values of the lands, water, and structures of the Area.
(2) The preservation, restoration, maintenance, operation, interpretation, and promotion of buildings, structures, facilities, sites, and points of interest for public use that possess cultural, historical, and architectural values associated with the coal mining heritage of the Area.
(3) The coordination of activities by Federal, State, and local governments and private businesses and organizations in order to further historic preservation and compatible economic revitalization.
(4) The development of guidelines and standards for projects, consistent with standards established by the National Park Service, for the preservation and restoration of historic properties, including interpretative methods, that will further history preservation in the region.

SEC. 105. ELIGIBLE RESOURCES.

The resources eligible for the assistance under paragraphs (2) and (5) of section 104 shall include those set forth in appendix D of the study by the National Park Service, dated 1993, entitled "A Coal Mining Heritage Study: Southern West Virginia", conducted pursuant to title VI of Public Law 100-699. Priority consideration shall be given to those sites listed as "Conservation Priorities" and "Important Historic Resources" as depicted on the map entitled "Study Area: Historic Resources" in such study.

SEC. 106. COAL HERITAGE MANAGEMENT PLAN.

(a) IN GENERAL.--Pursuant to the contractual agreement referred to in section 104, within three years after the date of enactment of this title, the Governor of the State of West Virginia, acting through the Division of Culture and History and the Division of Tourism and Parks, shall submit to the Secretary a Coal Heritage Management Plan for the Area. The plan shall at a minimum--
(1) set forth the integrated cultural, historical, and land resource management policies and programs referred to in section 104;

(2) describe the guidelines and standards for projects referred to in section 104; and
(3) set forth the responsibilities of the State of West Virginia, units of local government, nonprofit entities, or Secretary to administer any properties acquired pursuant to section 104.
(b) PLAN APPROVAL.--The Secretary shall approve the plan submitted under subsection (a) unless he determines that it would not meet the objectives of this title.

SEC. 107. SUNSET.

The Secretary may not make any grant or provide any assistance under this title after September 30, 2012.

SEC. 108. AUTHORIZATION OF APPROPRIATIONS.

(a) IN GENERAL.--There is authorized to be appropriated under this title not more than $1,000,000 for any fiscal year. Not more than a total of $10,000,000 may be appropriated for the Area under this title.
(b) 50 PERCENT MATCH.--Federal funding provided under this title may not exceed 50 percent of the total cost of any assistance or grant provided or authorized under this title.

<< 16 USCA § 461 NOTE >>

TITLE II--TENNESSEE CIVIL WAR HERITAGE AREA

SEC. 201. FINDINGS AND PURPOSES.

(a) FINDINGS.--The Congress finds that--
(1) there are situated in the State of Tennessee the sites of several key Civil War battles, campaigns, and engagements;
(2) certain sites, battlefields, structures, and areas in Tennessee are collectively of national significance in the history of the Civil War;
(3) the Civil War Sites Advisory Commission, established by Congress in 1991, identified 38 sites in Tennessee as significant;
(4) the preservation and interpretation of these sites will make an important contribution to the understanding of the heritage of the United States;
(5) the preservation of Civil War sites within a regional framework requires cooperation among local property owners and Federal, State, and local government entities; and
(6) partnerships between Federal, State, and local governments and their regional entities, and the private sector, offer the most effective opportunities for the enhancement and management of the Civil War battlefields and related sites located in Tennessee.
(b) PURPOSES.--The purposes of this title are--
(1) to preserve, conserve, and interpret the legacy of the Civil War in Tennessee;
(2) to recognize and interpret important events and geographic locations representing key Civil War battles, campaigns, and engagements in Tennessee;
(3) to recognize and interpret the effect of the Civil War on the civilian population of Tennessee during the war and postwar reconstruction period; and
(4) to create partnerships among Federal, State, and local governments and their regional entities, and the private sector to preserve, conserve, enhance, and interpret the battlefields and associated sites associated with the Civil War in Tennessee.

SEC. 202. DEFINITIONS.

For purposes of this title:
(1) The term "national heritage area" means the Tennessee Civil War Heritage Area as designated pursuant to section 203.
(2) The term "Secretary" means the Secretary of the Interior.
(3) The term "compact" means the compact approved under section 204.
(4) The term "management plan" means the management plan submitted under section 205.

SEC. 203. TENNESSEE CIVIL WAR HERITAGE AREA.

(a) DESIGNATION.--Upon publication by the Secretary in the Federal Register of notice that a compact regarding the Tennessee Civil War Heritage Area has been approved by the Secretary in accordance with this title, there is hereby designated the Tennessee Civil War Heritage Area.
(b) BOUNDARIES.--The Tennessee Civil War Heritage Area shall be comprised of areas of the State of Tennessee depicted on the map entitled "Tennessee Civil War Heritage Area". The map shall be on file and available for public inspection in the office of the Director of the National Park Service.
(c) ADMINISTRATION.--The national heritage area shall be administered in accordance with the compact and the management plan.

SEC. 204. COMPACT.

(a) COMPACT.--The compact referred to in section 203(a) shall include information relating to the objectives and management of the area proposed for designation as the national heritage area. Such information shall include (but not be limited to) each of the following:

(1) A delineation of the boundaries of the proposed national heritage area.

(2) A discussion of the goals and objectives of the proposed national heritage area, including an explanation of the approach proposed by the partners referred to in paragraph (4), to conservation and interpretation of resources.

(3) An identification and description of the management entity that will administer the proposed national heritage area.

(4) A list of the initial partners to be involved in developing and implementing the management plan for the proposed national heritage area, and a statement of the financial commitment of the partners.

(5) A description of the role of the State of Tennessee.

(b) PREPARATION OF AND ACTIONS CALLED FOR IN COMPACT.--The compact shall be prepared with public participation. Actions called for in the compact shall be likely to be initiated within a reasonable time after designation of the proposed national heritage area and shall ensure effective implementation of the State and local aspects of the compact.

(c) APPROVAL AND DISAPPROVAL OF COMPACTS.--

(1) IN GENERAL.--The Secretary, in consultation with the Governor of Tennessee, shall approve or disapprove the proposed compact not later than 90 days after receiving such compact.

(2) PROCEDURES IF DISAPPROVED.--If the Secretary disapproves a proposed compact, the Secretary shall advise, in writing, of the reasons for the disapproval and shall make recommendations for revisions of the proposed compact. The Secretary shall approve or disapprove a proposed revision to such a compact within 90 days after the date on which the revision is submitted to the Secretary.

SEC. 205. MANAGEMENT.

(a) MANAGEMENT PLANS.--A management plan submitted under this title for the national heritage area shall present comprehensive recommendations for the conservation, funding, management, and development of the area. The management plan shall--

(1) be prepared with public participation;

(2) take into consideration existing Federal, State, county, and local plans and involve residents, public agencies, and private organizations in the area;

(3) include a description of actions that units of government and private organizations are recommended to take to protect the resources of the area;

(4) specify existing and potential sources of funding for the conservation, management, and development of the area; and

(5) include the following, as appropriate:

(A) An inventory of the resources contained in the national heritage area, including a list of property in the area that should be conserved, restored, managed, developed, or maintained because of the natural, cultural, or historic significance of the property as it relates to the themes of the area.

(B) A recommendation of policies for resource management that consider and detail the application of appropriate land and water management techniques, including (but not limited to) the development of intergovernmental cooperative agreements to manage the historical, cultural, and natural resources and the recreational opportunities of the area in a manner consistent with the support of appropriate and compatible economic viability.

(C) A program, including plans for restoration and construction, for implementation of the management plan by the management entity specified in the compact for the area and specific commitments, for the first 5 years of operation of the plan, by the partners identified in the compact.

(D) An analysis of means by which Federal, State, and local programs may best be coordinated to promote the purposes of this title.

(E) An interpretive plan for the national heritage area.

(b) MANAGEMENT ENTITIES.--The management entity for the national heritage area shall do each of the following:

(1) Develop and submit to the Secretary a management plan not later than three years after the date of the designation of the area as a national heritage area.

(2) Give priority to the implementation of actions, goals, and policies set forth in the compact and management plan for the area, including--

(A) assisting units of government, regional planning organizations, and nonprofit organizations--

(i) in conserving the national heritage area;

(ii) in establishing and maintaining interpretive exhibits in the area;

(iii) in developing recreational opportunities in the area;

(iv) in increasing public awareness of and appreciation for the natural, historical, and cultural resources of the area;

(v) in the restoration of historic buildings that are located within the boundaries of the area and relate to the themes of the area; and

(vi) in ensuring that clear, consistent, and environmentally appropriate signs identifying access points and sites of interest are put in place throughout the area; and

(B) consistent with the goals of the management plan, encouraging economic viability in the affected communities by appropriate means.

(3) In developing and implementing the management plan for the area, consider the interests of diverse units of government, businesses, private property owners, and nonprofit groups within the geographic area.

(4) Conduct public meetings at least quarterly regarding the implementation of the management plan for the area.

(c) CLEARING HOUSE.--The Congress recognizes the Center for Historic Preservation at Middle Tennessee State University

(a) LACK OF EFFECT ON AUTHORITY OF GOVERNMENTS.--Nothing in this title shall be construed to modify, enlarge, or diminish any authority of the Federal, State, or local governments to regulate any use of land as provide for by law or regulation.

(b) LACK OF ZONING OR LAND USE POWERS OF ENTITY.--Nothing in this title shall be construed to grant powers of zoning or land use to any management entity for the national heritage area.

(c) FISH AND WILDLIFE.--The designation of the national heritage area shall not diminish the authority of the State of Tennessee to manage fish and wildlife, including the regulation of fishing and hunting within such area.

SEC. 208. SUNSET.

The Secretary may not make any grant or provide any assistance under this title after September 30, 2012.

SEC. 209. AUTHORIZATION OF APPROPRIATIONS.

(a) IN GENERAL.--There is authorized to be appropriated under this title not more than $1,000,000 for any fiscal year. Not more than a total of $10,000,000 may be appropriated for the national heritage area under this title.

(b) 50 PERCENT MATCH.--Federal funding provided under this title, after the designation of the national heritage area, may not exceed 50 percent of the total cost of any assistance or grant provided or authorized under this title.

<< 16 USCA § 461 NOTE >>

TITLE III--AUGUSTA CANAL NATIONAL HERITAGE AREA

SEC. 301. FINDINGS.

The Congress finds that--

(1) the Augusta Canal National Landmark in the State of Georgia, listed on the National Historic Register of Historic Places, and designated by the Governor of Georgia as one of four regionally important resources in the State, is one of the last unspoiled areas in the State of Georgia;

(2) the Augusta Canal National Historic Landmark possesses excellent water quality, beautiful rural and historic cultural landscapes, architecturally significant mill structures and mill villages, and large acreages of parks and permanent open space;

(3) three national historic districts, the Harrisburg, Laney Walker, and Greene Street districts, and two national historic landmarks, Stallings Island, located in the Savannah River, and Meadow Garden, are connected by the Augusta Canal Area;

(4) the beautiful rural landscapes and historic cultural landscapes, scenic vistas and excellent water quality of the Augusta Canal contain significant undeveloped recreational opportunities for people throughout the United States;

(5) the Augusta Canal and related mill sites, structures, and associated neighborhoods are representatives of the development of the cotton textile industry and associated agriculture and trade in the South;

(6) the transformation of the agrarian economy of the area into an early industrial economy was precipitated by the development and use of the Augusta Canal;

(7) several significant sites associated with the American Revolution, the Civil War, Native Americans, Colonial Americans, African Americans, Chinese Americans, and Irish Americans are located within the Augusta Canal area;

(8) despite the efforts by the State of Georgia, political subdivisions of the State, volunteer organizations, and private businesses, the cultural, historical, natural, and recreational resources of the area have not realized full potential and may be lost without assistance from the Federal Government;

(9) the Secretary of the Interior considers this landmark to be threatened and has designated it a priority for protection;

(10) many local, regional, and State agencies, businesses, and private citizens have expressed an overwhelming desire to combine forces to work cooperatively to preserve and enhance the resources of the Augusta Canal National Historic Landmark and better plan for its future; and

(11) the Augusta Canal Authority, a public body established under the law of the State of Georgia, would be an appropriate

management entity for a National Heritage Area established in the area of the Augusta Canal.

SEC. 302. PURPOSE.

It is the purpose of this title to provide a cooperative management framework to assist the State of Georgia, its units of local government, and area citizens in retaining, enhancing, and interpreting the significant features of the lands, water, and structures of the Augusta Canal, in a manner that is consistent with positive economic impact and development for the benefit and inspiration of present and future generations in the State of Georgia and the United States.

SEC. 303. DESIGNATION OF AUGUSTA CANAL NATIONAL HERITAGE AREA.

(a) DESIGNATION.--There is hereby designated in the State of Georgia the Augusta Canal National Heritage Area (referred to in this title as the "Heritage Area").
(b) BOUNDARIES.--
(1) IN GENERAL.--The Heritage Area shall include the land generally depicted on the map entitled "The Augusta Canal", numbered AUCA-80,000, and dated August 1994, which shall be on file and available for public inspection in the Office of the Director of the National Park Service, Washington, D.C.
(2) LEGAL DESCRIPTION.--As soon as practicable after the date of enactment of this title, the Secretary of the Interior (referred to in this title as the "Secretary") shall prepare and place on file with the map described in paragraph (1) a legal description of the boundaries of the Heritage Area.

SEC. 304. MANAGEMENT.

The Secretary, acting through the Director of the National Park Service, shall enter into a cooperative agreement with the Augusta Canal Authority, a public body established under the law of the State of Georgia, providing for the management of the Heritage Area by the Augusta Canal Authority under terms and conditions stated in the cooperative agreement. The Secretary shall consult with the Augusta Canal Authority before carrying out any management authority with respect to the Heritage Area which is not provided for by the cooperative agreement.

SEC. 305. MANAGEMENT PLAN.

(a) PREPARATION OF PLAN.--Not later than three years after the date of enactment of this title, the Augusta Canal Authority shall prepare and submit to the Secretary for review and approval a plan for the management and administration of the Heritage Area.
(b) CONTENTS.--The plan shall be based on Federal, State, and local plans in existence on the date of enactment of this title, including the Augusta Canal Master Plan. The Augusta Canal Authority shall coordinate and combine such plans and present an integrated and cooperative approach for the protection, enhancement, and interpretation of the cultural, natural, scenic, and recreational resources of the Heritage Area.
(c) ASSISTANCE.--The Secretary may provide technical and financial assistance in the preparation of the management plan.
(d) APPROVAL.--
(1) IN GENERAL.--Not later than 180 days after receipt of the plan submitted under subsection (a), the Secretary shall approve or disapprove the plan.
(2) CRITERIA.--In determining whether to approve a plan, the Secretary shall consider--
(A) whether the plan has strong local support from a diversity of landowners, business interests, nonprofit organizations, and governments within the area;
(B) whether the plan is consistent with and complements continued economic activity in the area;
(C) whether the plan has a high potential for effective partnership mechanisms;
(D) whether the plan improperly infringes on private property rights; and
(E) whether the plan will take appropriate action to ensure private property rights are observed.
(3) DISAPPROVAL.--
(A) IN GENERAL.--If the Secretary disapproves the proposed management plan, the Secretary shall notify the Augusta Canal Authority of the disapproval in writing.
(B) CONTENTS.--A notification under subparagraph (A) shall include--
(i) the reasons for the disapproval; and
(ii) recommendations for revision.
(C) REVISED PLAN.--The Augusta Canal Authority shall revise and resubmit the management plan to the Secretary for approval. Not later than 180 days after receipt of the revised plan, the Secretary shall approve or disapprove the plan as provided in paragraph (2). The Augusta Canal Authority shall revise and submit the management plan until the management plan is approved by the Secretary.
(e) IMPLEMENTATION.--
(1) IN GENERAL.--Upon approval of the management plan as provided in subsection (d), the Secretary, in conjunction with the Augusta Canal Authority, shall take appropriate steps to implement the management plan.
(2) COOPERATIVE AGREEMENTS.--The Secretary is authorized to enter into cooperative agreements with the State of Georgia, political subdivisions of the State, the Augusta Canal Authority, or any organization or individual to implement the management plan.
(f) ECONOMIC DEVELOPMENT.--It is the sense of Congress that the Augusta Canal Authority, the State of Georgia, the City

of Augusta, and other political subdivisions of the State of Georgia should encourage, by appropriate means, enhanced economic and industrial development in the area consistent with the goals of the Augusta Canal Master Plan.

SEC. 306. GRANTS AND TECHNICAL ASSISTANCE.

The Secretary may provide grants and technical assistance for the purposes of this title.

SEC. 307. ACQUISITION OF REAL PROPERTY.

The Augusta Canal Authority may not use any Federal funds that it may receive pursuant to this title to acquire real property or an interest in real property.

SEC. 308. OCCUPATIONAL, SAFETY, CONSERVATION, AND ENVIRONMENTAL REGULATION.

Nothing in this title shall be construed to--
(1) impose any occupational, safety, conservation, or environmental regulation on the Heritage Area that is more stringent than the regulations that would be applicable to the Heritage Area but for the designation of the Heritage Area under section 303; or
(2) authorize any Federal agency to promulgate an occupational, safety, conservation, or environmental regulation for the Heritage Area that is more stringent than the regulations applicable to the Heritage Area in existence on the date of enactment of this title, solely as a result of the designation of the Heritage Area under section 303.

SEC. 309. LAND USE REGULATION.

Nothing in this title shall be construed to--
(1) modify, enlarge, or diminish any authority of Federal, State, and local governments to regulate any use of land as provided for by law or regulation; or
(2) grant powers of zoning or land use to the Augusta Canal Authority.

SEC. 310. SUNSET.

The Secretary may not make any grant or provide any assistance under this title after September 30, 2012.

SEC. 311. AUTHORIZATION OF APPROPRIATIONS.

(a) IN GENERAL.--There is authorized to be appropriated under this title not more than $1,000,000 for any fiscal year. Not more than a total of $10,000,000 may be appropriated for the Heritage Area under this title.
(b) 50 PERCENT MATCH.--Federal funding provided under this title, after the designation of the Heritage Area, may not exceed 50 percent of the total cost of any assistance or grant provided or authorized under this title.

<< 16 USCA § 461 NOTE >>

TITLE IV--STEEL INDUSTRY HERITAGE PROJECT

SEC. 401. SHORT TITLE.

This title may be cited as the "Steel Industry American Heritage Area Act of 1996".

SEC. 402. FINDINGS AND PURPOSE.

(a) FINDINGS.--The Congress finds that--
(1) the industrial and cultural heritage of southwestern Pennsylvania, including the city of Pittsburgh, and the counties of Allegheny, Armstrong, Beaver, Fayette, Greene, Washington, and Westmoreland, related directly to steel and steel-related industries, is nationally significant;
(2) these industries include steelmaking, ironmaking, aluminum, specialty metals, glass, coal mining, coke production, machining and foundries, transportation, and electrical industries;
(3) the industrial and cultural heritage of the steel and related industries in this region includes the social history and living cultural traditions of the people of the region;
(4) the labor movement of the region played a significant role in the development of the Nation, including the formation of many key unions such as the Congress of Industrial Organizations (CIO) and the United Steel Workers of America (USWA), and crucial struggles to improve wages and working conditions, such as the Rail Strike of 1877, the Homestead Strike of 1892, and the Great Steel Strike of 1919;
(5) the Department of the Interior is responsible for protecting the Nation's cultural and historic resources, and there are significant examples of these resources within this seven-county region to merit the involvement of the Federal Government to develop programs and projects, in cooperation with the Steel Industry Heritage Corporation, the Commonwealth of

Pennsylvania, and other local and governmental bodies, to adequately conserve, protect, and interpret this heritage for future generations, while providing opportunities for education and revitalization; and
(6) the Steel Industry Heritage Corporation would be an appropriate management entity for a Heritage Area established in the region.
(b) STATEMENT OF PURPOSE.--The objectives of the Steel Industry American Heritage Area are--
(1) to foster a close working relationship with all levels of government, the private sector, and the local communities in the steel industry region of southwestern Pennsylvania and empower the communities to conserve their heritage while continuing to pursue economic opportunities; and
(2) to conserve, interpret, and develop the historical, cultural, natural,

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Next Part | Previous Part | First Part

Previous Part | First Part

and recreational resources related to the industrial and cultural heritage of the seven-county region of southwestern Pennsylvania.

SEC. 403. STEEL INDUSTRY AMERICAN HERITAGE AREA.

(a) ESTABLISHMENT.--There is hereby established the Steel Industry American Heritage Area (in this title referred to as the "Heritage Area").
(b) BOUNDARIES.--The Heritage Area shall be comprised of the counties of Allegheny, Armstrong, Beaver, Fayette, Greene, Washington, and Westmoreland in Pennsylvania.
(c) MANAGEMENT ENTITY.--The management entity for the Heritage Area shall be the Steel Industry Heritage Corporation.

SEC. 404. COMPACT.

(a) IN GENERAL.--To carry out the purposes of this title, the Secretary of the Interior (in this title referred to as the "Secretary") shall enter into a compact with the management entity. The compact shall include information relating to the objectives and management of the area, including the following:
(1) A delineation of the boundaries of the proposed Heritage Area.
(2) A discussion of the goals and objectives of the proposed Heritage Area, including an explanation of the proposed approach to conservation and interpretation and a general outline of the protection measures committed to by the partners referred to in paragraph (4).
(3) An identification and description of the management entity that will administer the proposed Heritage Area.
(4) A list of the initial partners to be involved in developing and implementing the management plan for the proposed Heritage Area, and a statement of the financial commitment of the partners.
(5) A description of the role of the Commonwealth of Pennsylvania.
(b) ADDITIONAL REQUIREMENTS.--The compact shall be prepared with public participation. Actions called for in the compact shall be likely to be initiated within a reasonable time after designation of the proposed Heritage Area and shall ensure effective implementation of the State and local aspects of the compact.

SEC. 405. MANAGEMENT PLAN.

The management entity shall develop a management plan for the Heritage Area that presents comprehensive recommendations for the Heritage Area's conservation, funding, management and development. Such plan shall take into consideration existing State, county, and local plans and involve residents, public agencies, and private organizations working in the Heritage Area. It shall include actions to be undertaken by units of government and private organizations to protect the resources of the Heritage Area. It shall specify the existing and potential sources of funding to protect, manage, and develop the Heritage Area. Such plan shall include, as appropriate, the following:
(1) An inventory of the resources contained in the Heritage Area, including a list of any property in the Heritage Area that is related to the themes of the Heritage Area and that should be preserved, restored, managed, developed, or maintained because of its natural, cultural, historic, recreational, or scenic significance.
(2) A recommendation of policies for resource management which considers and details application of appropriate land and water management techniques, including but not limited to, the development of intergovernmental cooperative agreements to protect the Heritage Area's historical, cultural, recreational, and natural resources in a manner consistent with supporting appropriate and compatible economic viability.
(3) A program for implementation of the management plan by the management entity, including plans for restoration and construction, and specific commitments of the identified partners for the first 5 years of operation.
(4) An analysis of ways in which local, State, and Federal programs may best be coordinated to promote the purposes of the title.
(5) An interpretation plan for the Heritage Area.

SEC. 406. AUTHORITIES AND DUTIES OF MANAGEMENT ENTITY.

(a) AUTHORITIES OF THE MANAGEMENT ENTITY.--The management entity may, for purposes of preparing and implementing the management plan under section 405, use Federal funds made available through this title--
(1) to make loans and grants to, and enter into cooperative agreements with, States and their political subdivisions, private organizations, or any person; and
(2) to hire and compensate staff.
(b) DUTIES OF THE MANAGEMENT ENTITY.--The management entity shall--
(1) develop and submit to the Secretary for approval a management plan as described in section 405 within 3 years after the date of the enactment of this title;
(2) give priority to implementing actions set forth in the compact and the management plan, including taking steps to--
(A) assist units of government, regional planning organizations, and nonprofit organizations in preserving the Heritage Area;
(B) assist units of government, regional planning organizations, and nonprofit organizations in establishing and maintaining interpretive exhibits in the Heritage Area;
(C) assist units of government, regional planning organizations, and nonprofit organizations in developing recreational resources in the Heritage Area;
(D) assist units of government, regional planning organizations, and nonprofit organizations in increasing public awareness of and appreciation for the natural, historical and architectural resources and sites in the Heritage Area;
(E) assist units of government, regional planning organizations and nonprofit organizations in the restoration of any historic building relating to the themes of the Heritage Area;
(F) encourage by appropriate means economic viability in the Heritage Area consistent with the goals of the plan;
(G) encourage local governments to adopt land use policies consistent with the management of the Heritage Area and the goals of the plan; and
(H) assist units of government, regional planning organizations and nonprofit organizations to ensure that clear, consistent, and environmentally appropriate signs identifying access points and sites of interest are put in place throughout the Heritage Area;
(3) consider the interests of diverse governmental, business, and nonprofit groups within the Heritage Area;
(4) conduct public meetings at least quarterly regarding the implementation of the management plan;
(5) submit substantial changes (including any increase of more than 20 percent in the cost estimates for implementation) to the management plan to the Secretary for the Secretary's approval;
(6) for any year in which Federal funds have been received under this title, submit an annual report to the Secretary setting forth its accomplishments, its expenses and income, and the entity to which any loans and grants were made during the year for which the report is made; and
(7) for any year in which Federal funds have been received under this title, make available for audit all records pertaining to the expenditure of such funds and any matching funds, and require, for all agreements authorizing expenditure of Federal funds by other organizations, that the receiving organizations make available for audit all records pertaining to the expenditure of such funds.

If a management plan is not submitted to the Secretary as required under paragraph (1) within the specified time, the Heritage Area shall no longer qualify for Federal funding.
(c) PROHIBITION ON THE ACQUISITION OF REAL PROPERTY.--The management entity may not use Federal funds received under this title to acquire real property or an interest in real property. Nothing in this title shall preclude any management entity from using Federal funds from other sources for their permitted purposes.

SEC. 407. DUTIES AND AUTHORITIES OF FEDERAL AGENCIES.

(a) TECHNICAL AND FINANCIAL ASSISTANCE.--
(1) IN GENERAL.--The Secretary may, upon request of the management entity, provide technical and financial assistance to the Heritage Area to develop and implement the management plan. In assisting the Heritage Area, the Secretary shall give priority to actions that in general assist in--
(A) conserving the significant natural, historic, and cultural resources which support its themes; and
(B) providing educational, interpretive, and recreational opportunities consistent with its resources and associated values.
(2) SPENDING FOR NON-FEDERALLY OWNED PROPERTY.--The Secretary may spend Federal funds directly on non-federally owned property to further the purposes of this title, especially in assisting units of government in appropriate treatment of districts, sites, buildings, structures, and objects listed or eligible for listing on the National Register of Historic Places. The Historic American Building Survey/Historic American Engineering Record shall conduct those studies necessary to document the industrial, engineering, building, and architectural history of the region.
(b) APPROVAL AND DISAPPROVAL OF COMPACTS AND MANAGEMENT PLANS.--
(1) IN GENERAL.--The Secretary, in consultation with the Governor of Pennsylvania shall approve or disapprove a compact or management plan submitted under this title not later than 90 days after receiving such compact or management plan.
(2) ACTION FOLLOWING DISAPPROVAL.--If the Secretary disapproves a submitted compact or management plan, the Secretary shall advise the management entity in writing of the reasons therefor and shall make recommendations for revisions in the compact or plan. The Secretary shall approve or disapprove a proposed revision within 90 days after the date it is submitted.
(c) APPROVING AMENDMENTS.--The Secretary shall review substantial amendments to the management plan for the Heritage Area. Funds appropriated pursuant to this title may not be expended to implement the changes made by such amendments until the Secretary approves the amendments.

SEC. 408. SUNSET.

The Secretary may not make any grant or provide any assistance under this title after September 30, 2012.

SEC. 409. AUTHORIZATION OF APPROPRIATIONS.

(a) IN GENERAL.--There is authorized to be appropriated under this title not more than $1,000,000 for any fiscal year. Not more than a total of $10,000,000 may be appropriated for the Heritage Area under this title.
(b) 50 PERCENT MATCH.--Federal funding provided under this title, after the designation of this Heritage Area, may not · exceed 50 percent of the total cost of any assistance or grant provided or authorized under this title.

<< 16 USCA § 461 NOTE >>

TITLE V--ESSEX NATIONAL HERITAGE AREA

SEC. 501. FINDINGS AND PURPOSE.

(a) FINDINGS.--The Congress finds that--
(1) Essex County, Massachusetts, was host to a series of historic events that influenced the course of the early settlement of the United States; its emergence as a maritime power; and its subsequent industrial development;
(2) the North Shore of Essex County and the Merrimack River valley in Essex County contain examples of significant early American architecture and significant Federal-period architecture, many sites and buildings associated with the establishment of the maritime trade in the United States, the site of the witchcraft trials of 1692, the birthplace of successful iron manufacture, and the establishment of the textile and leather industries in and around the cities of Peabody, Beverly, Lynn, Lawrence, and Haverhill;
(3) Salem, Massachusetts, has a rich heritage as one of the earliest landing sites of the English colonists, the first major world harbor for the United States, and an early thriving hub of American industries;
(4) the Saugus Iron Works National Historic Site is the site of the first sustained, integrated iron works in Colonial America, and the technology employed at the Iron Works was dispersed throughout the Colonies and was critical to the development of industry and technology in America;
(5) the Salem Maritime National Historic Site contains nationally significant resources that explain the manner in which the Nation was settled, its evolution into a maritime power, and its development as a major industrial force;
(6) the story told at the Salem Maritime and Saugus Iron Works National Historic Sites would be greatly enhanced through the interpretation of significant theme-related resources in Salem and Saugus and throughout Essex County;
(7) partnerships between the private and public sectors have been created and additional partnerships will be encouraged to preserve the rich cultural heritage of the region, which will stimulate cultural awareness, preservation, and economic development through tourism;
(8) a visitors' center that has already been constructed at the Salem Maritime National Historic Site in Salem, Massachusetts, will be available to interpret the themes of the Essex National Heritage Area established by this title and to coordinate the interpretive and preservation activities of the Area; and
(9) the resident and business communities of the region have formed the Essex Heritage Ad Hoc Commission for the preservation, interpretation, promotion, and development of the historic, cultural, and natural resources of the region and are investing significant private funds and energy to develop a plan to preserve the nationally significant resources of Essex County.
(b) PURPOSE.--It is the purpose of this title--
(1) to establish the Essex National Heritage Area to recognize, preserve, promote, interpret, and make available for the benefit of the public the historic, cultural, and natural resources of the North Shore and lower Merrimack River valley in Essex County, Massachusetts, which encompass the three primary themes of the Salem Maritime National Historic Site and Saugus Iron Works National Historic Site (the histories of early settlement, maritime trade, and the textile and leather industries);
(2) to implement the appropriate alternative as described in the document entitled "The Salem Project: A Study of Alternatives", dated January 1990, within the boundaries of Essex County; and
(3) to provide a management framework to assist the Commonwealth of Massachusetts and its units of local government in the development and implementation of an integrated cultural, historical, and land resource management program in order to retain, enhance, and interpret the significant values of the lands, waters, and structures located in the Essex National Heritage Area.

SEC. 502. DEFINITIONS.

For purposes of this title:
(1) The terms "Area" and "National Heritage Area" mean the Essex National Heritage Area established by section 503.
(2) The term "Secretary" means the Secretary of the Interior.

SEC. 503. DESIGNATION OF NATIONAL HERITAGE AREA.

(a) DESIGNATION.--For the purpose of preserving and interpreting, for the educational and inspirational benefit of present

and future generations, the unique and significant contributions to our national heritage of certain historic and cultural lands, natural waterways, and structures within the County of Essex in the Commonwealth of Massachusetts, there is hereby established the Essex National Heritage Area.

(b) BOUNDARIES.--The Area shall comprise the lands generally depicted on the map numbered NAR-51-80,000 and dated August 1994. The map shall be on file and available for public inspection in the office of the Director of the National Park Service.

(c) ADMINISTRATION.--The Area shall be administered in accordance with the provisions of this title.

SEC. 504. MANAGEMENT ENTITY.

(a) IN GENERAL.--The management entity for the National Heritage Area shall be an entity which is selected by the Essex Heritage Ad Hoc Commission or its designee, reflects a broad cross-section of interests within the Area, and includes--

(1) at least 1 representative of one or more units of government in each State in which the National Heritage Area is located; and

(2) private property owners who reside within the National Heritage Area.

(b) DUTIES.--The management entity for the Area shall fulfill each of the following requirements:

(1) HERITAGE PLAN.--Not later than 3 years after the date of the designation of the Area as a National Heritage Area, the management entity shall develop and forward to the Secretary, and to the Governor of Massachusetts, a heritage plan for the Area.

(2) PRIORITIES.--The management entity shall give priority to the implementation of action, goals, and policies set forth in the compact and heritage plan for the Area, including assisting units of government and others in--

(A) carrying out programs which recognize important resource values within the Area;

(B) encouraging economic viability in the affected communities;

(C) establishing and maintaining interpretive exhibits in the Area;

(D) developing recreational and educational opportunities in the Area;

(E) increasing public awareness of and appreciation for the natural, historical, and cultural resources of the Area;

(F) restoring historic buildings that are located within the boundaries of the Area and relate to the theme of the Area; and

(G) ensuring that clear, consistent, and appropriate signs identifying public access points and sites of interest are put in place throughout the Area.

(3) CONSIDERATION OF INTERESTS OF LOCAL GROUPS.--The management entity shall, in developing and implementing the heritage plan for the Area, consider the interests of diverse units of government, businesses, private property owners, and nonprofit groups within the geographic area.

(4) PUBLIC MEETINGS.--The management entity shall conduct public meetings at least annually regarding the implementation of the heritage plan for the Area. The management entity shall place a notice of each such meeting in a newspaper of general circulation in the Area and shall make the minutes of the meeting available to the public.

SEC. 505. DUTIES OF THE SECRETARY.

(a) IN GENERAL.--To carry out the purpose of this title, the Secretary shall assist the management entity in preparing such studies and plans as the Secretary considers appropriate and in implementing the recommendations contained in a study report prepared by the management entity. The Secretary is authorized to enter into agreements with the Commission or with any owner of property with national historic or cultural significance within the Area for the purpose of facilitating public use and enjoyment of such resources or to otherwise further the objectives of the management entity. Any such agreement shall provide whenever appropriate that--

(1) the public may have access to such resources at specified, reasonable times for the purpose of viewing the property or exhibits or attending programs or other activities, as may be appropriate;

(2) the Secretary may make improvements to such resources as the management entity or the Secretary deem necessary to enhance the public use and enjoyment of the resources, or to render such property usable by the Secretary, the management entity, or any person for the purpose of this title; and

(3) the Secretary may occupy, utilize, and acquire easements or leasehold interests in resources as required to implement the programs and purpose of this title.

(b) TECHNICAL ASSISTANCE AND GRANTS.--The Secretary may provide, upon request, technical assistance and grants to the management entity to assist the management entity in the performance of its powers and functions as authorized under this title. The Secretary may provide to any owner of property within the Area, to the Commonwealth of Massachusetts, to the City of Salem and other participating municipalities, to any other Federal or State entity, to any institution, or to any person such technical assistance and grants as the Secretary considers appropriate to carry out the purpose of this title.

SEC. 506. PRIVATE PROPERTY.

No privately owned property shall be included within the boundaries of the Area unless the government of the county, city, or town in which the property is located agrees to be so included and submits notification of such agreement to the Secretary.

SEC. 507. SUNSET.

The Secretary may not make any grant or provide any assistance under this title after September 30, 2012.

SEC. 508. AUTHORIZATION OF APPROPRIATIONS.

(a) IN GENERAL.--There is authorized to be appropriated under this title not more than $1,000,000 for any fiscal year. Not more than a total of $10,000,000 may be appropriated for the Area under this title.
(b) 50 PERCENT MATCH.--Federal funding provided under this title, after the designation of the Area, may not exceed 50 percent of the total cost of any assistance or grant provided or authorized under this title.

<< 16 USCA § 401 NOTE >>

TITLE VI--SOUTH CAROLINA NATIONAL HERITAGE CORRIDOR

SEC. 601. SHORT TITLE.

This title may be cited as the "South Carolina National Heritage Corridor Act of 1996".

SEC. 602. FINDINGS AND PURPOSE.

(a) FINDINGS.--Congress finds that--
(1) the South Carolina National Heritage Corridor, more than 250 miles in length, possesses a wide diversity of significant rare plants, animals, and ecosystems, agricultural and timber lands, shell-fish harvesting areas, historic sites and structures, and cultural and multicultural landscapes related to the past and current commerce, transportation, maritime, textile, agricultural, mining, cattle, pottery, and national defense industries of the region, which provide significant ecological, natural, tourism, recreational, timber management, educational, and economic benefits;
(2) there is a national interest in protecting, conserving, restoring, promoting, and interpreting the benefits of the Corridor for the residents of, and visitors to, the Corridor area;
(3) a primary responsibility for conserving, preserving, protecting, and promoting the benefits resides with the State of South Carolina and the units of local government having jurisdiction over the Corridor area; and
(4) in view of the longstanding Federal practice of assisting States in creating, protecting, conserving, preserving, and interpreting areas of significant natural and cultural importance, and in view of the national significance of the Corridor, the Federal Government has an interest in assisting the State of South Carolina, the units of local government of the State, and the private sector in fulfilling the responsibilities described in paragraph (3).
(b) PURPOSES.--The purposes of this title are--
(1) to protect, preserve, conserve, restore, promote, and interpret the significant land and water resource values and functions of the Corridor;
(2) to encourage and support, through financial and technical assistance, the State of South Carolina, the units of local government of the State, and the private sector in the development of a heritage plan for the Corridor to ensure coordinated public and private action in the Corridor area in a manner consistent with subsection (a);
(3) to provide, during the development of an integrated heritage plan, Federal financial and technical assistance for the protection, preservation, and conservation of land and water areas in the Corridor that are in danger of being adversely affected or destroyed;
(4) to encourage and assist the State of South Carolina and the units of local government of the State to identify the full range of public and private technical and financial assistance programs and services available to implement the heritage plan;
(5) to encourage adequate coordination of all government programs affecting the land and water resources of the Corridor; and
(6) to develop a management framework with the State of South Carolina and the units of local government of the State for--
(A) planning and implementing the heritage plan; and
(B) developing policies and programs that will preserve, conserve, protect, restore, enhance, and interpret the cultural, historical, natural, economic, recreational, and scenic resources of the Corridor.

SEC. 603. DEFINITIONS.

For purposes of this title--
(1) CORRIDOR.--The term "Corridor" means the South Carolina National Heritage Corridor established by section 604.
(2) GOVERNOR.--The term "Governor" means the Governor of the State of South Carolina.
(3) SECRETARY.--The term "Secretary" means the Secretary of the Interior.

SEC. 604. SOUTH CAROLINA NATIONAL HERITAGE CORRIDOR.

(a) ESTABLISHMENT.--There is established in the State of South Carolina the South Carolina National Heritage Corridor.
(b) BOUNDARIES.--
(1) IN GENERAL.--The boundaries of the Corridor are generally the boundaries of the western counties of the State of South Carolina, extending from the western Piedmont along the Savannah Valley to Augusta, Georgia, along the route of the old Southern Railroad, along the Ashley River to Charleston.
(2) INCLUDED COUNTIES.--The Corridor shall consist of the following counties of South Carolina, in part or in whole, as the heritage plan may specify on the recommendations of the units of local government with the Corridor area:

(A) Oconee.
(B) Pickens.
(C) Anderson.
(D) Abbeville.
(E) Greenwood.
(F) McCormick.
(G) Edgefield.
(H) Aiken.
(I) Barnwell.
(J) Orangeburg.
(K) Bamberg.
(L) Dorchester.
(M) Colleton.
(N) Charleston.
(3) DETAIL.--The boundaries shall be specified in detail in the heritage plan.

SEC. 605. MANAGEMENT ENTITY.

(a) IN GENERAL.--The management entity for the National Heritage Corridor shall be an entity selected by the Governor of the State of South Carolina which reflects a broad cross-section of interests within the Corridor and which includes--
(1) at least 1 representative of one or more units of government in South Carolina; and
(2) private property owners who reside within the National Heritage Corridor.
(b) DUTIES.--The management entity for the National Heritage Corridor shall fulfill each of the following requirements:
(1) HERITAGE PLAN.--Not later than 3 years after the date of the designation of the area as a National Heritage Corridor, the management entity shall develop and forward to the Secretary, and to the Governor of South Carolina, a heritage plan.
(2) PRIORITIES.--The management entity shall give priority to the implementation of actions, goals, and policies set forth in the compact and heritage plan for the Corridor, including assisting units of government and others in--
(A) carrying out programs which recognize important resource values within the National Heritage Corridor;
(B) encouraging economic viability in the affected communities;
(C) establishing and maintaining interpretive exhibits in the Corridor;
(D) developing recreational and educational opportunities in the Corridor;
(E) increasing public awareness of and appreciation for the natural, historical, and cultural resources of the Corridor;
(F) restoring historic buildings that are located within the boundaries of the Corridor and relate to the theme of the Corridor; and
(G) ensuring that clear, consistent, and appropriate signs identifying public access points and sites of interest are put in place throughout the Corridor.
(3) CONSIDERATION OF INTERESTS OF LOCAL GROUPS.--The management entity shall, in developing and implementing the heritage plan for the Corridor, consider the interest of diverse units of government, businesses, private property owners, and nonprofit groups within the geographic area.
(4) PUBLIC MEETINGS.--The management entity shall conduct public meetings at least annually regarding the implementation of the heritage plan for the Corridor. The management entity shall place a notice of each such meeting in a newspaper of general circulation in the Corridor and shall make the minutes of the meeting available to the public.

SEC. 606. DUTIES OF THE SECRETARY.

(a) ASSISTANCE.--On request of the management entity, and subject to the availability of funds appropriated specifically for the purpose, or made available on a reimbursable basis, the Secretary shall provide administrative, technical, financial, development, and operations assistance for the purposes of this title. The assistance may include--
(1) general administrative support in planning, finance, personnel, procurement, property management, environmental and historical compliance, and land acquisition;
(2) personnel;
(3) office space and equipment;
(4) planning and design services for visitor use facilities, trails, interpretive exhibits, publications, signs, and natural resource management;
(5) development and construction assistance, including visitor use facilities, trails, river use and access facilities, scenic byways, signs, waysides, and rehabilitation of historic structures; and
(6) operations functions, including interpretation and visitor services, maintenance, and natural resource management services conducted within the boundaries of the Corridor.
(b) LOANS, GRANTS, AND COOPERATIVE AGREEMENTS.--For the purposes of assisting in the development and implementation of the heritage plan, the Secretary may, in consultation with the management entity, make loans and grants to, and enter into cooperative agreements with, the State of South Carolina (or a political subdivision of the State), private nonprofit organizations, corporations, or other persons.
(c) APPROVAL OF HERITAGE PLAN.--
(1) IN GENERAL.--Not later than 180 days after receipt of the plan submitted under section 605(b), the Secretary shall approve or disapprove the plan.
(2) CRITERIA.--In determining whether to approve a plan under this title, the Secretary shall consider--

(A) whether the plan has strong local support from a diversity of landowners, business interests, nonprofit organizations, and governments within the area;
(B) whether the plan is consistent with and complements continued economic activity in the area;
(C) whether the plan has a high potential for effective partnership mechanisms;
(D) whether the plan improperly infringes on private property rights; and
(E) whether the plan will take appropriate action to ensure private property rights are observed.
(3) DISAPPROVAL.--
(A) IN GENERAL.--If the Secretary disapproves the proposed heritage plan, the Secretary shall notify the management entity.
(B) CONTENTS.--A notification under subparagraph (A) shall include--
(i) the reasons for the disapproval; and
(ii) recommendations for revision.
(C) REVISED PLAN.--The management entity shall revise and resubmit the heritage plan to the Secretary for approval. Not later than 180 days after receipt of the revised plan, the Secretary shall approve or disapprove the plan as provided in paragraph (2). The management entity shall revise and submit the heritage plan until the heritage plan is approved by the Secretary.

## SEC. 607. SUNSET.

The Secretary may not make any grant or provide any assistance under this title after September 30, 2012.

## SEC. 608. AUTHORIZATION OF APPROPRIATIONS.

(a) IN GENERAL.--There is authorized to be appropriated under this title not more than $1,000,000 for any fiscal year. Not more than a total of $10,000,000 may be appropriated for the Corridor under this title.
(b) 50 PERCENT MATCH.--Federal funding provided under this title, after the designation of this Corridor, may not exceed 50 percent of the total cost of any assistance or grant provided or authorized under this title.

<< 16 USCA § 461 NOTE >>

TITLE VII--AMERICA'S AGRICULTURAL HERITAGE PARTNERSHIP

## SEC. 701. FINDINGS AND PURPOSES.

(a) The Congress finds that--
(1) the city of Waterloo, Iowa, and northeast Iowa posses many important elements of the nationally significant story of American agriculture, including Native American agriculture, agricultural mechanization, seed hybridization, farm cooperative movements, rural electrification, farm-to-market systems, rural to urban migration, veterinary practice, food processing and preservation, national farm organizations, international hunger relief, and the development of national and international agribusiness;
(2) these resources offer outstanding and unique opportunities to acknowledge and appreciate the development of American agriculture;
(3) the National Park Service has determined that the story of American agriculture is nationally significant, that northeast Iowa is an ideal place to tell that story, and that this story could be divided into 4 principal topics for interpretation in northeast Iowa: the Amazing Science of Agriculture, Agriculture as a Way of Life, Organizing for Survival, and Crops from Field to Table;
(4) the responsibility for interpreting, retaining, enhancing, and promoting the resources, values, and amenities of Waterloo, Iowa, and northeast Iowa resides with volunteer associations, private businesses, political subdivisions of the State, and the State of Iowa; and
(5) despite the efforts by volunteer associations, private businesses, political subdivisions of the State, and the State of Iowa, the cultural and historical resources of the area have not realized full potential and may be lost without some assistance from the Federal Government.
(b) PURPOSES.--The purposes of this title are--
(1) to interpret, retain, enhance, and promote the unique and significant contributions to national and international agriculture of certain natural, historic, and cultural resources within Waterloo, Iowa, and northeast Iowa;
(2) to provide a partnership management framework to assist volunteer associations, private businesses, political subdivisions of the State, and the State of Iowa in developing and implementing Management Plan policies and programs that will assist in the interpretation, retention, enhancement, and promotion of the cultural, natural, and recreational resources of northeast Iowa;
(3) to allow for local, State, and Federal contributions through limited grants and technical assistance to create America's Agricultural Heritage Partnership through cooperative agreements among volunteer associations, private businesses, political subdivisions of the State, the State of Iowa, and residents of the area; and
(4) to provide for an economically self-sustaining Partnership for the educational and inspirational benefit of current and future generations concerning the story of American agriculture.

## SEC. 702. DEFINITIONS.

As used in this title:
(1) PARTNERSHIP.--The term "Partnership" means the America's Agricultural Heritage Partnership as established by section 703(a).
(2) MANAGEMENT ENTITY.--The term "management entity" means the management entity as established by section 704(a).
(3) POLITICAL SUBDIVISION.--The term "political subdivision" means a political subdivision of the State of Iowa, any part of which is located in or adjacent to the area in which the Partnership's activities occur, including a county, city, or town.
(4) STATE.--The term "State" means the State of Iowa.
(5) SECRETARY.--The term "Secretary" means the Secretary of Agriculture.
(6) PARTNERSHIP MANAGEMENT PLAN.--The term "Partnership Management Plan" means the plan approved pursuant to section 705(a).
(7) ACTIVITIES.--The term "activities" means the activities referred to in section 703(b).

SEC. 703. ESTABLISHMENT OF THE AMERICA'S AGRICULTURAL HERITAGE PARTNERSHIP.

(a) ESTABLISHMENT.--To carry out this title, there is established in the State of Iowa the "America's Agricultural Heritage Partnership" (in this title referred to as the "Partnership"), upon publication by the Secretary in the Federal Register of notice that a Partnership Management Plan has been approved by the Secretary under this title.
(b) ACTIVITIES.--The Partnership's activities shall be limited to the counties of northeast Iowa that are generally depicted in "Alternatives #2 and #3" described in the 1995 National Park Service "Special Resource Study, Cedar Valley, Iowa.".
(c) PARTICIPATION.--Nothing in this title shall require any resident located in the area in which the Partnership's activities occur to participate in or be associated with the Partnership or the Partnership's activities.
(d) AFFILIATIONS.--Nothing in this title shall prohibit future affiliations or designations of the Partnership or Partnership Management Entity.
(e) GRANTS, TECHNICAL ASSISTANCE, AND COOPERATIVE AGREEMENTS.--
(1) GRANTS AND TECHNICAL ASSISTANCE.--The Secretary may make grants and provide technical assistance to America's Agricultural Heritage Partnership to assist it in carrying out its purposes.
(2) COOPERATIVE AGREEMENTS.--The Secretary is authorized to enter into cooperative agreements with private entities, the State of Iowa, any political subdivision thereof, and other Federal entities, to further the purposes of this title, the Partnership, or the Partnership Management Entity.

SEC. 704. ESTABLISHMENT OF THE AMERICA'S AGRICULTURAL HERITAGE PARTNERSHIP MANAGEMENT ENTITY.

(a) ESTABLISHMENT.--There is established a management entity for the Partnership based on the "Management Option #5" outlined in the 1995 National Park Service "Special Resource Study, Cedar Valley, Iowa" and subject to the approval of the Secretary.
(b) PARTNERSHIP MANAGEMENT PLAN.--The Partnership management entity shall be established in accordance with the Partnership Management Plan referred to in section 705(a).
(c) COMPOSITION.--The members of the management entity may include persons affiliated with the following entities: the American Association of Museums, American Farm Bureau, American Farmland Trust, Effigy Mounds National Monument and Herbert Hoover National Historic Site, Iowa Department of Agriculture and Land Stewardship, Iowa Department of Corrections, Iowa Department of Cultural Affairs, Iowa Department of Economic Development, National Trust for Historic Preservation, the Smithsonian Institution, the State Historic Preservation Office of the State of Iowa, the United States Department of Agriculture, the United States Department of Transportation, and the America's Agricultural/Industrial Heritage Landscape, Inc.

SEC. 705. PARTNERSHIP MANAGEMENT PLAN.

(a) PREPARATION OF PARTNERSHIP MANAGEMENT PLAN.--A Partnership Management Plan shall be submitted to the Secretary for approval no later than three years after the date of the enactment of this title.
(b) ASSISTANCE.--The Secretary may provide technical assistance in the preparation of the Partnership Management Plan.

SEC. 706. LAND USE REGULATION AND PRIVATE PROPERTY PROTECTION.

(a) REGULATION.--Nothing in this title shall be construed to modify, enlarge, or diminish any authority of Federal, State, and local governments to regulate any use of privately owned land provided by law or regulation.
(b) LAND USE.--Nothing in this title shall be construed to grant the powers of zoning, land use, or condemnation to the Partnership Management Entity, the Secretary or any other Federal, State, or local government entity.

SEC. 707. SUNSET.

The Secretary may not make any grant or provide any assistance under this title after September 30, 2012.

SEC. 708. AUTHORIZATION OF APPROPRIATIONS.

(a) IN GENERAL.--There is authorized to be appropriated under this title not more than $1,000,000 for any fiscal year. Not more than a total of $10,000,000 may be appropriated for the Partnership under this title.

(b) 50 PERCENT MATCH.--Federal funding provided under this title, after the designation of this Partnership, may not exceed 50 percent of the total cost of any assistance or grant provided or authorized under this title.

<< 16 USCA § 461 NOTE >>

TITLE VIII--OHIO & ERIE CANAL NATIONAL HERITAGE CORRIDOR

SEC. 801. SHORT TITLE.

This title may be cited as the "Ohio & Erie Canal National Heritage Corridor Act of 1996".

SEC. 802. FINDINGS AND PURPOSE.

(a) FINDINGS.--Congress finds the following:
(1) The Ohio & Erie Canal, which opened for commercial navigation in 1832, was the first inland waterway to connect the Great Lakes at Lake Erie with the Gulf of Mexico via the Ohio and Mississippi Rivers and a part of a canal network in Ohio that was one of America's most extensive and successful systems during a period in history when canals were essential to the Nation's growth.
(2) The Ohio & Erie Canal spurred economic growth in the State of Ohio that took the State from near bankruptcy to the third most economically prosperous State in the Union in just 20 years.
(3) A 4-mile section of the Ohio & Erie Canal was designated a National Historic Landmark in 1966 and other portions of the Ohio & Erie Canal and many associated structures were placed on the National Register of Historic Places.
(4) In 1974, 19 miles of the Ohio & Erie Canal were declared nationally significant under National Park Service new area criteria with the designation of Cuyahoga Valley National Recreation Area.
(5) The National Park Service found the Ohio & Erie Canal nationally significant in a 1975 study entitled "Suitability/Feasibility Study, Proposed Ohio & Erie Canal".
(6) A 1993 Special Resources Study of the Ohio & Erie Canal Corridor conducted by the National Park Service entitled "A Route to Prosperity" has concluded that the corridor is eligible as a National Heritage Corridor.
(7) Local governments, the State of Ohio, and private sector interests have embraced the heritage corridor concept and desire to enter into partnership with the Federal Government to preserve, protect, and develop the corridor for public benefit.
(b) PURPOSES.--The purposes of this title are--
(1) to preserve and interpret for the educational and inspirational benefit of present and future generations the unique and significant contributions to our national heritage of certain historic and cultural lands, waterways, and structures within the 87-mile Ohio & Erie Canal Corridor between Cleveland and Zoar;
(2) to encourage within the corridor a broad range of economic opportunities enhancing the quality of life for present and future generations;
(3) to provide a management framework to assist the State of Ohio, its political subdivisions, and nonprofit organizations, or combinations thereof, in preparing and implementing an integrated Corridor Management Plan and in developing policies and programs that will preserve, enhance, and interpret the cultural, historical, natural, recreation, and scenic resources of the corridor; and
(4) to authorize the Secretary to provide financial and technical assistance to the State of Ohio, its political subdivisions, and nonprofit organizations, or combinations thereof, in preparing and implementing a Corridor Management Plan.

SEC. 803. DEFINITIONS.

For the purposes of this title:
(1) The term "corridor" means the Ohio & Erie Canal National Heritage Corridor established by section 804.
(2) The term "Committee" means the Ohio & Erie Canal National Heritage Area Committee established by section 805.
(3) The term "Corridor Management Plan" means the management plan developed under section 808.
(4) The term "Secretary" means the Secretary of the Interior.
(5) The term "technical assistance" means any guidance, advice, help, or aid, other than financial assistance, provided by the Secretary of the Interior.
(6) The term "financial assistance" means funds appropriated by Congress and made available to the management entity for the purposes of preparing and implementing a Corridor Management Plan.
(7) The term "management entity" means the entity recognized by the Secretary pursuant to section 807(a) to receive, distribute, and account for Federal funds appropriated for the purposes of this title.
SEC. 804. OHIO & ERIE CANAL NATIONAL HERITAGE CORRIDOR.
(a) ESTABLISHMENT.--There is established in the State of Ohio the Ohio & Erie Canal National Heritage Corridor.
(b) BOUNDARIES.--
(1) IN GENERAL.--The boundaries of the corridor shall be composed of the lands that are generally the route of the Ohio & Erie Canal from Cleveland to Zoar, Ohio, as depicted in the 1993 National Park Service Special Resources Study, "A Route to Prosperity", subject to paragraph (2). The specific boundaries shall be those specified in the management plan submitted under section 808. The Secretary shall prepare a map of the corridor which shall be on file and available for public inspection in the office of the Director of the National Park Service.
(2) CONSENT OF LOCAL GOVERNMENTS.--No privately owned property shall be included within the boundaries of the

corridor unless the municipality in which the property is located agrees to be so included and submits notification of such agreement to the Secretary.

(c) ADMINISTRATION.--The corridor shall be administered in accordance with the provisions of this title.

SEC. 805. THE OHIO & ERIE CANAL NATIONAL HERITAGE CORRIDOR COMMITTEE.

(a) ESTABLISHMENT.--There is hereby established a Committee to be known as the "Ohio & Erie Canal National Heritage Corridor Committee", whose purpose shall be to assist Federal, State, and local authorities and the private sector in the preparation and implementation of an integrated Corridor Management Plan.

(b) MEMBERSHIP.--The Committee shall be comprised of 21 members, as follows:

(1) Four individuals, appointed by the Secretary after consideration of recommendations submitted by the Greater Cleveland Growth Association, the Akron Regional Development Board, the Stark Development Board, and the Tuscarawas County Chamber of Commerce, who shall include one representative of business and industry from each of Ohio counties of Cuyahoga, Summit, Stark, and Tuscarawas.

(2) One individuals, appointed by the Secretary after consideration of recommendations submitted by the Director of the Ohio Department of Travel and Tourism, who is a director of a convention and tourism bureau within the corridor.

(3) One individual, appointed by the Secretary after consideration of recommendations submitted by the Ohio Historic Preservation Officer, with knowledge and experience in the field of historic preservation.

(4) One individual, appointed by the Secretary after consideration of recommendations submitted by the Director of the National Park Service, with knowledge and experience in the field of historic preservation.

(5) Three individuals appointed by the Secretary after consideration of recommendations submitted by the county or metropolitan park boards in the Ohio counties of Cuyahoga, Summit, and Stark.

(6) Eight individuals appointed by the Secretary after consideration of recommendations submitted by the county commissioners or county chief executive of the Ohio counties of Cuyahoga, Summit, Stark and Tuscarawas, including--

(A) from each county, one representative of the planning offices of the county; and

(B) from each county, one representative of a municipality in the county.

(7) Two individuals appointed by the Secretary after consideration of recommendations submitted by the Governor of Ohio, who shall be representatives of the Directors of the Ohio Department of Natural Resources and the Ohio Department of Transportation.

(8) The Superintendent of the Cuyahoga Valley National Recreation Area, ex officio.

(c) APPOINTMENTS.--

(1) IN GENERAL.--Except as provided in paragraph (2), members of the Committee shall be appointed for terms of three years and may be reappointed.

(2) INITIAL APPOINTMENTS.--The Secretary shall appoint the initial members of the Committee within 30 days after the date on which the Secretary has received all recommendations pursuant to subsection (b). Of the members first appointed--

(A) the members appointed pursuant to subsection (b)(6)(B) shall be appointed to a term of two years and may not be reappointed to a consecutive term; and

(B) the member appointed pursuant to subsection (b)(2) shall be appointed to a term of two years and may not be reappointed to a consecutive term.

(d) CHAIR AND VICE CHAIR.--The chair and vice chair of the Committee shall be elected by the members of the Committee. The terms of the chair and vice chair shall be two years.

(e) VACANCY.--A vacancy in the Committee shall be filled in the manner in which the original appointment was made. Any member appointed to fill a vacancy occurring before the expiration of the term for which their predecessor was appointed shall be appointed only for the remainder of such term. Any member of the Committee appointed for a definite term may serve after the expiration of their term until their successor has taken office.

(f) COMPENSATION AND EXPENSES.--Members of the Committee shall serve without compensation for their service on the Committee.

(g) QUORUM.--Eleven members of the Committee shall constitute a quorum.

(h) MEETINGS.--The Committee shall meet at least quarterly at the call of the chairperson or 11 of its members. Meetings of the Committee shall be subject to section 552b of title 5, United States Code (relating to open meetings).

(i) NOT TREATED AS ADVISORY COMMITTEE.--The Committee shall not be treated as an Advisory Committee for purposes of the Federal Advisory Committee Act (5 U.S.C. App.).

SEC. 806. POWERS AND DUTIES OF THE NATIONAL HERITAGE CORRIDOR COMMITTEE.

(a) HEARINGS.--The Committee may, for the purpose of carrying out this title, hold such hearings, sit and act at such times and places, take such testimony, and receive such evidence, as the Committee considers appropriate. The Committee may not issue subpoenas or exercise any subpoena authority.

(b) BYLAWS.--The Committee may make such bylaws and rules, consistent with this title, as it considers necessary to carry out its functions under this title.

(c) POWERS OF MEMBERS AND AGENTS.--Any member or agent of the Committee, if so authorized by the Committee, may take any action which the Committee is authorized to take by this title.

(d) CORRIDOR MANAGEMENT PLAN.--Upon submission of a draft Corridor Management Plan to the Committee from the management entity, the Committee shall, within 60 days, review such plan for consistency with the purposes of this title and endorse the plan or return it to the management entity for revision. Upon endorsement of the Corridor Management Plan, the Committee shall submit such plan to the Secretary for approval pursuant to section 808.

(e) REVIEW OF BUDGET.--The Committee shall review on an annual basis the proposed expenditures of Federal funds by the management entity for consistency with the purpose of this title and the Corridor Management Plan.

SEC. 807. MANAGEMENT ENTITY.

(a) ENTITY.--Upon petition, the Secretary is authorized to recognize the Ohio & Erie Canal Association as the management entity for the Heritage Corridor.
(b) ELIGIBILITY.--To be eligible for designation as the management entity of the corridor, an entity must possess the legal ability to--
(1) receive Federal funds for use in preparing and implementing the management plan for the corridor;
(2) disburse Federal funds to other units of government or other organizations for use in preparing and implementing the management plan for the corridor;
(3) account for all Federal funds received or disbursed; and
(4) sign agreements with the Federal Government.
(c) FEDERAL FUNDING.--
(1) AUTHORIZATION TO RECEIVE.--The management entity is authorized to receive appropriated Federal funds.
(2) DISQUALIFICATION.--If a management plan for the corridor is not submitted to the Secretary as required under section 808 within the time specified herein, the management entity shall cease to be eligible for Federal funding under this title until such a plan regarding the corridor is submitted to the Secretary.
(d) AUTHORITIES OF MANAGEMENT ENTITY.--The management entity of the corridor may, for purposes of preparing and implementing the management plan for the corridor, use Federal funds made available under this title--
(1) to make grants and loans to the State of Ohio, its political subdivisions, nonprofit organizations, and other persons;
(2) to enter into cooperative agreements with, or provide technical assistance to, Federal agencies, the State of Ohio, its political subdivision, nonprofit organizations, and other persons;
(3) to hire and compensate staff;
(4) to obtain money from any source under any program or law requiring the recipient of such money to make a contribution in order to receive such money; and
(5) to contract for goods and services.
(e) PROHIBITION OF ACQUISITION OF REAL PROPERTY.--The management entity for the corridor may not use Federal funds received under this title to acquire real property or any interest in real property.

SEC. 808. DUTIES OF THE MANAGEMENT ENTITY.

(a) CORRIDOR MANAGEMENT PLAN.--
(1) SUBMISSION FOR REVIEW BY COMMITTEE.--Within 3 years after the date on which the Secretary has recognized the management entity for the corridor, the management entity shall develop and submit for review to the Committee a management plan for the corridor.
(2) PLAN REQUIREMENTS.--A management plan submitted under this title shall present comprehensive recommendations for the conservation, funding, management, and development of the corridor. The plan shall be prepared with public particiation. The plan shall take into consideration existing Federal, State, county, and local plans and involve residents, public agencies, and private organizations in the corridor. The plan shall include a description of actions that units of government and private organizations are recommended to take to protect the resources of the corridor. The plan shall specify existing and potential sources of funding for the conservation, management, and development of the corridor. The plan also shall include the following, as appropriate:
(A) An inventory of the resources contained in the corridor, including a list of property in the corridor that should be conserved, restored, managed, developed, or maintained because of the natural, cultural, or historic significance of the property as it relates to the themes of the corridor.
(B) A recommendation of policies for resource management that consider and detail the application of appropriate land and water management techniques, including (but not limited to) the development of intergovernmental cooperative agreements to manage the historical, cultural, and natural resources and recreational opportunities of the corridor in a manner consistent with the support of appropriate and compatible economic viability.
(C) A program, including plans for restoration and construction, for implementation of the management plan by the management entity and specific commitments, for the first six years of operation of the plan by the partners identified in said plan.
(D) An analysis of means by which Federal, State, and local programs may best be coordinated to promote the purposes of this title.
(E) An interpretive plan for the corridor.
(3) APPROVAL AND DISAPPROVAL OF THE CORRIDOR MANAGEMENT PLAN.--
(A) IN GENERAL.--Upon submission of the Corridor Management Plan from the Committee, the Secretary shall approve or disapprove said plan not later than 60 days after receipt of the plan. If the Secretary has taken no action after 60 days upon receipt, the plan shall be considered approved.
(B) DISAPPROVAL AND REVISIONS.--If the Secretary disapproves the Corridor Management Plan, the Secretary shall advise the Committee, in writing, of the reasons for the disapproval and shall make recommendations for revision of the plan. The Secretary shall approve or disapprove proposed revisions to the plan not later than 60 days after receipt of such revision. If the Secretary has taken no action for 60 days after receipt, the plan shall be considered approved.
(b) PRIORITIES.--The management entity shall give priority to the implementation of actions, goals, and policies set forth in the management plan for the corridor, including--
(1) assisting units of government, regional planning organizations, and nonprofit organizations--

(A) in conserving the corridor;

(B) in establishing and maintaining interpretive exhibits in the corridor;

(C) in developing recreational opportunities in the corridor;

(D) in increasing public awareness of and appreciation for the natural, historical, and cultural resources of the corridor;

(E) in the restoration of historic buildings that are located within the boundaries of the corridor and relate to the themes of the corridor; and

(F) in ensuring that clear, consistent, and environmentally appropriate signs identifying access points and sites of interest are put in place throughout the corridor; and

(2) consistent with the goals of the management plan, encouraging economic viability in the affected communities by appropriate means.

(c) CONSIDERATION OF INTERESTS OF LOCAL GROUPS.--The management entity shall, in preparing and implementing the management plan for the corridor, consider the interest of diverse units of government, businesses, private property owners, and non-profit groups within the geographic area.

(d) PUBLIC MEETINGS.--The management entity shall conduct public meetings at least quarterly regarding the implementation of the Corridor Management Plan.

(e) ANNUAL REPORTS.--The management entity shall, for any fiscal year in which it receives Federal funds under this title or in which a loan made by the entity with Federal funds under section 807(d)(1) is outstanding, submit an annual report to the Secretary setting forth its accomplishments, its expenses and income, and the entities to which it made any loans and grants during the year for which the report is made.

(f) COOPERATION WITH AUDITS.--The management entity shall, for any fiscal year in which it receives Federal funds under this title or in which a loan made by the entity with Federal funds under section 807(d)(1) is outstanding, make available for audit by the Congress, the Secretary, and appropriate units of government all records and other information pertaining to the expenditure of such funds and any matching funds, and require, for all agreements authorizing expenditure of Federal funds by other organizations, that the receiving organizations make available for such audit all records and other information pertaining to the expenditure of such funds.

SEC. 809. DUTIES AND AUTHORITIES OF FEDERAL AGENCIES.

(a) TECHNICAL ASSISTANCE AND GRANTS.--

(1) IN GENERAL.--The Secretary may provide technical assistance and grants to units of government, nonprofit organizations, and other persons, upon request of the management entity of the corridor, and to the management entity, regarding the management plan and its implementation.

(2) PROHIBITION OF CERTAIN REQUIREMENTS.--The Secretary may not, as a condition of the award of technical assistance or grants under this section, require any recipient of such technical assistance or grant to enact or modify land use restrictions.

(3) DETERMINATIONS REGARDING ASSISTANCE.--The Secretary shall decide if the corridor shall be awarded technical assistance or grants and the amount of that assistance. Such decisions shall be based on the relative degree to which the corridor effectively fulfills the objectives contained in the Corridor Management Plan and achieves the purposes of this title. Such decisions shall give consideration to projects which provide a greater leverage of Federal funds.

(b) PROVISION OF INFORMATION.--In cooperation with other Federal agencies, the Secretary shall provide the general public with information regarding the location and character of the corridor.

(c) OTHER ASSISTANCE.--Upon request, the Superintendent of Cuyahoga Valley National Recreation Area may provide to public and private organizations within the corridor (including the management entity for the corridor) such operational assistance as appropriate to support the implementation of the Corridor Management Plan, subject to the availability of appropriated funds. The Secretary is authorized to enter into cooperative agreements with public and private organizations for the purposes of implementing this subsection.

(d) DUTIES OF OTHER FEDERAL AGENCIES.--Any Federal entity conducting any activity directly affecting the corridor shall consider the potential effect of the activity on the Corridor Management Plan and shall consult with the management entity of the corridor with respect to the activity to minimize the adverse effects of the activity on the corridor.

SEC. 810. LACK OF EFFECT ON LAND USE REGULATION AND PRIVATE PROPERTY.

(a) LACK OF EFFECT ON AUTHORITY OF GOVERNMENTS.--Nothing in this title shall be construed to modify, enlarge, or diminish any authority of Federal, State, or local governments to regulate any use of land as provided for by law or regulation.

(b) LACK OF ZONING OR LAND USE POWERS.--Nothing in this title shall be construed to grant powers of zoning or land use control to the Committee or management entity of the corridor.

(c) LOCAL AUTHORITY AND PRIVATE PROPERTY NOT AFFECTED.--Nothing in this title shall be construed to affect or to authorize the Committee to interfere with--

(1) the rights of any person with respect to private property; or

(2) any local zoning ordinance or land use plan of the State of Ohio or a political subdivision thereof.

SEC. 811. SUNSET.

The Secretary may not make any grant or provide any assistance under this title after September 30, 2012.

SEC. 812. AUTHORIZATION OF APPROPRIATIONS.

(a) IN GENERAL.--There is authorized to be appropriated under this title not more than $1,000,000 for any fiscal year. Not more than a total of $10,000,000 may be appropriated for the corridor under this title.
(b) 50 PERCENT MATCH.--Federal funding provided under this title, after the designation of this corridor, may not exceed 50 percent of the total cost of any assistance or grant provided or authorized under this title.

<< 16 USCA § 461 NOTE >>

TITLE IX--HUDSON RIVER VALLEY NATIONAL HERITAGE AREA

SEC. 901. SHORT TITLE.

This title may be cited as the "Hudson River Valley National Heritage Area Act of 1996".

SEC. 902. FINDINGS.

The Congress finds the following:
(1) The Hudson River Valley between Yonkers, New York, and Troy, New York, possesses important historical, cultural, and natural resources, representing themes of settlement and migration, transportation, and commerce.
(2) The Hudson River Valley played an important role in the military history of the American Revolution.
(3) The Hudson River Valley gave birth to important movements in American art and architecture through the work of Andrew Jackson Downing, Alexander Jackson Davis, Thomas Cole, and their associates, and played a central role in the recognition of the esthetic value of the landscape and the development of an American esthetic ideal.
(4) The Hudson River Valley played an important role in the development of the iron, textile, and collar and cuff industries in the 19th century, exemplified in surviving structures such as the Harmony Mills complex at Cohoes, and in the development of early men's and women's labor and cooperative organizations, and is the home of the first women's labor union and the first women's secondary school.
(5) The Hudson River Valley, in its cities and towns and in its rural landscapes--
(A) displays exceptional surviving physical resources illustrating these themes and the social, industrial, and cultural history of the 19th and early 20th centuries; and
(B) includes many National Historic Sites and Landmarks.
(6) The Hudson River Valley is the home of traditions associated with Dutch and Huguenot settlements dating to the 17th and 18th centuries, was the locus of characteristic American stories such as "Rip Van Winkle" and the "Legend of Sleepy Hollow", and retains physical, social, and cultural evidence of these traditions and the traditions of other more recent ethnic and social groups.
(7) New York State has established a structure for the Hudson River Valley communities to join together to preserve, conserve, and manage these resources, and to link them through trails and other means, in the Hudson River Greenway Communities Council and the Greenway Conservancy.

SEC. 903. PURPOSES.

The purposes of this title are the following:
(1) To recognize the importance of the history and the resources of the Hudson River Valley to the Nation.
(2) To assist the State of New York and the communities of the Hudson River Valley in preserving, protecting, and interpreting these resources for the benefit of the Nation.
(3) To authorize Federal financial and technical assistance to serve these purposes.

SEC. 904. HUDSON RIVER VALLEY NATIONAL HERITAGE AREA.

(a) ESTABLISHMENT.--There is hereby established a Hudson River Valley National Heritage Area (in this title referred to as the "Heritage Area").
(b) BOUNDARIES.--
(1) IN GENERAL.--Except as otherwise provided in paragraph (2), the Heritage Area shall be comprised of the counties of Albany, Rensselaer, Columbia, Greene, Ulster, Dutchess, Orange, Putnam, Westchester, and Rockland, New York, and the Village of Waterford in Saratoga County, New York.
(2) AREAS EXCLUDED.--The Heritage Area shall not include any of the following:
(A) The counties of Greene and Columbia.
(B) Those portions of the counties of Rensselaer and Dutchess located entirely within the 22d Congressional District of New York (as such district exists on the date of the enactment of this Act).
(c) MANAGEMENT ENTITIES.--The management entities for the Heritage Area shall be the Hudson River Valley Greenway Communities Council and the Greenway Conservancy (agencies established by the State of New York in its Hudson River Greenway Act of 1991, in this title referred to as the "management entities"). The management entities shall jointly establish a Heritage Area Committee to manage the Heritage Area.

SEC. 905. COMPACT.

To carry out the purposes of this title, the Secretary of the Interior (in this title referred to as the "Secretary") shall enter into a compact with the management entities. The compact shall include information relating to the objectives and management of the area, including the following:

(1) A discussion of the goals and objectives of the Heritage Area, including an explanation of a proposed approach to conservation and interpretation, and a general outline of the protection measures committed to by the parties to the compact.

(2) A description of the respective roles of the management entities.

(3) A list of the initial partners to be involved in developing and implementing a management plan for the Heritage Area, and a statement of the financial commitment of such partners.

(4) A description of the role of the State of New York.

SEC. 906. MANAGEMENT PLAN.

The management entities shall develop a management plan for the Heritage Area that presents comprehensive recommendations for the Heritage Area's conservation, funding, management and development. Such plan shall take into consideration existing State, county, and local plans and involve residents, public agencies, and private organizations working in the Heritage Area. It shall include actions to be undertaken by units of government and private organizations to protect the resources of the Heritage Area. It shall specify the existing and potential sources of funding to protect, manage, and develop the Heritage Area. Such plan shall include specifically as appropriate the following:

(1) An inventory of the resources contained in the Heritage Area, including a list of any property in the Heritage Area that is related to the themes of the Heritage Area and that should be preserved, restored, managed, developed, or maintained because of its natural, cultural, historic, recreational, or scenic significance.

(2) A recommendation of policies of resource management which consider and detail application of appropriate land and water management techniques, including but not limited to, the development of intergovernmental cooperative agreements to protect the Heritage Area's historical, cultural, recreational, and natural resources in a manner consistent with supporting appropriate and compatible economic viability.

(3) A program for implementation of the management plan by the management entities, including plans for restoration and construction, and specific commitments of the identified partners for the first 5 years of operation.

(4) An analysis of ways in which local, State, and Federal programs may best be coordinated to promote the purposes of this title.

(5) An interpretation plan for the Heritage Area.

SEC. 907. AUTHORITIES AND DUTIES OF MANAGEMENT ENTITIES.

(a) AUTHORITIES OF THE MANAGEMENT ENTITIES.--The management entities may, for purposes of preparing and implementing the management plan under section 906, use Federal funds made available through this title--

(1) to make loans and grants to, and enter into cooperative agreements with, States and their political subdivisions, private organizations, or any person; and

(2) to hire and compensate staff.

(b) DUTIES OF THE MANAGEMENT ENTITIES.--The management entities shall--

(1) develop and submit to the Secretary for approval a management plan as described in section 906 within 5 years after the date of the enactment of this title.

(2) give priority to implementing actions as set forth in the compact and the management plan, including taking steps to--

(A) assist units of government, regional planning organizations, and nonprofit organizations in preserving the Heritage Area;

(B) assist units of government, regional planning organizations, and nonprofit organizations in establishing, and maintaining interpretive exhibits in the Heritage Area;

(C) assist units of government, regional planning organizations, and nonprofit organizations in developing recreational resources in the Heritage Area;

(D) assist units of government, regional planning organizations, and nonprofit organizations in increasing public awareness of an appreciation for the natural, historical and architectural resources and sites in the Heritage Area;

(E) assist units of government, regional planning organizations and nonprofit organizations in the restoration of any historic building relating to the themes of the Heritage Area;

(F) encourage by appropriate means economic viability in the corridor consistent with the goals of the plan;

(G) encourage local governments to adopt land use policies consistent with the management of the Heritage Area and the goals of the plan; and

(H) assist units of government, regional planning organizations and nonprofit organizations to ensure that clear, consistent, and environmentally appropriate signs identifying access points and sites of interest are put in place throughout the Heritage Area;

(3) consider the interests of diverse governmental, business, and nonprofit groups within the Heritage Area;

(4) conduct public meetings at least quarterly regarding the implementation of the management plan;

(5) submit substantial changes (including any increase of more than 20 percent in the cost estimates for implementation) to the management plan to the Secretary for the Secretary's approval;

(6) for any year in which Federal funds have been received under this title, submit an annual report to the Secretary setting forth its accomplishments, its expenses and income, and the entities to which any loans and grants were made during the year for which the report is made; and

(7) for any year in which Federal funds have been received under this title, make available for audit all records pertaining to the expenditure of such funds and any matching funds, and require, for all agreements authorizing expenditure of Federal funds by

other organizations, that the receiving organizations make available for audit all records pertaining to the expenditure of such funds.

If a management plan is not submitted to the Secretary as required under paragraph (1) within the specified time, the Heritage Area shall no longer qualify for Federal funding.
(c) PROHIBITION ON THE ACQUISITION OF REAL PROPERTY.--The management entities may not use Federal funds received under this title to acquire real property or an interest in real property. Nothing in this title shall preclude any management entity from using Federal funds from other sources for their permitted purposes.
(d) ELIGIBILITY FOR RECEIVING FINANCIAL ASSISTANCE.--
(1) ELIGIBILITY.--The management entities shall be eligible to receive funds appropriated through this title for a period of 10 years after the day on which the compact under section 905 is signed by the Secretary and the management entities, except as provided in paragraph (2).
(2) EXCEPTION.--The management entities' eligibility for funding under this title may be extended for a period of not more than 5 additional years if--
(A) the management entities determine such extension is necessary in order to carry out the purposes of this title and notify the Secretary not later than 180 days prior to the termination date;
(B) the management entities, not later than 180 days prior to the termination date, present to the Secretary a plan of their activities for the period of the extension, including provisions for becoming independent of the funds made available through this title; and
(C) the Secretary, with the advice of the Governor of New York, approves such extension of funding.

SEC. 908. DUTIES AND AUTHORITIES OF FEDERAL AGENCIES.

(a) DUTIES AND AUTHORITIES OF THE SECRETARY.--
(1) TECHNICAL AND FINANCIAL ASSISTANCE.--
(A) IN GENERAL.--The Secretary may, upon request of the management entities, provide technical and financial assistance to the Heritage Area to develop and implement the management plan. In assisting the Heritage Area, the Secretary shall give priority to actions that in general assist in--
(i) conserving the significant natural historic, and cultural resources which support its themes; and
(ii) providing educational, interpretive, and recreational opportunities consistent with its resources and associated values.
(B) SPENDING FOR NON-FEDERALLY OWNED PROPERTY.--The Secretary may spend Federal funds directly on nonfederally owned property to further the purposes of this title, especially in assisting units of government in appropriate treatment of districts, sites, buildings, structures, and objects listed or eligible for listing on the National Register of Historic Places.
(2) APPROVAL AND DISAPPROVAL OF COMPACTS AND MANAGEMENT PLANS.--  .
(A) IN GENERAL.--The Secretary, in consultation with the Governor of New York, shall approve or disapprove a compact or management plan submitted under this title not later than 90 days after receiving such compact or management plan.
(B) ACTION FOLLOWING DISAPPROVAL.--If the Secretary disapproves a submitted compact or management plan, the Secretary shall advise the management entities in writing of the reasons therefor and shall make recommendations for revisions in the compact or plan. The Secretary shall approve or disapprove a proposed revision within 90 days after the date it is submitted.
(3) APPROVING AMENDMENTS.--The Secretary shall review substantial amendments to the management plan for the Heritage Area. Funds appropriated pursuant to this title may not be expended to implement the changes until the Secretary approves the amendments.
(4) PROMULGATING REGULATIONS.--The Secretary shall promulgate such regulations as are necessary to carry out the purposes of this title.
(b) DUTIES OF FEDERAL ENTITIES.--Any Federal entity conducting or supporting activities directly affecting the Heritage Area, and any unit of government acting pursuant to a grant of Federal funds or a Federal permit or agreement conducting or supporting such activities, shall to the maximum extent practicable--
(1) consult with the Secretary and the management entities with respect to such activities;
(2) cooperate with the Secretary and the management entities in carrying out their duties under this title and coordinate such activities with the carrying out of such duties; and
(3) conduct or support such activities in a manner consistent with the management plan unless the Federal entity, after consultation with the management entities, determines there is no practicable alternative.

SEC. 909. AUTHORIZATION OF APPROPRIATIONS.

(a) COMPACTS AND MANAGEMENT PLAN.--There is authorized to be appropriated to the Secretary, for grants for developing a compact under section 905 and providing assistance for a management plan under section 906, not more than $300,000, to remain available until expended, subject to the following conditions:
(1) No grant for a compact or management plan may exceed 75 percent of the grantee's cost for such study or plan.
(2) The total amount of Federal funding for the compact for the Heritage Area may not exceed $150,000.
(3) The total amount of Federal funding for a management plan for the Heritage Area may not exceed $15,000.
(b) MANAGEMENT ENTITY OPERATIONS.--There is authorized to be appropriated to the Secretary for the management entities, amounts as follows:
(1) For the operating costs of each management entity, pursuant to section 907, not more than $250,000 annually.

(2) For technical assistance pursuant to section 908, not more than $50,000 annually.
The Federal contribution to the operations of the management entities shall not exceed 50 percent of the annual operating costs of the entities.
(c) IMPLEMENTATION.--There is authorized to be appropriated to the Secretary, for grants (and the administration thereof) for the implementation of the management plans for the Heritage Area pursuant to section 908, not more than $10,000,000, to remain available until expended, subject to the following conditions:
(1) No grant for implementation may exceed 50 percent of the grantee's cost of implementation.
(2) Any payment made shall be subject to an agreement that conversion, use, or disposal of the project so assisted for purposes contrary to the purposes of this title, as determined by the Secretary, shall result in a right of the United States of reimbursement of all funds made available to such project or the proportion of the increased value of the project attributable to such funds as determined at the time of such conversion, use, or disposal, whichever is greater.

SEC. 910. SUNSET.

The Secretary may not make any grant or provide any assistance under this title after September 30, 2012.

Approved November 12, 1996.

PL 104-333, 1996 HR 4236

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
NORTHERN DIVISION

No. 2:05-CV-17-BO

| | | |
|---|---|---|
| COUNTY OF CURRITUCK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **ORDER** |
| v. | ) | |
| | ) | |
| OUTER BANKS CONSERVATIONISTS, | ) | |
| INC., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

This matter is before the Court on Plaintiff's motion to remand and Defendants' motions to dismiss for failure to join the United States as a Necessary Party. The matters are ripe for ruling.

## BACKGROUND

This case centers around the lighthouse located in Currituck County, North Carolina ("lighthouse" or "Currituck Beach lighthouse"). The lighthouse was constructed by the United States in 1875 and serves as a navigational aid for ships along the northeastern coastline of North Carolina.

On June 26, 1990, the United States Department of Transportation granted Defendant Outer Banks Conservationsists, Inc. ("OBC") a twenty year license for use of the lighthouse.[1] The stated purpose of the license was for "restoration and preservation - museum/archive." Plaintiff's Exhibit 1. Pursuant to the license, OBC was responsible for restoring, preserving, and maintaining the lighthouse. In exchange, OBC was granted the right to charge an admission fee

---

[1] OBC is a non-profit corporation.

to the lighthouse and operate a gift shop or museum shop at the base of the lighthouse.

In 2000, Congress enacted the National Historic Lighthouse Preservation Act ("NHLPA"), 16 U.S.C. § 470w-7. The NHLPA established a national program for the preservation of historic light stations. The act allows the federal government to convey title of historic lighthouses to eligible entities which in exchange, will maintain and care for the lighthouses. Conveyances under the NHLPA are subject to extensive conditions and reservation of easements.

On October 17, 2003, the United States conveyed title to the Currituck lighthouse to OBC by Quitclaim and Indenture Deed.[2] OBC's co-defendant, the State of North Carolina, Department of Cultural Resources ("NCDCR"), received a reversionary interest in the property if OBC is unable to maintain and operate the lighthouse under the terms provided by the conveyance. The United States also reserved the right to revert the property to itself in the event OBC ceases to maintain and operate the lighthouse under the terms provided by the conveyance.

On March 1, 2005, Plaintiff filed a civil action in the Superior Court of Currituck County against OBC and NCDCR. Plaintiff claims that when title was conveyed to OBC the property was no longer afforded a federal exemption and became subject to Currituck County's Uniform Development Ordinance. Plaintiff argues that OBC is required to apply for a conditional use permit to continue to run the lighthouse as a museum. Plaintiff further asserts that OBC has incurred $20,600 in fines pursuant to the Uniform Development Ordinance for operating the museum without a permit and that fines in the amount of $100 will accrue for each day the museum is open and operating without a permit.

----

[2] In accordance with the NHLPA the transfer was made without payment of monetary consideration. *See* 16 U.S.C. § 470w-7(b)(3)(A).

2

On April 4, 2005, Defendants filed a notice of removal pursuant to 28 U.S.C. § § 1331 and 1442(a)(2). Subsequently, on May 2, 2005, Defendants filed a motion to dismiss the complaint for failure to join the United States as a necessary party. On May 24, 2005, Plaintiff filed a motion to remand.

DISCUSSION

A.    Motion to Remand

Plaintiff contends the cause of action is limited to the authority of the county to enforce a local zoning ordinance and there is no federal question as required by 28 U.S.C. § 1331. Plaintiff also argues that while Defendants derived title from the United States, the action does not affect the validity of any law as required by 28 U.S.C. § 1442(a)(2).

Title 28 U.S.C. § 1331 provides federal courts jurisdiction over all actions arising under the Constitution or laws of the United States. Although in the majority of federal-question cases the cause of action is based upon federal law, federal-question jurisdiction is not restricted to such cases. *Grable & Sons Metal Products, Inc. v. Darve Engineering & Mfg.*, 125 S. Ct. 2363 (2005). Federal question jurisdiction may exist when although "the cause of action is not created by federal law, the case's resolution depends on resolution of a federal question sufficiently substantial to arise under federal law within the meaning of 28 U.S.C. § 1331." *Ormet Corp. v. Ohio Power Corp.*, 98 F.3d 799, 806 (4th Cir. 1996) (citing *Franchise Tax Bd. v. Construction Laborers Vacation Trust*, 463 U.S. 1, 27-28 (1983); *Merrill Dow Pharmaceuticals Inc. v. Thompson*, 478 U.S. 804, 808-09 (1986)). To confer federal jurisdiction under these circumstances, the federal issue implicated in the action must be substantial "indicating a serious federal interest in claiming the advantages thought to be inherent in a federal forum." *Grable*, No. 125 S. Ct. at 2367. The federal issue need not only be substantial, but "will ultimately

3

qualify for a federal forum only if federal jurisdiction is consistent with congressional judgment about the sound division of labor between state and federal courts governing the application of § 1331." *Id.* "[T]he question is, does a state-law claim necessarily raise a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." *Grable*, at 2368. In deciding, the court should limit its consideration to the claims pleaded in the complaint. A case cannot be removed on the basis of a federal defense. *Franchise Tax Bd.*, 463 U.S. at 14.

The NHLPA was enacted to provide the federal government with a means to preserve historic lighthouses by passing the cost and daily responsibility of maintaining the stations to eligible entities. The program serves dual goals: to preserve historic light stations for educational, cultural, and historic purposes; and, to maintain the light stations as homes for Federal aids to navigation. In enacting the NHLPA, Congress set forth detailed provisions for the transfer of light stations. The quitclaim deed at the heart of this matter, in accordance with NHLPA, sets forth extensive conditions restricting OBC's use of and ability to modify the lighthouse. The federal government also granted itself present property interests in the lighthouse for the purpose of accessing federal aids to navigation as well as a reversionary interest for the United States in the event the terms of conveyance are not complied with or if the light station is required for national security purposes.[3]

One of the specific subsections of the NHLPA states that the eligible entity to whom the lighthouse is conveyed must "make the historic light station available for education, park,

---

[3] The NHLPA provides in pertinent part that "the Federal aids to navigation located at the historic light station in operation on the date of the conveyance remain the personal property of the United States and continue to be operated and maintained by the United States for as long as needed for navigational purposes." 16 U.S.C. § 470w-7(c)(1).

recreation, cultural or historic preservation purposes for the general public . . . ." 16 U.S.C. §

470w-7(c)(3). The terms of the conveyance transferring the property to OBC provide that the

property will revert if the light station "ceases to be available for education, park, recreation,

cultural, or historical preservation purposed for the general public." This use of the lighthouse

for the general public is mandated by the NHLPA. Plaintiff asserts in its complaint that OBC's

current use of the lighthouse is illegal. Plaintiff claims that under local zoning ordinances OBC

must apply for a conditional use permit before operating the lighthouse for the public. If Plaintiff

prevails on its claims, the action by the county could diminish or frustrate the acts and intent of

Congress and effectively nullify Congress' careful efforts under the NHLPA. Plaintiff may deny

a use permit and preclude OBC from operating the lighthouse for the public. This would force

reversion of the title from OBC, the entity selected to take title by the Secretary of the Interior

after an application process held in accordance with the provisions of the NHLPA.[4]

In the paragraph 8 of the complaint, Plaintiff states that until October 17, 2003, the

United States was the owner of the property and as the owner "was exempt from Currituck

County's Unified Development Ordinance." In paragraph 11 of the complaint, Plaintiff pleads

that "[t]he transfer of ownership from the Federal Government to Defendants removed the

property from the exemption and made it subject to local zoning regulations." This paragraph

recognizes that central to the action is a determination of whether or not OBC is protected from

local zoning ordinances by a federal exemption. Plaintiff states, as fact, that OBC lost the federal

exemption. However, whether OBC and the property have retained the federal exemption, an

exemption arising under the Supremacy Clause of the United States Constitution, is an issue

---

[4] While Plaintiff assert title would revert to the North Carolina Department of Cultural
resources, it appears the United States has retained the right to revert to property to itself.

5

which must be determined in the course and scope of the litigation.

Under these circumstances, "the existence of federal judicial power is both appropriate and pragmatic." *Ormet*, 98 F.3d at 807 (citing *Merrell Dow*, 478 U.S. at 813-14).[5] Given the unique situation presented by the United States' significant present and future interests in the lighthouse as well as the impact to the NHLPA, the Court may entertain the substantial federal issue without infringing upon judicial matters more appropriately reserved for the state.

B.    Motions to Dismiss

Defendants have filed motions to dismiss pursuant to Fed. R. Civ. P. 12(b)(7) and 19(a). Defendants ask the Court to dismiss Plaintiff's action for failure to join the United States as a necessary party, or alternatively, ask the Court to order Plaintiff to join the United States.

A necessary party must be joined in an action if that party is subject to service and the joinder will not destroy subject matter jurisdiction. Fed. R. Civ. P. 19; *see also National Union Fire Inc. Co. of Pittsburgh, Pa. v. Right Aid of South Carolina, Inc.*, 210 F. 3d 246, 249-50 (4th Cir. 2000). Fed. R. Civ. P. 19(a) provides that a party is necessary to an action if complete relief cannot be granted without the party or the party claims an interest in the action and if the party is not included their ability to protect the interest may be impaired or the parties already involved could face additional or inconsistent legal obligations if the party is not joined. Fed. R. Civ. P. 19(a) further provides that when a necessary party has not been joined and there are no procedural bars to joinder "the court shall order that the person be made a party."

The United States has significant legally protected interests in the light station stemming from the conditions for conveyance, as required by the federally mandated provisions set forth in

---

[5] Having found jurisdiction proper under 28 U.S.C. § 1331, the Court need not determine whether jurisdiction is also supported by 28 U.S.C. § 1442(a)(2).

6

the NHLPA. These conditions reserve to the United States present and future property interests including access to and use of the property for a Federal aid to navigation and the right to revert title to itself. These significant interests, detailed in the NHLPA, may be frustrated by Plaintiff's action which essentially challenges the legislative action of Congress in this area.

Notably, in paragraph 10 of the complaint Plaintiff states it joined NCDCR as a "necessary party" because NCDCR has a reversionary interest if OBC can no longer operate or maintain the property. *See* Complaint ¶ 10. The deed conveying title to OBC states in pertinent part:

> Further, the Grantee agrees that proposed in it application, with the approval of the State and with the approval of the Grantor that the Property would be transferred to the State of North Carolina, Department of Cultural Resources, without consideration in the event that the Grantee can no longer operate, maintain, or preserve the Property in accordance with the conditions of the deed. *However, the Administrator of the General Services Administration, at his or her option, may still exercise the option to revert the Property under those conditions specified in Exhibit "A" and 16 U.S.C. § 470w-7(c) of the NHLPA . . .*

Exhibit 2 to Mem. in Support of Mot. to Dismiss at 2 (emphasis added). [6] Therefore, by Plaintiff's own reasoning, the United States is a necessary party as a result of its reversionary interest in the property.

Furthermore, the conveyance, in compliance with the provisions of the NHLPA, provided the lighthouse must be made available for "education, park, recreation, cultural or historic preservation purposes for the general public . . . . ." Central to the resolution of the action is Plaintiff's claim that OBC is illegally operating the lighthouse and may only continue to do so by applying for and obtaining a permit through the county. Therefore, a resolution of the action

---

[6] Exhibit "A" to the deed reiterates in paragraph 7 that in the event the property ceases to be maintained in compliance with the terms, "the Property shall, at the option of the Administrator of General Services ("Administrator") revert to the United States to be placed under administrative control of the Administrator.

7

places OBC in a position of conflicting legal obligations. OBC is obligated to the United States to continue operating the lighthouse for the general public, however, Plaintiff attacks OBC operation of the lighthouse doing so as illegal.

Accordingly, the United States is a necessary party to the action as set forth in Fed. R. Civ. P. 19(a). The parties have not shown or argued that joinder is not feasible. Therefore, a motion to dismiss is not proper at this juncture. Rather, Plaintiff must amend its action to join the United States as a party.

## CONCLUSION

For the reasons stated, Plaintiff's motion to remand and Defendants' motions to dismiss are DENIED. Plaintiff's request for costs incurred related to the removal of the action to this Court is DENIED. Plaintiff is DIRECTED to join the United States as a necessary party within 45 days of the date this Order is filed.

SO ORDERED, this _10_ day of January 2006.

Terrence W. Boyle

TERRENCE W. BOYLE
UNITED STATES DISTRICT JUDGE

8