UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                                )
BAKER'S ISLAND LIGHTHOUSE       )
PRESERVATION SOCIETY, INC.      )
And ROBERT LEAVENS,             )
          Plaintiff,            )
v.                              )    CIVIL ACTION NO. 05-10855 PBS
                                )
UNITED STATES DEPARTMENT OF     )
THE INTERIOR, SECRETARY OF      )
THE INTERIOR, NATIONAL PARK     )
SERVICE, DIRECTOR NATIONAL      )
PARK SERVICE, CRAIG MANSON,     )
As He Is Assistant Secretary    )
of Fish, Wildlife, And Parks,   )
JANET SNYDER MATTHEWS, As She   )
Is Associate Director,          )
Cultural Resources, National    )
Park Service, BRIAN SWEATLAND,  )
As He Is Special Assistant to   )
Office Of The Director,         )
National Park Service,          )
ADMINISTRATOR OF GENERAL        )
SERVICES, GENERAL SERVICES      )
ADMINISTRATION, and JOHN        )
KELLY, As He Is Acting          )
Director of Property            )
Disposal, General Services      )
Administration,                 )
          Defendants.           )
_____)
```

**MEMORANDUM AND ORDER**

October 17, 2006

Saris, U.S.D.J.

## I. **INTRODUCTION**

This case involves a historic lighthouse built in 1796 in

Salem Sound, five miles off the coast of Massachusetts.

Plaintiff Baker's Island LightHouse Preservation Society, Inc., a

1

neighborhood group, seeks review of the decision of the National Park Service ("NPS"), Department of the Interior, and the General Services Administration ("GSA") to transfer title of the Baker's Island Light Station to the Essex National Heritage Commission, pursuant to the National Historic Lighthouse Preservation Act, 16 U.S.C. § 470w-7(a)(2000).

For the reasons set forth below, after hearing, the Court **ALLOWS** the Defendant's motion to affirm the decision and **DENIES** the Plaintiff's motion to reverse the decision.

## II. BACKGROUND

### A. The Statutory Scheme

In 2000, Congress enacted the National Historic Lighthouse Preservation Act ("NHLPA") to create "a national historic light station program." See 16 U.S.C. § 470w-7(a). The purpose of the program is to dispose of light stations that are determined to be "excess property."[1]  16 U.S.C. § 470w-7(b)(2). Excess light stations are transferred at no cost to an eligible entity, which is any financially capable "department or agency of the Federal Government" or "department or agency of the State in which the historic light station is located, the local government of the community in which the historic light station is located,

---

[1] Excess property is defined as any "property under the control of a federal agency that the head of the agency determines is not required to meet the agency's needs or responsibilities."  40 U.S.C. § 102(3).

2

nonprofit corporation, educational agency, or community development organization." Id. § 470w-7(e)(3)(B). The statutory goals include fostering "educational programs relating to the history, practice, and contribution to society of historic light stations" and sponsoring "research and study into the history of light stations." Id. § 470w-7 (a)(2),(3).

The NHLPA procedure begins when an agency reports to the GSA that a light station is no longer required to meet the agency's needs. Id. at § 470w-7(b)(2); 40 U.S.C. §102(3). The Secretary of the Interior reviews all applications for conveyance of the historic light station, and selects an eligible entity. Id. § 470w-7(a)(2). It then forwards to the Administrator of GSA the approved application. Id.

Under the statute, the conveyance must be made subject to conditions necessary to ensure that, inter alia, the eligible entity will (1) "at its own cost and expense, use and maintain the historic light station in accordance with . . . the Secretary of the Interior's Standards for treatment of Historic Properties, 36 C.F.R. Part 68," and (2) "make the historic light station available for education, park, recreation, cultural or historic preservation purposes for the general public at reasonable times and under reasonable conditions." 16 U.S.C. §§ 470w-7(c)(1)(D),(E).

3

B. __The Baker's Island Light Station__

The following facts are derived from the Administrative Record.

Baker's Island, a sixty acre area located approximately five miles off the coast of Massachusetts, is one of the fifteen islands named "The Miseries", so named because of the many shipwrecks which have occurred there over the years. Baker's Island is a small community of sixty-two privately owned cottages, supported by a community hall, grocery store, gift shop, pump house, and a fire barn. The island and its people have played important and historic roles by providing timber and cobbles used to develop Essex County, and a home to many of the harbor pilots who guided vessels into the port of Salem. Its only pier is privately owned and operated.

In 1796, Congress authorized $6,000 for the construction of twin lighthouses on the Northwest corner of the island, which were completed and illuminated for the first time in 1798. Ownership of the land was vested in the United States in 1797. These original two wooden lighthouses were eventually replaced by stone structures in 1821. In addition to the lighthouse itself, the light station includes two keepers' cottages and two other small outbuildings. Today, because the smaller tower was razed in 1916, only the large stone tower remains with its supporting fog signal building, oil house, and keeper's houses.

4

In the 1980s, the United States Coast Guard entered into a license agreement with the Baker's Island Association which gave the association the use and occupancy of one of the residential buildings.  In 1988 a 30-year revocable license for the keepers buildings was given by the Coast Guard to the association allowing it to use and preserve the residences.

### C. **The Application Process**

In 2002, the United States Coast Guard reported the Baker's Island Light Station to be excess property to the GSA.  On May 23, 2003, the GSA issued its Notice of Availability.  Ten entities expressed their interest in acquiring the property in August 2003.  On August 14, the NPS sent each entity a twenty page application, which included an explanation of the method used to evaluate the applications.  There were four categories of evaluation, each of which had a maximum score of 25 points:

Preservation and Maintenance Plan - 25 points

Higher priority will be given to proposals that best demonstrate comprehensive planning for the long-term preservation of the historic features of the property and competency in developing treatment and maintenance plans.  Attention to detail counts.

Use Plan - 25 points

Higher priority will be given to proposals that will reach large public audiences; raise funds in ways compatible to the character of the property; provide adequate revenue for preservation, operation, and education; and provide for safe, enjoyable, educational,

park, recreational, cultural, or historic
preservation uses of the property.

Financial Plan - 25 points

Higher priority will be given to proposals
that demonstrate reasonable, well-founded
estimates of the financial needs to
accomplish the organization's plans and its
capabilities to meet those needs.  Secondary
priority considerations will include past
financial support of this and similar sites.

Management Plan - 25 points

Higher priority will be given to those
organizations that demonstrate a strong
capability and history of successful
preservation management.  Other
considerations include demonstration of
successful management of educational,
conservation, and recreational programs and
projects; and the success of past, present,
and planned partnerships between the
applicant and other government or non-profit
organizations.

Environmental Analysis - Go/No-Go from GSA

(AR 0065).  Of the ten interested entities, only two submitted

completed applications, the Plaintiff Baker's Island Lighthouse

Preservation Society and the Essex National Heritage Commission.

On August 26, 2003, the GSA arranged for an official site visit

for interested entities.  The Baker's Island Residents Wharf

Company refused access via the private pier so those attending

had to land directly on the beach.

**D.  The Preservation Society**

The Baker's Island Lighthouse Preservation Society

("Preservation Society") was formed under Massachusetts law as a

6

501(c)(3) tax-exempt organization in anticipation of the eventual disposal of the Baker's Island Light Station by the Coast Guard. Its sole mission is to preserve and maintain historic structures and lands at the Baker's Island Light Station. The Preservation Society is currently governed by fifteen directors, all of whom have held various positions in its sister organizations such as the Baker's Island Association, the island group which leased the keeper's houses. The Preservation Society members are volunteers whose terms are set by the Board of Directors whereas membership of the Baker's Island Association is available to any person owning a cottage on the island and any person sympathetic to the objectives of preserving the historic, cultural, and societal aspects of island life.

**E. Essex National Heritage Commission**

The Essex National Heritage Commission ("Heritage Commission") is a 501(c)(3) non-profit corporation incorporated in Massachusetts. The Essex National Heritage Area (along with eight other Heritage areas) was established in Division II of the Omnibus Parks and Public Lands Management Act of 1996, Pub. L. No. 104-333, § 503, 110 Stat. 4093, 4258. The Heritage Commission is the management entity selected under §504 of the Act to manage the Heritage Area. Its mission is to preserve and promote the historic, cultural, and natural resources of Essex County. The Essex National Heritage Area ("ENHA") is affiliated

7

with the NPS and performs work under a cooperative agreement with it.  The Heritage Commission is governed by a Board of Trustees composed of twenty-four business and community leaders.  Among its accomplishments, it has created the county wide Trails & Sails program, an after school history and art program called History in the Making, and a resource directory that makes educators aware of environmental and historical resources in the area.

**F. <u>The Selection and Appeal Process</u>**

On January 22, 2004, a committee consisting of five NPS employees reviewed the two completed applications.  The employees represented the Maritime Heritage Program, the Federal Land to Parks Program, and the Historic Surplus Property Program.  Each member gave the competing applications numerical scores based on pre-determined criteria set forth in the application.

According to the review committee's evaluations, the application submitted by the Preservation Society consistently scored "unsatisfactory" or "below average" grades.  Reviewers' scores ranged between zero (0) and eleven (11) points, with an average of 6.35 points for each twenty-five (25) point section. In contrast, the Heritage Commission's application consistently scored "very good" or "excellent" grades.  Reviewers' scores ranged between thirteen (13) and twenty-two (22) points, with an average of 19.1 points for each twenty-five (25) point section.

8

Based on those scores, the review committee recommended that the ownership of the Baker's Island Light Station be transferred to the Heritage Commission.  On February 27, 2004, after conferring, the review committee issued its recommendation.

As a basis for the recommendation, the government reviewers concluded that the Heritage Commission had the stronger plan although they had three areas of concern.  First, while the application did not specify how many people would be introduced to the property from May through September, there was some indication that the number could reach 60-70 visitors a day.  The reviewers believed that the Commission would need to look at "less intense" usage at least initially.  (AR0576).  Second, there was no evidence to support beach access and the reviewers believed that a letter from a boat company showing feasibility was necessary.  (Id.)  Third, the reviewers admonished that Baker's Island residents should be included in implementing plans for the lighthouse to protect their privacy and the island environment.  (Id.)

Specifically, in comparing the two plans, the reviewers found the Heritage Commission plan "very thorough," demonstrating "extensive experience with historic preservation projects in a marine environment." (AR 0577).  In contrast, the reviewers found that the Preservation Society's preservation and maintenance plan was "inadequate."  For example, the latter plan did not list

9

specific maintenance tasks and was focused primarily on "past preservation efforts." (AR 0579). The reviewers also found that the Heritage Commission "clearly articulated specific uses and programs," including a written commitment from a local college (AR 0577), whereas the Preservation Society had inadequate information on arranging public access opportunities, like public tours, and no experience with educational and recreational programming (AR 0581). With respect to finances, the Heritage Commission provided financial statements demonstrating that in addition to receiving $1 million per year in federal funds, it raises $1.9 million annually through donations and non-federal funding (AR 0578), whereas the Preservation Society had financial assets totaling $30,000 and an "ambitious" capital campaign to raise $400,000 per year (AR 0581). The reviewers also noted that the Preservation Society had only a small group of members and no expertise in historic preservation. (AR 0580-0581).

On May 5, 2004, P. Daniel Smith, Special Assistant to the NPS Director, who did not participate in the review committee, signed off on its recommendation but did not forward it immediately to the NPS director. Instead, on May 19, 2004, he visited the light station for inspection of beach access and to meet with both applicants. The Preservation Society contends this inspection was done in bad faith because the Heritage Commission had already been pre-selected.

10

On June 28, 2004, NPS Director Fran Mainella adopted the recommendation.  On July 14, 2004, the NPS notified both the Preservation Society and the Heritage Commission that it would recommend to the Secretary that the Heritage Commission should be the recipient of the Baker's Island Light Station.  It also informed the Preservation Society that the selection recommendation was subject to administrative review if a request was filed within 15 days. The letter stated that a new committee made up of staff from the Washington, D.C. offices including two subject-matter experts and two appointees would review the applicants and submit recommendations to the secretary.  (AR 0653).

On July 27, 2004, the President of the Preservation Society formally and timely petitioned the Department of Interior for an administrative review of the Baker's Island Light Station recommendation, contending the Preservation Society submitted the superior proposal.

The Preservation Society raised the following two issues in its request for review.  First, it challenged the eligibility of the Heritage Commission to apply because there was no confirmation that Baker's Island was within the physical boundaries of the jurisdiction of the Heritage area under the statute; it had no statutory authority to own real property; it had limited funds to preserve and maintain the lighthouse; and

11

the acquisition of the station was not within the Heritage
Commission's management plan.  (AR 0660-0663).

Second, the Preservation Society challenged the Heritage
Commission's proposal on the merits because it did not comply
with a number of requirements in the application.  As an initial
matter, it contended that no entity could provide safe access
over the shorelines, stating, "The Coast Guard beach is rocky,
located in an area prone to ocean swells and squalls and is in an
unlikely location for installation of a pier or boat rail
installation."  (AR 0663).  It pointed out that there is only one
privately owned pier and that building a pier on the Coast Guard
beach would be expensive, difficult and involve a "morass of red
tape."  It emphasized problems with fire protection, the lack of
a sewer system, needs for medical care, funding sources and year-
round security.  The Preservation Society insisted it could
better address these problems.

An administrative appeal committee, consisting of four
members of the NPS, reviewed the initial recommendation and
concluded that it was based on a fair assessment of the two
competing applications.  (AR 0703-0709).  One reviewer stated:

> The Bakers Island Lighthouse Preservation
> Society obviously cares immensely for the
> protection of the light station and the
> respect for the island ecology.  However, the
> application criteria were not addressed to
> the extent needed to adequately compete with
> the level of detail provided by the other
> application.  I read Baker's Island LPS

12

application first, and I was impressed with
the description of the knowledge provided
regarding fire and water systems and island
ecology.  However, the application indicated
a lack of analysis for the historical
preservation and maintenance of the light
station, which is largely the intent of the
NHLPA.  I wondered why the application stated
the houses would require ongoing maintenance
while the light station, previously rehabbed
by the Coast Guard, could go for up to 20
years before further maintenance would be
needed.  <u>The overall application, rather than
review of just the use plan, seemed to
emphasize the need to keep people out more
than the desire to plan for ways to bring
people in</u>.

(AR 0703) (emphasis added).  Another reviewer stated that the

Heritage Commission's application had a "full understanding of

the Secretary of Interior standards for Historic Preservation"

and "there is really no public use considered under the Society's

application."  (AR 0704).  A third reviewer concurred, stating,

"In summary, the [Heritage Commission] application provided a

superior plan for the preservation of the station to that of the

[Preservation Society]; and only the [Heritage Commission] plans

for the station provided a valuable public benefit (educational,

natural resource protection and monitoring, and maritime cultural

uses) beyond preservation."  (AR 0706-0707).

On January 18, 2005, Craig Manson, the Assistant Secretary

for Fish and Wildlife and Parks, notified the Preservation

Society, through Mr. Thomas Hallowell, that the NPS appeal

committee affirmed the recommendation of the review committee and

13

that the Secretary would recommend to the GSA Administrator that
the Baker's Island Light Station be transferred to the Heritage
Commission (AR 0721).  On April 22, 2005, the Secretary formally
forwarded the Heritage Commission's name to GSA as the single
approved entity "for conveyance of the historic station."  16
U.S.C. §470w-7(b)(2); (AR 0724).

### III. <u>DISCUSSION</u>

**A. <u>Standard of Review</u>**

The Preservation Society seeks judicial review of the
decision of the Department of the Interior.  Under the
Administrative Procedure Act, 5 U.S.C. §§ 701, *et seq.* ("APA"), a
reviewing court is required to "hold unlawful and set aside
agency action, findings, and conclusions found to be arbitrary,
capricious, an abuse of discretion, or otherwise not in
accordance with law."  <u>Id.</u> § 706(2)(A).  In determining whether
an agency decision was arbitrary and capricious, the court must
"determine whether the agency has examined the pertinent
evidence, considered relevant factors, and articulated a
satisfactory explanation for its action including a rational
connection between the facts found and the choice made."
<u>Penobscot Air Servs. v. FAA,</u> 164 F.3d 713, 719 (1st Cir. 1999)
(internal quotation marks omitted).  Although the court defers
heavily to agency decisions, it must "conduct a searching and
careful inquiry into the Administrative Record" to determine if

the agency decision was arbitrary and capricious.  <u>Neighborhood</u>
<u>Ass'n of the Back Bay, Inc. v. Fed. Transit Admin.</u>, 407 F. Supp.
2d 323, 331 (D. Mass. 2005).

**B. <u>Supplementation of the Administrative Record</u>**

Plaintiff claims the record should be supplemented with
extrinsic evidence to show the government acted in bad faith by
(1) pre-selecting the winning applicant through ad hoc procedures
and then threatening to make the decision "appeal proof;" (2)
misrepresenting the status of its application in May, 2004; (3)
engaging in a conflict of interest by serving as a co-applicant
with the Heritage Commission and also as the decision-maker; and
(4) failing to respond to various requests for information under
the Freedom of Information Act.

Courts are allowed to supplement the administrative record
"where: (1) the agency knew of an important matter that was
unavailable to the other party; (2) the agency relied on
important, but secret, information that was not part of the
record; (3) the court needs expert testimony to help it
understand matters in the agency record or needs additional
factual evidence to aid its understanding, or (4) the agency
engaged in bad faith or other improper behavior that warrants
supplementing the record." <u>Harvard Pilgrim Health Care of New</u>
<u>Eng. v. Thompson</u>, 318 F. Supp. 2d 1, 9 (D.R.I. 2004).  To
establish a claim of bad faith, the Plaintiff must surmount the

inherent presumption of regularity regarding actions of government agencies by making a specific allegation and supporting it with a reasonable factual basis.  United States Postal Serv. v. Gregory, 534 U.S. 1, 10 (2001); Apex Constr. Co., Inc. v. United States, 719 F. Supp. 1144, 1147 (D. Mass. 1989).

    1. Smith's Alleged Misrepresentation

    The Preservation Society claims that the winning applicant was pre-selected and that Smith made a misrepresentation that the decision was "close," when in reality the Heritage Commission had already been declared winner by a landslide.  It is true that if Smith stated the applications were "close" that description would not have been accurate since under the point system the difference between the applications was large.  However, Smith candidly added that the Heritage Commission would be awarded the light station.  Therefore, any "white lie" about the closeness of the applications is irrelevant.  The Preservation Society also complains because during the light station visit in May of 2004, Smith indicated that he would be writing the recommendation so that it would be acceptable to the Secretary and impregnable to an appeal.  Shoring up a recommendation with additional information for the Secretary does not indicate that the decision to award the light station to the Heritage Commission was made in bad faith.  For example, one significant issue raised by the applicants involved the accessibility of the Coast Guard beach by

boat.  An inspection of the island is an appropriate method of addressing this (and other concerns) although it would ideally have been done before the review committee issued its recommendation.

    2. <u>Conflict of Interest</u>

The Preservation Society argues that because the Heritage Commission and the NPS were essentially co-applicants, the NPS had a conflict of interest.  The Society never raised this claim before the agency.  "[C]laims of bias must be raised as soon as practicable after a party has reasonable cause to believe that grounds for disqualification exist." <u>Vill. of Bensenville v. FAA</u>, 457 F.3d 52, 73 (D.C. Cir. 2006) (internal quotation marks omitted).  Because this claim was not raised, it was waived.

Even if the claim were not waived, it would fail on the merits.  The Preservation Society is correct that the Heritage Commission is affiliated with the NPS.  It has a cooperative agreement with the NPS through which the Heritage Commission receives federal funds.  Moreover, the Heritage Commission and the NPS "partnered" on another project in the past.  (AR 0245).  Describing itself as "affiliated" with the National Park Service, (AR 0245), the Heritage Commission conducts ranger guided tours from NPS's Salem Maritime National Historic site.  As the Preservation Society points out, the NPS staff at the Salem site

17

assisted the Heritage Commission in preparing the environmental response in the application.  (AR 0281).

The question is whether the close working relationship between NPS and the Heritage Commission creates an impermissible conflict of interest.  An agency's decision is entitled to a presumption of regularity.  Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 415 (1971).  A conflict of interest does not automatically destroy the inherent presumption of regularity in agency decisions.  Ass'ns Working for Aurora's Residential Env't v. Colorado DOT, 153 F.3d 1122, 1129 (10th Cir. 1998).  The ultimate question for the court is whether the conflict of interest "compromised the objectivity and integrity of the [agency] process."  Utahns v. United States DOT, 305 F.3d 1152, 1186 (10th Cir. 2002).

While the Preservation Committee may well have been disadvantaged in the process because of the Heritage Commission's federal funding and affiliation with NPS, there is no evidence that the decision-making process was tainted by bad faith.  The Preservation Society complains that the staff person sent the reviewers incomplete copies of the Preservation Society application but the record suggests this was an inadvertent oversight which did not affect the core concerns about the application, and in any event was rectified.  There is no allegation that any of the decision-makers on the review

18

committee or appellate committee worked personally with the
Heritage Commission, or acted in bad faith or arbitrarily given
the point system for selecting the winning applicant.  The mere
fact that one applicant was affiliated with NPS does not
disqualify it.  By statute, the Department of the Interior is
entrusted with reviewing all applications and may select an
eligible entity that includes other state or federal agencies or
non-profit corporations, educational agencies, or community
development organizations.  Id. § 470w-7(e)(3)(B).  As such,
under the statutory scheme, it could arguably have transferred
the lighthouse to itself if there had been a good faith basis for
doing so.  In sum, the Preservation Society has not demonstrated
that any conflict of interest compromised the objectivity and
integrity of the process.

    3. Miscellaneous

    The Plaintiff complains (at length) that the agency engaged
in foot-dragging in responding to FOIA requests.  While that may
be so, it is irrelevant to the issue before the Court which must
determine whether the selection process was arbitrary,
capricious, or contrary to law.  Other alleged statements by
agency officials which also post-dated the design are similarly
irrelevant.

C. **Issues Not Brought Before the Administrative Agency**

The Preservation Society set forth a number of arguments regarding the Baker's Island Light Station and the de-accessioning process. Because many of those arguments were not brought before the administrative agency, they cannot be reviewed by this court.

"It is inappropriate for courts reviewing appeals of agency decisions to consider arguments not raised before the administrative agency." Harvard Pilgrim, 318 F. Supp. 2d at 8. "A reviewing court usurps the agency's function when it sets aside the administrative determination upon a ground not theretofore presented and deprives [the agency] of an opportunity to consider the matter, make its ruling, and state the reasons for its action." Unemployment Comp. Comm'n of Alaska v. Aragon, 329 U.S. 143, 155 (1946).

For those reasons, the Court will not review the arguments that the light station was not excess property, that the United States did not possess marketable title to the light station, and that the reversion interest in the light station belonged to the Commonwealth of Massachusetts. The Court will also not address the myriad of assaults on the Heritage Commission's application which were not raised on appeal.

20

D. **Review of the Administrative Record**

   1. Eligible Entity

    The Preservation Society claims that the Heritage Commission is not an eligible entity because it was not empowered to own or acquire real estate, its geographical boundary does not include Baker's Island, and it does not have the financial ability to carry out the mandates of the NHLPA.  The record shows that each of these claims is unfounded.

    Although Congress created the ENHA, the Heritage Commission was incorporated as a non-profit organization in the Commonwealth of Massachusetts.  As a non-profit corporation, it has the power to hold real estate.  See Mass. Gen. Laws ch. 180, § 6.  In addition, it has the power "to purchase, receive . . . or otherwise acquire, own, hold, improve, use and otherwise deal in and with, real or personal property, or any interest therein, wherever situated."  See id. ch. 156B, § 9(e).  Although the Omnibus Parks and Public Lands Management Act explicitly prohibited some management entities from holding property, the management entity of the ENHA was not one of them.  See Pub. L. No. 104-333 §§ 504, 406(c), 807(e), 907(c).  Therefore, all the powers that were vested in the Heritage Commission under Massachusetts law, including its ability to own and acquire property, were not limited or restricted by the act that created the ENHA.  While the Preservation Society argues that property

21

acquisition was not in the management plan, that omission does not deprive it of the statutory power to purchase property.

The Preservation Society also claims that the Heritage Commission is not an eligible entity because its geographical jurisdiction excludes the body of water in which the light station is located is equally misguided.  In support of its argument the Preservation Society presents the map of the ENHA referred to in the Omnibus Parks and Public Lands Management Act, given to them by the Department of the Interior, which does not depict Baker's Island or any other land located off the Massachusetts coast.  See Pub. L. No. 104-333 § 503.  The government argues that the map was not meant to be used as a specific illustration of the ENHA's geographic boundary. Congress stated that "[t]he Area shall comprise the lands generally depicted on the map."  Id. § 503(b) (emphasis added). NPS argues that, by statute, the boundaries of the ENHA are the boundaries of Essex County itself, of which Baker's Island is indisputably a part, even if the map on file does not reflect those lands.

The Heritage Commission, as the management entity for the ENHA, is charged with "preserving and interpreting, for the educational and inspirational benefit of present and future generations, the unique and significant contributions to our national heritage of certain historic and cultural lands, natural

22

waterways, and structures within the County of Essex." <u>Id.</u> §§
503, 504. Congress created the ENHA to reflect its findings that
Essex County contains "many sites and buildings associated with
the establishment of the maritime trade in the United States" and
that Salem was "the first major world harbor for the United
States." <u>Id.</u> § 501(a)(2),(3). As the oldest light station in
Salem Harbor, which was listed on the National Register of
Historical Places in 1976, the Baker's Island Light Station is
part of that heritage. Because of the mandate given to the
management entity of the ENHA to preserve structures within Essex
County, and the fact that Baker's Island is in fact located in
Essex County, the Court concludes that the Heritage Commission is
an "eligible entity" even though it is not on the map.

Lastly, with respect to the challenge to the financial
ability of the Heritage Commission, the record shows that it
receives $1 million per year from the Department of the Interior
and $1.9 million in donations, in-kind contributions, state, and
other non-federal funding. These funding sources make it
financially able to maintain the light station. In contrast, the
financial assets of the Preservation Society were listed on its
application as $30,000. Based on these figures, the review
committee and appeal committee could have rationally believed
that the Heritage Commission was a more financially secure
eligible entity than the Preservation Society. While the funding

is due to expire in 2012, the Heritage Commission has proposed alternative funding sources.

Because the administrative records show that the Heritage Commission is not barred from owning real estate, the geographical boundary includes Baker's Island, and it has the financial ability to carry out the mandates of the NHLPA, it is an eligible entity able to receive ownership of the light station.

2. Procedures

The Preservation Society claims that the selection of the Heritage Commission as the entity to receive the Baker's Island Light Station occurred in the absence of procedures and policies required by Congress.

The NHLPA states that "[n]ot later than 1 year after the date of enactment of this section[2], the Secretary and the Administrator shall establish a process and policies for identifying, and selecting, an eligible entity to which a historic light station could be conveyed."  16 U.S.C. § 470w-7(b)(1).  This issue was not preserved or raised before the Commission, and was therefore waived.  In any event, as the government argues, the agency did establish policies and procedures in the application which describe in detail the method by which the review committee will select the recipient of the

---

[2] The section was enacted on October 24, 2000.  See 16 U.S.C. § 470w-7(b)(1).

24

light station, including a detailed description of the point
system for evaluation.  In addition, the government notified the
Preservation Society about the appeal process.  While it would
have been preferable to have published a set of rules and
procedures within the statutory deadline, the failure to do so
created no prejudice in light of the extensive guidance in the
application itself.

While NPS did not provide notice and an opportunity to
comment on these procedures, the APA exempts from general notice
and publication in the Federal Register any "interpretive rules,
general statements of policy, or rules of agency organization,
procedure, or practice."  5 U.S.C.S. § 553(b)(A).

3. <u>The Decision</u>

Plaintiff argues that the decision to award the light
station to the Heritage Commission was arbitrary and capricious
under the criteria set up in the application.  With respect to
the preservation and maintenance plan, the NPS determined that
the proposal submitted by the Heritage Commission demonstrated
extensive experience with historic preservation.  The
Preservation Society's application, on the other hand, was
determined to be inadequate because it focused more on past
efforts than on future plans, and disregarded the long term
planning requirement.  Moreover, its application did not list
specific maintenance tasks, did not discuss a cyclical
maintenance schedule, and did not acknowledge the Secretary of

the Interior's Standards for preservation and maintenance, all of
which are required under the NHLPA.

For the use plan, the reviewers concluded that the Heritage
Commission's plan specified the uses and the programs it believed
would present and interpret the history and environment of the
region. The Committee highlighted the portion of the application
that stated that the Heritage Commission obtained a letter of
commitment from Gordon College to procure money for maintenance
and preservation and to establish a summer Marine Biology
Institute, a beneficial education initiative. In contrast, the
review committee commented that the Preservation Society's
application devoted a sizable amount of space to ecological and
fire concerns, describing what could not be done with the light
station. Its application provided "preliminary" ideas for
possible tours of the island and educational opportunities but
did not support those ideas with concrete information on visitor
numbers or frequency of tours. It did not provide any evidence
that it had experience with educational or recreational
programming or any evidence of established partnerships with
those who do.

The Preservation Society argues that NPS failed to take
into account the limited access available to the island. As
pointed out above, there is only one pier on the island which is
privately owned by the Baker's Island Wharf Company. The review
committee recognized that the access and usage issues must be

26

resolved.  To that end, it recommended that final transfer of the light station be conditioned on a boat company's submitting a letter indicating that the landings are in fact feasible.  In sum, the review committee acknowledged that access to the island was an important issue but one that should not outweigh the strength of the Heritage Commission's entire application.

For the financial plan, the NPS gave priority to those applications that demonstrated reasonable, well-founded estimates of financial resources needed to carry out the applicant's proposed uses and a capability of generating those resources.  The Heritage Commission's application specified the projected restoration expenses and income, including an agreement with Gordon College and a fundraising campaign.  According to its financial records and audited financial statements, the Heritage Commission receives $1 million per year from the Department of the Interior and $1.9 million in donations, in-kind contributions, state, and other non-federal funding.  The Preservation Society's application indicated its current financial assets to amount to approximately $30,000.  And, while the Review Committee acknowledged the Preservation Society's idea for a future fundraising/membership campaign was noteworthy, there was a question as to how it would be able to maintain a 1,000 member group for an island consisting of sixty-two residences.  Plaintiff challenges the refusal of NPS to produce documents regarding the Heritage Commission's ability to "match"

the federal funding.  However, the agency was allowed to rely on the independent audit to establish that the Commission was complying with the 50 percent matching requirement.

Lastly, the NPS gave priority to applications with management plans that demonstrated a strong capability and history of successful preservation management, including any partnerships between the applicant and other government or non-profit organizations.  The Heritage Commission's application illustrated that it was well suited to take on the preservation and use of the historic light station.  As the management entity for the ENHA, it had experience with preserving and interpreting historic and cultural lands and structures.  It showed evidence of organizational competency, with over 200 organizational partners throughout Essex County, and supported its application with letters of support from a number of entities.  The Preservation Society's application described the structure of the management organization but notably, none of the directors or advisors listed had any experience in historic preservation.

In sum, the agency decision was supported by substantial evidence in the record.


## IV. ORDER

The Preservation Society's motion to reverse the administrative decision is **DENIED** and the Defendant's motion to affirm the decision is **ALLOWED**.

**S/PATTI B. SARIS**
United States District Judge

29